**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| NEW ENGLAND TEAMSTERS PENSION FUND, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> WEST PHARMACEUTICAL SERVICES, INC., ERIC M. GREEN, BERNARD J. BIRKETT, and QUINTIN J. LAI, <br><br> Defendants. | Civil Action No. <br><br> COMPLAINT -- CLASS ACTION <br><br> JURY TRIAL DEMANDED |

Plaintiff New England Teamsters Pension Fund ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through counsel, which included, among other things, a review of the public U.S. Securities and Exchange Commission ("SEC") filings of West Pharmaceutical Services, Inc. ("West" or the "Company"), Company press releases, conference call transcripts, investor presentations, analyst and media reports, and other public reports and information regarding the Company. Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein, which evidence will be developed after a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired West common stock between February 16, 2023, and February 12, 2025, inclusive (the "Class Period"). Plaintiff brings this action seeking to recover damages

caused by Defendants' (defined herein) violations of the federal securities laws under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      West is a medical supplies company based in Exton, Pennsylvania, that operates as a key supplier to firms in the pharmaceutical, biotechnology, and generic drug industries.  The Company specializes in the development, manufacture, and distribution of elastomer-based supplies for the containment and administration of injectable drugs.  These products include basic equipment such as syringes, stoppers, and plungers, as well as more complex devices like auto-injectors and self-injection platforms.

3.      West reports its business results in two segments: Proprietary Products and Contract Manufacturing ("CM").  The Proprietary Products segment manufactures and sells West's proprietary drug packaging and delivery products to biologic, generic, and pharmaceutical drug customers.  Within this segment, the Company classifies its offerings as High-Value Products ("HVP") and standard products.  The CM segment manufactures and sells drug packaging and delivery products based on its customers' patented designs and specifications.  West claims that its HVP offerings generate significantly higher profit margins than the Company's standard products and CM offerings.  Therefore, the growth and profitability of West's HVP offerings are critical to the Company's overall financial performance.

4.      During the COVID-19 pandemic, West experienced a significant surge in demand as pharmaceutical and biotechnology companies rapidly increased their purchases of injectable components for COVID-19 vaccine delivery devices.  At the same time, supply chain disruptions caused by the pandemic prompted the Company's customers to stockpile

other West products for non-COVID-19 uses. This pandemic-driven demand boom temporarily inflated West's revenues and margins.

5.    However, in the aftermath of the pandemic, these same customers reduced their purchasing activity as they worked through the excess inventories they had amassed. Consequently, throughout 2023 and 2024, West experienced a significant slowdown in order volumes across its customer base. While Defendants publicly acknowledged this broad-based destocking trend, they repeatedly assured investors that West had strong visibility into customer inventory levels and their demand for the Company's products. As a result, investors were misled into believing that West's financial pressures were temporary and industrywide, when in fact, undisclosed customer losses and margin deterioration posed a substantial and continuing threat to the Company's profitability.

6.    Throughout the Class Period, Defendants misled investors by failing to disclose that: (a) despite claiming strong visibility into customer demand and attributing headwinds to temporary COVID-related product destocking, West was in fact experiencing significant and ongoing destocking across its high-margin HVP portfolio; (b) West's SmartDose device, which was purportedly positioned as a high-margin growth product, was highly dilutive to the Company's profit margins due to operational inefficiencies; (c) these margin pressures created the risk of costly restructuring activities, including the Company's exit from continuous glucose monitoring ("CGM") contracts with long-standing customers; and (d) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading or lacked a reasonable basis.

7.    The truth about this fraud was revealed over a series of disclosures culminating on February 13, 2025, when West issued extremely weak 2025 revenue and earnings forecasts.  West attributed the disappointing guidance in part to CM headwinds, including the loss of two major CGM customers that had begun transitioning to in-house manufacturing of next-generation devices after West "made the decision to not participate going forward as our financial thresholds cannot be achieved."  West also revealed that its SmartDose wearable injector devices would be "margin dilutive" in 2025 and that it would be "taking steps to improve [its SmartDose] economics, and all options are on the table."  On this news, West's stock dropped $123.17 per share, a decline of approximately **38%**, to close at $199.11 on February 13, 2025.

8.    Wall Street analysts were caught off guard by this news.  For example, analysts at William Blair noted that the "sell-off was a reaction to the very disappointing guide … and acknowledgment that excluding some recent one-off cash incentive payments, the SmartDose manufacturing ramp is going worse than expected – to the extent that management is contemplating whether it makes sense for West to continue to own and invest in that product line."  William Blair further expressed surprise at the Company's decision not to renew the two CGM contracts, stating, "[c]ollectively, and quite surprisingly given lack of historical disclosure, these customers made up slightly more than 20% of contract manufacturing revenue in 2024."

9.    As a result of Defendants' wrongful acts and omissions, and the significant decline in the market value of the Company's common stock pursuant to the revelation of the fraud, Plaintiff and other members of the Class (defined herein) have suffered significant damages.

## II.    JURISDICTION AND VENUE

10.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (*see* 17 C.F.R. § 240.10b-5).

11.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

12.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  The Company's principal offices are located in this District.  Substantial acts in the furtherance of the alleged fraud or the effects of the fraud have occurred in this District.  Defendants' wrongful acts also arose in, emanated from, and caused harm in this District.  Such acts include the dissemination of false and misleading statements into this District.  Additionally, venue is proper in light of the purchase of the Company's stock by members of the Class who reside in this District.

13.    In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, the United States mail, interstate telephone communications, and the facilities of a national securities exchange, the New York Stock Exchange.

## III.    PARTIES

### A.    Plaintiff

14.    Plaintiff New England Teamsters Pension Fund purchased or otherwise acquired West common stock during the Class Period and was damaged as the rest of Defendants' wrongdoing alleged in this complaint.

**B.** **Defendants**

15.    Defendant West is incorporated in Pennsylvania and headquartered in Exton, Pennsylvania.  West stock trades on the New York Stock Exchange under the ticker symbol "WST."

16.    Defendant Eric M. Green ("Defendant Green") was at all relevant times West's President and Chief Executive Officer.

17.    Defendant Bernard J. Birkett ("Defendant Birkett") was at all relevant times West's Senior Vice President and Chief Financial Officer.

18.    Defendant Quintin J. Lai ("Defendant Lai") was at all relevant times West's Vice President of Strategy and Investor Relations.

19.    Defendant Green, Defendant Birkett, and Defendant Lai are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of West's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, i.e., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from, the public, and that the positive representations which were being made were then materially false or misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## IV.     SUBSTANTIVE ALLEGATIONS

### Company Background

20.     West is a Pennsylvania corporation that is headquartered in Exton, Pennsylvania.  West is a medical supplies company specializing in packaging components, containment solutions, and delivery systems for injectable drugs.  West operates with two reportable segments: Proprietary Products and CM.

21.     The Company categorizes its Proprietary Products segment into three categories: (1) HVP components; (2) HVP delivery devices; and (3) standard products. HVP components include vial seals, vial stoppers, and syringe plungers under West brands such as FluroTec, NovaPure, and Westar.  HVP delivery devices are advanced drug systems that include the Company's SmartDose devices.  The Contract Manufacturing segment consists of custom drug delivery systems and device assemblies produced according to customers' proprietary designs and specifications.  As part of the Company's CM business, West develops CGM devices for its customers.  West claims that its HVP offerings generate significantly higher margins than the Company's standard proprietary products and CM products, making the strength and profitability of the HVP portfolio critical to West's overall financial performance.

22.     During the COVID-19 pandemic, West experienced a significant surge in demand as pharmaceutical and biotechnology companies rapidly increased their purchases of injectable components for vaccine delivery devices.  At the same time, supply chain disruptions caused by the pandemic prompted the Company's customers to stockpile other West products for non-COVID-19 uses.  This pandemic-driven demand boom temporarily inflated West's revenues and margins.

23.     In the aftermath of the pandemic, West's customers reduced their purchasing activity as they worked through the excess inventories they had amassed.  As a result, throughout 2023 and 2024, West experienced a significant slowdown in order volumes across its customer base.  Despite this reduction in orders, West touted its visibility into customer inventory levels and demand trends, repeatedly assuring investors that the Company's financial performance would recover as ordering patterns normalized.

**Materially False and Misleading Statements Issued During the Class Period**

24.     The Class Period begins on February 16, 2023, when the Company issued a press release announcing its results for the fourth quarter and full-year 2022, ended December 31, 2022.  The press release quoted Defendant Green stating "I am pleased to report that we had a solid finish to 2022 and that we enter 2023 with a strong order book and continued demand for our core business," and that the Company "**remain[s] committed to a capital spending program that expands our high-value product (HVP) manufacturing capacity to stay ahead of our accelerating customer demand from recent launches and anticipated drug programs in the coming years**."

25.     The same day, West hosted an earnings call for the fourth quarter of 2022 (the "Q4 2022 Call").  During the Q4 2022 Call, Defendant Green touted the Company's margin expansion, stating that West's "**expected margins for this year are significantly above pre-pandemic 2019 levels**" and that "[t]his underscores the strength of our financial construct with annual margin expansion of 100 basis points or more per year."

26.     During the question-and-answer portion of the Q4 2022 Call, Defendant Birkett was asked about the effect of decreased COVID revenue on the Company's margins:

> Q: David Howard Windley, Jefferies LLC: So where I wanted to go with that, and I'll make this my last one, is you're losing the year-over-year COVID $300-ish million. Management has made the point

that that has been very high gross margin, high incremental margin revenue. And so that creates, I think, contributes to this transition year on margin, Eric, that you mentioned in your prepared remarks, it seems like as you've put some of this equipment in place that was the hold up in 3Q, again, your last answer helps me to understand that better. But the revenue potential that that equipment unlocks is in the neighborhood of the revenue that you're losing from COVID. I guess I now understand that maybe the margin on that revenue that's coming in is perhaps not quite as rich as COVID, you could confirm that for me. But just thinking about that and any other factors that we should be keeping in mind that influence that margin transition that are not as rich as the COVID revenue that is coming off?

A: Defendant Birkett:

[W]ith regard to your question on margin, it's not as simple as one product coming out and another product going in. So we're looking at it where there's a mix impact, obviously, with the COVID revenues falling off and they have been higher-margin products. And we've also got the impact of inflation on our cost base. So you've got those two headwinds. And then as we alluded to, we talked about earlier is the increase in price that we're seeing is above what we would normally see in our business. So that helps offset some of this margin pressure.

And then we have a very specific cost initiatives within our business, both from an operations manufacturing perspective and then on SG&A and R&D, really looking at cost control and cost management. That is delivering a number of efficiencies for us. So it helps us to overcome some of the margin challenges, but not all of them. **And then that goes back to the point earlier, we're not actually -- margin is not stepping back to pre-COVID levels. We're maintaining or holding on to a lot of the improvements that we made or the gains that we made.**

27. On February 21, 2023, the Company filed with the SEC a Form 10-K reporting the Company's financial and operational results for the year ended December 31, 2022 (the "2022 10-K"). In the 2022 10-K, the Company described the following "Industry Risk Factor":

If we are unable to provide comparative value advantages, timely fulfill customer orders, or resist pricing pressure, we will have to reduce our prices, which may reduce our profit margins.

28.    On April 27, 2023, the Company filed with the SEC a Form 10-Q reporting the Company's financial results for the first quarter ended March 31, 2023 (the "Q1 2023 10-Q").

29.    The same day, the Company hosted an earnings call for the first quarter of 2023 (the "Q1 2023 Call").   During the Q1 2023 Call, Defendant Green touted the Company's improved visibility into customer demand, stating "now we're back into that environment, **have better visibility, better -- as we do make to order, our customers are giving us visibility of their demands over the next several quarters**."

30.    On May 11, 2023, at the Bank of America 2023 Healthcare Conference, Defendant Birkett stated the following regarding visibility:

> I believe that we're much closer to our customers now than we have been in the past and understanding their inventory positions.   And it is something that we managed quite effectively as we move through COVID with where, in some parts of our business, we had constraints, so we really had to manage the supply to customers.

31.    Also, during the Bank of America 2023 Healthcare Conference, Defendant Birkett highlighted that destocking was not affecting the Company's HVP portfolio, but rather the lower margin standard product portfolio, stating, "what we're seeing more so is within the standard part of our portfolio, not HVP but with the standard part, we're seeing customers manage their inventory more effectively."

32.    The statements referenced in ¶¶ 24-31 were materially false and misleading because Defendants failed to disclose that: (a) despite claiming strong visibility into customer demand and attributing headwinds to temporary COVID-related product destocking, West was in fact experiencing significant and ongoing destocking across its high-margin HVP portfolio; (b) West's SmartDose device, which was purportedly positioned as a high-margin growth product, was highly dilutive to the Company's profit

margins due to operational inefficiencies; (c) these margin pressures created the risk of costly restructuring activities, including the Company's exit from CGM contracts with long-standing customers; and (d) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading or lacked a reasonable basis.

**The Truth Begins to Emerge While West Continues to Mislead Investors**

33.    On July 27, 2023, the Company filed with the SEC a Form 10-Q reporting the Company's financial results for the second quarter ended June 30, 2023 (the "Q2 2023 10-Q).  The same day, the Company hosted an earnings call for the second quarter of 2023 (the "Q2 2023 Call").  During the Q2 2023 Call, Defendant Birkett touted the Company's strong margins, stating:

> **We're seeing that continued growth in high-value products ex-COVID and retain that positive impact that's flown into margin.** We're also improving the throughputs within our facilities, getting better levels of efficiency, and we're seeing that partly because of the capacity that we're layering in. **But, again, improvements to our existing infrastructure and that combination is delivering to those improved margins**. And again, that's part of the overall construct that we've been talking about over the last number of years. So we just continue to deliver on that.

34.    During the Q2 2023 Call, Defendant Green was also asked whether West was experiencing any destocking issues:

> Q: Derik De Bruin: Got it. That's really helpful. Your competitor Datwyler, called out some stocking issues, inventory issues going on with it. I mean I know . . .  you've seen a little bit of this, but I'm just sort of wondering has that had any impact on the business? Are you seeing any issues with that, that are are sort of like popping up, the unexpected?
>
> A: Defendant Green: Yeah, Derik, it's - all that's taken into consideration as we kind of set the guidance for the balance of the year. Fortunately, we have a good lens with our customers. And . . .

when you think about the COVID vaccine, obviously, there's a stocking-destocking has been going on for the last couple of quarters. **And then when we look at the base business, there's some inventory management here and there, but it's very low in amounts when compared to our order book, particularly last year. We have a good handle on it, and we're keeping an eye on and having conversations with customers, but it's a very low impact at West right now.**

35.    On the Q2 2023 Call, Defendant Green later clarified on destocking that "**it's all -- majority of it is around the COVID-19 destocking.** And so, we've been pretty clear on our quarterly cadence last year and what we're seeing this year. So that's probably the majority of it. From the base perspective, we're not seeing a material difference from quarter-to-quarter."

36.    On news of this destocking activity, West's stock price **dropped $24.52 per share, or approximately 6.5%,** to close at $354.90 per share on July 27, 2023. While this news partially revealed Defendants' fraud, Defendants continued to mislead investors.

37.    On August 16, 2023, at the UBS Genomics 2.0 and MedTech Innovations Summit, Defendant Green discussed the lack of impact of destocking on the business, stating "[s]o right now, where we stand, **what we see is not a lot of destocking with our products.**" Defendant Lai touted HVP as a driver of margin expansion stating: "**HVPs are going to be the driver of top line as well as gross and operating margin expansion.**"

38.    On September 14, 2023, at the Bank of America Global Healthcare Conference, Defendant Birkett stated: "**[w]e're seeing strong demand in our core business**" and that "**we've done a really good job on that and continuing with revenue growth, the margin performance, managing through inflationary periods and how we've adjusted to that and reorganized our business has been very positive.**"

39.     During the Bank of America Global Healthcare Conference, Defendant Birkett was asked to comment on the drivers of operating margin expansion, in response he stated:

> **The typical driver for the 100 basis points is mix shift and driving high-value products, and that still stands. That is the main driver.**
>
> …
>
> That's probably north of where we would typically be . . . given that we had to cover some of these inflationary pressures. And that was part of being able to do that and manage that cost base, but we're also driving a lot of cost efficiencies and operational excellence within our business. So taking cost out, becoming a lot more efficient, introducing higher levels of automation, better throughput. So there's a number of drivers there.

40.     On October 26, 2023, the Company filed with the SEC a Form 10-Q reporting the Company's financial results for the third quarter ended September 30, 2023 the "Q3 2023 10-Q". The same day, West issued a press release announcing its results for the third quarter ended September 30, 2023. The press release quoted Defendant Green stating "[w]e had a solid quarter of organic net sales growth, driven by our Proprietary Products' high-value product (HVP) and strong Contract Manufacturing components." Later that same day, the Company hosted an earnings call for the third quarter of 2023 (the "Q3 2023 Call"). During the Q3 2023 Call, Defendant Green discussed the Company's visibility of demand, stating:

> But as the injectable space continues to grow in GLP-1, as new molecules are approved and launched, we're -- and the investments we're making both on the Proprietary and CM side, **we have a good visibility of cadence of what we're being asked to build support through our global network to support the demand**.
>
> I'll just be clear, one other aspect is on the Proprietary side, we always enjoy a very high participation rate. On the CM side, we've been very clear that our customers are looking at multiple suppliers

to support them, and we're one of them. **So we're positioned very well on both sides of the business**.

41.    During the question-and-answer portion of the Q3 2023 Call, an analyst asked about any potential effects of destocking on the Company:

> Q: David Howard Windley: I wanted to start on stocking and just to understand some moving parts a little bit better. Understanding, I think, well, that you're talking today that within elastomers or components, the destocking is mostly standard. I think early in the year, we had understood that you had some areas that post pandemic- maybe Westar for example, post pandemic had not gotten the capital allocation, the growth allocation and were understocked and catching up. And so, I guess, I wanted to try to understand better if those two factors were both at play and offsetting in the quarter or maybe the West was already done, and therefore, the standard destocking now is what we're feeling. I just - it feels like there have been through the year moving parts in both directions. And I just wanted to understand those and the cadence of them.

> A: Defendant Lai: Dave. So maybe it's just a definition or just maybe when you say destocking, we think of it more as customers that are having a demand issue like in COVID-19 and what they're doing is they're not reordering. And they're taking down their safety stock and consuming their safety stock. **And that's certainly happening in COVID-19, which we're seeing year-over-year declines**.

> The other impact is the fact that we have been behind in terms of delivering because of our capacity constraints. And then as we've been able to restock, the base growth that you've seen in generics and pharma is well above the financial construct. So, well, that has been going on for the first part of this year.

> What we're seeing now is that, that base growth is going to temper, it's not declining. It's just not going to be as high as we thought it was going to be in Q4. **That's why we're calling it a slowing of a restock. It's not necessarily a destock situation**. And again, a lot of it happens is the fact that we've done a really good job of clearing the backlog. We've been -- we've gone to our customers. We said, "Hey, we have that capacity to deliver product. And they said, "No, given where we are in the year, given where our manufacturing schedules are, we would rather be delivered next year instead of Q4.

42.    During the question-and-answer portion of the Q3 2023 Call, when asked why the implied margin step down was so big between Q3 and Q4, Defendant Lai stated:

**Really, it's just utilization and absorption given that we're probably going to have lower volumes through our facilities in the fourth quarter,** we're just -- we just want to make sure that we have a reasonable swag at gross margin. And then we're going to continue to manage our costs on the SG&A and R&D line -- but -- so that's where the margin impact is really going to be reflected, especially in proprietary products margin for the quarter.

43.     On news of this continued destocking, West's stock price **dropped $30.68 per share, or approximately 8.5%**, to close at $327.32 per share on October 26, 2023. While this news partially revealed Defendants' fraud, Defendants continued to mislead investors.

44.     On November 14, 2023, the Company participated in the Jeffries London Healthcare Conference.  Defendant Green touted the Company's visibility into demand stating **"[s]o we have visibility over the next, call it, four to eight quarters of demand of our customers."**

45.     On February 15, 2024, the Company issued a press release announcing its results for the quarter ended December 31, 2023.  The press release quoted Defendant Green stating that West "had strong 2023 base organic sales growth, excluding the headwinds from lower pandemic-related sales, led by high-value product (HVP) components and devices and contract manufacturing," and that the Company's "**continued investments in both HVP as well as contract manufacturing capacity to support customer demand will fuel our long-range financial construct of future organic sales growth and operating profit margin expansion**."

46.     The same day, the Company hosted an earnings call for the fourth quarter of 2023 (the "Q4 2023 Call").  During the Q4 2023 Call, Defendant Green stated that he was "disappointed that we're not – we will not achieve our usual full year organic sales and margin expansion in 2024."  During the Q4 2023 earnings call, Defendants discussed the

impact of destocking on various parts of West's business, including HVP, and made

representations about the timing and trajectory of recovery.  Defendant Birkett claimed that

"**there's still a level of destocking, so it's probably low single-digit growth in**

**proprietary.  And then on a consolidated basis, also, we would see a returning to**

**growth in Q2."**  Defendant Green also commented on destocking, stating:

> One of the areas that [destocking] was more pronounced on the
> standard and bulk areas, but we're also seeing it in some cases in
> parts of our HVP portfolio. So, it is, I would say it's across a broader
> set, but I would say the primary area has been the bulk and of the
> standard area. . . . And however, based on the conversations in the
> data we've been looking at with our customers, there will be some
> still in **Q2 that have some destocking, but not as pronounced in
> Q1**. So, it's really most of it that we're seeing is really a Q1
> phenomenon. . . . **And when we look at growth in our business,
> particularly in the Proprietary, it is led by the high-value
> products in the component side that is leading the growth**.

47.    During the Q4 2023 earnings call, Defendant Green emphasized the strength

and future growth potential of West's HVP portfolio, including SmartDose and other self-

injection systems, and described ongoing capital investments to expand capacity for these

offerings:

> [W]e will be expanding our industry-leading capacity with major
> HVP expansion projects in Jersey Shore and Eschweiler as well as
> other projects across the global network. **Another driver of growth
> with a bright future comes from our HVP devices, which includes
> our injection delivery device platforms**, Crystal Zenith
> containment solutions in the admin systems. **HVP devices had very
> strong double-digit organic sales growth in 2023 and now
> represent 10% of overall sales**.
>
> West platforms are an integral part of our customers' drug device
> combination products they're making a difference to patients. **And
> this year, we have had multiple capital expansion projects that
> will increase capacity for SmartDose, SelfDose and Admin
> Systems, with some expected to come online in the second half of
> 2024 and fully online in 2025**.
>
> …

> And lastly, the area with the most potential for our future growth is our HVP capacity to support a mix shift. . . . The mix shift of legacy to HVP has historically been a smaller contributor for us compared to contribution from newly approved drugs. However, with the industry landscape changing, regulators are introducing new regulations for higher quality, lower particulate, and more standardized solutions. And therefore, customers are looking to upgrade their standard primary components.

48.     During the question-and-answer portion of the Q4 2023 call, Defendant Green attributed the majority of the Company's Proprietary Products' high single digit decline to destocking, stating, "[w]hile I mentioned two other factors, majority is destocking, and it's specifically 75% of the destocking has come from six customers." When asked about the Company's visibility into destocking, Defendant Birkett stated that "**we don't see it as being a long-term problem**."

49.     On news that destocking had expanded to the Company's HVP portfolio, West's stock price **dropped $57.49 per share, or approximately14%,** to close at $350.70 per share on February 15, 2024.  While this news partially revealed Defendants' fraud, Defendants continued to mislead investors.

50.     On February 20, 2024, the Company filed with the SEC a Form 10-K reporting the Company's financial and operational results for the year ended December 31, 2023 (the "2023 10-K").  In the 2023 10-K, the Company described the following "Industry Risk Factor":

> If we are unable to provide comparative value advantages, timely fulfill customer orders, or resist pricing pressure, we will have to reduce our prices, which may reduce our profit margins.

51.     On April 25, 2024, West issued a press release announcing its results for the first quarter ended March 31, 2024.  On the same day, the Company hosted an earnings call

for the first quarter of 2024 (the "Q1 2024 Call").  During the Q1 2024 Call, Defendant

Green stated that:

> We delivered a solid start to the year. During the quarter, we again saw growth in our top-tier HVP component, NovaPure, and our HVP devices such as SmartDose. We also continue to see inventory management or destocking by our larger mature customers that are working down their inventory closer to pre-pandemic levels. With that said, Q1 had a solid start due to favorable order timing of customer deliveries fulfilled in the quarter.
>
> I want to address the question that many of you are asking, are we seeing an inflection in destocking? The short answer is not quite yet. Several customers are still working through their safety stock levels, and we still expect Q2 to have an impact from customer destocking and **customer order trends continue to indicate a stronger second half of 2024** with a return to more typical order patterns in Q4.

52.     During the Q1 2024 Call, Defendant Birkett addressed the Company's

margin performance for the quarter, stating:

> Looking at margin performance. slide 11 shows our consolidated gross profit margin of 33.1% of Q1 2024, down from 37.9% in Q1 2023. Proprietary Products first quarter gross profit margin of 37% was 550 basis points lower than the margin achieved in the first quarter of 2023. The key drivers for the decline in Proprietary Products gross profit margin were lower sales volume and an unfavorable mix of products sold, partially offset by increased sales prices.
>
> Contract Manufacturing first quarter gross profit margin of 17% was 60 basis points below the margin achieved in the first quarter of 2023, primarily due to inflationary labor costs and an unfavorable mix of products sold, partially offset by increased sales prices.

53.     During the question-and-answer portion of the Q1 2024 Call, Defendants

were asked whether standard packaging was the weakest part of West's business and what

products were driving that weakness:

> Q: Paul Knight, KeyBanc Capital Markets: Which leaves, I guess, standard packaging, the weakest? Is that a fair assumption? And is standard -- what's in standard packaging to make that the weakest, if it is?

A: Defendant Green: Well, if I -- let me rephrase that. **I think the HVP components for us, most of the destocking that we've experienced earlier this year is around that category**. However, that particular part of the portfolio will ramp up quite -- very nicely sequentially throughout the year. **So it is -- most of the -- if you look at the Q1, the Proprietary elastomer side, it really is due to destocking at this point in time but very strong outlook towards the end of the year and very strong obviously beyond that.**

A: Defendant Birkett: Yeah. I think, Paul, on that, it's important to note that we don't anticipate any major mix shift. There's still the growth opportunities around HVP and in the biologics space. And even in Q1, that continued to grow. And you could see the growth driven there by the growth in NovaPure. So from a mix perspective, I think when you look at it in the whole, areas are growing. And our growth potential, as we look out past 2024, around standard components and packaging and HVP, **the trajectory is the same; that they are the growth drivers**.

54.     During the question-and-answer portion of the Q1 2024 Call, Defendants

were asked for additional clarity on how product mix was affecting West's margin profile:

Q: David Windley, Jefferies LLC: I was going to come back to the mix. I hope I don't confuse the situation further, but just trying to understand the original question, I guess Jacob's question about the decremental margin and the moving parts there. I understand revenue was lower overall, and so you have absorption impacts from that. But NovaPure, you call out as strong, and we've identified that the margin contribution from that ought to be really, really high. And then it sounds like you have some other reasonably high margin contributors that are being destocked. And so I guess I wanted to make a plea for maybe a little bit more granularity so we could understand the moving parts there and then how that progresses as you see the sequential improvement through the balance of the year possibly?

A: Yeah, David. **So it was really in some of the other areas of high value products where we saw some step back in Q1, but what we do expect to see as we progress through the year, the volumes around that business to increase again sequentially**. And that's when we talked about the destocking earlier on in the year, we were saying it was across all different parts of our business. **So we would expect that HVP growth to accelerate as we move through the year and then the margin-and that to be reflected in our margins**. And also we'll get the pickup of incremental or increased throughput

as we move through the year. I think Q1 was our lowest level of throughput and we're a high volume business. So absorption does get impacted.

55.    On this news, West's stock price dropped $17.55 per share, or approximately **4.5%**, to close at $368.18 per share on April 25, 2024.  While this news partially revealed Defendants' fraud, Defendants continued to mislead investors.

56.    On July 25, 2024, West issued a press release announcing its results for the second quarter ended June 30, 2024.  In the press release, Defendant Green was quoted as stating that "[t]he second quarter continued to be impacted by an elevated level of customer destocking."  Defendant Green further stated that "[b]ased on our confirmed order book and ongoing customer conversations, we remain confident in a return to organic growth in the fourth quarter and as we move into 2025."

57.    The same day, the Company hosted an earnings call for the second quarter of 2024 (the "Q2 2024 Call").  During the Q2 2024 Call, Defendant Green stated:

> **We had a lower-than-expected second quarter impacted by continued customer destocking**. **That being said, we are seeing promising signs from our customers that give us confidence of a turning point in this trend**. Looking ahead, we expect the second half of the year to be stronger than the first half with a return to year-over-year organic growth in the fourth quarter led by our Proprietary Products segment, specifically biologics.
>
> …
>
> Another focus for our capital allocation is our HVP devices, which includes our self-injection devices. Our platforms are an integral part of our customers' drug-device combination products that are making a difference to patients. **These expansion projects remain on target for the back half of the year and 2025.**
>
> Our promising growth drivers have us positioned to drive significant value for our customers, the patients and shareholders as we move forward.

58.     During the Q2 2024 Call, Defendant Birkett discussed the sales decline in the Company's proprietary products segment stating: **"High value products, which made up approximately 71% of proprietary product sales in the quarter declined by double-digits, primarily due to decreased sales of our Westar, Daikyo Crystal Zenith and FluroTec products."**

59.     During the question-and-answer portion of the Q2 2024 Call, Defendants were asked about the continued impact of destocking, its effect on product mix and margins, and changes in customer ordering patterns:

> Q: Justin Bowers, Deutsche Bank AG: So just a couple of questions. How is the coverage ratio shaping up? And how has that changed throughout the year? And then the other question would be just in terms of the destocking. I think earlier in the year, you mentioned that it was skewing heavier towards standard components versus like HVPs. And just curious if that's still what you're seeing.

> A: Defendant Birkett: Yeah. So on the destocking, Justin, when we look at that, we have been seeing that in our Biologics segment and in Generics, that's where we saw the biggest impacts here in the second quarter. And you know that's really where-as we were going through COVID, that's where we saw the most pressure also around lead times where customers really had to manage their supply chains. And that's where we believe the safety stock built over time. So that's why we are seeing destocking in those areas right now, and -- to a larger extent versus comparing this to our other market units. And you can see that play through then on the impact on our gross margin and operating margin is that that's impacting our mix. So we're having, one, volume impact because of that, but we're also having a mix impact.

> And I think what we saw in COVID and what we would see when we return to normalized growth rates and in seeing that gross margin and operating margin expand in line with our long-term constructs and potentially beyond that. So that's, I think that's where we -- when we look at it, we're looking at it from a revenue perspective, but also looking at an impact on margin, and saying how do we get back to the margins that we're used to delivering on? And when we see those biologics and generic market start to normalize, we'll see the revenue rebound and also from a margin perspective, we'd see that also.

Q: Justin Bowers, Deutsche Bank AG: Understood. And then maybe just one quick follow-up in terms of your improved throughput. Do you have a sense from your -- or conversation with customers, are they now trying to manage inventory levels in line with your lead times or -- just trying to get a sense of change in ordering patterns and where that might normalize?

A: Defendant Green: Yeah, Justin, exactly that's the point. We're unfortunately during the pandemic due to the demand that was put on our business, our lead times did go up to anywhere between 30 weeks to 50 weeks. And with the consistency now in the last several quarters of, call it, eight to 12 weeks, sometimes earlier, sometimes a little bit longer depending on the processing, our customers are realigning their reordering patterns based on those lead times. **And we're seeing that clearly. So, as they built inventories during the longer lead time periods and during the supply chain constraints during the pandemic, and across the whole industry, we're seeing that also coming down**, but also the realigning.

So what you'll see a pattern of more frequency instead of one large bolus is more paced throughout the next three or four quarters, which by the way is also very effective for our operations. So it aligns real well with where we want to be long-term.

60. During the question-and-answer portion of the Q2 2024 Call, Defendants were asked to clarify the extent of customer destocking and whether prior guidance had properly incorporated the expected inventory reductions:

Q: Matthew Larew, William Blair & Company: I just want to go back again to what exactly happened intra-quarter from a destocking perspective. If I go back to the initial outlook from the Q4 call where you had incorporated about 200 to 300 basis points of the cut from the Q3 call last fall from destocking but mentioned that 75% of destocking with some fixed customers. Obviously, the first quarter results themselves actually were positive relative to the outlook you provided and you maintained the guide for the year.

So now having 400 to 500 basis points come out of the organic guide with about four months left - four or five months left in the year, the magnitude is pretty large. So just was it, going back to conversations, specifically with that group of big customers, was it something that - historically, you've used the term broadened and worsened, did things broaden and worsen further? Was there one or two pockets of customers or product categories? Just trying to understand what

happened from mid-April to the end of June in terms of the big change here.

A: Defendant Birkett: What we did see, as we were progressing through Q2, the level of intra-quarter orders that we would have anticipated to materialize in that period of time, it wasn't at the rate that we would have expected it to be. So - and then there was some timing with customers moving some orders out late in the quarter that has impacted us.

And then, as we've looked at the balance of the year and as we've rolled through the end of June and practically through July, what we're seeing in Q3 is that orders that we would have anticipated materializing for the period and even some for Q4, they just weren't coming through. And when we assess what was happening there, it's still really related to levels of destocking. **So it's gone longer than we would have originally anticipated. And that is essentially the main driver.**

And when we had looked at it originally, our coverage rate for Q3 and Q4 was pretty much in line or a little bit ahead of pre-COVID levels. But what hasn't happened then is filling in between the actual orders confirmed and the forecast that we had. That hasn't accelerated in the way that we would have anticipated that, that would take place. And so when we did the assessments, we felt that we have to be transparent and do the right thing and take the guide down and do it with the right level. We don't want to be in the position where we're cutting and cutting and cutting. So hence, the reason why the drop in the guide is pretty significant. It's not something we want to do, but it's a reality that we're dealing with today.

61.     During the question-and-answer portion of the Q2 2024 Call, Defendants were asked to explain the Company's deteriorating margins in light of its prior guidance and long-term financial model, and to clarify expectations for margin expansion as revenue growth recovered. Defendant Birkett responded:

Yes. **So the major impacts on margin that we've seen here in Q2 is really driven by volume and mix**. And for high-volume manufacturing operation, any decrease in volume like that is going to have a significant impact. And what - where we're seeing it, Jacob, is really in HVP. So the drop is in biologics and generics. And so we're getting this kind of outsized impact on margin where, if you look back at - take the COVID years when we were getting a large

amount of expansion in HVP and growth in that area, we were getting outsized margin expansion well beyond our 100 basis points.

So essentially, what we're seeing now is the reverse of that. So when things normalize, we start to see growth again and getting back into our long-term construct, that volume growth will be driven within HVP and then also that aligns with the mix shift as well improving where our HVP was in the kind of mid-70s as a percent of proprietary revenues. And today, what we're saying it's about 71%. And that's the type of impact it has on our business. So when we're returning to growth, we would expect to see that margin recover pretty much - pretty quickly and in line with that growth, particularly around biologics and the generics space. . . . It's all in gross margin. The OpEx is pretty tight.

62.    On news of this greater-than expected destocking activity, West's stock price **dropped $46.61 per share, or approximately 14.4%,** to close at $277.16 per share on July 25, 2024.  While this news partially revealed Defendants' fraud, Defendants continued to mislead investors.

63.    On October 24, 2024, West issued a press release announcing its results for the third quarter ended September 30, 2024.  The same day, the Company hosted an earnings call for the third quarter of 2023 (the "Q3 2023 Call").  During the Q3 2023 Call, Defendant Green stated that:

> **We are also making significant progress in ramping up production of HVP delivery devices**. The strong increase with on-body self-injection devices during the quarter, was driven by a combination of capital investment, improved utilization and the implementation of a new production line. We anticipate this ramp-up to continue into the fourth quarter, as we execute on our expansion plans. We have initiatives in place to improve the margin, including optimizing our manufacturing process, driving efficiency through automation and scaling to fulfill customer demand.
>
> Now let me shift to destocking, as this remains a factor with our customers. We are starting to see signs of stabilization within our business and in recent customer discussions, we have observed a positive shift with some customers showing interest in increasing their near-term order levels. This gives us confidence that we're getting closer to a turning point in the destocking trend. **We now**

**expect continued signs of normalization in our pharma business, improving trends in biologics driven by the ramp-up in delivery devices and continued destocking with some generic customers into 2025**.

64.    During the Q3 2024 Call, Defendant Birkett stated: "Proprietary Products organic net sales decreased 0.5% in the quarter. High-Value Products, which made up approximately 75% of Proprietary Products sales in the quarter, declined by low single digits primarily due to destocking of our FluroTec, Nova brand and Westar products, offset by an increase in sales of our drug delivery devices." Birkett further stated that "Contract Manufacturing third quarter gross profit margin of 19.9%, was 130 basis points greater than the margin achieved in the third quarter of 2023 primarily due to production efficiencies."

65.    During the question-and-answer portion of the Q3 2024 Call, an analyst asked Defendants about destocking:

> Q: Justin Bowers, Deutsche Bank AG: Eric, can you, maybe at a high level, just talk about what inning you think we're in with respect to the destocking? And then are there -- amongst the different components, are you closer to the finish line versus others like, let's say, standard versus NovaPure versus FluroTec? And then part two would be just around the margins. You've had some pretty high decrementals this year. As volumes begin to normalize, is there any reason why you wouldn't have greater incrementals on the way back up and maybe above construct?
>
> A: Defendant Green: Yeah. Justin, let me take the first part and then, Bernard, if you don't mind, the second part. In regards to kind of where we are with the destocking area, I think the way that we've been consistently communicating is that it's not equal across the entire customer portfolio and/or product portfolio. But by the way, the product portfolio is really driven by the market segments. And so we've been pretty clear that in the pharma area, the small molecule, we've seen that more normalize recently. So we feel, if you want to look at from the spectrum, **it's closer to the end, let's say**. And we're starting to see more normalization of order patterns and future outlook.
>
> When we look at the biologics, we -- it is very clear with our customer conversations, if you take the drug delivery devices off the table from

a discussion point of view, the elastomers and products used for containment, that particular area, we continue to see destocking in Q3. And as we mentioned, we'll see a little bit more in Q4. We do see that getting closer to the end, but we – let's go through our Q4. And as we think about our order book going forward, we'll update you in the first part of the year about 2025.

Biologics, so we've been pretty consistent that particularly a few customers that we believe that while there is some positive conversations about future demand, it's -- we do believe that's going to continue to the first part of 2025. So that's how we look at it from a destocking point of view. I didn't give you an aggregate total on that, but it is mix based on the customer segments. And it's pretty – it's playing out as we started to communicate, let's call it, the last quarterly call. And we'll keep an eye on that and make sure that we deliver and the year, we'll reassess as we think about going forward.

A: Defendant Birkett: On the margin, what we would expect is when demand normalizes and our mix normalizes, that **we would get back to our 2023 levels of operating margin** and then through the long term construct, grow 100 basis points per year off that.

When we look at what's occurred this year in 2024, much of the de-stocking we've seen within biologics and generics, and that's where typically we would tend to see more HV product sales. And obviously, then the margin impact has been greater than what we would have seen prior to that when we saw de-stocking within pharma.

If you go back and look at our margin expansion over 2021 and into 2022, a lot of that was driven by HVP growth and that mix shift. So that shows you the power of the construct we have. And when that biologics engine starts growing again and gets back to normalized levels of growth, **we would expect to see that margin start to expand. And first thing is we need to get back to like pre-2024 levels of margin and then start growing off that. We're confident that will happen over time.**

66.     Later on during the question-and-answer portion of the Q3 2024 Call, an analyst asked Defendants about the ramp up of their SmartDose device:

Q: Paul Richard Knight, KeyBanc Capital Markets: Eric, the comment about wearable injection devices, does that mean Phoenix line is building, producing? And then kind of a follow-up is, could we get an update on Grand Rapids, Michigan and the Dublin facility as well?

A: Defendant Green: Yeah. Good morning, Paul, and thanks for the question. Twofold. The first one on SmartDose, particularly our Phoenix facility, you're correct, that ramp-up started in Q3, where we did receive FDA approval for commercial manufacturing into the market. And we're really excited about that new team that has been put together and just the level of capability of the ramp-up. **They're meeting expectations, and I'm really proud of that team to really go from a brand-new facility and now producing high-quality product that's going to the market**. So I'm very pleased.

As you know, a lot of these start-ups and ramp-ups do take time. So it's going to be -- it's going to take several quarters to get to what I call peak throughput, **but the initial results are very, very positive.** In regards to the facilities, investments in Grand Rapids and Dublin, these are two Contract Manufacturing facilities that are really focused on the -- to be able to support our customers in GLP-1s. On Grand Rapids, Michigan, that is still ramping up as we speak. We are producing commercial product, but it is still in ramp-up phase. As you know, that takes probably a good three to five quarters to really get to the levels that we expect and what our customers expect as far as throughput.

On Dublin, it's a little bit longer. This is kind of a two-stage approach. The first is the manufacturing of the devices for Contract Manufacturing, again, GLP-1s. And that will commence shortly, probably early 2025. And as that ramps up, we're also adding in that facility, already communicated before, but just to reiterate, the drug handling. So we'll be taking a finished drug product contained and put it with our -- the device that we're going to manufacture there so it's a complete solution for our customer.

We're really excited about that because that's playing out our high-value product or our high-value focus on Contract Manufacturing, adding services and capabilities that really help us expand not just revenue but also margin in that particular business. So they're different timelines. They're on us right now. The teams are executing within -- as planned, and I'm excited to see full production in the near future from both sites.

67. Defendants were also asked about their outlook for their Contract

Manufacturing segment during the question-and-answer portion of the Q3 2024 Call:

Q: Matthew Richard Larew, William Blair & Company: I wanted to ask about Contract Manufacturing. Gross margins there were up nearly 400 basis points sequentially. You've referenced obviously scaling capacity at -- in Dublin and Grand Rapids and also adding

new capabilities with higher revenue margin potential. Most of the story over the last, call it, five or seven years has been margin expansion on the Proprietary Products side. Just wonder if you could maybe using this quarter as a window into what the potential is for Contract Manufacturing moving forward.

A: Defendant Birkett: Yeah, Matt. **I think if you're looking out over the next like 12 to 24 months, we see a slight uptick on the Contract Manufacturing**, as drug handling business comes on board because that is a very different margin profile for our Contract Manufacturing business. But for us to scale that is going to take a little bit of time. So I would anticipate the margins around Contract Manufacturing to be relatively consistent with what they are now.

We get a little bit of variability between quarters depending on product mix and the level of kind of DA or engineering work that's involved. That's pretty consistent within that high teens. . . . **So it's more longer term where we would see it's like a significant step-up in the margins within CM.**

68.    The statements in ¶¶ 33-35, 37-42, 44-48, 50-54, 56-61 and 63-67 were materially false and misleading when made because they failed to disclose the following adverse facts: (a) despite claiming strong visibility into customer demand and attributing headwinds to temporary COVID-related product destocking, West was in fact experiencing significant and ongoing destocking across its high-margin HVP portfolio; (b) West's SmartDose device, which was purportedly positioned as a high-margin growth product, was highly dilutive to the Company's profit margins due to operational inefficiencies; (c) these margin pressures created the risk of costly restructuring activities, including the Company's exit from CGM contracts with long-standing customers; and (d) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading or lacked a reasonable basis.

**The Truth Is Fully Revealed**

69.    The truth about this fraud was fully revealed to the market on February 13, 2025, when West issued 2025 earnings guidance in the range of $6.00 to $6.30 per share,

28

with its 2025 revenue forecast in the range of $2.88 billion to $2.91 billion, significantly below expectations.  West attributed the disappointing guidance in part to CM headwinds, including the loss of two major CGM customers that had begun transitioning to in-house manufacturing of next-generation devices because West "made the decision to not participate going forward as our financial thresholds cannot be achieved."  The Company also revealed that its SmartDose wearable injector will become margin dilutive in 2025 due to lower pricing.  On this news, West's stock **dropped $123.17 per share, a decline of approximately 38%**, to close at $199.11 on February 13, 2025.

70.    Analysts reacted to this news with shock.  For example, analysts at William Blair noted that the "sell-off was a reaction to the very disappointing guide . . . and acknowledgment that excluding some recent one-off cash incentive payments, the SmartDose manufacturing ramp . . . is going worse than expected – to the extent that management is contemplating whether it makes sense for West to continue to own and invest in that product line."  William Blair further expressed surprise at the Company's decision not to renew the two CGM contracts, stating, "[c]ollectively, and **quite surprisingly given lack of historical disclosure**, these customers made up slightly more than 20% of contract manufacturing revenue in 2024."  Analysts at Bank of America similarly stated that the guidance setback was "disappointing and requires a serious re-evaluation of the business visibility and year-to-year consistency."  Capital Markets cut price targets on West stock from $470 to $325, noting that West had issued "disappointing FY25 guidance" and the Company's "Contract Manufacturing (CM) and Proprietary Delivery systems… had problems with the Company moving away from lower-margin glucose monitors in Dublin."

71.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's stock, Plaintiff and other Class members have suffered significant losses and damages.

## POST CLASS PERIOD EVENTS

72.     On April 24, 2025, just two months after the end of the Class Period, Defendants announced that Defendant Birkett would "step down from his current position this year" and that the Company had appointed a new Chief Proprietary Segment Officer.

## ADDITIONAL SCIENTER ALLEGATIONS

73.     During the Class Period, as alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

74.     The Individual Defendants permitted West to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's common stock.

75.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding West, their control over, receipt, or modification of West's allegedly materially misleading statements and omissions, or their positions with the Company that made them privy to confidential information concerning West, participated in the fraudulent scheme alleged herein.

76.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of West common stock by disseminating materially false and misleading statements or concealing material adverse facts.  The scheme deceived the investing public regarding West's business, operations, and management and the intrinsic value of West stock and caused Plaintiff and members of the Class to purchase West stock at artificially inflated prices.

## V.    LOSS CAUSATION/ECONOMIC LOSS

77.    During the Class Period, as detailed herein, West and the Individual Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of West common stock and operated as a fraud or deceit on Class Period purchasers of West common stock by misrepresenting the Company's business and prospects.  Later, when Defendants' prior misrepresentations and fraudulent conduct became known to the market, the price of West common stock declined as the prior artificial inflation came out of the price over time.  As a result of their purchases of West common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

### A.    Applicability of Presumption of Reliance: Fraud on the Market

78.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's common stock traded in an efficient market;

      (d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

      (e)    Plaintiff and other members of the Class purchased West common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

79.    At all relevant times, the markets for West common stock were efficient for the following reasons, among others:

      (a)    as a regulated issuer, West filed periodic public reports with the SEC;

      (b)    West regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

      (c)    West was followed by numerous securities analysts employed by a major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

      (d)    West common stock was actively traded in an efficient market, the New York Stock Exchange, under the ticker symbol "WST."

80.     As a result of the foregoing, the market for West common stock promptly digested current information regarding West from publicly available sources and reflected such information in West's common stock prices.  Under these circumstances, all purchasers of West common stock during the Class Period suffered similar injury through their purchase of West common stock at artificially inflated prices and the presumption of reliance applies.

81.     Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff and the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

**B.     No Safe Harbor**

82.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking

statement was authorized or approved by an executive officer of West who knew that the statement was false when made.

## VI.    CLASS ACTION ALLEGATIONS

83.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired West common stock during the Class Period and were damaged upon the revelation of the alleged corrective disclosure.  Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

84.    The members of the Class are so numerous that joinder is impracticable. West common stock is actively traded on the New York Stock Exchange.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes there are hundreds, if not thousands, of members in the Class.  Record owners and other Class members may be identified from records procured from or maintained by the Company or its transfer agent and may be notified of the pendency of this action using a form of notice similar to that customarily used in securities class actions.

85.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

86.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

87.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of West;

(c)    whether the Individual Defendants caused West to issue false and misleading financial statements during the Class Period;

(d)    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)    whether the prices of West common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

88.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.    Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it exceedingly difficult, if not impossible and impracticable, for Class members to individually redress the wrongs alleged.    There will be no difficulty in managing this action as a class action.

## COUNT I

## For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against West and the Individual Defendants

89.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

90.    During the Class Period, the Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

91.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

      (a)    Employed devices, schemes, and artifices to defraud;

      (b)    Made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

      (c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of West stock during the Class Period.

92.    Plaintiffs and Class members have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for West stock.  Plaintiffs and Class members would not have purchased West stock at the prices they paid, or at all,

if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

93.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of West stock during the Class Period.

## COUNT II

**For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

94.    Plaintiff repeats and realleges the allegations contained in ¶¶ 1-88 as if fully set forth herein.

95.    The Individual Defendants acted as controlling persons of West within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions and their power to control the actions of West and its employees. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the proposed Class, respectfully pray for judgment against Defendants as follows:

(A)    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(B)    Awarding Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, together with pre-judgment interest thereon;

(C)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

(D)    Granting such other, further, and/or different relief as the Court deems just and proper.

## VII.    DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.

DATED: May 5, 2025                            Respectfully submitted,

*s/ Naumon A. Amjed*
Naumon A. Amjed (PA #309520)
**KESSLER TOPAZ**
  **MELTZER & CHECK, LLP**
Ryan T. Degnan (PA #309305)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
namjed@ktmc.com
rdegnan@ktmc.com

*Liaison Counsel for Plaintiff*

**LABATON KELLER SUCHAROW LLP**
Francis P. McConville
Connor C. Boehme
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
fmcconville@labaton.com
cboehme@labaton.com

*Counsel for Plaintiff*

## CERTIFICATION

I, Daniel J. Greene, as Executive Director of New England Teamsters Pension Fund ("New England Teamsters"), hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of New England Teamsters. I have reviewed a complaint prepared against West Pharmaceutical Services, Inc. ("West") alleging violations of the federal securities laws, and authorize the filing of this pleading;

2.      New England Teamsters did not purchase West common stock at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      New England Teamsters is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary. New England Teamsters fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class;

4.      New England Teamsters' transactions in West common stock during the Class Period are reflected in Exhibit A, attached hereto;

5.      New England Teamsters sought to serve as a lead plaintiff or representative party in the following class actions filed under the federal securities laws during the last three years:

*Erie County Employees' Retirement System v. Cutera, Inc.*, No. 5:23-cv-02560 (N.D. Cal.)
*New England Teamsters Pension Fund v. RTX Corporation*, No. 3:23-cv-1274 (D. Conn.)
*In re Agilon Health, Inc. Securities Litigation*, No. 1:24-cv-0297 (W.D. Tex.)
*New England Teamsters Pension Fund v. The Trade Desk, Inc.*, No. 2:25-cv-1936 (C.D. Cal.)

6.      Beyond its pro rata share of any recovery, New England Teamsters will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is

true and correct this 2nd day of May, 2025.

Daniel J. Greene
Executive Director
New England Teamsters Pension Fund

## EXHIBIT A

## TRANSACTIONS IN WEST PHARMACEUTICALS SERVICES, INC. COMMON STOCK

| Transaction Type | Trade Date | Shares | Price | Cost/Proceeds |
|---|---|---|---|---|
| Purchases | 04/28/23 | 956 | $361.2400 | ($345,345) |
| Sales | 06/28/23 | (100) | $369.2100 | $36,921 |
| Sales | 07/28/23 | (100) | $365.4600 | $36,546 |
| Sales | 05/28/24 | (100) | $327.4700 | $32,747 |
| Sales | 07/29/24 | (100) | $288.1200 | $28,812 |
| Purchases | 09/04/24 | 98 | $304.7200 | ($29,863) |
| Purchases | 10/25/24 | 100 | $307.9200 | ($30,792) |
| Purchases | 01/03/25 | 58 | $335.5600 | ($19,462) |