**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| NEW ENGLAND TEAMSTERS PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>WEST PHARMACEUTICAL SERVICES, INC., ERIC M. GREEN, BERNARD J. BIRKETT, QUINTIN J. LAI, and CINDY REISS-CLARK,<br><br>　　　　　　Defendants. | Case No. 2:2025-cv-02285-JS<br><br>CLASS ACTION<br><br><u>JURY TRIAL DEMANDED</u> |

**AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 2

II.     JURISDICTION AND VENUE ...................................................................... 17

III.    THE PARTIES.................................................................................................. 17

        A.      Lead Plaintiffs ...................................................................................... 17

        B.      Defendants .............................................................................................. 18

IV.     INTRODUCTION OF CONFIDENTIAL WITNESSES............................. 21

V.      SUBSTANTIVE ALLEGATIONS ................................................................ 24

        A.      Overview of Company.......................................................................... 24

                1.      Proprietary Products Segment.................................................... 25

                        a.      Proprietary Standard Products ....................................... 27

                        b.      Proprietary HVP Products (Components & Delivery Devices).... 27

                        c.      Proprietary HVP Delivery Devices: SmartDose........................... 28

                2.      Contract Manufacturing Segment ............................................. 32

                        a.      Contract Manufacturing Products: CGM..................................... 33

        B.      The COVID-19 Pandemic Creates a Surge in Demand for West Products .......... 34

        C.      Customer Demand for West Products Drastically Slows in Late 2022 ................ 36

                1.      Customers Cancel or Reduce Orders Due to Stockpiles of Inventory...... 37

                2.      Regular Meetings Were Held Where Order Cancellations, Delays, Forecasts, and Customer Demand Were Discussed with West Executives ..................... 40

                3.      West Executives Were Directly Informed in Spring and Summer 2023 That West's Generic Customers Had Upwards of Nine Months of Inventory Build-Up.............................. 44

        D.      Dexcom, One of West's Top Two CGM Customers, Informs West in Late 2022, That It Is Ending Its Partnership with West and Ramping Down Production During the Class Period.................................. 53

E.    Pervasive Manufacturing and Quality Challenges with West's SmartDose Delivery Device Leads to Rising Costs and Customer Exits During the Class Period ......................................................................................... 55

1.    Manufacturing and Quality Issues with SmartDose 3.5 and 10 ............... 58

2.    SmartDose 10 Only Approved for Use with One Customer; West Does Not Get FDA Approval to Sell It to Any Other Customers ........... 64

3.    Massive Undisclosed Manufacturing and Quality Issues with SmartDose Lead to Costly Interim Fixes .................................................. 65

4.    West Tracked Quality and Manufacturing Issues with SmartDose .......... 66

5.    Defendants Green and Birkett Were Directly Informed of Pervasive Manufacturing Issues and Customer Discontent with SmartDose .......... 70

6.    West's Largest SmartDose Customers Leave Due to Pervasive Manufacturing and Quality Issues And High Prices ............................... 74

7.    West's Attempts to Automate the Production of SmartDose Fail Miserably During Class Period ................................................................ 77

F.    Defendant Reiss-Clark Was Informed, in March 2023, That Raising Prices on West Products Significantly More Than West's Historical Annual Price Increases Would Lead to Additional Customer Exits ........................................... 78

G.    The 20A Defendants Engaged in Insider Trading in Violation of §§ 10(b) and 20A of the Exchange Act by Selling $27,009,679 Worth of West Common Stock While in Possession of MNPI ..................................................................... 83

VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD .................................................. 85

1.    February 16, 2023: 2022 Financial Results .............................................. 86

2.    March 14, 2023: Barclays Global Healthcare Conference ....................... 92

3.    March 22, 2023: KeyBanc Life Sciences and MedTech Forum ............... 94

4.    April 27, 2023: Q1 2023 Financial Results .............................................. 96

5.    May 11, 2023: Bank of America Healthcare Conference ....................... 102

6.    June 6, 2023: William Blair Stock Growth Conference ......................... 104

7.    The Truth Begins to Emerge, but Defendants Continue to Mislead Investors .................................................................................................. 105

a.    July 27, 2023: Financial Results (First Partial Disclosure).........105

b.    August 16, 2023: UBS Genomics 2.0 and MedTech Innovations Summit ....................................................109

c.    September 14, 2023: Bank of America Global Healthcare Conference ................................................................111

d.    October 26, 2023: Financial Results (Second Partial Disclosure) .............................................................113

e.    November 10, 2023: Baron Investment Conference...................120

f.    November 14, 2023: Jefferies London Healthcare Conference..121

g.    November 16, 2023: Stephens Investment Conference.............124

h.    February 15, 2024: Financial Results (Third Partial Disclosure) .............................................................125

i.    April 25, 2024: Financial Results (Fourth Partial Disclosure) ...133

j.    May 14, 2024: BofA Securities Health Care Conference...........141

k.    June 4, 2024: William Blair Growth Stock Conference .............143

l.    July 25, 2024: Financial Results (Fifth Partial Disclosure) ........143

m.    September 18, 2024: BofA Global Healthcare Conference........150

n.    October 24, 2024: Financial Results...........................................151

o.    November 12, 2024: UBS Global Healthcare Conference .........154

p.    November 19, 2024: Jefferies London Healthcare Conference..156

q.    November 21, 2024: Stephens Investment Conference.............157

8.    The Truth Is Fully Revealed ....................................................158

VII.    POST-CLASS PERIOD STATEMENTS.......................................................161

VIII.    ADDITIONAL EVIDENCE OF SCIENTER .............................................163

A.    Statements by Former West Employees Corroborate that Defendants Knew or Recklessly Disregarded the Falsity of Their Statements and Omissions during the Class Period at the Time Such Statements Were Made....................165

B.    The Individual Defendants' Stock Sales During the Class Period Were Unusual and Suspicious in Timing and Amount. ................................................ 169

1.    The Value and Amount of Trading by the Individual Defendants Was Highly Unusual ........................................................................................ 170

2.    The Nominal Amount and Percentage of West Stock Sold During the Class Period Were Extremely Large ........................................................ 171

3.    The Individual Defendants' Stock Sales During the Class Period Were Inconsistent with Their Prior Trading Practices ........................... 172

4.    The Presence of 10b5-1 Trading Plans Adopted by the Individual Defendants Does Not Absolve the Individual Defendants of Liability ........................................................................................................ 174

C.    The Individual Defendants Spoke Frequently About Their Strong Visibility into Customer Inventory Levels and Demand Trends. ....................................... 175

D.    The Departures of Defendants Lai, Reiss-Clark, and Birkett Support an Inference of Scienter. ................................................................................... 179

E.    Defendants' Admissions After the Class Period Support an Inference of Scienter. ............................................................................................................ 179

IX.    LOSS CAUSATION/ECONOMIC LOSS ........................................................ 180

A.    July 27, 2023: Q2 2023 Financial Results (First Partial Disclosure) ................. 181

B.    October 26, 2023: Q3 2023 Financial Results (Second Partial Disclosure) ....... 181

C.    February 15, 2024: Q4 and Full Year 2023 Financial Results (Third Partial Disclosure) ......................................................................................................... 182

D.    April 25, 2024: Q1 2024 Financial Results (Fourth Partial Disclosure) ............. 182

E.    July 25, 2024: Q2 2024 Financial Results (Fifth Partial Disclosure) ................. 182

F.    February 13, 2025: Q4 and Full Year 2024 Financial Results (Final Disclosure) ......................................................................................................... 182

X.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET ........................................................................................................... 183

XI.    NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE ........................................................................................................ 185

XII.    CLASS ACTION ALLEGATIONS .................................................................... 185

COUNT I  For Violations of Section 10(b) and SEC Rule 10b-5  Promulgated Thereunder Against All Defendants ................................................................................................... 188

COUNT II  For Violations of Section 20(a) of the Exchange Act  Against the Individual Defendants ......................................................................................................... 190

COUNT III  For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Against the 20A Defendants (Green, Birkett, and Reiss-Clark) .................................... 191

COUNT IV  Against the 20A Defendants for Violations of Section 20A of the Exchange Act ............................................................................................................................. 193

PRAYER FOR RELIEF ............................................................................................................. 195

JURY TRIAL DEMANDED ....................................................................................................... 196

Court-appointed Lead Plaintiffs AkademikerPension – Akademikernes Pensionskasse ("Akademiker"), Public Employees' Retirement System of Mississippi ("MS PERS"), and Mineworkers' Pension Scheme ("Mineworkers," and together with Akademiker and MS PERS, "Plaintiffs"), by and through their undersigned counsel, bring this action individually and on behalf of all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of West Pharmaceutical Services, Inc. ("West" or the "Company") during the period from February 16, 2023 through February 12, 2025, inclusive (the "Class Period"), and were damaged thereby.  This federal securities class action is brought pursuant to Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (15 U.S.C. § 78a et seq., the "Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) against Defendants West, Eric M. Green ("Green"), Bernard J. Birkett ("Birkett"), Quintin J. Lai ("Lai") and Cindy Reiss-Clark ("Reiss-Clark," together with Green, Birkett and Lai, the "Individual Defendants," and the Individual Defendants with Defendant West, the "Defendants").

Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.  Plaintiffs' information and belief is based upon, among other things, the investigation conducted by and through counsel, which included review of: (i) West's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) securities analyst reports about West; (iii) transcripts of West's investor conference calls and conference appearances; (iv) West's press releases and publicly available presentations; (v) press and media reports, including online news sources; (vi) other public material obtained in connection with Plaintiffs' continuing investigation; (vii) interviews of former West employees and contractors ("Confidential Witnesses" or "CWs") and others with knowledge of the matters

alleged herein;[1] and (viii) consultation with experts in the areas of damages and insider trading. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    This is a classic securities fraud case where Defendants made false and misleading statements and material omissions about demand and margins for West's products while in possession of information to the contrary. Former senior-level West employees and contractors provide extensive, first-hand information about drastic reductions in order volumes and a substantial increase in order cancellations for West's low and high margin products, as customers worked through excess inventories of West products they had stockpiled during the COVID-19 pandemic (i.e., "destocking"). The destocking, which started before the Class Period and continued even after the Class Period, was far deeper and more widespread than West led the market to believe. While Defendants internally discussed sky-high customer inventories, reduced growth, and slowing order trends due to widespread destocking across all of West's business segments, Defendants led the market to believe that destocking was confined to only a few customers in limited segments of the business and that West's SmartDose on-body delivery device would be the next growth area and high margin product for the Company. Former West employees also confirm Defendants knew about serious and recurring quality issues and nonconformances with the manufacturing of SmartDose which were drastically increasing manufacturing costs that West couldn't pass on to its SmartDose customers. Nonconformances, product failures, persistent manufacturing delays and cost overruns led to customer exits and a high rate of complaints regarding SmartDose, which Defendants failed to disclose. Defendants also failed to disclose the

---

[1] Confidential witnesses will be identified herein by number (CW-1, CW-2). All CWs will be described in the masculine to protect their identities.

forthcoming exit of one of West's top customers in its continuous glucose monitoring ("CGM") business, which materially affected revenues in the Company's Contract Manufacturing Segment. The confidential witnesses detail how Defendants Green, Birkett, Lai and Reiss-Clark knew, or recklessly disregarded, internally disseminated facts, presentations, and reports reflecting West's deteriorating demand environment, which was severely impacting revenues from early 2023 onward. The Individual Defendants received internal reports, analyses and information in early and mid-2023 identifying hundreds of millions of dollars of revenues that were projected to be missed based on customer inventory buildups and loss of customers. While in receipt of this information that contradicted their statements about demand and margins, Defendants Green, Birkett, Lai, and Reiss-Clark collectively sold more than $122 million of their West stock. This trading was highly unusual and suspiciously timed. Soon after the end of the Class Period, it was announced that Defendants Reiss-Clark and Birkett would be leaving the Company, while Defendant Lai had departed approximately halfway through the Class Period. As a result of Defendants' wrongful acts and omissions, Plaintiffs and other members of the Class suffered significant damages.

2.      West is a medical supplies company that specializes in components for the containment and administration of injectable drugs, develops and manufactures advanced proprietary delivery systems, and performs contract manufacturing of health products including individual health monitoring systems.

3.      West reports its business results in two segments: Contract Manufacturing Products ("Contract Manufacturing") and Proprietary Products ("Proprietary Products").

4.     The Contract Manufacturing Segment manufactures and sells drug packaging and delivery products based on customers' designs and specifications, making products such as continuous glucose monitors ("CGM") for customers.

5.     The Proprietary Products Segment manufactures and sells West's drug packaging and delivery products to biologic, generic, and pharmaceutical drug customers. Within this segment, West classifies its proprietary offerings into: (i) Standard Packaging products ("Standard Products"), which include traditional elastomer and metal components (uncoated or minimally processed) used in injectable drug packaging—such as vial stoppers, vial seals, and plungers for syringes and cartridges—generally used for generic and small-molecule drugs; and (ii) High-Value Products ("HVP"), which consist of West's HVP components ("HVP Components") and HVP delivery devices ("HVP Delivery Devices"). The HVP Components include vial seals, vial stoppers, and syringe plungers sold under West brands such as FluroTec, NovaPure, and Westar, which are higher-value, premium-quality components compared to West's Standard Products. The HVP Delivery Devices include West's flagship SmartDose wearable on-body injector.

6.     West's HVP offerings tend to generate significantly higher profit margins than the Company's Standard Products and Contract Manufacturing offerings, which historically have provided the bulk of West's sales unit volume. Therefore, prior to and during the Class Period, the growth and profitability of West's HVP offerings were important factors to the Company's overall financial performance, revenue, and profit growth.

7.     During the two-year period preceding the Class Period, West experienced a surge in demand as pharmaceutical and biotechnology companies increased their purchases of injectable components used in COVID-19 vaccine delivery devices prompting customers to stockpile West

products for non-COVID-19 uses. This pandemic-driven demand caused West's revenues and profit margins to increase substantially during 2020 through 2022.

8.      After COVID-19 subsided and during the Class Period, Defendants represented to the market that West's financial condition and revenue growth remained robust, citing steady increases in customer demand for its products across all of the Company's business lines. Defendants repeatedly emphasized that West's continued revenue expansion was being driven by increasing demand for its HVP, which carried higher profit margins. Defendants further claimed that West's growth was anchored by strong demand in the Company's core Standard Products and Contract Manufacturing businesses. Defendants also assured investors that customers' inventories of previously purchased West products were not creating a meaningful or sustained drag on current demand, bolstering those statements by claiming that West had good visibility into customer inventory levels.

9.      However, during the Class Period, Defendants made false and misleading statements about demand for West's products, including statements: (i) concerning the factors purportedly driving the Company's revenue growth (e.g., "***We're seeing strong demand in our core business . . . If you draw off COVID, we're seeing that double-digit growth. And it's across nearly all areas of our business. Everything is performing in the ways we would have expected this year, achieving all our targets. . .***"); (ii) touting West's visibility into customer inventory levels and representing that existing customer inventories, and any related destocking (or working through existing inventories, which can reduce new product orders) was cabined to COVID, temporary, and would not materially slow West's demand growth (e.g., "***So right now, where we stand what we see is not a lot [of] destocking with our products***"); and (iii) assuring investors that West's longstanding customer relationships in its Contract Manufacturing business provided West

with stable and dependable sales (e.g., "*we have a level of visibility as to the type of commitment we're going to get and that that does support the long-term growth of the [Contract Manufacturing] business…*"). For ease of reference, these statements are referred to as the "Demand Statements."

10.     During the Class Period, Defendants also issued false and misleading statements about West's high margins, including statements: (i) concerning the effects of HVP sales—including sales of West's SmartDose devices—on the Company's margins (e.g., "*We're seeing that continued growth in high-value products ex COVID, and we're seeing that positive impact that's flown into margin*"); and (ii) lauding West's "mix" of products, a signal that West's margin expansion was driven by higher-margin HVPs (e.g., "*The HVP mix shift is really the biggest driver of the margin expansion…*"). For ease of reference, these statements are referred to as the "Margin Statements."

11.     Both Defendants' Demand Statements and Margin Statements were materially false and misleading when made. In fact, and unbeknownst to investors, West's true revenue and demand picture was far worse than Defendants represented. By 2023, negative developments across West's entire business—including Standard Products, HVPs, and Contract Manufacturing—were materially impacting customer demand for West's products and services, thereby constraining the Company's ability to achieve further revenue growth or margin expansion. These multiple material headwinds were identified and well known within the Company, yet Defendants concealed or publicly misrepresented them throughout the Class Period, causing substantial losses to investors.

12.     The material headwinds that Defendants concealed or misrepresented during the Class Period when making their Demand Statements included (but were not limited to) the

following: *First,* throughout 2023 and 2024, the Company experienced a drastic reduction in order volumes and a substantial increase in order cancellations for Standard Products and HVPs, as customers worked through excess inventories of West products stockpiled during the COVID-19 pandemic. *Second*, aggressive price increases implemented by West further dampened customer demand, according to an internal analysis provided to certain of the Individual Defendants. *Third*, before the Class Period, West had been notified that one of its largest CGM-device customers would be leaving West by early 2025 and was already decreasing orders before then. These factors, among others, drastically reduced demand for West's products during the Class Period, resulting in declining reported revenues.

13.     Former West employees and contractors provide extensive, first-hand information regarding reduced demand for West's products during the Class Period and the factors driving that reduced demand, confirming, among other things, that:

(a)     during the COVID-19 pandemic, and prior to the Class Period, customers had overordered West's products (due to supply issues and longer manufacturing lead times at West) and had built up unusually large stockpiles of inventory of West products;

(b)     because customers had built up stockpiles of West inventory, customers delayed placing new orders and/or canceled existing orders with West beginning in late 2022 and continuing through 2024;

(c)     the rate of reduction in order volumes that West received increased during 2023, meaning that the decline in orders was accelerating;

(d)     West's Standard / generic ("Generic") customers (which made up approximately 20% of West's annual revenues during the Class Period), had 9 or more months of inventory of West components and products on hand as of January and February 2023, and had

informed West that they would not be placing new orders for several quarters while they worked through their existing inventories. These inventory levels remained elevated and the impact of the inventory buildup continued into 2024;

(e)     Defendant Reiss-Clark knew no later than March 2023 (when she received an internal analysis that she had specifically requested), that West's Generic customers had built up approximately 9 months or more of inventory of West components, and would not be ordering additional West products until their inventory levels returned to normal (the "Inventory Build Analysis");

(f)     according to the Inventory Build Analysis, because of anticipated reduced order volume based on customer inventory buildup, for fiscal 2023, West projected a revenue shortfall of $90 to $100 million in Generic orders as compared to internal West targets for the Generics business;

(g)     a presentation given to Defendants Green, Birkett, Lai, and Reiss-Clark in June 2023 (which included similar information previously presented to Reiss-Clark months earlier, in March 2023, in the Inventory Build Analysis) identified a 9-month plus inventory buildup in Generics as a major risk. Defendants were informed that, because of that massive inventory buildup, Generics revenues over the next several quarters would be down, and that the revenue risk to the target forecast was $130 to $140 million, with $100 million of that risk due to the inventory buildup;

(h)     the Generics revenue shortfall, compared to targets, shown in the internal Inventory Build Analysis proved remarkably accurate for fiscal year 2023. Of the approximately $400 million total revenue shortfall, between $80 and $90 million of the shortfall was due to reduced and canceled orders resulting from the inventory buildup in the Generic business;

(i)    information regarding West's product orders and demand planning was tracked and shared at senior levels of the Company, including with the Individual Defendants;

(j)    before the start of the Class Period, West's top CGM customer, Dexcom, informed the Company that it was ending its partnership with West and would be "ramping down" its orders and business in 2023; and

(k)    Dexcom ended its partnership with West, in part, because West's costs were too high.

14.    With respect to the Margin Statements, Defendants failed to disclose numerous material adverse facts, which were known or recklessly disregarded by them, including that: (i) West's purported high-margin SmartDose device was riddled with ongoing manufacturing and quality issues; (ii) the substantial expenditures required to fix the manufacturing problems and hire a legion of outside contractors to remediate the SmartDose manufacturing and quality issues were eating into West's SmartDose profits; and (iii) rising costs, together with the manufacturing and quality issues, resulted in the decline of demand and margins on SmartDose, and the loss of West's key SmartDose customers. Indeed, at the end of the Class Period, Defendants revealed SmartDose was actually margin dilutive.

15.    Former West employees and contractors provide extensive, first-hand information regarding SmartDose manufacturing and customer issues, as well as factors that increased SmartDose's manufacturing costs and reduced its margins, confirming, among other things, that:

(a)    serious and recurring quality issues and nonconformances in West's manufacturing of SmartDose forced the Company to spend substantial money on outside contractors to help address nonconformances, product return and failure reports, and persistent manufacturing problems, delays, and cost overruns;

(b)      the equipment used by West to manufacture SmartDose consistently failed function testing and did not perform adequately either in assembling SmartDose components or in manufacturing the final product (putting all the components together);

(c)      in 2023, there was an approximate 80% "scrap rate" in the sub-assembly manufacture of SmartDose components (the manufacture of the components before the finished device is assembled);

(d)      for the 20% of SmartDose devices that survived sub-assembly, the finished devices ultimately failed at an unreasonably high rate;

(e)      there was a "mountain" of SmartDose component scrap piles littering West's SmartDose manufacturing facility in Phoenix, AZ;

(f)      SmartDose had become a "disaster" and West "took its eye off the ball";

(g)      West maintained a "massive" database of complaint data for SmartDose 3.5 and SmartDose 10, which included customer failure report data that members of West's Executive Leadership Team were required to review and certify;

(h)      West implemented a 50% price increase for SmartDose in August 2023—a price that customers were not willing to pay and resulted in customers leaving West;

(i)      because of recurring and significant quality issues, along with price increases, the largest SmartDose customers canceled or declined to renew their contracts with West during the latter half of 2023 and into 2024;

(j)      West executives refused to outsource the manufacture of SmartDose to an external manufacturer or sub-manufacturer, despite knowing that West could not produce a viable product at a price that current and prospective SmartDose customers were willing to pay;

(k)    West's attempt to change the SmartDose sub-assembly production line from manual to automated was failing, as the automated line could not pass validation testing;

(l)    SmartDose 10, the second generation of West's SmartDose delivery system, could not pass regulatory requirements and could not be commercially launched, except for sale with a single customer, Furoscix, which was approved in October 2022;

(m)    these recurring problems with SmartDose were reported up to West's Executive Leadership Team, which closely monitored the progress of "their flagship device"; and

(n)    the Individual Defendants were updated throughout the Class Period about the extensive SmartDose manufacturing problems and SmartDose's persistent and costly quality problems.

16.    West's misrepresentations and omissions were revealed to the market through a series of six disclosures between July 27, 2023 and February 13, 2025.  The first limited, partial disclosure occurred on July 27, 2023, during West's Q2 2023 earnings call, when Defendants started to indicate that customer destocking was affecting demand and financial performance in West's base business (as distinct from COVID), but misleadingly downplayed the scope and effects of the destocking and order trends that they knew were adversely affecting the Company. On the partial disclosure, West's stock price declined $24.52 per share, or approximately 6.46%, to close at $354.90 per share on July 27, 2023. Critically, Defendants continued to mislead the market on, among other things: (i) the extent of the destocking; (ii) the nature of customer order delays and cancellations; (iii) how long it would take customers to work through their bloated inventories; and (iv) the numerous other factors that were negatively affecting West's demand. In addition, Defendants continued to mislead the market about the Company's margin performance.

17.     In a second partial corrective disclosure on October 26, 2023, Defendants informed the market that West was continuing to see some negative demand effects from customer destocking, though they again misleadingly downplayed the true extent to which destocking was affecting West's business. Defendants revealed limited destocking in West's Standard Products segment but not in West's higher-margin HVP segment, minimizing the issue by falsely claiming it concerned the "***timing of inventory management with a few select customers.***" On this disclosure, West's stock price fell $30.68 per share, or approximately 8.57%, to close at $327.32 per share on October 26, 2023. At the time, however, Defendants knew customers were destocking across multiple categories of West products, including higher-margin HVP, and that customers would not work through their overstuffed inventories for several more quarters. Moreover, Defendants continued to mislead the market about other adverse factors affecting demand, including a significant customer loss in the Contract Manufacturing Segment and margin pressures within the HVP segment.

18.     Then, on February 15, 2024, West revealed continued negative demand impacts from destocking in its Proprietary Products Segment, which the Company disclosed was now expected to persist into Q2 2024. Reflecting the market's surprise, on this news, West's stock price dropped $57.49 per share, or approximately 14.08%, closing at $350.70 per share on February 15, 2024. Despite this partial disclosure, Defendants continued to mislead the market regarding the true scope of the other noted demand headwinds the Company was facing. In addition, Defendants continued to mislead the market about demand for West's CGM devices, the pervasive quality failures with SmartDose, and the Company's margin performance and other adverse demand drivers.

19.     Defendants continued to trickle out corrective information to the market on April 25, 2024, when they revealed for the first time that "most of the destocking" West was experiencing was concentrated in the Company's HVP segment, rather than in its lower-margin segments, as Defendants had previously represented. On this news, West's stock price declined by $17.55 per share, or 4.55%, to close at $368.18 per share that same day. Notwithstanding these disclosures, Defendants continued to mislead investors by failing to disclose the full impact that destocking was having on the Proprietary Products Segment, which Defendants knew would continue for several additional quarters. In addition, Defendants continued to mislead the market regarding the Company's margin performance and other negative demand factors, including that the SmartDose device was plagued with quality and manufacturing issues which led to the product being margin dilutive, and significant customer losses in its Contract Manufacturing Segment, which were driven in part by price increases.

20.     The truth about the material adverse factors affecting the Company's revenues further emerged on July 25, 2024, when Defendants revealed that the destocking trends impacting West's business were affecting the Company's margins and would extend into Q3 2024, and that the anticipated return to growth in Q4 2024 would be weaker than originally anticipated. It was on this news that the truth about destocking was fully revealed. On this revelation, West's stock price dropped $46.61 per share, or 14.4%, to close at $277.16 per share on July 25, 2024. However, Defendants still failed to disclose other ongoing adverse issues, including that West's "flagship device"—SmartDose—was not in fact a high-margin product, based on the severe quality issues and the costs that West was experiencing in trying to manufacture the device in-house, and that West was losing key business in the CGM space of its Contract Manufacturing operations.

21.     The full truth regarding the Company's margin performance and depressed demand across multiple business segments finally emerged on February 13, 2025, when West announced its Q4 2024 and full-year results for fiscal year 2024 and issued extremely weak 2025 revenue and earnings forecasts. The Company attributed the disappointing numbers in part to headwinds in the Contract Manufacturing segment, including the loss of two of the Company's top customers with contracts for CGM products. The Company also revealed that SmartDose, which the Company had previously touted as a high-margin growth driver, would be "margin dilutive" in 2025. On this news, West's stock price plunged by $123.17 per share, or approximately 38.22%, to close at $199.11 per share on February 13, 2025.

22.     Defendants Green, Birkett, Lai, and Reiss-Clark knew, or recklessly disregarded, internally disseminated facts, presentations, and reports reflecting West's deteriorating demand environment, which was severely impacting revenues from early 2023 onward. For example, the Individual Defendants received internal reports, analyses and information identifying tens to hundreds of millions of dollars of revenues that were projected to be missed based on customer inventory buildups, in and around March of 2023, and again in June of 2023 (and thereafter). The Individual Defendants also knew throughout the Class Period that West had lost one of its most significant CGM customers, which materially harmed the Contract Manufacturing Segment.  In addition, the Defendants were aware that, throughout the Class Period, SmartDose margins were decimated by persistent design, manufacturing, supply, and quality problems, which required West to spend a substantial amount of money on outside contractors and remediation efforts to help address defects with the device and ultimately led to West losing major SmartDose customers. Contrary to Defendants' public statements that led the market to believe that SmartDose was a high-margin product, the reality within West was that SmartDose was "like a black hole."

23.     Additionally, and unbeknownst to investors, during the Class Period, Defendants Green, Birkett, Lai, and Reiss-Clark collectively sold West stock in amounts totaling more than $122 million, at prices as high as $397.90 per share, while in possession of material nonpublic information ("MNPI") concerning West's true financial condition, including: (i) the scope and financial impact of the destocking and reduced demand that were materially affecting West's products; (ii) the magnitude of the manufacturing and quality problems and cost overruns associated with SmartDose, which were driving away SmartDose customers and eroding profit margins; and (iii) the loss of one of West's top CGM customers. This trading was highly unusual and suspiciously timed: for example, Green's stock sales during the two-year Class Period were 566% higher than his stock sales during the two-year period before the Class Period (the "Control Period"). Additionally, Birkett's stock sales during the Class Period were 58% higher than his stock sales during the Control Period. And Reiss-Clark made her only sale of West stock during the Class Period. ***In total, during the Class Period, the Individual Defendants sold 339,776 shares for more than $122 million, compared to 71,247 shares for $22.7 million during the Control Period***.

24.     Plaintiffs also allege claims under Section 20A of the Exchange Act against Defendants Green, Birkett, and Reiss-Clark for trading contemporaneously with certain Plaintiffs and members of the Class while in possession of MNPI during the Class Period. Green, Birkett, and Reiss-Clark are referred to herein as the "20A Defendants."

25.     Shortly after the Class Period, on March 12, 2025, at the Barclays Global Healthcare Conference, Green acknowledged that "2024 [was] a year of a lot of . . . destocking effect that occurred." This statement confirmed that customer destocking had materially impacted West's performance throughout 2024, directly contradicting Defendants' Class Period assurances

that "***demand is strong***" and that destocking was having a "***very low impact at West*** . . . ." At the same conference, Green further admitted that West's SmartDose device was "creating the most headwind for us" as the Company set guidance, explaining that the product was still being "scal[ed] up in a manual process" and that "where we are with the cost to produce a product is imbalanced[,]" while emphasizing the "urgency to get this rectified." Birkett added that the Company was "resolving the issues . . . around SmartDose and the economics" and conceded that the platform was a "drag . . . in 2025."

26. On March 7, 2025, less than one month after the end of the Class Period, West announced that Defendant Reiss-Clark, Senior Vice President and Chief Commercial Officer, had departed the Company. On April 24, 2025, just two months after the end of the Class Period, West announced that Defendant Birkett would be leaving his position as Senior Vice President and Chief Financial Officer. Defendant Lai also departed from the Company in or around July 2024.

27. On June 5, 2025, during the William Blair Growth Stock Conference, Green revealed that SmartDose was "the least profitable part" of West's drug delivery device portfolio, explaining that it remained "a highly manual process" requiring a "cost down" transition to automation and that management was considering "other options around portfolio fit." Green also stated that the Company had faced "a challenge" from destocking over "the last two years."

28. All told, over the course of the Class Period, the price of West stock fell from a high of over $415 per share (in August 2023) to close at $199.11 per share on February 13, 2025, **a more than 50% decline.** Defendants' fraud caused substantial losses to West's investors as the market learned the full extent of the Company's demand issues and that certain products and business segments were not profitable, facts that Defendants had materially concealed or misrepresented during the Class Period.

29.     As a result of Defendants' wrongful acts and omissions, and the resulting precipitous decline in the market value of West securities, Plaintiffs and other members of the Class suffered significant damages. This action seeks to recover those damages for the Class.

## II.    JURISDICTION AND VENUE

30.     The claims asserted arise under Sections 10(b), 20(a), and 20A of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a), §78t-1), and SEC Rule 10b-5 promulgated thereunder (*see* 17 C.F.R. § 240.10b-5).

31.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

32.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa). The Company's principal offices are located in this District. Substantial acts in the furtherance of the alleged fraud occurred in this District. Defendants' wrongful acts also arose in, emanated from, and caused harm in this District, including the dissemination of false and misleading statements into this District. Additionally, venue is proper in light of the purchase of the Company's stock by members of the Class who reside in this District.

33.     In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, the United States mail, interstate telephone communications, and the facilities of a national securities exchange, the New York Stock Exchange.

## III.    THE PARTIES

### A.    Lead Plaintiffs

34.     Court-appointed Lead Plaintiff Akademiker is a member-owned pension fund for academics. Akademiker is a sophisticated institutional investor that, as of September 1, 2025, had approximately $21 billion in total pension assets under management. As set forth in the

Certification previously submitted to the Court (ECF No. 15-3), Akademiker purchased or otherwise acquired West common stock at artificially inflated or artificially maintained prices during the Class Period and suffered damages thereby.

35.    Court-appointed Lead Plaintiff MS PERS provides retirement benefits for individuals working in Mississippi government, public schools, universities, community colleges, municipalities, counties, the Legislature, highway patrol, and other such public entities. MS PERS is a sophisticated institutional investor that, as of September 1, 2025, had approximately $38 billion in total pension assets under management. As set forth in the Certification previously submitted to the Court (ECF No. 15-3), MS PERS purchased or otherwise acquired West common stock at artificially inflated or artificially maintained prices during the Class Period and suffered damages thereby.

36.    Court-appointed Lead Plaintiff Mineworkers is one of the largest pension schemes in the UK and has been part of the coal mining community for over 70 years. Mineworkers is a sophisticated institutional investor that has more than $13.9 billion in total pension assets under management. As set forth in the Certification previously submitted to the Court (ECF No. 15-3), Mineworkers purchased or otherwise acquired West common stock at artificially inflated or artificially maintained prices during the Class Period and suffered damages thereby.

**B.    Defendants**

37.    Defendant West is a Pennsylvania corporation with its principal executive offices located at 530 Herman O. West Drive, Exton, PA 19341.  During the Class Period, the Company's common stock traded on the New York Stock Exchange (the "NYSE") under the symbol "WST."

38.    Defendant Eric M. Green has served as West's President and Chief Executive Officer ("CEO") since 2015. In May 2022, Green became the Board Chair. During his tenure as CEO, Green signed West's annual reports and SOX certifications stating that the financial

information contained in the Company's financial reports was accurate and disclosed any material changes to West's internal controls over financial reporting. Throughout his tenure as CEO, Green also participated in the Company's quarterly earnings conference calls described herein.

39.     Defendant Bernard J. Birkett served as West's Senior Vice President and Chief Financial Officer ("CFO") from June 2018 until August 4, 2025. In 2022, Birkett was appointed to the combined role of CFO and Chief Operations Officer ("COO"), and in 2024, Birkett transitioned to solely act as the CFO. In the combined role of Chief Financial and Operations Officer, Birkett led West's Global Operations and Global Supply Chain. During the Class Period, Birkett signed West's annual reports and SOX certifications stating that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to West's internal controls over financial reporting. Throughout his tenure as CFO, Birkett also participated in the Company's quarterly earnings conference calls described herein. On April 24, 2025, just two months after the Class Period, West announced that Birkett would be leaving the Company. The Company announced that Birkett would remain in his position as CFO until his successor was in place, and as an advisor to West to facilitate the transition.

40.     Defendant Quintin J. Lai served as West's Vice President of Strategy and Investor Relations from June 2016 until July 2024. During his tenure as Vice President of Strategy and Investor Relations, Lai participated in the Company's quarterly earnings conference calls described herein. Defendant Lai departed from West in July 2024.

41.     Defendant Cindy Reiss-Clark served as West's Senior Vice President and Chief Commercial Officer from May 2022 to March 7, 2025, and as the Senior Vice President of Global Markets and Commercial Solutions since November 2019. Prior to her role as Senior Vice President, Reiss-Clark served as the Vice President and General Manager of Global Biologics

Market Unit from September 2018 to November 2019. During her time as Chief Commercial Officer, Reiss-Clark reported directly to Defendant Green. Reiss-Clark also participated in investor conferences and earnings calls on behalf of West, where she made statements about the Company. On March 7, 2025, less than one month after the end of the Class Period, West announced that Reiss-Clark had departed West effective the same day.

42.    Defendants Green, Birkett, Lai, and Reiss-Clark are collectively referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of West's SEC filings, press releases and public presentations and statements alleged herein to be misleading prior to, or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with West, and their access to material information available to them but not to the public, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein. Defendants Green, Birkett, and Reiss-Clark also had a duty under Sections 10(b) and 20A of the Exchange Act to either not trade on MNPI, or to disclose that information before trading.

43.    The Company and the Individual Defendants are sometimes collectively, in whole or in part, referred to herein as the "Defendants."

## IV.    INTRODUCTION OF CONFIDENTIAL WITNESSES

44.    This complaint references numerous former employees and contractors of West that support Plaintiffs' allegations herein.[2]

45.    CW-1 was a former strategic marketing head within the Generics division at West from January 2022 through May 2024. CW-1 explained that his job function was to spend his marketing budget in a way that would generate a return on investment ("ROI") for West. To do so, CW-1 developed strategic plans to enable greater profitability year-over-year. CW-1's boss for most of his tenure was David Maier, former Vice President and General Manager for the Generics division at West. Maier reported to Defendant Reiss-Clark, West's Chief Commercial Officer. During his last two months at West, after Maier departed, CW-1 reported to Deborah Stutz, then VP, Commercial Operations, who also reported to Reiss-Clark.

46.    CW-2 was a former Director of Global Marketing from 2018 until he left West in June 2023. CW-2 worked the marketing segment mostly for generic injectables, but also worked on "self-dose" injectables, including the SmartDose on-body injector. CW-2 was also part of a COVID task force established by West in approximately 2021 to assist in responding to the pandemic. During his last few years as Director of Global Marketing, CW-2 reported to a Senior Director. CW-2 also worked with a Vice President and General Manager of a business segment, who reported to Cindy Reiss-Clark, then Chief Commercial Officer, who in turn reported to CEO Eric Green.

47.    CW-3 was a former Senior Executive in Supply Chain from the beginning of the Class Period through early 2024. CW-3 was a part of the team run by Emily Oberlee, former VP,

---

[2] Plaintiffs believe that the details of the responsibilities of all of the CWs contained herein are sufficient to satisfy the requirements of the PSLRA. However, Plaintiffs can provide additional specificity, including exact titles for CWs 1-8 to the Court through an *in-camera* submission.

Global Supply Chain, who in turn reported to CFO Bernard Birkett. CW-3 worked closely with Birkett although he did not report directly to him. CW-3 described meeting directly with Birkett from the start of his employment. CW-3 also had 30-minute one-on-one meetings with Green which were scheduled by Green and Birkett, not by him. CW-3's position was remote but he visited West's headquarters in Exton, PA every other week for a full week, so he was highly visible at the Company's headquarters and was present in Exton for meetings. According to CW-3, there were approximately 74 employees in his department with approximately seven employees reporting directly to him.

48.    CW-4 was a former Engineer on the SmartDose device platform from early 2023 through the first half of 2024. CW-4 worked on SmartDose 3.5 and interacted with engineers working on SmartDose 10 and other products manufactured at the Scottsdale, AZ facility where he worked. CW-4 confirmed that he worked at West's Scottsdale Operations Center, or SOC, which is one of two West facilities in Scottsdale. CW-4 reported to an engineer supervisor, who in turn reported to Rauf Nayaz, the Site Engineering and Facilities Director at West's Scottsdale facility where CW-4 and the engineer supervisor had worked.

49.    CW-5 was a former Value Stream Manager for West's new SmartDose device production line, based in the Company's Tempe, Arizona location from March 2023 through February 2024. CW-5 explained that although the facility is located in Tempe, the Company referred to it as its "Phoenix location." CW-5 reported to the Manager of Operations at the facility named Jason Allen, who reported to Victor Cisneros, former Site Director at the Phoenix facility. CW-5 advised that he worked solely on SmartDose 3.5.

50.    CW-6 was a former Regulatory Manager before being promoted to Director of Regulatory Affairs, from March 2022 through September 2024. CW-6 reported to a Senior

Director of Regulatory Affairs who reported to a Vice President of Regulatory Affairs. CW-6 was responsible for monitoring, disseminating, and facilitating regulatory changes by both the FDA and European regulatory agencies that would affect West's products and informing the Company regarding compliance. CW-6 explained that when regulatory changes were implemented, he informed the Company and oversaw the implementation of changes to enable West to be in compliance. CW-6 worked remotely in Arizona but spent a lot of time on-site in two of West's manufacturing facilities in Arizona to conduct inspections, training, and facilitating changes. CW-6 was also responsible for cybersecurity compliance.

51.     CW-7 was employed as a Quality Engineer Contractor at West, from approximately September 2023 through January 2024. CW-7 was brought in by West as a contractor to handle SmartDose complaints. CW-7's job was to investigate defective SmartDose devices West received back from customers all over the world, including the United States, Australia, Japan and Germany. CW-7 reported to Trevor Barchus, engineering lead/complaints team lead. According to CW-7, Barchus reported to Ashlee Austin, currently Complaints Quality Manager at West. CW-7 worked in West's facility in Scottsdale, Arizona.

52.     CW-8 was employed as a Manager in one of West's Scottsdale, Arizona production facilities from approximately April 2023 until he was laid off in February 2025. CW-8 explained that his position was created specifically to help the Company regain control of its materials management systems and internal inventory processes after years of unchecked production during the COVID-19 pandemic. CW-8 reported to Bob Olenik, currently Site Supply Chain Leader at West's Scottsdale facility. CW-8 was laid off in February 2025, which he attributed to a combination of shrinking orders and the drop in COVID-related vial production.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Overview of Company

53.    West is a global manufacturer engaged in the design and production of integrated containment and delivery systems for injectable drugs and healthcare products. West's products include a variety of primary proprietary packaging and containment solutions, reconstitution and transfer systems, and drug delivery devices, as well as Contract Manufacturing products, analytical laboratory services, and integrated solutions. West's customers include biologic, generic, pharmaceutical, diagnostic, and medical device companies worldwide.

54.    Founded in 1923 and headquartered in Exton, Pennsylvania, West has expanded into a multinational operation with more than 10,000 employees and manufacturing facilities around the globe, including in North America, Europe, and the Asia Pacific region.

55.    West sells and distributes its products and services directly to customers primarily through its own sales force and distribution network, with limited use of contract sales agents and regional distributors.

56.    In fiscal year 2024, the Company reported $2.89 billion in net sales and delivered more than 41 billion components and devices. These sales were derived from a global customer base, with approximately 45% of net sales generated in the United States and 55% outside the United States, including a growing contribution from the Asia Pacific region.

57.    For reporting purposes, West's fiscal year ("FY") is the same as the calendar year— it begins on January 1 and ends on December 31.  Quarter 1 ("Q1") runs from January 1 to March 31; Quarter 2 ("Q2") from April 1 to June 30; Quarter 3 ("Q3") from July 1 to September 30; and Quarter 4 ("Q4") from October 1 to December 31.

58.    West organizes its business operations into two global business segments: Proprietary Products and Contract Manufacturing.

## 1.    Proprietary Products Segment

59.    The Proprietary Products Segment offers elastomers and primary containment, drug delivery devices, integrated solutions, and analytical lab services, primarily to biologic, generic, and pharmaceutical drug customers.

60.    West's proprietary packaging, containment, and drug delivery products include stoppers and seals for injectable packaging systems. West also produces syringe and cartridge components, which are designed to deliver medicines at a consistent rate, reduce drug waste and microbial contamination, and help patients receive accurate doses. In addition, West provides supporting services—such as film and coating applications, washing, sterilization, and inspection processes—to its customers.

61.    Within its proprietary packaging, containment, and drug delivery products, West also offers containment and delivery systems such as Daikyo Crystal Zenith, a cyclic olefin polymer used to manufacture syringes, vials, and cartridges. These containers are an alternative to glass, reducing risks of breakage or incompatibility, and they can withstand extreme conditions such as cold storage. Other leading West brands include NovaPure (high-performance stoppers and plungers), FluroTec (a barrier film coating that improves compatibility and shelf life), and Westar (washed and sterilized components).

62.    Collectively, West markets its proprietary packaging, containment, and drug delivery products as reducing time to market, total cost of ownership, supply chain risk, and increasing regulatory assurance—factors that increase customer reliance and enable West to command premium pricing and, thus, drive higher margins.

63.    The Proprietary Products Segment generates the majority of West's overall revenue, accounting for 81.3% and 80.7% of West's total net sales in 2023 and 2024, respectively.

64.    Within the Proprietary Products Segment are the Biologics, Generics, and Pharma market groups. The following table presents the approximate percentage of West's net sales (in revenue) by market group in FY 2023 and FY 2024:

| | 2024 | 2023 |
|---|---|---|
| Biologics | 39% | 37% |
| Generics | 17% | 20% |
| Pharma | 25% | 24% |

65.    During the Class Period, significant growth at West was driven by Biologics, which the Company identified as the fastest-growing sub-segment of the injectable medicines market.

66.    CW-1 explained that West's Generics division had three customers that generated approximately 15% of all Generics revenue. CW-1 added that the three largest customers, which made up the 15% figure, were Fresenius Kabi (FK), Hikma, and Pfizer.  CW-1 added further that Sanofi was also one of the larger customers in Generics.

67.    CW-1's revenue targets for the Generics business varied each year but ranged from roughly $600 to $800 million per year.

68.    Within the Proprietary Products Segment, West further classifies its product offerings as Standard Products and HVP, selling three categories of products: (1) Standard Products; (2) HVP Components; and (3) HVP Delivery Devices. The following table presents the percentage of West's net sales (in revenue) by these Proprietary Product sub-categories in FY 2023 and 2024:

| | 2024 | 2023 |
|---|---|---|
| High-Value Product Components | 45% | 50% |
| High-Value Product Delivery Devices | 14% | 10% |
| Standard Packaging | 22% | 21% |

69.    As demonstrated by the graph below, Standard Products are lower in value to West, whereas, for example, SmartDose—an HVP Delivery Device—has a much higher value to West.



### a.    Proprietary Standard Products

70.    Standard Products include traditional elastomer and metal components used in injectable drug packaging—such as vial stoppers, seals, and plungers for syringes and cartridges—that are widely used across pharmaceutical and biotechnology applications.  These products are less complicated than West's HVP and consist of uncoated or minimally processed components designed to meet broad regulatory and quality requirements, generally serving generic and small-molecule drugs. Standard Products provide a stable but lower-margin revenue stream for West compared to its HVP offerings. While Standard Products account for approximately 78% of West's unit volume, it represented between 21%-22% of West's total net sales during the Class Period.

### b.    Proprietary HVP Products (Components & Delivery Devices)

71.    HVP Components—which include vial seals, vial stoppers, and syringe plungers sold under West brands such as FluroTec, NovaPure, and Westar—accounted for approximately 50% of West's total net sales in FY 2023 and 45% in FY 2024.  HVP Components include products treated with upgraded processes and higher quality, safer components.

27

72.     HVP Delivery Devices are West's advanced drug systems, including its SmartDose devices, and accounted for approximately 10% of West's total net sales in FY 2023 and 14% in FY 2024.

73.     Together, the HVP Components and HVP Delivery Devices generate significantly higher profit margins for West than either its Standard Products or its Contract Manufacturing Segment (discussed below).

74.     During the Class Period, HVP represented only approximately 20% to 22% of West's total unit volume but accounted for roughly 60% of West's total net sales, underscoring the higher pricing power and profitability of these offerings.

**c.      Proprietary HVP Delivery Devices: SmartDose**

75.     Within the HVP Delivery Devices component of its Proprietary Products Segment, West develops and markets self-injection systems.

76.     SmartDose is West's flagship wearable, on-body injector. The device allows patients to self-administer high-volume therapies outside a clinical setting and reduces the patient's need for frequent visits to infusion centers. SmartDose adheres directly to the patient's body and is pre-programmed to deliver set volumes of medications, thereby enabling patients to remain hands-free while receiving treatment. The device may also be combined with connected health technologies intended to improve medication adherence.

77.     The first version of SmartDose—SmartDose 3.5 Gen. I—was announced in 2012 and received FDA approval in 2016 for use by one of West's customers, Amgen, with Amgen's drug Repatha. Because SmartDose 3.5 Gen I was customized specifically for Repatha, it was categorized within West's Contract Manufacturing Segment and therefore, it could not be used with most other drugs, which limited its marketability. In 2019, Alexion Pharmaceuticals

announced it would integrate SmartDose 3.5 Gen. I to deliver its drug Ultomiris, following West's incorporation of the device as a platform product.

78.    In July 2015, West announced that it had expanded its manufacturing capabilities at the Company's facility in Scottsdale, Arizona to support increasing customer demand for SmartDose. The Scottsdale expansion included new clean-room manufacturing areas and additional laboratory space, and West disclosed that it was creating new roles in research and development ("R&D"), engineering, quality, and operations to support the ramp-up of SmartDose production.

79.    CW-8 described the Scottsdale facility as one of West's largest and most important plants. CW-8 added that it produced glass and plastic vials as part of West's Crystal Zenith (CZ) brand and SmartDose injector devices, which are wearable electronic drug delivery systems used by major pharmaceutical companies.

80.    In 2017, West introduced SmartDose 10 Gen. II, describing it as an "On-Body Delivery System Platform" that drug companies could pair with their medicines. SmartDose 10 Gen. II was promoted as a patient-friendly way to handle larger doses (up to 10 mL)—including higher-volume or higher-viscosity therapies—that were too large for traditional auto-injectors, and was positioned as a convenient option for longer-term treatments. However, SmartDose 10 Gen. II itself was never approved by the FDA as a standalone product. Instead, in October 2022, the FDA approved Furoscix, a loop diuretic developed by scPharmaceuticals, for the treatment of edema in adult patients with chronic heart failure or chronic kidney disease, which uses an on-body infusor built on SmartDose 10 Gen. II technology. That FDA approval applied only to Furoscix, not to the SmartDose 10 Gen. II device itself or for its use with any other drugs.

81.    In 2017, West also introduced the SmartDose 3.5 Gen. III, promoting it as a patient-friendly way to deliver medicines that were too large or thick for standard auto-injectors, with added upgrades in software, electronics, and power management. SmartDose 3.5 Gen. III came preloaded with the drug cartridge, so patients only needed to open the package and apply the device. By preloading the cartridges, West also began handling its customers' drugs during production, which reduced steps for customers, shortened turnaround times, and lowered costs, making the device more profitable for West. However, the SmartDose 3.5 Gen. III device also was never approved by the FDA as a standalone product and, as of August 2025, has not been commercially launched.

82.    CW-2 explained that SmartDose was manufactured at West's facilities in Arizona and managed through West's Operations division. CW-2 described the device as an on-body subcutaneous delivery system for medication. CW-2 worked with the customer who bought the second generation SmartDose 10. CW-2 stated that West developed the device alongside the customer, scPharmaceuticals.

83.    Throughout the Class Period, West and its senior executives repeatedly touted to investors the purportedly high margins and strong customer pipeline for SmartDose:

(a)    On October 26, 2023, Defendant Lai stated, "*we're seeing really active uptake*" for the SmartDose platform, "*[a]nd we have a very active pipeline of customers that are evaluating the platform*."

(b)    At the UBS Global Healthcare Conference on November 12, 2024, Defendant Green represented that "*the margin of this portfolio [SmartDose] is far greater than what we currently have*."

(c)     On November 21, 2024, at the Stephens Investment Conference, Defendant Reiss-Clark stated, with respect to SmartDose, that "*we certainly have a pipeline of customers that we're working with to be able to help those customers bring different treatment options to their patients*."

84.     Throughout the Class Period, analysts echoed Defendants' statements about SmartDose and repeatedly highlighted the product line as a significant growth and margin opportunity for West. For example:

(a)     On October 26, 2023, Stephens reported that West was "seeing an active uptick in interest for their SmartDose platform . . ."

(b)     On December 11, 2024, UBS reported that West "has participated in the majority of commercial drugs approved for use with wearable devices to date," and projected that the Company would "materially benefit from the scale up of SmartDose manufacturing capacity at Phoenix over the next year."

(c)     Similarly, on January 5, 2025, Wolfe Research reported that West's high-value devices segment "has exhibited significant growth over the past year driven by solid uptake of its SelfDose and SmartDose devices."

(d)     On January 8, 2025, Citi reported that West was "enhancing its Phoenix facility to support one customer's drug that already has a captive patient population," and that management believed SmartDose margins could rise to "~50% vs. 20-30% currently" with the automated line.  Similarly, KeyBanc reported on January 26, 2025, that West had begun ramping up the Phoenix site for SmartDose in the third quarter of 2024 and "expects to see margin improvement in the product line over the next year."

85.     Additionally, given Defendant Green's representation on the February 16, 2023 earnings call that HVP margins "could range anywhere between 55% to 80%," and because SmartDose was a product within the HVP Delivery Devices category, investors were led to believe that West's "flagship device" had margins equivalent to the Company's overall HVP margins of 55% to 80%. It was not until February 13, 2025 that investors learned that this HVP Delivery Device was, in fact, margin dilutive to West.

### 2.     Contract Manufacturing Segment

86.     West's Contract Manufacturing reportable segment operates as a fully integrated business focused on the design, manufacture, and automated assembly of complex devices, primarily for pharmaceutical, diagnostic, and medical device customers.

87.     This segment includes a variety of custom Contract Manufacturing assembly solutions, which use technologies such as multi-component molding, in-molding labeling, ultrasonic welding, clean room molding, device assembly, and drug handling capabilities. West manufactures customer-owned components and devices used in surgical, diagnostic, ophthalmic, injectable, and other drug delivery systems, as well as in consumer products.

88.     Contract Manufacturing customers include some of the world's largest pharmaceutical, diagnostic, and medical device companies. Contract Manufacturing components are generally incorporated into customers' manufacturing lines for further processing or assembly.

89.     West's U.S.-based Contract Manufacturing operations produce reusable insulin pens, CGM devices, and pump components for diabetes customers.

90.     The Contract Manufacturing Segment accounted for 18.7% and 19.3% of West's total net sales in 2023 and 2024, respectively.

91.     CW-2 observed that in approximately 2021 the Contract Manufacturing Segment had margins between 10% to 20%.

92.     West Contract Manufacturing facilities are located throughout North America and Europe. CW-2 explained that West owns buildings, such as in Dublin, Ireland, where Contract Manufacturing operates. CW-2 explained that West provides the buildings for the assembly of products in Contract Manufacturing; the customer owns the design and specific molding equipment, while West performs the assembly. CW-2 advised that the contracts are based on the utilization of the building space and resources, based on the volume of manufacturing. CW-2 stated that some customers could pay a penalty if there was manufacturing downtime but was uncertain if that applied to all Contract Manufacturing customers.

### a.    Contract Manufacturing Products: CGM

93.     CGM devices are wearable medical products that track blood sugar levels for patients with diabetes. Unlike traditional finger-stick tests, which provide only a single reading at one time, CGMs use a sensor placed under the skin to generate continuous data over multiple days or weeks. The information is sent to a monitor or compatible device so patients can follow trends and manage glucose levels. Some CGM devices also include alarms to warn when glucose levels are too high or too low. West has worked with pharmaceutical customers to manufacture CGM devices that the customer designs and markets.

94.     Prior to the Class Period, on December 3, 2021, Defendant Lai stated at the Stephens Investment Conference that, "over the last 10 years, [West has] really pared back consumer products" and "focused mostly on health care," including "areas that either are involved with injection or complement injection, like continuous glucose monitors for diabetes[.]"

95.     Prior to and during the Class Period, CGM devices represented a significant portion of West's Contract Manufacturing Segment, accounting for more than 20% of the Contract Manufacturing Segment's revenue in 2024.

96.     Between 2023 and 2025, the CGM space was dominated by two companies: Dexcom and Abbott, both of whom were customers of West.

97.     Dexcom is a medical device company that designs, develops, and sells CGM systems. Dexcom launched its newest generation CGM system (the G7) in the US in 2023.

98.     Abbott develops, manufactures, and sells a wide range of healthcare products, including pharmaceuticals, diagnostic systems and tests, nutritional products, and medical devices, as well as CGM. In 2014, Abbott launched its Libre CGM in Europe, and since then, Abbott has launched three versions of Libre—with the latest, FreeStyle Libre 3, receiving FDA approval in 2022.

99.     CW-3 stated that CGM was a small industry and the only two customers he knows of were Dexcom and Libre [Abbott].  CW-3 added that these were the only two CGM customers at West during his employment.

**B.      The COVID-19 Pandemic Creates a Surge in Demand for West Products**

100.    During the COVID-19 pandemic, West experienced a significant surge in demand as pharmaceutical and biotechnology companies rapidly increased their purchases of injectable components for vaccine delivery devices, prompting the Company's customers to stockpile West products for non-COVID-19 uses. This pandemic-driven spike in demand temporarily inflated West's revenues and profit margins.

101.    According to CW-8, during COVID, West's focus was on "producing as much as possible" to meet record demand for pharmaceutical vials and medical device components, particularly those tied to Pfizer's COVID-19 vaccine. CW-8 described the Scottsdale facility as "running at full steam for two years straight." CW-8 added that when he started working at the Scottsdale facility, "the warehouse was at about 150% capacity."

102.    In response to the COVID-19 pandemic, West established a global core working team—the COVID task force—whose function "was to understand the rapidly evolving market, balance customer demand and quickly build an infrastructure to support customers' requirements, all while servicing core business." The information gathered by the COVID task force regarding customer orders and demand trends was known to the Defendants. According to CW-2, the COVID task force was a direct response to COVID-related demand which was piling up.

103.    CW-2 explained that the COVID task force started in late 2020, and he joined in early 2021 and remained on the task force for approximately 18 months.  According to CW-2, the task force was run by Tom Gribbin, Vice President Global Operations.

104.    CW-2 confirmed that the task force had weekly or bi-weekly meetings and worked on order prioritization and workstreams, COVID-vaccine-related projects, and a workstream to increase West's plant capacity. CW-2 stated that all information from the Covid Task Force meetings was reported to the C-suite, though the C-suite did not attend the Task Force meetings.

105.    According to CW- 2, from approximately 2020 through 2022, West saw an influx of orders which was occurring throughout the industry. CW-2 observed that during this time, lead times for filling orders were extended, meaning the time between receiving the orders and shipping out the product was extended. CW-2 explained that West is a made-to-order manufacturing company, which means it does not stockpile products for its customers. CW-2 said customers added additional orders to build up their inventory and increased their orders to buffer themselves against West's increased lead times.

106.    CW-2 described that, in a typical year, orders could be managed through the manufacturing plants. CW-2 elaborated that, because all products were made-to-order, there was always an ebb and flow at the plants in fulfilling customer orders. During COVID, CW-2 stated

that there was a major influx of demand like a "tsunami" which pushed all available manufacturing time out in the future. CW-2 added that this tsunami caused the plants to require overtime to complete the orders.

107.    CW-2 recalled that, early in the COVID pandemic, as demand increased, West tried to track if customers were double ordering. CW-2 indicated that West created a spreadsheet tracking pre-COVID and post-COVID orders to analyze historical ordering patterns. CW-2 added that Sales and Demand Planning has access to that information. CW-2's understanding was that order data was rolled up into a summary which would have been seen at least by Reiss-Clark.

108.    Analysts later acknowledged that West's customers had mass-purchased and stockpiled inventory during the COVID-19 pandemic, and that—as was ultimately revealed—the subsequent drawdown of this excess inventory materially affected West's results. For example, *Reuters* reported, on February 13, 2025, that West's "revenues and order books have been under pressure from biotech clients depleting inventories they had built up during pandemic-era supply chain disruptions" and that "biotech clients had stocked up on inventories after facing supply chain disruptions during the pandemic and are now using existing supplies."

## C.    Customer Demand for West Products Drastically Slows in Late 2022

109.    In the aftermath of the COVID-19 pandemic, West's customers reduced their purchasing activity as they worked through the excess inventories they had amassed during the pandemic and their increased ordering patterns. Numerous CWs reported that this reduced ordering post-pandemic, together with price increases and quality and manufacturing failures, constituted negative demand drivers across West's business, of which Defendants were acutely aware.

110.    CW-8 described how West was sorting through the aftermath of "over-ordering and poor record keeping" from the pandemic production boom.  According to CW-8, when that surge tapered off, it became clear that West's books did not match what was in its warehouse. CW-8

highlighted that the warehouse chaos and system failures made it impossible to get accurate inventory data, leading to inaccurate data being distributed throughout the Company.

111.    CW-8 explained West's lingering overstock problem began as a response to supply chain disruptions during the pandemic. CW-8 confirmed that because lead times for many components stretched out to six to twelve months, West routinely over ordered materials "just in case."

112.    CW-8 labelled these inventory issues as a mix of poor planning, overreaction to supply chain fears, and a company culture that prioritized customer appeasement over operational discipline. CW-8 emphasized that the company did not want to "say no to big clients like Amgen or AbbVie."

### 1.    Customers Cancel or Reduce Orders Due to Stockpiles of Inventory

113.    According to CW-2, because customers had previously overordered and had built an unusually large stockpile of inventory, post-COVID, ordering slowed down and customers canceled or "attempted" to cancel orders which decreased West's manufacturing lead times. CW-2 confirmed that the process of customers working through their inventory build-up was called "destocking."

114.    CW-2 indicated that beginning in March 2022, as the situation during COVID began to return to normal, pockets of time opened up again to enable West plants to "pull up" or fulfill orders faster than originally anticipated. CW-2 explained what "pull forward" means in the context of made-to-order: when an order is submitted, West would tell the customer that the order could be fulfilled on a certain date depending on anticipated manufacturing, testing, and shipping time, for example. CW-2 added that, if capacity opened for any reason, West could fulfill the orders before the original anticipated completion date. CW-2 explained that, at that point, West would offer the earlier available completion date to the customer. CW-2 commented that, pre-

COVID, customers would often agree to pull their orders forward; post-COVID, however, when offers were made to pull orders forward, customers said no more often.

115.    Starting in 2022, as lead times dropped, CW-2 said the number of orders which customers agreed to pull forward declined. CW-2 observed that very few customers agreed to move up their orders when this was offered as they no longer needed the product or did not need it so soon.  CW-2 stated that these customers requested to keep the later date, and some customers wanted the fulfillment date pushed back even further, or the order cancelled completely.

116.    Regarding cancellation of orders post-COVID, CW-2 explained that customers could cancel their orders based on policies in their contracts, which permitted customers to cancel within a certain amount of time. CW-2 recalled some customers tried to cancel within a shorter time and West's response was to push the order out to be filled at a later date, rather than allowing the outright cancellation of the orders. CW-2 stated that in some cases, management allowed customers to completely cancel their order in a shorter time period. CW-2 explained that these cancellations started in 2022 and continued in 2023.

117.    Regarding the time frame of the cancellations, CW-2 stated that, by 2022, there were orders that had been placed during the pandemic with long lead times; those orders had been placed in 2021 and pushed out to 2022.  CW-2 commented that, during 2022 and 2023, as orders on the books were shipped out or adjusted, there was a period of time in which new orders were not coming in as the older orders were filled. CW-2 recounted that orders which were normally expected to come in from customers were not coming in, as those customers had built up an inventory of products, and those customers were also experiencing a drop in demand for their products as COVID waned.

118.    Regarding destocking issues, CW-3 stated that the issue was primarily customers cancelling their orders.  CW-3's understanding was that this drop was vaccine-related, as COVID waned, the orders dropped.  CW-3 advised that customers had over-ordered during COVID and didn't need additional product. According to CW-3, he observed orders consistently dropped from the beginning of 2023 throughout the remainder of 2023, and into 2024. CW-3 noted that he continued to see orders dropping at the time he departed the Company in early 2024. CW-3 also reported the rate of reduction in order volume increasing over time in 2023—meaning that the reductions in orders were accelerating.

119.    CW-3 reported that cancelled orders were coming from "everybody," meaning both generic and branded customers. CW-3 confirmed that Green and Birkett knew about the accelerating pace of order cancellations and reduced orders. CW-3 added that it was a "not a secret" and "everyone knew it" about the accelerating pace of order cancellations and reduced orders. CW-3 confirmed that, throughout 2023, orders were dropping, West was not hitting its targets and employees were not making their bonuses, as customers like Pfizer and Moderna dropped their orders. Regarding sales to Pfizer and Moderna, CW-3 explained that those entities purchased containment products such as plungers and stoppers.

120.    CW-3 explained that following the announcement of bonuses reaching only 25% of the target, Birkett held a Town Hall Meeting in early 2023 to "calm everyone down." CW-3 continued to say that "people were pissed" and during the meeting Birkett highlighted "all of this," referring to dropped orders and increased cancellations. According to CW-3, Birkett discussed missed targets and impact of COVID waning on West's business.

121.    CW-3 explained that orders and demand planning information was tracked and shared at the senior level, although he was not responsible for tracking that information. CW-3

advised that Demand Planning prepared a Customer Open Order report which included customer purchase orders.

122.    CW-3 noted that the Company publicly claimed it would grow, but CW-3 pointed out that West's business was not growing and growth had stalled.

123.    CW-8 recounted that when COVID-related demand disappeared, West was left with warehouses full of unused parts, many with expiration dates. CW-8 observed that by 2024, he was writing off significant amounts of expired materials. CW-8 commented that, by the time he left West, "I was writing off close to a million dollars' worth of SmartDose batteries." CW-8's understanding was that the Company had two years of inventory on hand.

124.    CW-8 explained that even before official cutbacks were announced, it was clear things were slowing down. CW-8 observed that production shifts were being consolidated, fewer materials were being moved through the plant, and he saw fewer transaction errors appearing in SAP. CW-8 stated that fewer transactions did not indicate that things were functioning smoothly, only that the volume of transactions was lower. CW-8 commented that the CZ product had the "most dramatic reduction" in production, from a high of three shifts to a point where shifts were being "turned off" or canceled. Towards the end of his time at West, CW-8 continued, they were running half of a shift.

> **2.      Regular Meetings Were Held Where Order Cancellations, Delays, Forecasts, and Customer Demand Were Discussed with West Executives**

125.    CW-2 learned of the customer cancellations and delays through staff meetings and other interactions with co-workers. CW-2 advised that each market unit had staff meetings where the attendees discussed quarterly sales, forecasts, numbers of orders, which orders could be pulled up (moved forward), and other issues. CW-2 noted that the staff meetings were very focused on

meeting quarterly goals, and that one or two Generic orders could swing volume significantly, thereby impacting the quarter.

126.    CW-2 explained that the staff meetings between 2022 and 2023 were attended by sales managers and regional leaders, and the meetings focused on the "cadence" of monthly sales and forecasts.  CW-2 stated that the staff meetings ran on the "SIOP" process: Sales, Inventory, Operations, and Planning. CW-2 explained that Sales provides customer demand information, and inputs that information into West's SAP system called APO, Advanced Planning & Optimization. CW-2 added that sales forecasts are rolled up every month.

127.    CW-2 added that Operations would say which orders could be pulled forward; Sales or Customer Service would then call the customer and ask if they wanted their orders pulled forward. CW-2 noted that this was standard practice whenever there was manufacturing capacity available to pull an order forward.

128.    CW-2 recalled that Birkett, Reiss-Clark, and Operations were all involved in discussions regarding pulling orders forward. CW-2 added that any communications with customers were conducted through the Commercial department, meaning Reiss-Clark's department. CW-2 added that West's Operations group held monthly meetings to discuss fulfilling orders, that is, what "goes out the door." CW-2 added that Birkett, Reiss-Clark, and Gribbin [Vice President Global Operations] knew of the activities and the roll-up numbers and what could be pulled forward from a financial basis.

129.    CW-2 explained that the Sales, Inventory, Operations, and Planning ("SIOP") process conducted a monthly demand review with West's General Manager and Sales Demand Planner. CW-2 reported that, at these monthly reviews, there was discussion of customers' forecasts, derived either from sales statistics, or, for a few customers, from the customers

themselves. CW-2 explained that from there the forecasts went to supply chain for planning. CW-2 said actual orders from the customers were evaluated and compared to the forecasts.

130.    CW-3 described meeting directly with Birkett from the start of CW-3's employment. CW-3 confirmed his meetings with Birkett occurred monthly, whenever Birkett was available, and they were held in person. CW-3 indicated many of these meetings were one-on-one strategy discussions with Birkett, because CW-3's job responsibilities included planning for, sourcing and buying raw materials. CW-3 added that Oberlee attended some of these meetings, but many were just him and Birkett, the CFO.

131.    CW-3 advised that he had conversations with Green as he did with Birkett, but those conversations were not as in-depth as those with the CFO, because he met with and travelled with Birkett more often. CW-3 indicated that he had 30-minute one-on-one meetings with Green which were scheduled by Green and Birkett, not by him. CW-3 indicated that these meetings with Green occurred throughout 2023.

132.    CW-3 also attended internal meetings within West's supply chain organization to plan for customer demand, headed by Oberlee, in which the reason given for the cancelled orders from customers was that COVID was over, demand for the customers' products had dropped, and these customers did not need products from West.

133.    CW-3 advised that there were monthly meetings at West to discuss forecasting for sales. He explained that, during these monthly meetings, customer demand reports were used so that Procurement could plan what it needed to buy to fill the orders. CW-3 recalled that, at these meetings, there were discussions about Pfizer and Moderna cancelling orders, because COVID-related demand was "gone." CW-3 added that this was important to him because he had to go back to West's suppliers and reduce West's supply orders.

134.    CW-3 explained that he learned in these planning meetings that demand started decreasing in the second half of 2022, before he joined West. CW-3 recalled being told that there had been a lot of backlog orders to fill, which was why West was expanding, but by summer of 2022, the Company was already seeing demand signals showing a decline.

135.    CW-3 advised that there was a lot of communication at West regarding forecasts. CW-3 noted that Oberlee reported regularly to Green and Birkett, and that she also worked closely with Atul Patel, VP, Devices and Delivery Systems, and Reiss-Clark. CW-3 commented that forecast information was part of the normal presentations of information to Company leadership.

136.    CW-3 confirmed that this information about forecasts was discussed at regular monthly demand planning meetings, during which they discussed orders which were cancelled and how to use the freed-up manufacturing space. CW-3 indicated that the demand planning meetings covered "everything," meaning all of West's products, including CGM, SmartDose, and other products.

137.    CW-3 noted that he also attended Operational meetings with Oberlee, who in turn reported to Birkett in his role as both CFO and COO. CW-3 explained that these Operational meetings were run by Oberlee, and during these meetings, the team reviewed annual and quarterly demand as part of their capacity planning. CW-3 confirmed that these were regular monthly meetings with Oberlee.

138.    CW-3 stated that Green and Birkett did not attend these Operational meetings, but Oberlee did, and she would report the information to Birkett. CW-3 added that he also discussed this with Green and Birkett during his monthly meetings with them. CW-3 commented that these were normal operational discussions, so everyone at West knew about these issues.

139.    CW-3 noted that sometimes related issues came up during weekly staff meetings with Oberlee. CW-3 advised that the staff meetings were attended by: (i) Oberlee, (ii) Inventory Directors, (iii) Supply Chain Directors, (iv) the Director of Demand Planning for Containment, (v) the Director of Demand Planning for SmartDose, and (vi) the Director of Demand Planning for Contract Manufacturing. CW-3 confirmed that, during these meetings, information would flow to Oberlee, who would then communicate that information to senior leadership. CW-3 explained that all Demand, Forecasting, and Capacity functions were within the Supply Chain organization and part of Oberlee's team.

140.    CW-3 also described Oberlee's separate "SIOP" (Sales, Inventory, Operational Planning) meetings in mid-2023, and a SIOP manager brought in to lead that initiative. CW-3 added that the SIOP manager was responsible for coordinating Customer Demand with Supply Chain Planning and Operations. CW-3 explained that analyzing demand is necessary to understand how much the Company needs to procure, and that SIOP was brought in to standardize the process. According to CW-3, the SIOP group met bi-weekly and was attended by the same individuals who attended the Supply Chain staff meetings. CW-3 added that he attended some SIOP meetings.

### 3.    West Executives Were Directly Informed in Spring and Summer 2023 That West's Generic Customers Had Upwards of Nine Months of Inventory Build-Up

141.    According to CW-1, in January 2023, Reiss-Clark, Chief Commercial Officer (and a direct report to Birkett) asked David Maier, Vice President and General Manager for the Generics Division at West for an inventory-build analysis for West's Generics customers, which Reiss-Clark told Maier to have CW-1 prepare because of his background in analytics.  This request came after CW-1 had informed Maier that there would be major problems with the Generics financial targets, and CW-1 asked Maier to tell Reiss-Clark about the significant risk to the targets and why. According to CW-1, Maier told Reiss-Clark, who in turn told Maier to prepare the inventory-build

analysis, which Maier then asked CW-1 to complete. CW-1 confirmed that he was assigned this task in January 2023, at which time he estimated that there would be at least a $50 million order shortfall among West's Generics customers.

142.    CW-1 began the Inventory Build Analysis in January 2023 by speaking with his Generics customers. CW-1 spoke to his customer contacts who managed inventory to gather this information including customers with whom he had previously worked as an employee. CW-1 indicated that his former employers were FK and Pfizer, and he maintained many contacts there who trusted him, and who told him that they would not be ordering for a while. CW-1 added that these customers with whom he had previously worked trusted him and gave him more granular details, which he then reported to Maier and Reiss-Clark with his concerns about orders being pushed back. CW-1 also visited customers and toured their facilities to learn about their inventories. CW-1 also spoke with peers in West's non-Generics, or Branded [Pharma], division, and factored their responses into his analysis.

143.    CW-1 explained that the information gathering and analysis covered at least ten of West's Generics customers, including its top five Generic customers: (i) Pfizer, (ii) Fresenius Kabi (FK), (iii) Hikma, (iv) American Regent, and (v) Sanofi. CW-1 spent 2-3 months gathering data and preparing the analysis. CW-1 described it as an "eye-opening experience." CW-1 added that the eye-opening part was that he finally had enough information to push back on unrealistic targets. CW-1 commented that "data doesn't lie," and the data came from customers. CW-1 stated that "you can't possibly dismiss it," but it was dismissed.

144.    CW-1 completed the inventory build analysis in March 2023. CW-1 explained that the inventory build analysis showed that, because of customers' increased ordering activity during the pandemic, the customers had an "upwards of 9-months" build-up of inventory of West

components, and for some customers it was longer, worth approximately $100 million in orders, which meant that those customers' future orders to West would be delayed or not placed during that time due to their inventory build. CW-1 added that he later learned it could be longer than that.

145.    CW-1 explained that the five customers that made up most of the $100 million revenue shortfall risk reflected in the inventory build analysis were: (i) Pfizer, (ii) Fresenius Kabi (FK), (iii) Hikma, (iv) American Regent, and (v) Sanofi. CW-1 noted that either he or his Head of Sales, North America had close ties with people at each of these companies, and those company contacts informed him or his head of sales that their companies had an inventory build-up consisting of upwards of 9 months for most components, so they would not be ordering during that time.

146.    CW-1 explained that, during COVID, generic customers put in multiple orders for the same components because they did not know if or when they would be able to get those components due to pandemic-related problems and shortages. CW-1 added that West ultimately filled those increased orders for its customers during the pandemic.

147.    CW-1 presented the Inventory Build Analysis to Cindy Reiss-Clark towards the end of March 2023 after first sharing his results with David Maier. CW-1 explained that the meeting with Reiss-Clark was a video conference, and during the conference he presented her with slides of his analysis.  CW-1 recalled that there were approximately 20 PowerPoint slides in the presentation which presented a granular level of detail for his analysis. According to CW-1, five slides were a high-level summary of his analysis for the C-suite, and five slides were for the top five customers making up the majority of the $100 million shortfall (Pfizer, Fresenius Kabi (FK),

Hikma, American Regent, and Sanofi), and five lower-volume Generics customers were also covered.

148.    CW-1 informed Reiss-Clark that there was a 90% risk or probability that the $100 million revenue shortfall would occur in 2023. CW-1 also informed Reiss-Clark that customers were saying they had upwards of 9 months of inventory, some had more. CW-1 recalled that Reiss-Clark asked him questions about the shortfall, noted that she did not have a background in analytics, and pushed him to find a way to make up the $100 million revenue shortfall, but he responded to her that he couldn't make it up.

149.    CW-1 added that the bare minimum shortfall was $50 million, but he knew it would be more.  CW-1 noted that he told Reiss-Clark that when she asked what the bare minimum risk was. CW-1 added that Reiss-Clark asked if they could use a price increase to offset the shortfall. CW-1 indicated that he had already prepared a price increase analysis and that a price increase would not make up for the shortfall that they would lose in volume.

150.    According to CW-1, Reiss-Clark was visibly upset in response to his presentation. CW-1 noted that she had wanted him to add $60 to $75 million more to his Generics revenue target, which, if added, would mean a likely $165-175 million shortfall under his inventory build analysis (the $100 million he warned her about and the $65 million Reiss-Clark hoped he'd add to the target for Generics). According to CW-1, Reiss-Clark told him he had to work harder to reach his target.  CW-1 responded that it was not possible, and provided her with the total analysis, justifying in detail his risk analysis.  CW-1 noted that the target was $750 million, and his analysis showed a shortfall risk of between $90 and $100 million, but Reiss-Clark wanted to add an additional approximately $65 to $75 million to his original target, to make the new target roughly $805 million.

151.    CW-1 elaborated that Reiss-Clark pressured him to try to sell more, including offering devices to his Generic customers to try to reach his target. CW-1 reiterated that he again gave her his inventory build analysis and told her why the goals she wanted were not possible (zero percent chance for him to add revenue above the original targets), and why trying to sell more, including devices, would not work.

152.    CW-1 elaborated that the new target was at least $805 million; it was somewhere between $800 and $900 million. CW-1 explained that the range in the target figures was because West changed its targets approximately six times that year, in part because management didn't listen to his risk analysis, and instituted price increases which he advised against. CW-1 could not recall the roughly six other targets but noted that citing a range of $800 to $900 million captured all the target changes.  CW-1 added that the strategy to offer devices to Generics customers would not work because devices are expensive, and Generics customers "don't do expensive."

153.    Additionally, CW-1 gave a presentation to the C-suite in approximately June 2023. CW-1 attended this June 2023 meeting via video conference, and confirmed that CEO Green, CFO Birkett, VP of Strategy Lai, and Reiss-Clark were all in attendance. CW-1 stated that, at this meeting, he was presenting what his numbers were for the year including risks and opportunities, which was done every year, a "couple of times a year." CW-1 stated that this was not the same risk analysis presentation that he had previously presented to Reiss-Clark.

154.    CW-1 explained that the purpose of the June 2023 meeting with the C-suite was for him to present the quarterly target projections for the Generics business for the next four quarters, compare those projections to the last four quarters, indicate what the differences were, and why. CW-1 recounted that, during the meeting, he explained why revenues in the next three quarters, at least, would be down compared to the previous year due to the inventory build-up at his customers.

CW-1 explained that his best recollection of the total revenue risk in his target forecast was about $130 to $140 million, but $100 million of that risk was due to the inventory build-up. CW-1 indicated that he had about eight different bar charts detailing why revenues would be lower quarter-over-quarter from the year before and that a significant part of that gap (of $130 million-$140 million) was due to inventory build at his customers.

155.    CW-1 stated that, in the presentation to the C-suite, he identified that the inventory build-up was the major risk, but it was clear that Birkett had not seen his prior risk analysis. CW-1 described Birkett as "shocked" at the information, and that Birkett asked how a 9-month plus inventory build could "possibly be." According to CW-1, Birkett said, at the June 2023 meeting, that he had believed the build-up was only a few weeks. CW-1 recalled that Lai asked some detailed questions at this meeting as well, while CEO Green watched but did not ask questions.

156.    After the June 2023 meeting, CW-1 said that he was not asked to update his analysis, although he offered to do so.

157.    CW-1 indicated that he compared actual revenue to projections "on a daily basis" and spoke with colleagues in Demand Planning and other divisions about this analysis. CW-1 named Kevin O'Donnell, currently Senior Director, Demand Planning, at West, as one individual whom he spoke with regularly regarding comparing actuals to projections in 2023. CW-1 advised that, due to O'Donnell's role in Demand Planning, O'Donnell met more regularly with the C-suite than he did. CW-1 added that O'Donnell supervised Demand Planning for all of West's business units. CW-1 noted that he spoke to O'Donnell and /or members of O'Donnell's team about the comparison routinely in 2023.

158.    According to CW-1, O'Donnell met with the C-suite monthly. One main purpose of CW-1's communications with O'Donnell was to assist O'Donnell with his preparations for his

monthly meetings with the C-suite. CW-1 added that O'Donnell was part of the critical path for CW-1 to get information to the C-suite and to provide him with information he needed to give guidance to the C-suite.

159.    CW-1 stated that he spoke with O'Donnell about twice a week to discuss actual sales orders versus projections, and that he asked O'Donnell to speak to the C-suite about the inventory build-up issues. CW-1 advised that he "went granular" in his conversations with O'Donnell in preparation for O'Donnell's meetings with the C-Suite, regarding which components were short, which were on target, and which were above target, as well as discussing components on hand. CW-1 added that he had that information "at the snap of his fingers." CW-1 further added that he had analysis as to why component sales were short of the target when that occurred. CW-1 indicated that he gave that information to O'Donnell and O'Donnell's team.

160.    CW-1 elaborated that he also asked O'Donnell to speak with the C-suite about the top three or four risks. CW-1 noted that he asked the four strategy leads to discuss all the risks, including customers going to West's competitors due to price increases, and other risks. CW-1 added that the issue of components on hand was a bigger part of the discussion. CW-1 noted that High Value Products were going to be prioritized by the Company, which created the risk that CW-1's division would not be prioritized for obtaining the components that it needed. CW-1 added that O'Donnell told him that O'Donnell had talked about this in his meetings with C-suite.

161.    CW-1 added that it took six months for him and his team to touch base with all of their customers and West's salespeople to gather the granular details and information needed to complete his risk analyses, but it did not matter how detailed the analysis was, as he and his team were always told they had to hit higher targets and the analysis was dismissed.

162.    CW-1 added that in the months between starting his initial analysis in January 2023 and presenting at the C-suite forecast meeting in June 2023, the customer inventory information became worse for the Generic sales order risk forecast. CW-1 reported that contacts at customer FK told him this directly. CW-1 recounted that he also heard informally from contacts at Hikma, during a tour of Hikma's facility, in the summer 2023, around the time of the June 2023 meeting, that Hikma was still working off its inventory buildup.

163.    CW-1 described how two Heads of Sales reported to him after visiting customers that they had not seen any West components at the customers' facilities, only competitors' products.  CW-1 indicated that he reported this observation to Maier, who later informed CW-1 that Maier had, in turn, reported this information to Reiss-Clark. In CW-1's view, this information should have a been a "red flag" and reason to lower targets, but Reiss-Clark's response was not to lower targets.

164.    CW-1 stated that his analysis of the revenue risk due to customer inventory build-up proved to be approximately 90% accurate based on the later comparison of actual revenue to forecast for the Generics division. CW-1 emphasized that he was very accurate in his assessment of the risk. CW-1 noted that he gave guidance to his peers in other divisions, but his analysis was "officially" only for the Generics division.

165.    CW-1 advised that he tried to show that the risks he identified applied to all the divisions, and he tried to show in his slide deck that his risk analysis was a "holistic" approach to West's risks, rather than just risks for Generics.  CW-1 added that some of his Generics customers, including Sanofi and Pfizer, were customers of West's other segments so CW-1 learned of inventory issues for those customers beyond their Generics inventory.

166.    CW-1 confirmed that by the end of calendar year 2023, he saw the shortfalls he had predicted based on his inventory build-up analysis. According to CW-1, the number one factor causing the forecast miss was the inventory buildup.  CW-1 observed that there had been a total revenue shortfall of about $400 million, and between $80 and $90 million of the shortfall was due to the impact of the inventory build-up on the Generics business. CW-1 added that there was less of an impact from inventory buildup on the Branded business, because the branded customers did not over order as much as the generics, but it was still significant.

167.    CW-1 confirmed that he met with members of West's C-suite, most frequently with Quintin Lai since Lai oversaw developing strategy at West. CW-1 advised that he met with Lai four times per year, mostly on video conference, and during those meetings, Lai "picked his brain" on marketing and strategy because of CW-1's background working at pharmaceutical companies. CW-1 added that Lai wanted to meet with him quarterly.

168.    CW-1 confirmed that, during his tenure, he met twice with CFO Birkett, in larger meetings with all or most of the rest of West's C-suite. CW-1 reported that one of those meetings occurred in the summer 2022, and the other in June 2023.  CW-1 advised that CEO Eric Green and Birkett both participated in the meeting in June 2023. According to CW-1, at these meetings, he presented his revenue targets for the Generics business and his plan to meet those targets, and that he would then highlight the risks West faced in trying to achieve those targets.

169.    Additionally, CW-1 indicated that there were two other occasions during which he met via video conference with the C-suite to assist with the executives' preparations for West earnings calls. In both cases, CW-1 was filling-in the role for his supervisor Maier, who was unavailable due to personal reasons. CW-1 stated that he filled in for Maier to help prepare before the Q4 2022 earnings call (held February 16, 2023) and before the Q3 2023 earnings call (held

October 26, 2023). CW-1 added that at other times, he prepared materials and assisted Maier in Maier's meeting with the C-suite to prepare for earnings calls; CW-1 provided Maier with spreadsheets and summaries detailing performance, with information on how and why they were falling short and other metrics. CW-1 explained that CEO Green was involved in those preparatory calls ahead of earnings releases and asked questions. CW-1 commented that Green's job was "to push back on numbers he didn't like." CW-1 recalled that he was only on one call with Green who did not direct any questions to him.

170.    CW-1 confirmed that when he presented on behalf of Maier before the Q3 2023 earnings call, he did speak to the inventory build-up and pricing issues directly, and he did set forth price and inventory risk analysis information in his presentation slides, which he provided.  CW-1 stated he had a bar graph detailing each risk, and it was "glaring" as to why the shortfall was occurring. CW-1 added that he included analysis of the actual shortfalls due to price and inventory build in his materials provided to Birkett and the other executives at the meeting.

171.    CW-1 reiterated that the inventory build-up was "absolutely" why his division did not hit its target numbers in Q3 2023. CW-1 added that roughly 75% of the forecast miss for the quarter, which was approximately $37 million, was due to the inventory build-up.

172.    CW-1 recounted that, in assisting Maier in his presentation to the C-suite before the Q1 2024 earnings call, CW-1 included information regarding the impact of the inventory build-up in materials. CW-1 added that the impact was still continuing into that calendar year.

**D.    Dexcom, One of West's Top Two CGM Customers, Informs West in Late 2022, That It Is Ending Its Partnership with West and Ramping Down Production During the Class Period**

173.    According to CW-3, before the Class Period, Dexcom informed West that it would end its partnership with West and engage a new manufacturer for its next generation products. CW-3 advised that the Dexcom contract was scheduled to be completed by the end of 2023.

174.    CW-3 recounted that when he joined West before the Class Period, it was already known within the Company that its CGM customer, Dexcom, had already started pulling business away from West. CW-3 confirmed that Dexcom's departure was well known internally at that time because plans were being made to adjust to the newly available production capacity. CW-3 indicated that there were a lot of discussions about how to use the production capacity freed up by the end of the Dexcom business.

175.    CW-3's understanding for why Dexcom decided to leave West was that the cost was too high for the customer Dexcom, and that Dexcom did not see West as a long-term growth partner.

176.    CW-3 confirmed that he had discussions with Birkett, Oberlee, Green, and Patel about not pursuing or renegotiating with Dexcom. CW-3 recalled that Patel reported to Cindy Reiss-Clark, Chief Commercial Officer, and that their focus was on negotiating new deals. CW-3 also confirmed that he had been in discussions with Green and Birkett about the margins for West's contract manufacturing business.

177.    CW-3 recalled that Dexcom had not awarded a new contract to West for its next generation product and was in the process of "ramping down" its existing production contract with West. CW-3 indicated that he received personal confirmation of this during his February 2023 visit to West's SmartDose production facility in Arizona.

178.    Additionally, CW-3 advised that he visited Dexcom's new supplier in Asia; his purpose for that visit was to look into moving West's critical electronic component production to that supplier, but while there, he saw the production lines for Dexcom's CGM product. CW-3 noted that this visit occurred in October or November 2023. Upon returning from his trip in October or November 2023, CW-3 reported out to CFO Bernard Birkett what he saw on his trip to

Asia.  CW-3 added that he also told: (i) CEO Eric Green, (ii) former VP, Global Supply Chain Emily Oberlee, and (iii) Atul Patel, currently VP, Devices and Delivery Systems, about what he saw at the supplier in Asia.  According to CW-3, they already knew about the situation with Dexcom; their reaction was that this was a "normal piece of information."

179.    CW-3 explained that West was still making products for Dexcom, per a fixed schedule, until production was complete. CW-3 recalled that during meetings he became aware that the Dexcom production was scheduled to be shut down at the end of 2023. CW-3 noted that this was "nothing new" and had been previously announced by Dexcom in 2022.

### E.    Pervasive Manufacturing and Quality Challenges with West's SmartDose Delivery Device Leads to Rising Costs and Customer Exits During the Class Period

180.    Numerous CWs confirm that, contrary to what West was telling the public, SmartDose was riddled with massive manufacturing issues that ultimately resulted in high manufacturing costs, an 80% scrap rate for component manufacturing, significant customers ending partnerships with West, and, ultimately, the product being margin dilutive.

181.    CW-6 explained that there are two different SmartDose models: the SmartDose 3.5 and SmartDose 10 (approved only for scPharmaceutical's heart failure drug, Furoscix) both of which had manufacturing and quality issues.

182.    CW-6 explained that the issues with regulatory significance involved the device's ability to pass certain safety standards.  CW-6 explained that there were standards for electrical safety, human safety, and particulate safety.  CW-6 added that the problems with SmartDose, however, were "absolutely not" normal.  CW-6 advised that there were "always challenges, but some of them were more regulatorily significant."

183.    CW-2 advised that, in its early development, SmartDose 10 had to be made by hand, so it was only feasible for West to manufacture a limited number of devices per year. CW-2 noted

that the ramp-up for wider production was very hard; many devices failed quality control. CW-2 added that, during COVID, it was also harder to obtain the electrical boards and related components for the devices. CW-2 commented that these issues raised West's costs, but due to the Company's agreement with the customer, West could not raise its price with scPharmaceutical. CW-2 recalled that, since then, scPharmaceuticals received approval for SmartDose 10 but is now phasing out the device for an auto-injector.

184.    CW-2 added that the device may have failed on the electronics side or with other device parameters. CW-2 observed that the scrap rate for the device—meaning the rate at which devices were produced but unsellable because they failed testing—was very high. CW-2 advised that the scrap rate was higher than the Company wanted. CW-2 stated that SmartDose's scrap rate was approximately 50%, meaning that about half of the SmartDose devices were scrapped. CW-2 added that that scrap rate applied only to SmartDose 10; he did not know about the scrap rate SmartDose 3.5. CW-2 recalled that these issues were occurring throughout 2023 and possibly started in late 2022.

185.    CW-3 explained that West had started working on SmartDose before he joined the Company, prior to the Class Period, but he learned that West had problems with the device "from day one" of his employment. CW-3 stated that there were design, manufacturing, supply, and quality issues from the start of the project. CW-3 commented that it was "crazy" how much scrap was generated, how much material was wasted, and how much it cost West to try to produce SmartDose.

186.    CW-3 described a "mountain" of scrap at the Arizona facility from SmartDose components that were not manufactured in accordance with specifications. CW-3 further described seeing carts full of scrap and non-working devices. CW-3 stated that when he went to the

manufacturing facility there also were "piles" of finished SmartDose devices that were not working. CW-3 explained that the scrapped and non-working devices did not yet have pharmaceuticals in them. CW-3 further commented that West was paying "crazy rates" to outside consultants to help support the SmartDose business.

187.    CW-3 described that "it [SmartDose] was a disaster," but Green and Birkett wanted to believe the SmartDose device "was the next iPhone." CW-3 discussed SmartDose problems in regular monthly meetings with Birkett. CW-3 stated that customers were leaving, SmartDose volume was dropping, and Abbvie told West that "we don't want to work with you."

188.    CW-3 explained that there were a lot of issues: SmartDose was a "disaster" and West "took its eye off the ball." CW-3 stated that Birkett's response about taking their "eyes off the ball" meant that West had only been focusing on filling contracts, rather than focusing on the cost of those contracts.

189.    CW-3 advised that customers such as Roche, Abbvie, and others raised concerns about the quality of the SmartDose product, and there was a risk that these customers would leave West due to these problems. CW-3 raised these concerns in his meetings with Birkett, during which he questioned whether it was worth it for West to keep attempting to manufacture the device in-house, because of the serious and recurring problems the Company was having with quality.

190.    In CW-6's view, West is a components company trying to make medical devices, but the Company does not know how to redesign and fix devices in an effective way. CW-6 stated that West had to redesign the entire device to fix the problems, but that solution was too expensive, so the Company would not do it.

191.    CW-6 said that West suffered reputational harm from the repeated production and quality failures with SmartDose. CW-6 observed that it was unusual for a company to move

forward with a faulty device and then try to fix it at the end of process, as West did. In CW-6's experience, most companies would not do that; instead, most companies would stop production, redesign and fix the problems with the device, and then move forward.

### 1.    Manufacturing and Quality Issues with SmartDose 3.5 and 10

192.    CW-6 explained that SmartDose 3.5 struggled with "liquid ingress" and electrical safety. CW-6 indicated that, for example, testing showed that if the device got wet, there was a risk of electric shock, which "is a no-no." CW-6 advised that, to fix the problem, West needed to do a redesign, but if the Company redesigned the device, it must re-do all of its validation and testing. CW-6 explained that re-doing its validation and testing is very costly, and West would not be able to pass those costs on to customers. CW-6 commented that it was a "very big challenge."

193.    CW-6 explained that he presented the problems and the steps needed for SmartDose 3.5 to pass the requirements and shared his findings with: (i) Dan Yates, Senior Director R&D, Delivery Systems at West, who was in charge of the entire SmartDose portfolio, (ii) the Vice President of Regulatory Affairs at West, (iii) the Senior Director of Regulatory Affairs, and (iv) a Senior Program Engineer named Sam Dauphinais.  According to CW-6, Dauphinais knew that the necessary work, including redesigns, was significant, but he could not get "buy-in" from West's Executive Leadership Team (referred to as the "XLT"). CW-6 recalled being told by Dauphinais that they needed to fix the problem some other way. CW-6 commented that they could not come up with another way and there was "no appetite" for a redesign. CW-6 stated that he and his colleagues tried to come up with solutions, but the Company never took action before he left West in September 2024.

194.    CW-6 advised that he developed information used in presentations and updates for the Executive Leadership Team (XLT).  CW-6 confirmed that CEO Green was a member of the XLT. CW-6 noted that the information he provided pertained to West's ability to comply with

regulations, status of compliance efforts, and related issues. CW-6 advised that he provided his work to the Vice President of Regulatory Affairs at West, who in turn presented it to CEO Green and the XLT.

195.    CW-5 also provided details about the problems with the SmartDose 3.5 production line. CW-5 explained that the device, along with the manufacturing equipment, were failing function testing and they were not performing the way they should, both in assembly and the final product.

196.    CW-5 provided as an example a piece of equipment responsible for sub-assembly, which assembled parts that could not pass validation. CW-5 explained that the sub-assembly equipment was a $4 million piece of equipment brought in by West's Transfer group to fix one problem. CW-5 explained that the $4 million machine West bought to improve production was supposed to take the approximately eleven components and assemble them – creating a "sub-assembly" to be moved to the next step in production – and automate the process.  CW-5 stated that the $4 million price was his recollection. CW-5 added that the operation of this equipment was intended to be transferred to him and his team once it was ready, but it failed validation. CW-5 explained that every time the equipment failed validation, the Transfer team had to go back to the machine manufacturer to fix it, requiring the machine to be shut down during that process.

197.    CW-5 elaborated that this equipment had an approximate 80% scrap rate in 2023 just for West's sub-assembly production of SmartDose 3.5 devices. CW-5 advised that he learned of the approximate 80% scrap rate, and saw it himself, in approximately June or July 2023. Because of that high rate, CW-5 concluded that other parts of the assembly were probably failing at a high rate as well. CW-5 stated that this was unacceptable. CW-5 stated that the rate was subsequently lowered but, in his view, never to an acceptable level and never to the initial targets

for scrap rate while he remained at West. CW-5 could not recall the reduced rate achieved later but maintained that the equipment never met the initial target during his tenure.

198.    CW-5 said that, based on his background in the medical device industry, he would never have moved forward with a product with a scrap rate that high and related validation problems. CW-5 confirmed that the scrap rate was very costly to West, although he could not recall the cost numbers.

199.    CW-5 explained that the 20% of the sub-assembly that wasn't scrapped was sent to his group for the next step in production toward the final product. Even for the 20% of devices that survived sub-assembly, CW-5 described that they also failed at a high rate.

200.    CW-5 indicated that West was trying to get to an 80% success rate, which in his professional opinion, was still not good enough to move forward.  CW-5 said that the success rate is the inverse of the scrap rate. CW-5 further explained, in other words, an 80% success rate is a 20% scrap rate.

201.    CW-5 confirmed that SmartDose's high failure rates were due to problems with equipment failing plus problems with employees' errors. CW-5 said that it seemed like not a single day went by without an equipment problem, and the failure rate for the approximately 16 sub-assembly stations was still far too high.

202.    CW-5 noted that he pushed back to his supervisors that the quality was not acceptable for putting a product into market. CW-5 emphasized that the process was not ready.

203.    CW-5 added that there were a host of other problems with SmartDose, including leaking tubes.  CW-5 recalled that motor failures in the device occurred at both the Tempe and Scottsdale, Arizona facilities. CW-5 commented that, "every day I go to work, there was

something new that was failing." CW-5 recalled in 2023 and 2024 that there were meetings every day about whatever failures occurred on the SmartDose line.

204.    CW-5 summarized the challenges with SmartDose production as "no throughput," meaning that there was not enough "good product" being produced. CW-5 asserted that the CFO [Birkett] and the C-suite were all aware of the problem of low throughput because they met about it during 2023 and 2024.  In CW-5's view, since SmartDose was a high-visibility project, these types of meetings would have occurred anyway, but because of the challenges the production was facing, he especially expected that these meetings would occur. CW-5's understanding was that information regarding the low throughput and high failure rate was presented at the meetings, but he did not know who put the information together.

205.    CW-4 also confirmed that there were always issues with quality events and nonconformances with the SmartDose 3.5 device. CW-4 explained that if something with the device does not meet conformance requirements, it must be documented, and corrective actions must be taken. CW-4 stated the report created as a result of a quality event was called a nonconformance report, or NCR. CW-4 elaborated that a quality event meant an issue with quality control for the device. CW-4 advised that it was not abnormal to have these issues, but what was unusual at West was that the Company took a long time to fix these problems, and so the problems piled up.

206.    CW-4 confirmed that there were defects causing products to be scrapped. CW-4 recalled that some batches of products had to be scrapped entirely. CW-4 described some having a "known defect," such as a batch with a defect in its casing, which required the operators to check each device manually. CW-4 advised that the problem involving the defective casings for the

device qualified as a nonconformance event, because the casings, which were purchased from a supplier, did not conform to West's requirements.

207.    CW-4 reiterated that under certain circumstances known defects required the plant to scrap an entire production batch. CW-4 recalled that this occurred in the summer 2023, when there was a problem with the supplier for the casing of the SmartDose device, which was not properly molded. That molding defect, CW-4 continued, forced the Company to either scrap the batch or manually check each device. CW-4 added that they may have had to re-do the entire production run. CW-4 was unsure of the cost from that defect but estimated that each SmartDose device cost West approximately $300 to make, although the precise cost varied depending on the batch.

208.    CW-4 commented that if the Company must hire outside contractors to complete necessary tasks, the Company should instead use those resources to add staff internally.

209.    One such contractor was CW-7, who was employed from approximately September 2023 through January 2024. CW-7 stated his job was to investigate defective SmartDose devices West received from customers all over the world. CW-7 said that 60-70% of SmartDose failures were due to mechanical problems. For example, CW-7 further explained, a common failure had to do with a component called a turning nut screw which was supposed to push the dose out through the syringe into the patient. CW-7 advised that he encountered roughly four to five different mechanical failure issues with the returned SmartDose devices, but the turning nut screw problem was the most common.

210.    CW-7 elaborated that the turning nut screw is a plastic screw which, when the device is activated, is supposed to turn and act as a plunger to push the medication through the SmartDose needle. CW-7 explained that it is one piece, but if it is not installed in the device or

assembled properly, then the nut screw does not move, and the drug is not delivered. CW-7 characterized this as a manufacturing problem. CW-7 added that he encountered this SmartDose problem consistently throughout his employment at West as it was never fixed.

211.    CW-7 commented that the turning screw failures were due to poor product design. In CW-7's view, the device was not thoroughly tested and should not have gone into mass production.

212.    CW-7 identified a manufacturing issue with SmartDose, which is referred to as a "cold solder." CW-7 explained that a cold solder referred to wires coming loose in the device due to faulty soldering. CW-7 noted that he did not see that problem himself, but he heard from his peers that this was a recurring manufacturing issue.

213.    CW-6 advised that SmartDose 3.5 failed an audit in April 2023. CW-6 explained that there was a failure to demonstrate "state of the art" compliance. CW-6 added that the regulations require devices to show compliance with the latest version of applicable standards. CW-6 added that if a device manufacturer cannot show compliance with the latest version of the standards, especially for safety, that it could cause major problems, so the manufacturer must bring its entire program up to standard. Failure to do so, CW-6 advised, can cause the device's CE mark (meaning its approval for sale in Europe) to be threatened.

214.    According to CW-6, West had failed the newest version of Europe's electronic safety standards by failing to show it had complied with the new standards and the regulator threatened to pull West's CE mark for SmartDose 3.5, which would have resulted in West no longer being able to sell SmartDose 3.5 in Europe. CW-6 added that West was allowed to keep its CE mark because it eventually showed that the SmartDose device passed the standard.

## 2. SmartDose 10 Only Approved for Use with One Customer; West Does Not Get FDA Approval to Sell It to Any Other Customers

215.    In regard to SmartDose 10, CW-6 said that SmartDose 10 never became commercially viable due to repeated failures to pass regulatory compliance. CW-6 confirmed that one of the standards requires that a device must be able to survive a one-meter drop and still be functional; this is called the "drop test." According to CW-6, SmartDose 10 could not pass the "drop test" for the entire time that he was with the Company (March 2022 – September 2024). CW-6 stated that when performing the drop test, which just entailed dropping the device from waist-level to see if it remained usable, the device shattered, or worse, it looked like it was still working, but it was not. CW-6 confirmed that without passing the drop test, the product could not be put into the market or paired with a drug.

216.    CW-6 elaborated that SmartDose 10 had other problems as well, which made the device "functionally unusable" for West's customers. CW-6 explained that SmartDose 10 had "no way to fail safely." CW-6 clarified that the device failing safely meant that a device failed, but in a way that the user would not reasonably believe it still worked, such as if the device shattered. An example CW-6 provided was that, after dropping the device, the device registered that a dose was delivered when it was not. CW-6 added that "failing safely" was a solution which West proposed to the FDA, and the FDA completely rejected the "fail safety" test as a standard for approval.

217.    This failure required a complete redesign of the SmartDose 10 product, which could take approximately 36 months—a delay West was unwilling to undertake. CW-6 confirmed that West was never able to sell SmartDose 10 for anything beyond the Furoscix drug.

218.    CW-6 stated that he learned of these problems mostly through internal testing at West.  CW-6 explained that West's engineering team tried to get around or rectify this problem throughout his entire employment but was not successful.

219.    CW-6 advised that he met with Yates multiple times between September 2022 and April 2024, during which he told Yates that SmartDose 10 could not pass regulatory requirements in the United States or Europe, and that if it cannot pass these standards, it cannot go to market. CW-6 confirmed that Yates reported to the XLT. CW-6 emphasized that "they knew," meaning that the XLT knew of the problems with SmartDose, which CW-6 called "their flagship device."

220.    In CW-6's view, Green and the XLT team were aware of the scope of the problems with SmartDose. As CW-6 described it, Green's actions "spoke of" an awareness of the problems because Green kept trying to fix the problems.  CW-6 recalled Green stating in town hall meetings that the Company was trying to get the SmartDose program back on track. CW-6 observed that Green added resources and personnel to try to address the problems and solve the issues, which signified to CW-6 Green's recognition that there was a problem with the device. CW-6 added that the SmartDose 10 problems were known throughout the Company.

### 3.    Massive Undisclosed Manufacturing and Quality Issues with SmartDose Lead to Costly Interim Fixes

221.    CW-3 described conversations he had with Annette Favorite, Senior Vice President and Chief Human Resources Officer, about [SmartDose] because West was engaging in "extreme, expensive" use of outside consultants and contractors, at "crazy" rates, to help work on SmartDose. CW-3 recalled discussing these practices with Favorite in approximately 2023. CW-3 indicated that he often met with Favorite when he met with Birkett and described the meetings with Favorite as sometimes formal and sometimes informal conversations.

222.    CW-3 spoke with Favorite about the use of consultants, not about the quality or manufacturing issues facing SmartDose. CW-3 characterized the use of consultants as "throwing away money" because of their high rates, including up to $300 per hour. CW-3 added that the

consultants were supposed to be fixing problems, including supply chain and manufacturing problems, but the problems remained.

223.    CW-4 added that the paperwork documenting nonconformance events piled up, causing staff to always lag behind trying to complete the documentation. CW-4 advised that he knew there was a backlog documenting reported nonconformance problems because West had to hire outside contractors to help the Quality Engineers catch up on completing NCRs. CW-4 added that the use of contractors caused friction with the full-time employees because the contractors were paid more.

224.    CW-7 was brought into West as a contractor to handle SmartDose complaints. CW-7 explained that the volume of defective SmartDose devices sent back to West caused such a large backlog that it required West to hire contractors to clear. CW-7 advised that the devices were returned to West by customers due to failed drug delivery.

225.    CW-7 stated that the Company received twice as many SmartDose devices as the team could investigate on a weekly basis, estimating that the facility received 50 to 100 devices per day. CW-7 added that he saw the same issues repeating with the devices throughout his time at West. CW-7 indicated that the contractors helped with the backlog, but it remained bad during his time at the Company.

226.    According to CW-7, when he left in January 2024, West was nowhere near clearing the backlog of SmartDose failures, and new failures kept coming in.

### 4.    West Tracked Quality and Manufacturing Issues with SmartDose

227.    CW-6 confirmed that West maintains a "massive" database of complaint data for SmartDose 3.5 and SmartDose 10 (approved only for scPharmaceutical's Furoscix diuretic) for which included customer failure reports data, such as device drive shaft failures. CW-6 added that

the database included customer-direct complaints as well as complaints from the FDA and EU regulatory bodies.

228.    CW-6 indicated that West's XLT knew about the failure data because they were required to review it and certify that they had reviewed it for the device to be re-certified. CW-6 did not know who on the XLT did so, but it would not have been all of them. CW-6 stated that it would have been someone on the XLT with the appropriate knowledge and expertise to do so, such as the CEO.

229.    CW-6 confirmed that he saw in the database a massive increase in complaints for both SmartDose 3.5 and SmartDose 10 over the course of late 2022 and 2023. CW-6 added that the trend leveled off in 2024, but it was still at a high rate. CW-6 characterized it as "well beyond an acceptable failure rate" for a quality system. In CW-6's view, the high failure rate resulted in a need to take multiple corrective actions.

230.    CW-6 noted that fixing the problems required product and field safety corrective actions of SmartDose, among other measures. CW-6 estimated that the Company was looking at tens of millions of dollars, at least, for labor, parts, equipment, and re-validating equipment, among other variables. CW-6 further estimated that the cost would rise to hundreds of millions of dollars if one factors in opportunity cost.

231.    CW-6 emphasized that these problems were not fixed, or even close to being fixed, by the time he left West in September 2024. CW-6 added that the Company was not even close to coming up with a solution to fix the problems when he left.

232.    CW-5 explained that the Tempe/Phoenix facility where he worked tracked each operation in the assembly line each day, as it was important to see if failure was due to the equipment or to operator error. CW-5 noted that daily targets were set for pushing product through

final operations, but the line consistently missed those targets due to repeated failures. CW-5 indicated that the facility was never able to meet those numbers due to failures.

233.    CW-5 stated that some failures were more costly to correct than others, such as replacing circuit boards or motors, because those components were expensive. CW-5 added that the cost of scrap increases significantly as the assembly process continued. CW-5 explained that if a defect occurred early in the build, the cost was low.  Once more components and labor had been completed, downstream scrap costs became significantly higher.

234.    CW-5 advised that the facility's management, including Jason Allen, Victor Cisneros, and Robbie Donohue all had access to daily SmartDose scrap rate reports. CW-5 confirmed that the facility tracked scrap at each operation or station in the assembly line and this data was put in a report each day. CW-5 advised that the Transfer group in Operations, as well as his supervisor, had access to all scrap data.

235.    CW-5 advised that the engineers responsible for the SmartDose equipment met daily.  CW-5 added that he reported the problems he observed, and that the supervisors who reported to him notified him and his boss, and Cisneros, and members of Donohue's team whenever equipment went down. CW-5 explained that his team would then call Donohue's team to fix the equipment. CW-5 stated that in addition to contacting Donohue's group (the "sending" team), his supervisors also notified West's manufacturing engineering group (the "receiving" team).

236.    CW-5's understanding was that either Donohue and/or Cisneros reported the production problems to the C-suite or at least higher-level management in 2023 and 2024, because the two of them were in charge. CW-5 recounted how the reporting occurred through meetings, calls, and emails. While CW-5 did not personally witness every instance, he "would be shocked"

if all levels of management did not have eyes on the issues. CW-5 explained that there was pressure on Donohue, Cisneros, and him to get the production line running, stating that they were "under the gun." CW-5 added that everyone involved, not just the individuals named above, were "under pressure, under the gun."

237.    CW-7 recalled that there were regular meetings to discuss the SmartDose failures, which he did not participate in. CW-7 observed that there were also weekly and monthly meetings to discuss what the investigative team was seeing. CW-7 described that at these meetings, issues including the number of failed units, the number investigated, and related metrics, including the numbers of devices reviewed by the contractors were discussed. CW-7 commented that the data was consistently bad. CW-7 was not part of monthly meetings which were attended by Ashlee Austin (Complaints Quality Manager), Trevor Barchus (Engineering or complaints lead), and other senior employees, but he was aware the monthly meetings occurred, as he was able to see the meetings occurring in the conference rooms.

238.    CW-7 noted that the weekly meetings which he attended consisted of contractors and full-time West employees, such as technicians or investigators, who were all working on analyzing the SmartDose failures.  CW-7 noted that the meetings were led by Austin and Barchus.

239.    CW-7 explained that he filled out electronic reports to document each of his investigations and the root causes of the failed SmartDose devices he was responsible for investigating. CW-7 recalled that the software used for the reports was Salesforce. CW-7 added that the reports were sent to the team leads who reviewed and approved the reports, which were then sent to the customer, which at the time was Amgen.

240.    CW-7 advised that he had access to the reports he prepared in Salesforce, which were funneled to the lead technicians (whose exact title he could not recall), who in turn funneled

the information further up the chain. CW-7 confirmed that the reports were ultimately sent to Amgen, the customer. CW-7 indicated that the reports were "tailor made" for the customer and were very detailed, including many photos of the devices.

241.    CW-7 confirmed that all the contractors made reports each day and those reports were sent to Austin, who was in charge. CW-7 believes West senior management was aware of the frequency of SmartDose failures considering the Company authorized payment for the use of outside contractors to help clear the backlog of device failures.

### 5.    Defendants Green and Birkett Were Directly Informed of Pervasive Manufacturing Issues and Customer Discontent with SmartDose

242.    CW-3 confirmed that he had regular conversations with Green approximately every month, starting before the Class Period up until early 2024, and during those conversations, CW-3 discussed his observations about SmartDose to Green.

243.    In February or March 2023, CW-3 made his first visit to the SmartDose facility in Phoenix. CW-3 noted that the former Director, Technical Sourcing, Devices and Components named Dan Halbert and a Vice President of Sales accompanied CW-3 on his site visit to the Phoenix facility.

244.    According to CW-3, during this visit, he met with the Lead Procurement Executive at Abbvie, regarding SmartDose. CW-3 recounted that the Lead Procurement Executive was the main contact person for Abbvie with West, and that she was "absolutely not happy with us." According to CW-3, the Lead Procurement Executive at Abbvie told him at their first meeting that Abbvie would not have stayed with West if they did not feel stuck with them. The Lead Procurement Executive at Abbvie also told CW-3 that Abbvie was very disappointed in West, that Abbvie was working on a risk mitigation plan to find a way to leave West, and that if Abbvie had an alternative, they would not be working with West.

245.    CW-3 recounted how immediately following his first visit to the Phoenix facility, he started discussing Abbvie's Lead Procurement Executive's comments and the problems with SmartDose with CFO Birkett. CW-3 also told Annette Favorite, Senior Vice President and Chief Human Resources Officer, and CEO Eric Green about Abbvie's Lead Procurement Executive's comments, adding that he had an "open relationship" with Green.

246.    According to CW-3, he suggested to Birkett the possibility of subcontracting the SmartDose product to a medical device manufacturer who could do a better job making the device. According to CW-3, Birkett rejected the suggestion claiming that medical devices were the future of West.  In CW-3's view, this was a problem, because West was not a medical device company, and it was facing problems with supply, design, and manufacture of SmartDose device.  CW-3 stated again that West tried to build it in-house, but it was not working.

247.    CW-3 advised that he had conversations with both Birkett and Green about "pulling the plug" on SmartDose prior to CW-3's visit to the production facility in Arizona in February 2023.  CW-3 also recalled a conversation, in early 2023, where CW-3 told them [Birkett and Green] that SmartDose was "like a black hole" and West was not making any money on the device. According to CW-3, he had discussions throughout 2023 with Green and Birkett where he "challenged" them to shift SmartDose production to a contractor.

248.    CW-3 stated that they had to develop a strategy and assess what they were trying to do with the SmartDose product. CW-3 added that West did not know how to make the device and again asked about using contract device manufacturers to make the product. CW-3 noted that Green and Birkett raised the possibility of licensing the technology to customers, but CW-3's response was, "license what? It [the device] is not working."

71

249.    CW-3 commented that West had big ideas and kept throwing money at the SmartDose project. CW-3 observed that target costs for SmartDose customers kept rising, because West could not lower its price on the product due to its internal production costs.

250.    CW-3 described having formal and informal meetings with Atul Patel, Vice President, Devices and Delivery Systems at West, about SmartDose throughout 2023. According to CW-3, Patel informed him that the cost to customers for the device needed to be $20 or less, but the current cost was over $100 per device due to high production costs. CW-3 pointed out that the SmartDose device was disposable, so West had to lower the cost, improve quality, and improve its production process in order to capture the market. CW-3 added that West struggled to get its costs down. CW-3 advised that he spoke to Birkett about his conversation with Patel and these issues, and CW-3 told Birkett that West did not know what it was doing with SmartDose.

251.    CW-3 indicated that he began having discussions with Birkett about sub-contracting the manufacturing of SmartDose in February 2023 before he visited West's Phoenix operations. CW-3 added that, beginning in February 2023, he also discussed the topic of subcontracting manufacturing with Green, although these discussions did not occur as often. CW-3 added that this was one of the topics he and Birkett discussed during their trip to Ireland, during which they spoke about "everything." CW-3 advised that he discussed subcontracting the manufacturing of SmartDose with Birkett until CW-3 left West.

252.    Regarding CW-3's suggestion to subcontract SmartDose manufacturing, CW-3 recalled Birkett telling him that he'd move it "tomorrow" to a subcontractor, but that it was not up to him. CW-3 added that he did not know why Birkett claimed the decision was not up to him, as Birkett was both the CFO and Chief Operating Officer for West. CW-3 advised that this conversation in which he told Birkett that West should run away from making SmartDose in-house

occurred in March or April 2023, after CW-3's visit to Arizona in February 2023. CW-3 clarified that he meant that West should run away from making SmartDose in-house, not the SmartDose device business entirely.

253.    CW-3 explained that the reason for the discussion was because he had been pulled into a meeting at West's headquarters in Exton, Pennsylvania with representatives from Abbvie which occurred in approximately February 2023. CW-3 added that "top guys" from Abbvie also participated in the meeting by phone or Zoom. CW-3 elaborated that Abbvie was unhappy and "did not trust West at all," so he was asked to join the meeting to help build trust. CW-3 explained that the purpose of the meeting was for Abbvie to pressure West to improve its quality, improve its capacity and production volume, and lower costs for SmartDose. CW-3 spoke with Oberlee "all the time" about this and other issues.

254.    CW-3 stated that he spoke with Birkett about the SmartDose issues again in approximately June or July 2023 during a business trip that the two took to Ireland. CW-3 explained that the reason for the trip to Ireland was because Birkett was finally considering using an external manufacturer with facilities in Ireland for SmartDose, so the trip was to visit potential manufacturers and check on their capabilities. CW-3 indicated that he told Birkett to work with these outside companies, because West was not capable of making the device on its own.

255.    CW-3 stated that Birkett changed his mind about using outside manufacturers for SmartDose production and decided to use them only to make the SmartDose's electronic component assembly instead of the whole SmartDose device. CW-3 elaborated that the original idea was to use these suppliers to manufacture all of SmartDose, but Birkett and Don O'Callaghan, the Vice President of Manufacturing for SmartDose, who was close to Birkett, changed their minds, watered down the scope of the contract, and hired one of the companies to make only the

electronic component assembly for the devices instead. CW-3 recalled that West ended up only sub-contracting the manufacture of the electronic component assembly used in SmartDose rather than the whole SmartDose device.

256.    CW-3 confirmed that during his tenure he had approximately three or four meetings with Quintin Lai, head of Strategy, and emphasized that Lai "knew everything" about what was occurring at West. CW-3 noted that Lai was in meetings with Green, Birkett, and other members of the leadership team, as Lai was part of the C-suite.

257.    CW-3 stated that public statements about SmartDose made by Green and Birkett, in 2023 and early 2024 were "not reflective of the facts on the ground." CW-3 characterized Green and Birkett's statements as "overly positive" while there were "all these challenges on the ground" which he observed, such as declining orders and quality issues.

### 6.    West's Largest SmartDose Customers Leave Due to Pervasive Manufacturing and Quality Issues And High Prices

258.    CW-6 explained that SmartDose had an additional six to twelve small customers, although Eli Lilly and Abbvie were the largest, making up about 90% of the SmartDose business, with the smaller customers making up the remaining 10%.

259.    CW-3 confirmed that SmartDose 3.5 customers threatened to leave West and all of them eventually did leave in the latter half of 2023, except for Abbvie. CW-3 stated that, in general, "customers were leaving left and right" during 2023, including Roche and others.

260.    CW-3 added that Abbvie personally informed him that if they had any other options, they would no longer work with West. CW-3 elaborated that Abbvie told him they stayed because their product had already been approved by the FDA with the SmartDose device, but they were looking for a way out of their deal with West. CW-3 confirmed that Abbvie had its own employees on site in Phoenix for quality control on SmartDose manufacture. CW-3 described the

customers' employees as "SWAT" teams" who were "living, visiting, auditing, and monitoring" at the Phoenix production facility because they had no confidence in West's ability to make the product.

261.    CW-3 recalled that Roche, and others were other customers that left West in the latter part of 2023.  CW-3 confirmed that these customers left West because of the ongoing quality problems with SmartDose, along with concerns about significantly higher costs for SmartDose because of the manufacturing and quality control problems.

262.    Regarding demand for SmartDose, CW-6 explained that the number of customers for SmartDose 3.5 and 10 dropped off.  CW-6 indicated that there was a lot of marketing and deals predicated on moving forward with SmartDose 10, but the failures with that device led to many customers moving away from West to its competitors for on-body delivery systems.

263.    CW-6 noted that West had partnerships with drug manufacturers Eli Lilly, Abbvie, and others to package their drugs with West's SmartDose delivery device to enable patients to administer medication at home. CW-6 advised that these were multi-year contracts to package the drugs with the SmartDose device.  Because of the problems with the device, West had to periodically go back to its partners and request delivery extensions under the contracts. CW-6 estimated that these cost West's partners "billions" since they could not bring the combination product to market, which, again, was because SmartDose 10 failed the drop test and needed to be redesigned.

264.    CW-6 indicated that Eli Lilly and Abbvie terminated their partnerships with West due to the SmartDose 10 failures. CW-6 recalled that Abbvie left in approximately 2023 and Eli Lilly left in early 2024.  CW-6 reiterated that those two companies were the largest SmartDose

customers. CW-6 characterized their departure as a "massive loss" to the Company - amounting to approximately hundreds of millions of dollars in lost revenue.

265.    CW-6 advised that there were "threats" or signals of softening demand for SmartDose throughout 2023, because West kept telling customers that it was taking longer, the device kept failing, and West had to keep asking for more time. CW-6 recalled that there were "hard conversations" with Abbvie about the delays, which led to Abbvie getting "fed up" and dropping West in 2023.  CW-6 recalled that the conversations with Abbvie began in late 2022.

266.    CW-6 noted that West could not get another drug company to partner with it for SmartDose. CW-6 reiterated that SmartDose is a combination product, an on-body delivery system plus the medication it delivers, so without a drug to sell with SmartDose, the device is "useless." CW-6 observed that it was "like a stapler but you can't get staples."

267.    CW-1 stated that Amgen, a SmartDose customer of West, issued a statement telling patients not to use SmartDose to deliver the Amgen medication—in part because of cracks in the devices, offered refunds to its customers who had SmartDose, and provided them with a different injector. CW-1 spoke with his personal contacts at Amgen who informed him that Amgen was walking away from SmartDose due to its 50% price increase, while Amgen was publicly blaming safety problems for discontinuing use of SmartDose. CW-1 confirmed that SmartDose did have safety problems.

268.    Similarly, CW-8 recalled a decline in SmartDose production in 2023 as its key customers, Amgen and Abbvie, scaled back. CW-8 advised that Amgen, once a major customer, decided not to renew its SmartDose contract sometime around mid-2023, though employees on the operations side did not hear about it until months later. CW-8 explained that the production pipeline is approximately 6 to 12 months long, so customers would leave or not renew contracts

roughly 6 to 12 months before leaving entirely and the existing production orders are completed. CW-8 recalled being told to start scrapping large volumes of Amgen-branded SmartDose covers.

269.    CW-8 noted that Abbvie remained active a bit longer but began winding down its orders throughout 2024, leaving SmartDose production at roughly "half a shift" by year's end. CW-8 advised that a handful of smaller customers, such as Xeris, continued to place limited orders, and that Abbvie continued placing limited orders for SmartDose 3.5 for its drug Skyrizi.

270.    CW-4 also confirmed that some SmartDose customers dropped West because of the Company's failure to meet production deadlines. CW-4 stated that the accumulation of problems with production led to customers dropping West, and that the plant management acknowledged the loss of customers. CW-4 added that a decrease in production was a sign of customers leaving, but the loss of customers was disclosed in staff meetings in late 2023 or early 2024.

**7.    West's Attempts to Automate the Production of SmartDose Fail Miserably During Class Period**

271.    CW-5 stated that he was brought in by West in March 2023 to serve as its Value Stream Manager for the new SmartDose production line. CW-5 explained that there was already a SmartDose production line in operation at West's Scottsdale facility, but that production line was all manual. CW-5 noted that manual production was more successful in meeting product specifications and quality control, but it could not generate the volume of production that West wanted.

272.    CW-5 advised that the sub-assembly section of the new production line was supposed to be fully automated, and that he tried to "turn over" the operation which was not passing validation testing. CW-5 commented that the Company kept pushing to get the line running, and

he kept pushing back that the production line was not ready. Eventually, in February 2024, CW-5 left West in frustration.

273.     CW-3 described how the Company's then-CTO, Silji Abraham, was developing robots and automation to automate the SmartDose manufacturing process, and that Abraham suggested licensing the automation process to customers. In CW-3 view, this was a "fool's dream," as he reiterated that there was nothing to license, since the device was not working.

### F.    Defendant Reiss-Clark Was Informed, in March 2023, That Raising Prices on West Products Significantly More Than West's Historical Annual Price Increases Would Lead to Additional Customer Exits

274.     CW-1 conducted a price increase analysis in early 2023. CW-1 explained that West's price increases generally were very limited because they drew pushback from customers. CW-1 said that in March 2023, the Company proposed global price increases due to increasing energy costs in Europe. CW-1 confirmed that more than 50% of Reiss-Clark's efforts to bridge the revenue gap was through price increases.

275.     CW-1 explained that the price analysis included a price increase as part of the budget; usually, the budget factored in a standard price increase of 3%. In this case, West's proposed price increase was 10%. CW-1 clarified that the price increase depended on the component, with most increases ranging from 8% to 10%, so that when the increases were "rolled up," it was a 10% increase. CW-1 added that SmartDose's price was to be increased by 50%.

276.     CW-1 advised that his price analysis showed that a 10% price increase was a mistake notwithstanding rising energy costs because of the greater risk of lost orders and customers fleeing to West's competitors from the proposed increase. CW-1 stated that the Generics industry is very price sensitive.

277.    CW-1 explained that the price analysis that he prepared and presented in March 2023 showed a $50 million risk due to the proposed price increase (on top of the inventory buildup risk he also identified).

278.    CW-1 presented his price increase analysis to David Maier and then to Reiss-Clark, in approximately March 2023. CW-1 recalled that this meeting was a video conference for him, but Maier and Reiss-Clark were together in person. CW-1 could not recall the exact date of the meeting, but it was around the same time as the inventory build-up analysis meeting with Reiss-Clark in March 2023.

279.    CW-1 recounted that, when he presented his price increase risk analysis to Maier and Reiss-Clark, Reiss-Clark was "horribly angry" at the analysis, because she was responsible for declaring the target numbers which they would hit.

280.    CW-1 stated that he told Reiss-Clark to raise prices by a maximum of 3%, not the 10% price increase planned, because West's closest competitor increased their prices by only 2.5%. According to CW-1, Reiss-Clark argued that West's competitors might have another price increase later in the year and he responded by asking, what if they don't? CW-1 noted that he was right, commenting that West's competitors had never had two price increases in one year.

281.    According to CW-1, Reiss-Clark pushed back on his price increase risk analysis by saying that Generics customers are price sensitive, but the rest of West's customers are not. CW-1 indicated that he disagreed, stating that non-Generics customers are less price sensitive than Generics, but they are still price sensitive.

282.    CW-1 indicated that he discussed his pricing analysis with other VPs and Senior Directors at West, although he did not have any direct conversations with the C-suite about this analysis. CW-1 named Jason Mattia, then Senior Director, Product Management, and currently

Senior Director, Technical Product Management and Scientific Communications; and Bill Matakas, then Vice President, Product Management, Elastomer and Container Closure Components, and currently Vice President of Business Transformation, as two of the people with whom he spoke about his pricing analysis. CW-1 recalled that his conversation with Matakas occurred in approximately July 2023, in-person, over lunch at the West café in Exton, PA. CW-1 indicated that Matakas reported to West's Chief Commercial Officer, Reiss-Clark and someone else whose name he could not recall.

283.    CW-1 reported that the price increase went through anyway and West lost customers as a result. CW-1 commented that his price analysis ultimately proved correct. CW-1 added that, in late 2023, West's price increases were at least triple its competitors' price increases. CW-1 noted that by the time the price increase was implemented, energy costs in Europe were not as high as they had been, but West implemented the price increase anyway. CW-1 added that, historically, West implemented one price increase per year, typically at the end of the 3rd Quarter or start of the 4th Quarter, after "marinating" on it for months. CW-1 recalled that Q3 2023 (ended September 30, 2023) had the largest miss, which he estimated was $37 million. According to CW-1, the number one factor causing the forecast miss was the inventory buildup; the second biggest factor was the price increases by West in late 3rd Quarter or early 4th Quarter 2023.

284.    CW-1 stated that his price analysis only covered the Generics business, but he and his peers in other segments at West talked with each other about business. CW-1 advised that the price risk started being reflected in business losses in 2024, due to the time it takes for a customer to switch to a different manufacturer.

285.    CW-1 explained that it can take one to three years for a customer to transition away from a supplier because there are stringent requirements for validation and compliance with FDA

regulations, including verifying new components, before a new supplier can be approved, so West is still seeing some loss of business "as we speak." CW-1 added that it did not happen before he left as the validation process takes too long. CW-1 stated that his customer contacts at his former employers had told him that the price increase was the last straw and they had already begun the validation process with West's competitors.

286.    CW-1 noted that his contacts at FK told him, in approximately October 2023, that West's prices were 63% higher than its competitors, and because of that, FK was leaving West as soon as possible. West's price increase was implemented in August 2023 and was companywide. CW-1 recalled that West instituted a 50% price increase on the SmartDose device, which West claimed was due to higher energy costs and COGS, but which was due in part to West's increased manufacturing costs.

287.    CW-1 confirmed that he heard complaints about the price increase from customers all over the world, including Canada and Spain. He noted that West is an old company which had developed a "dangerous" mentality that it did not have any real competitors. CW-1 explained that West dismissed its competitors, such as Aptar and Datwyler, as not having sufficient capacity to compete effectively, but those competitors had been building up their production capacity.

288.    CW-1 added that his price increase analysis proved to be accurate.CW-1 commented that he saw several large customers "pull back" from West by 2024 due to the price increases. CW-1 confirmed he spoke with his personal contacts at Amgen who informed him that Amgen was walking away from SmartDose due to its 50% price increase. In CW-1's view, Amgen discontinued SmartDose because of safety concerns as well as the significant price increase. CW-1 cited FK and Merck as other customers who told him that West's price increase was the last

straw, and if he couldn't do anything about the price, they were leaving West. CW-1 noted that Amgen and Merck had both Generic and Branded business with West.

289.    CW-1 indicated that he "absolutely" knew that customers switched away from West because of the price increases because he was told this by his friends and contacts at those customers.

290.    CW-1 added that the decision to move away from West applied not just to existing products but also for drugs in those customers' pipeline – that is, future drug delivery products. CW-1 added that, for example, none of the anticipated pipeline drug orders from FK came through, although those anticipated orders had been factored into West's multi-year strategic plans.  CW-1 estimated that the impact of the loss of orders for those new molecule products was in the tens of millions of dollars. CW-1 explained that "new molecule" means a new drug to the market, either an add-on to an existing molecule or drug for a company (such as in the generics space) or a brand-new drug.

291.    CW-1 elaborated that the $50 million loss risk he identified in his March 2023 price increase analysis "trickled in" over one year or so due to the time it took for customers to switch manufacturers.

292.    CW-1 explained that his $50 million pricing risk analysis was his estimate for the impact on the Generics business only. CW-1 noted that approximately $10 million of that risk "hit" in 2024, with the rest yet to come. CW-1 added that based on his conversations with his contacts at FK and comments from others in the pharmaceutical industry, he estimated an additional $50 million in lost orders from customers switching to competitors.

293.    CW-1's understanding was that there was a massive price increase in the Biologics side of the business as well, so he believed that that division also lost business due to the price

increase. CW-1 noted that, based on his contacts in the industry, West lost an additional $10 million in orders from Sanofi and Pfizer in its Generics business during 2024 and 2025. CW-1 further noted that Sanofi and Pfizer had a much larger Branded business with West. CW-1 understood that that the Branded business was also impacted by the large price increases, but he did not have specific details for that side of the business. CW-1 added that there were price increases in the High Value Products (HVP) side of the business as well, which involves multi-billion-dollar drugs in the Branded space; those customers use higher quality components and are less price sensitive than Generics customers.

### G.    The 20A Defendants Engaged in Insider Trading in Violation of §§ 10(b) and 20A of the Exchange Act by Selling $27,009,679 Worth of West Common Stock While in Possession of MNPI

294.    West's Securities Trading Policy applies to all officers, employees, and directors of West.  It prohibits trading West stock based on inside information:

> Employees and Directors who are in possession of Material Non-Public Information[3] cannot buy or sell the securities of the company to which the information pertains until such time as that information has been made public. Employees and Directors are also under a duty not to disclose Material Non-Public Information to: (i) anyone within the Company whose jobs do not require them to have such information; or (ii) to anyone outside the Company, including family and friends.

> If an Employee or Director is in possession of Material Non-Public Information concerning West or a company with which West does business, that person may not buy or sell the securities of West or that company until such time as that information has been made public and only then after the passing of two (2) full trading days from the date such information has been made public.

---

[3] West's Securities Trading Policy defines "Material Non-Public Information" as "information that, if known by the public, could reasonably be expected to have an effect on the price of publicly traded securities of West or the securities of companies with which West does business."

295.    Likewise, West's Securities Trading Policy prohibits "tipping":

Directors, officers and other Employees may be liable for communicating — or "tipping"— Material Non-Public Information to any third party regarding the Company (or any vendor, supplier or customer of the Company) or to whom a Director, officer or other Employee has made recommendations or expressed an opinion on trading in the Company's securities based on such information ("tippee"). Further, insider trading violations are not limited to trading or tipping by Insiders. Persons other than Insiders also can be liable for insider trading, including tippees who trade on Material Non-Public Information tipped to them and individuals who trade on Material Non-Public Information which has been misappropriated.

Tippees inherit an Insider's duties and are liable for trading on Material Non-Public Information illegally tipped to them by an Insider. Similarly, just as Insiders are liable for the insider trading of their tippees, so are tippees who pass the information along to others who trade. In other words, a tippee's liability for insider trading is no different from that of an Insider. Tippees can obtain Material Non-Public Information by receiving overt tips from others or through, among other things, conversations at social, business or other gatherings.

296.    West's Securities Trading Policy provides designated trading windows during which Company insiders may execute trades in West securities.  However, even so, "[t]he existence of an open Trading Window is not a safe harbor protecting Directors or Continuing Insiders from charges of unlawful trading if the Director or Continuing Insider possesses Material Non-Public Information at the time of the trade, even if made during a Trading Window."  Further, the policy makes clear that "[n]o one in possession of Material Non-Public Information should trade in the securities of the Company or any third party until the information has been made publicly available or is no longer material."

297.    West's Securities Trading Policy placed the 20A Defendants on notice that trading while in possession MNPI was prohibited.

298.    The 20A Defendants sold stock at suspicious times throughout the Class Period. *See* App'x A.  At the time of their insider sales, the 20A Defendants were in possession of MNPI concerning the demand and margin issues facing the Company.  For example, when the 20A Defendants sold stock in August 2023, they were already aware of declining customer demand and bloated inventory levels at certain customers, which would cause those customers to postpone or cancel product orders for upwards of three quarters or more.  The 20A Defendants were also aware of other negative and nonpublic demand information (*see supra* ¶¶109-293).  They likewise knew of significant margin-related problems, including serious quality and manufacturing issues with SmartDose and other negative and nonpublic margin information (*see id.*).

299.    Thus, the 20A Defendants' insider sales violated Section 10(b) of the Exchange Act because they traded while in possession of MNPI and had a duty to disclose such information or abstain from trading.

300.    Specifically, the 20A Defendants had a duty to publicly disclose the MNPI they possessed before executing their trades in August 2023, or to refrain from trading altogether.  They did neither and therefore they violated Sections 10(b) and 20A of the Exchange Act.

## VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

301.    Plaintiffs allege that the statements identified in ***bold and italics*** within this section were materially false and misleading because, among other reasons, they omitted to disclose material information that Defendants knew or were reckless in not knowing.  As alleged herein, such statements artificially inflated or artificially maintained the price of West securities and operated as a fraud or deceit upon all persons and entities that purchased or otherwise acquired those securities during the Class Period.  Because Defendants chose to speak on the issues described below—and thereby put these subjects into play—Defendants had a duty to fully, fairly,

and truthfully disclose all material facts and information regarding these issues. As detailed below, Defendants created a materially false impression of the state of affairs at West that differed significantly from reality.

### 1.    February 16, 2023: 2022 Financial Results

302.    On February 16, 2023, the first day of the Class Period, West filed a press release with the SEC on Form 8-K, signed by Defendant Birkett, announcing the Company's financial results for the fourth quarter and full year of 2022 (the "Q4 2022 Earnings Release"). In that release, West reported net sales of $708.7 million for the fourth quarter and net sales of $2.887 billion for the full year, which "exceeded [analyst] expectations across the board." The Q4 2022 Earnings Release further reported that net sales in the Proprietary Products Segment were $584.8 million, while net sales in the Contract Manufacturing Segment were $123.9 million. West also provided guidance for the fiscal year 2023, projecting net sales in the range of $2.935 billion to $2.960 billion.

303.    Additionally, on February 16, 2023, West hosted its fourth quarter 2022 earnings call (the "Q4 2022 Earnings Call"). On the Q4 2022 Earnings Call, Defendant Green touted strong growth and demand from West's existing customer base driven by a "**_very, very healthy growth profile of the higher end of HVPs._**" Green further stated:

> Excluding COVID-19, we estimate that our base organic sales growth was low-double digit, with mid-teens growth in proprietary products. ***And driving this base growth is demand for our high-value product offerings both legacy as well as recently launched drugs.*** And we ended the year with a return to growth in Q4 in Contract Manufacturing.
>
> *       *       *
>
> ***Looking ahead, we remain well-positioned with the right growth strategy around execute, innovate, and grow. Our solid order book of committed orders reinforces the criticality of West components and devices to address our customers' growing injectable drug***

*demand, and we continue to deploy capital investments to support the increase in demand driven by attractive end markets.*

304. Green also highlighted:

[W]hen I look at the order book versus pre-pandemic, and then strip out the COVID piece, *overall, it's a net increase from where we were at that point in time. When you look at the composite of the growth of that order book, it is really driven by our high value products, and particularly, the higher end of HVP.*

305. During the question-and-answer portion of the Q4 2022 Earnings Call, securities analysts questioned Defendant Birkett about the Company's Contract Manufacturing performance. In response, Birkett touted strong demand from West's existing customer base. Specifically, the analyst's question and Birkett's response were as follows:

Q: Jacob Johnson, Stephens: Got it. Thanks for that. And then on contract manufacturing, nice to see you return to growth there, uptick in revenue in the quarter, I think gross margin was down sequentially. Can you just hit on what drove both? And maybe related you're pointing to, I think pretty robust growth in 2023 where there's some investments you're making for this year and kind of again, along those same lines, what's driving the growth in that business in 2023?

A: Defendant Birkett: Yeah, I think, as you'll remember when we were talking through 2022, a lot of the challenges we faced within contract manufacturing was really around one customer mainly, and a shift in their business. And so, as that kind of have tailed off towards the back end of the year, it allows us to be able to return to growth. Then *we actually saw demand increase from our existing customer base, probably a little bit ahead of where we would have anticipated going into the fourth quarter. So that was again positive to see and what we would expect as we move into 2023 that we will be seeing mid-single-digit growth for our contract manufacturing on our existing business and then layering in with new business at the same time. So, we continue to make some investments in that area.*

306. Defendants' Demand Statements in ¶¶303-05 were materially false and misleading when made in that they failed to disclose the following adverse facts, which were known to or recklessly disregarded by Defendants: (i) prior to the start of the Class Period, West's customers

had built up unusually large stockpiles of inventory of West products; (ii) overordering caused customers to delay placing new orders for West's products and to cancel existing orders beginning in late 2022 and onward; and (iii) West was aware, prior to the Class Period, that a major Contract Manufacturing customer, Dexcom, was leaving its partnership with West and was in the process of phasing out its production of its CGM devices with West.

307.    Additionally, information from former West employees confirms that, as of February 2023, Defendants failed to disclose the following adverse facts, which were known to or recklessly disregarded by them:

(a)    Because customers had previously overordered West product and built up unusually large stockpiles of inventory, demand slowed substantially in 2022 and continuing onward, with customers delaying or canceling orders for several quarters (CW-2 ¶¶105-07, 113-17; CW-3 ¶¶118-123; CW-8 ¶¶110-11, 123);

(b)    Starting in 2022, the number of customers that agreed to "pull-forward" their orders—meaning that when West offered to fulfill customer orders earlier than originally scheduled—declined because they no longer needed the product or did not need it as soon (CW-2 ¶¶114-15);

(c)    Customers were requesting to push back delivery dates and were canceling orders altogether (CW-2 ¶¶113-17; CW-3 ¶¶118-22);

(d)    Orders that were normally expected to come in from customers were not coming in due to the buildup of inventory and drop in demand (CW-2 ¶¶113-17);

(e)    Prior to the Class Period, it was known internally at West that Dexcom, a CGM customer of West, was not renewing its partnership with West and had begun withdrawing its business from West (CW-3 ¶¶173-79);

(f)    One of the reasons Dexcom decided to end its partnership with West was because West's cost was too high (CW-3 ¶175); and

(g)    By February 2023, West's production facility in Arizona was in the process of shutting down the production of Dexcom products (CW-3 ¶¶173-79).

308.    On the same Q4 2022 Earnings Call, on February 16, 2023, Defendant Green touted the Company's margin expansion, stating:

> *[West's] expected margins for this year are significantly above pre-pandemic 2019 levels. This underscores the strength of our financial construct with annual margin expansion of 100 basis points or more per year.* In 2019, we posted operating margin of 16.1%. *In 2023, we expect operating margin of 23% to 24%, which would represent an increase of approximately 800 basis points over a four-year period . . . as you can see from our guidance, we see continued base momentum in 2023, and we're planning for further additional growth as our customers are preparing for expanded success of their current biologics portfolio and drug launches.*

309.    A securities analyst from Jefferies asked about the Company's margin performance, and Defendant Birkett responded:

> [W]ith regard to your question on margin, it's not as simple as one product coming out and another product going in. So we're looking at it where there's a mix impact, obviously, with the COVID revenues falling off and they have been higher-margin products. And we've also got the impact of inflation on our cost base. So you've got those two headwinds. *And then as we alluded to – or we talked about earlier is the increase in price that we're seeing is above what we would normally see in our business. So that helps offset some of this margin pressure.*
>
> And then we have very specific cost initiatives within our business, both from an operations manufacturing perspective and then on SG&A and R&D, really looking at cost control and cost management, and that is delivering a number of efficiencies for us. So it helps us to overcome some of the margin challenges, but not all of them. *And then that goes back to the point earlier, we're not actually – margin is not stepping back to pre-COVID levels. We're maintaining or holding on to a lot of the improvements that we made or the gains that we made.*

89

310.    Defendants' Margin Statements in ¶¶308-09 were materially false and misleading when made in that they failed to disclose the following adverse facts, which were known to or recklessly disregarded by Defendants: (i) the HVP SmartDose device was riddled with significant manufacturing and quality issues; (ii) SmartDose customers threatened to leave and end their partnerships with West due to the persistent and unresolved quality and manufacturing problems; and (iii) West's substantial expenditures to fix defective equipment and hire a legion of outside contractors to attempt to remediate SmartDose's manufacturing and quality issues materially increased SmartDose manufacturing costs and eroded SmartDose's profitability and margins.

311.    Information from former West employees confirms that, as of February 2023, Defendants failed to disclose the following adverse facts, which were known to or recklessly disregarded by them:

(a)    SmartDose was plagued with serious issues, which started before the Class Period, including "design, manufacturing, supply, and quality issues from the start of the project," resulting in a "mountain" of scrap and "piles" of nonworking devices (CW-3 ¶¶185-89);

(b)    From late 2022 into 2023, there was a significant increase in product complaints recorded in the complaint database for SmartDose 3.5 and SmartDose 10 (CW-6 ¶226-29);

(c)    SmartDose customer Abbvie threatened to leave the Company due to the quality and costs of the device (CW-3 ¶¶244-45, 253, 261);

(d)    West was "throwing away money" on outside contractors and consultants that were hired to help address the recurring quality issues and nonconformances with SmartDose, and, yet these efforts failed to resolve the underlying problems, which persisted (CW-3 ¶¶221-22; CW-4 ¶¶223; CW-7 ¶¶224-26); and

(e)    West was unable to effectively fix SmartDose and was unwilling to redesign the device, even though such redesign was necessary to address the systemic defects (CW-6 ¶¶190-93, 215-20).

312.    As a result of Defendants' misrepresentations and omissions on February 16, 2023, West's stock price was artificially inflated and/or artificially maintained.

313.    Securities analysts reacted favorably to Defendants' statements and West's Q4 2022 financial results.  On February 16, 2023, analysts at Deutsche Bank published a report, before the Q4 2022 Earnings Call, and stated that "[i]t appears that West brought online some of its pending HVP capacity expansions sooner than expected."  The Deutsche Bank analysts further stated that "[West] stock (+19%) has outperformed the S&P 500 (+8%) year-to-date; however, we expect the market to digest the initial guidance favorably."

314.    Similarly, analysts at Morningstar published a report on February 16, 2023, and stated that "our projections incorporate mid-single to high-single-digit revenue growth based on demand trends and our confidence in West's reputational expertise, especially in its proprietary products business."  The Morningstar analysts also proclaimed: "Biologics and biosimilars, specifically, remain a strong growth space for West and its new drug launches. Our assumptions around operating margins are unchanged in our long-term projections, and we are pleased to see West's capital expansion plans to meet growing demand globally for HVP components."  Finally, the Morningstar analysts praised West: "Our confidence here is reinforced by the company's increased injectable drug demand and order book of committed orders."

315.    The next day, on February 17, 2023, securities analysts at Jefferies published a report, stating that "we believe the long duration of HVP mix shift will sustain mid-to high single-digit proprietary product growth."

316.    Similarly, securities analysts at William Blair published a report on February 17, 2023, and stated that "heading into 2024 West is a faster growing, higher-margin business than pre-COVID—a profile driven by sustainable end-market trends (most notably biologics and the shift to high-value products) and the company's competitive position."

### 2.    <u>March 14, 2023:</u> Barclays Global Healthcare Conference

317.    On March 14, 2023, Defendant Green participated in the Barclays Global Healthcare Conference.  During the conference, Green discussed the impact of the COVID revenue decline and the Company's ongoing organic growth, stating:

> ***We have a very healthy participation in all areas.*** As you know, an injectable space is roughly around low-single-digit volume growth. ***The fastest growth of the injectable space is around biologics, and our participation rate in biologics is extremely high.*** And as you think about whether it's the innovative biologic for biosimilar, we view that as consistent, our value proposition is very, very similar. And to think about our participation in biologics and what has resulted is that in the last five years, we've gone from about 20% to 40% of our revenues are generated by the biologic space.
>
> ***If you think about the number of BLAs, pipeline and our participation in the pipeline as it comes out to be commercial, we're in a very strong position to continue to have accelerated growth top line of our business. And we're also driving, what we call, high value product portfolio and it has taken customers on a journey from the lower bottom section of the chart all the way to the upper right.***
>
> \*   \*   \*
>
> What you'll find is that during that period of time, there was a margin expansion that naturally through mix shift that occurred. As we think about specifically, we mentioned on the February call that COVID was about $388 million of our business in 2022 and we estimate, at this point in time, about $80 million, $85 million will be COVID. So, you can see a headwind of about $300 million and ***we're projecting growth in 2023, organic growth, in 2023 a number of initiatives that we've launched, a number of the demand-pull effects of the non-COVID business that we can see here continues to grow quite well. And we anticipate that continue on.***

318.    Defendants' Demand Statements in ¶317 were materially false and misleading when made for the reasons set forth in ¶¶306-07.

319.    During the Barclays Global Healthcare Conference, Defendant Green discussed the Company's wearable devices:

> As we think about new drugs, biologics and some other unique molecules and small molecule areas, we're pushing – we're discussing with our customers around NovaPure. We're proceeding the market with around NovaPure with higher end of the trajectory of this portfolio. ***And we're also now getting involved with devices and these devices we have for last several years we have now wearables for combination devices with wearables which is exciting as you think about the smart shift between IV to subcu. We're in a very good position to support that transition and for our customers and ultimately the experience of the patient***

320.    Defendant Green further discussed margin expansion, stating:

> ***So, as we go forward and continue to the market, around the fastest areas of injectable medicine, where we believe that we'll continue to able to leverage our organization with a mix shift and other initiatives like automation, pricing, gives us continued expansion on margin here at West. . . . We have more opportunities ahead of us. I'd say early on in the automation journey and we're excited that this is an enabler for us to support our customers and mitigate risk of their supply chain and continue to appreciate the high participation rate in all different areas of biologics, generics and pharma.***

321.    Defendants' Margin Statements in ¶¶319-20 were materially false and misleading when made for the reasons set forth in ¶¶310-11.

322.    Additionally, former West employees confirm that, as of March 2023, Defendants failed to disclose the following adverse facts, which were known or recklessly disregarded by them:

> (a)    Not a single day went by without an equipment problem for SmartDose (CW-5 ¶201); and

(b)    The sub-assembly section of the new production line for SmartDose could not pass the validation testing that was required to become fully automated (CW-5 ¶¶271-72).

323.    As a result of Defendants' misrepresentations and omissions on March 14, 2023, West's stock price was artificially inflated and/or artificially maintained.

### 3.    March 22, 2023: KeyBanc Life Sciences and MedTech Forum

324.    On March 22, 2023, Defendants Green and Birkett participated in the KeyBanc Life Sciences and MedTech Forum.    During the question-and-answer portion, Green touted the opportunities to come with the shift from manual to automated production lines, stating:

> And one area I'm actually quite excited about is around automation. We've been talking about this. We've been moving in that direction. ***And I believe you see one of our plants with some of that automation installed, but we continue to have opportunities to invest further around automation, give us more higher quality, better safety, better yield and actually, better productivity of our cost base. So a lot more to come[.]***

325.    Defendant Birkett was asked about West's long-term outlook for margin improvement.    Specifically, the analyst's question and Birkett's response were as follows:

> Q: Paul Richard Knight, KeyBanc: And Bernard, operating margin, we've obviously seen a transition here, as COVID dissipates, you validate other production technology. And then, of course, there's this fight with inflation. Can you talk about – I think margins are guided to increase throughout the year, but if you could talk about the issues around your thinking on margins and why it can improve over time?
>
> A: Defendant Birkett: Yeah. So for 2023 . . . I said we did have the inflation pressures and . . . ***that has kind of helped device what our pricing strategy should be as we move into 2023. And that's reflected in our really kind of higher than normal price again that we would particularly see in our business. And we moved from 1% to 2% in previous year and we were close to 3% to 4% last year. And this year, we're forecasting 5% to 6%, and a lot of those conversations already taken with most of our – taken place with customers.***

And the other piece that we've seen is that the transition from COVID vaccine business and changes that we're seeing there. Obviously, we're selling a lot of high-value products into that area. And we've had to offset some of those margin headwinds again . . . but we're looking at the cost base within our business. We've made adjustments to our cost structures, both from a manufacturing perspective and within OpEx. And again, that was something that we were working through as we got to the back of 2022 . . . *we are continuing to see the mix shift that we have really embedded into our long-term construct from a revenue growth perspective and an operating margin expansion perspective. And that has been taken place within some of that COVID as we moved through 2020 and 2021. We were seeing that operating margin expansion in our core business.*

*And so that, together with the opportunities that we've been talking about just here and the investments that we're making, that informs how we're looking at the long-term construct and what we expect to see over the next number of years. And that continued operating margin expansion that builds into what we've talked about. So it's really more of what we've seen in the past. It's that mix shift to continue to execute on our operating plans and then pretty tight controls around our cost base within our business*.

326.    Defendants' Margin Statements in ¶¶324-25 were materially false and misleading when made for the reasons set forth in ¶¶310-11, 322.

327.    Similarly, on March 22, 2023, during the KeyBanc Life Sciences and MedTech Forum, Defendant Birkett touted demand around HVP products, stating:

*So it's more of what we've seen over the last number of years. The demand . . . that's a positive thing, but the underlying demand, they are particularly around the high-value products and mix shift. . . . So that's what's informing our whole process at West.*

328.    During the same forum, Defendant Green touted visibility into customer demand and growth opportunities in HVPs and the Contract Manufacturing Segment, stating:

[T]he significant focus around large molecule and our criticality and *our high participation rate is due to continuously advancing technology, continuously advancing the scale, particularly on higher end of HVP, which is NovaPure particularly* . . . . And if you think about the obesity, diabetes market, that's an opportunity that we can participate in from two different angles. *One is from the*

> *high-value product plungers for pre-filled syringes and also from the delivery device perspective through our contract manufacturing business. So we have really strong visibility of that particular market. And the learnings of COVID has given us confidence we're able to scale it at the right pace with our customers as they launch new molecules that could have quite meaningful impact on society and volume requirements around that.*

329.    Defendants' Demand Statements in ¶¶327-28 were materially false and misleading when made for the reasons set forth in ¶¶306-07.

330.    Additionally, former West employees confirm that, as of March 2023, Defendants failed to disclose the following adverse facts, which were known to or recklessly disregarded by them: an internal inventory analysis, completed at Defendant Reiss-Clark's request and presented to her in March 2023, showed that West's Generic customers had accumulated an upwards of 9-months buildup of inventory of West components—worth approximately $100 million in orders—due to increased customer purchasing during the pandemic.  The analysis further indicated that this inventory buildup was expected to cause a revenue shortfall of $100 million in 2023, as those customers informed West that they would delay or forgo new orders for at least the next three quarters while working through their existing inventory buildup (CW-1 ¶¶141-52).

331.    As a result of Defendants' misrepresentations and omissions on March 22, 2023, West's stock price was artificially inflated and/or artificially maintained.

### 4.    April 27, 2023: Q1 2023 Financial Results

332.    On April 27, 2023, West filed a press release with the SEC on Form 8-K, signed by Defendant Birkett, announcing its financial results for the first quarter of 2023 (the "Q1 2023 Earnings Release").  The Q1 2023 Earnings Release reported net sales of $716.6 million for the quarter and revealed that the Company was increasing its 2023 financial guidance to a range of $2.965 billion to $2.990 billion.  West raised its FY 2023 guidance despite reducing expected

COVID-19 related sales for FY 2023 from $85 million to $60 million, as COVID business activities continued to dwindle across the sector. The Q1 2023 Earnings Release also reported that net sales in the Proprietary Products Segment were $583.1 million, a decline of 3.0% from the same quarter in 2022, and that net sales in the Contract Manufacturing Segment were $133.5 million, a growth of 12.5% from the same quarter in 2022.

333.    Additionally, on April 27, 2023, the Company hosted an earnings call for the first quarter of 2023 (the "Q1 2023 Earnings Call") where Defendant Green touted the strength of West's core business supporting the guidance raise, stating: "***We continue to expect mid-teens Proprietary Products base organic sales growth for the year. Contract Manufactured is now expected to be double-digit growth compared to prior high-single digit outlook, as we expect to see continued demand for certain injection devices, as seen in Q1***." During the question-and-answer portion of the Q1 2023 Earnings Call, Green responded to a securities analyst's questions about waning COVID-related demand by affirming the Company's overall growth outlook:

> Q: Larry S. Solow, CJS Securities: . . . Are your customers – from their perspective, has that helped to, in terms of less focus on – at some of your customers on COVID treatments and more back to their core? I'm just trying to bucket sort of the drivers of that, the acceleration in growth between COVID, perhaps a little bit waning COVID impacts and just more growth, I guess, in NovaPure and other high-value products. And I guess, the third thing is just the overall growth in Biologics. But I'm just trying to get a feel for how those three drivers sort of line up, if you will.
>
> A: Defendant Green: . . . ***we're seeing that, obviously, as COVID demand decreases, we've been able to, through the reprioritization of the long lead time items, we're able to bring them back in line what we expect for the market. And therefore, you're seeing us with a very strong growth in both the Pharma and the Generics market units, which is significantly higher than what you would see from a market volume demand perspective.***
>
> ***So, that's where you see the benefit, specifically on Generics, is really due to the long lead times that have been brought in.***

334.    During the Q1 2023 Earnings Call, in response to a William Blair securities analyst's question regarding the Company's order book, Defendant Green touted the strength of West's order book and highlighted that future growth would be driven by HVPs, stating:

> *I think from an order book perspective, if you think about where our growth profile is, it really is around the Biologics. We obviously have high growth right now in Generics and Pharma. We'll continue to see that over the course of 2023. But really, as you think about the future longer-term, it is around the Biologics, in that multiple therapeutic categories and it tends to be the higher end of our high-value products.*
>
> The plungers specifically, it's a range of different types of plungers within high-value products. So, it ranges anywhere from FluroTec all the way up to NovaPure, depending on the customer's needs, so it is kind of a range. *But our – the optics of our order book continues to be strong, but this portion of that tends to be more around the high-value products and the higher end of that.*

335.    During the question-and-answer portion of the Q1 2023 Earnings Call, Defendant Birkett was asked about expectations for the growth of the Contract Manufacturing Segment:

> Q: Jacob Johnson, Stephens: Maybe first, just sticking on the GLP-1 topic. And as it relates to contract manufacturing, I think that's a business that at times kind of the work you do as customers can vary year to year. Obviously, strong start to the year. You're increasing expectations there. Is this something that is kind of sustainable growth for you all, or is there something about 2023 that maybe we shouldn't carry this forward into 2024 and beyond?
>
> A: Defendant Birkett: *Yeah, Jacob. We typically would see the growth rate in Contract Manufacturing around mid-single-digits within our longer-term construct.* Last year, we had declines in the Contract Manufacturing business, and *now we're seeing a bit of a rebound. So if I'm looking out past 2023, I would see kind of more the mid-single, high-single-digit growth rate.*

336.    During the question-and-answer portion of the Q1 2023 Earnings Call, Defendant Green discussed customers' forecasted demand, stating:

> *And we'll continue – we respond to our customers' forecasted demand. And again, it's more than just one customer, it's multiple customers. So, that's one. It's around the conversations with our*

> *customers, planning ahead, not on just existing solutions in the market but future drug launches that they're planning, that's where our conversation is*.

337.    Additionally, during the Q1 2023 Earnings Call, Defendant Green touted the Company's improved visibility into customer demand and cabined customer "movements of stocking or working capital" to "non-HVP" products and, critically, emphasized that any such customer stocking or working capital movements were fully baked into West's guidance raise for FY 2023 (and hence, implicitly, not a material negative factor to its outlook):

> Q: Matt Larew, William Blair: . . . . For the space more broadly, destocking has been an issue and I would say that's further upstream and not something that's really has affected through your business. But just some – subject to visibility, can you maybe speak to your visibility into customer demand right now, particularly around [HVP], and maybe how that compares to your historical visibility over the last three to five years or so?

> A: Defendant Green: . . . . I think before COVID, we were continuously building the capabilities to have better visibility with our customers in the markets around demand, and we have been building that. I would say, during the COVID period, it's been a little more volatile. *But now, we're back into the environment, have better visibility, better – as we do make to order, our customers are giving us visibility of their demands over the next several quarters*, and then we plan accordingly in our global operations. . . .

> *[I]n regards to any movements of stocking or working capital, we do see some of that in certain parts of the business, and we take that in consideration and when we think about our forecast or guidance for the full year. There are certain areas, I would say, probably more in our – on our non-HVP area that might have more volatility*.

338.    Defendants' Demand Statements in ¶¶333-37 were materially false and misleading when made for the reasons set forth in ¶¶306-07, 330.

339.    Former West employees confirm that, as of April 2023, Defendants failed to disclose the following adverse facts, which were known to or recklessly disregarded by them:

(a)    Customers did not need additional products because they still had significant inventory remaining from overordering during the COVID-19 pandemic (CW-3 ¶¶118-22);

(b)    Customers from all segments of West's business, not just purchasers of COVID-related products, were canceling orders and refraining from placing new orders; the canceled orders were coming from "everybody" (CW-3 ¶¶118-22);

(c)    The rate of reduction in order volume was increasing, meaning that order declines were accelerating (CW-3 ¶¶118).

340.    During the Q1 2023 Earnings Call, on April 27, 2023, Defendant Birkett addressed margins, highlighting the Company's cost initiatives and pricing strategy:

> Q: Larry S. Solow, CJS Securities: [O]n Proprietary Products, gross margin down a little, I think 90 bps, year-over-year. But I think it absorbed like a $90 million or so drop in COVID sales, right, so or something around. I don't think you gave the actual quarter number, but somewhere around there. So, I'm just trying to – going forward, gross margin, it feels like most of the COVID benefit is added there, right, so should we kind of expect Proprietary Products gross margin to just be maybe a good number, a good starting point and maybe we can grow a little bit off of this gross margin base?
>
> A: Defendant Birkett: ***[W]e have been really focused on increasing the level of efficiency through our plants, really understanding the cost base. And as we were progressing through 2022, we're already lining up some of those changes. We're starting to see the impact there. Also, the price that we've been able to get, which is above what we'd normally see, that . . . more than 5%, that's also helping with that margin and to absorb some of the inflationary costs. So, I would expect it to – it is a good start for the year. So there's obviously a lot of puts and takes . . .*** given what's going on within the macro environment. ***And – but we're confident on – to deliver within our guidance.***

341.    During the question-and-answer portion of the Q1 2023 Earnings Call, a BofA Securities analyst asked about the Company's expectations for margin expansion:

Q: Derik de Bruin, BofA Securities: . . . . When you think about your forward model construct . . . does that margin . . . look more like 150 basis points or are you still thinking about 100 basis points is where you should come out on the . . . margin expansion on an annual basis, just given the mix?

A: Defendant Green: *[W]e've said that we will achieve 100-plus basis point margin expansion year-over-year for a number of years . . . but as an organization, as a team, we're really focused on how we continue to beat that. Looking through automation, looking at the mix shift effect that that's happening. Really when you think about the biologics, just reviewing the – our participation in biologics more recently continues to remain extremely strong, I'm very proud of that. And so, we believe – well, we're going to commit to the 100-plus basis points on operating margin, but we do believe there's opportunities to continue that and stay aggressive.*

342.    Defendants' Margin Statements in ¶¶340-41 were materially false and misleading when made for the reasons set forth in ¶¶310-11, 322.

343.    As a result of Defendants' misrepresentations and omissions on April 27, 2023, West's stock price was artificially inflated and/or artificially maintained.

344.    On April 27, 2023, securities analysts at Jefferies published a report, titled *First Take: WST 1Q23*, stating: "Trading at 48x '23 earnings, [West] needed to deliver upside, and it did. After a surprisingly weak 3Q22 and lots of consternation about the margin impact of the COVID decline, [West]'s delivery has improved in the two quarters since" and stated that "[West] is very expensive, but results are solid."

345.    Also on April 27, 2023, securities analysts at KeyBanc published a note, titled *WST: 1Q23* - Solid *Beat, Conservative Guide, View into 2024/25*, and stated that "[West] raised FY23 total revenue guidance $30M at the midpoint to $2.965B-$2.990B," and summarized its conclusion by stating that, "[w]ith incredible pricing power, robust demand, and incremental capacity coming online, we think guidance looks highly conservative."

346.    The next day, on April 28, 2023, William Blair published a report, titled *Post-Call Update: Meets Lofty Expectations and Stands Out as Bright Spot in Otherwise Murky Waters*, and stated that "West's first-quarter beat stood out amid a volatile bioprocessing earnings season[,]" and wrote that "[o]n capacity expansions, management continues to emphasize that the company is building into existing HVP demand (which resonates with what we heard from peers this week)." In their note, the William Blair analysts highlighted that "mix shift to high-value products remains the key driver with some upside to contract manufacturing."

347.    Similarly, on April 28, 2023, Morningstar analysts published a report, titled *West Pharmaceutical Earnings: Strong Organic Demand Shines as Pandemic Demand Winds Down*, and highlighted: "We think West's outlook looks good on a long-term basis, with West likely to have high win rates of new business and maintain dominant market share of injectable components for the foreseeable future" and "West has significant room to bring customers up the value chain to higher-margin services, giving it a lengthy tailwind for earnings growth and margin expansion."

348.    Also, on April 28, 2023, securities analysts at Jefferies published a report, titled *4 Key Insights: WST 1Q23*, and stated: "The FY24 growth outlook remains strong, we are modeling base business growth of 15%, which would be roughly in-line with the mid-to-high teens growth mgt expects in FY23" and "HVP mix shift is highly durable and consistent at >200 bps annually; Although growth will not be low-teens, we believe the long duration of HVP mix shift will sustain mid-to high single-digit proprietary product growth."  Analysts at Jefferies went on to note that the "Downside Scenario" for West going forward would include "[n]ormalized ex-COVID GM% is lower than expected and growth in 'base' business slows."

### 5.    May 11, 2023: Bank of America Healthcare Conference

349.    On May 11, 2023, Defendants participated in the Bank of America Healthcare Conference, maintaining West's messaging from the Company's Q1 2023 Earnings Call in April.

During the conference, Defendants reaffirmed West's recent guidance raise, while Defendant Birkett continued to emphasize West's visibility into customer demand, stating, "*I believe that we're much closer to our customers now than we have been in the past and understanding their inventory position.*"

350.    As Defendants had done in April, Defendant Birkett again emphasized, during the Bank of America Healthcare Conference, that any customer stocking activity West observed was cabined to West's COVID business, as opposed to in its core business.  Birkett stated, for example: "*Where we are seeing some destocking and we called it out as we went through the backend of last year is particularly around COVID.*"

351.    In marked contrast, Defendant Birkett assured investors, during the Bank of America Healthcare Conference, that the continuing growth of West's base business (as reflected in West's guidance) was not impacted by stocking activities, stating that West was merely "*seeing customers manage their inventory more effectively[,]*" "*not [in] HVP*," but "*within the standard part*," and that this "*can impact the pacing*" of deliveries, "*but not our overall growth . . . .*"

352.    Defendants' Demand Statements in ¶¶349-51 were materially false and misleading when made for the reasons set forth in ¶¶306-07, 330, 339.

353.    As a result of Defendants' misrepresentations and omissions on May 11, 2023, West's stock price was artificially inflated and/or artificially maintained.

354.    Reflecting this assertion that customer destocking activities were not adversely affecting West's core business, analysts at BofA Securities published a note on May 11, 2023, titled *WST: Demand for HVP continues*, which reported that "[West] has not seen Inventory Issues that have plagued some LST companies selling consumables. [West] believes that they have good visibility due to monitoring of buying patterns by their customers."

6.    **June 6, 2023**: William Blair Stock Growth Conference

355.    On June 6, 2023, Defendant Green participated in the William Blair Stock Growth Conference.  During the conference, Green touted West's portfolio strength and growth trajectory, emphasizing the Company's reliance on HVPs and Biologics as long-term growth drivers, stating:

> *And with a very, very healthy participation rate in Biologics, what you're seeing here is that more demand of our products is higher up on the high-value product curve. And I'm excited with our R&D focus, with our product expansion is continuously moving the curve up to the right, and also moving the concept from components to systems, we're well on our way, will elongate and make another trend for high-value products.*

> *   *   *

> The COVID piece is moving from $388 million last year. We were guiding about $60 million this year based on what we have with discussions with customers. ***But what's really exciting about this growth, while the Pharma and the Generics continue to grow faster than we believe the market*** and we do think that is a temporary phenomena, we do believe Pharma is about low- to mid-single-digit type growth long-term. We do believe Generics is mid-to high-single type growth for West*. **But the Biologics continues to be double-digits and that's the main thrust of growth when you think about the long-term construct for West***.

356.    Defendants' Demand Statements in ¶355 were materially false and misleading when made for the reasons set forth in ¶¶306-07, 330, 339.

357.    Former West employees confirm that, as of June 2023, Defendants failed to disclose the following adverse facts, which were known to or recklessly disregarded by them: a presentation was given to Defendants Green, Birkett, Lai and Reiss-Clark in June 2023 that identified a 9-month plus inventory buildup, worth approximately $100 million in orders.  This presentation also informed the Defendants that revenues over at least the next three quarters would be down compared to the prior year due to the inventory buildup (CW-1 ¶¶153-55).

358.    As a result of Defendants' misrepresentations and omissions on June 6, 2023, West's stock price was artificially inflated and/or artificially maintained.

### 7.    The Truth Begins to Emerge, but Defendants Continue to Mislead Investors

359.    The truth behind Defendants' misrepresentations and omissions emerged through a series of disclosures beginning on July 27, 2023, and ending February 13, 2025.[4]

### a.    July 27, 2023: Financial Results (First Partial Disclosure)

360.    On July 27, 2023, the Company filed a press release with the SEC on Form 8-K, signed by Defendant Birkett, announcing its financial results for the second quarter of 2023 (the "Q2 2023 Earnings Release").  Defendant Green was quoted in the Q2 2023 Earnings Release, stating, in relevant part:

> While COVID-19 related sales continued to decline as expected, our base Proprietary Products business again organically grew double digits. ***We see continued stability in both near- and long-term demand trends for our HVP components, devices and systems, and our team members remain focused on creating value-added solutions for our customers.***

361.    Later that day, the Company hosted an earnings call for the second quarter of 2023 (the "Q2 2023 Earnings Call").  Defendant Green touted demand for HVPs and the Contract Manufacturing Segment, stating:

> ***[T]he key levers of growth in Q2 were primarily driven by HVP components and delivery systems. . . . This is also reflected in the solid order book across our Biologics, Generics, and Pharma customers, a clear reflection of the needs of the market. And we continue to make good progress on bringing down lead times for certain HVPs. We're seeing our order book patterns reverting to a more normal pre-pandemic cadence.***
>
> ***In addition, we continue to work closely with customers to update demand trends for the near and long term.***

---

[4] Statements in **bold and underlined** provided corrective information to the market.

362.    Also, during the Q2 2023 Earnings Call, an analyst asked about downstream demand for West products, to which Defendant Birkett responded: "*[W]e are getting indications from our customers on what their demand is across a number of different therapeutics. . . . But we haven't seen no major impact on our business to this point.*"

363.    Defendants' Demand Statements in ¶¶360-62 were materially false and misleading when made for the reasons set forth in ¶¶306-07, 330, 339, 357.

364.    During the question-and-answer segment of the Q2 2023 Earnings Call, Defendant Birkett was asked about margins for Proprietary Products:

> Q: Larry S. Solow, CJS Securities: . . . . A question on just margins in the Proprietary Products and for Bernard. A nice sequential improvement, a little bit higher sales and I think a lot – most of those sales look like drop to the gross margin line there. Anything unusual in this quarter compared to last quarter? Looks like COVID sales were about the same – COVID-related sales. So anything we should be aware of there that drove that sort of 150 bps sequential improvement in gross margin of Proprietary Products?
>
> A: Defendant Birkett: *Yeah. It's really down to product mix. We're seeing that continued growth in high-value products ex COVID, and we're seeing that positive impact that's flown into margin.*

365.    Defendants' Margin Statements in ¶364 were materially false and misleading when made for the reasons set forth in ¶¶310-11, 322.

366.    Additionally, former West employees confirm that, as of July 2023, Defendants failed to disclose the following adverse facts, which were known to or recklessly disregarded by them:

(a)    There were "threats" or signals of softening demand for SmartDose due to persistent quality and manufacturing failures with the device (CW-3 ¶¶189, 259-61; CW-6 ¶¶265-66; CW-8 ¶¶268);

(b)    The sub-assembly manufacture of SmartDose components (the manufacturing of parts before the final device was assembled) had an approximate 80% "scrap rate," and "mountain[s]" of scrap piles were accumulating throughout West's SmartDose manufacturing facility in Phoenix, AZ (CW-3 ¶¶186-88; CW-5 ¶¶197-200); and

(c)    For the roughly 20% of SmartDose devices that survived sub-assembly, the finished devices still failed at a high rate, and the resulting scrap and rework costs were extremely costly to West (CW-5 ¶¶197-200).

367.    Then, when asked on the Q2 2023 Earnings Call whether West was experiencing any destocking issues, Defendant Green revealed the following:

> Q: Derik de Bruin, BofA Securities:  Your competitor, Datwyler, called out some stocking issues, inventory issues going on with it. I mean, I know you haven't really – you've seen a little bit of this, but I'm just sort of wondering, has that had any impact on the business? Are you seeing any issues with that, that are sort of like popping up the unexpected?
>
> A: Defendant Green: [I]t's – all that's taken into consideration as we kind of set the guidance for the balance of the year. ***Fortunately, we have a good lens with our customers.*** And . . . ***when you think about the COVID vaccine, obviously, there's a stocking – destocking has been going on for the last couple of quarters.***
>
> ***And then when we look at the base business, there's some inventory management here and there,*** *but it's very low in amounts when you compare it to our order book, particularly last year. We have a good handle on it. And we're keeping an eye on and having conversations with customers, but a very low impact at West right now.*

368.    On the Q2 2023 Earnings Call, Defendant Green later stated, regarding destocking, that "**it's all – majority of it is around the COVID-19 destocking.** And so, we've been pretty clear on our quarterly cadence last year and what we're seeing this year. So that's probably the majority of it. From the base perspective, ***we're not seeing a material difference from quarter to quarter***."

369. On news of destocking activity impacting West's "base business," West's stock price dropped $24.52 per share, or approximately 6.46%, to close at $354.90 per share on July 27, 2023. While this news partially revealed Defendants' fraud, Defendants continued to mislead investors.

370. Notwithstanding Defendants' revelation of limited destocking encroaching West's "base business," Defendants' Demand Statements in ¶¶367-68 were materially false and misleading when made for the reasons set forth in ¶¶306-07, 330, 339, 357. Despite claiming that West had a "*good lens*" and was "*keeping an eye on and having conversations with customers*," Defendants knew that customers had accumulated nine months plus worth of inventory and were reducing or outright canceling orders (CW-1 ¶¶148-55). Yet, Defendants failed to disclose the true extent of the destocking or how many quarters it was expected to persist.

371. Analysts accepted Defendants' false reassurances that destocking was mostly limited in scope to COVID-related products. For example, on July 27, 2023, analysts at Jefferies published a report, titled *4 Key Insights: WST 2Q23*, stating: "COVID-related destocking and unfavorable mix are negatives" and "customer destocking is predominately COVID-related[.]" That same report further acknowledged that other West business segments were beginning to show signs of destocking, noting: "[I]n the base business, destocking is very small compared to the order book." The Jefferies analysts also wrote: "[West] highlighted demand for injection devices" and, "[i]n Generics, demand for self-injection devices, notably SmartDose, picked up in 2Q. GLP-1s use an auto-injector (pre-filled syringe) or a pen-injector (cartridge) and are contributing to Proprietary Products growth." Finally, the Jefferies analysts stated: "[West's] HVP mix shift is highly durable and consistent at >200 bps annually; . . . we believe the long duration of HVP mix

shift will sustain mid- to high-single-digit proprietary product growth. . . . Continued biologic volume growth will help sustain/accelerate HVP mix shift."

372.    That same day, analysts at Stephens also published a report, titled *WST 2Q23 Wrap: Solid Quarter, Capacity Additions Should Drive Numbers Higher*, stating: "Admittedly, [West] shares have had a good run this year, but the biologics end-market remains healthy (especially at the commercial end), GLP-1s remain an opportunity, [West] has limited destocking/China concerns, and we see upside to our estimates. With that said, [West] sentiment remains bullish and buyside expectations are likely ahead of consensus. Should we see a risk-on appetite, [West] shares may lag, but we still think [West] grinds higher from here and the LT fundamental outlook remains bright."

373.    Additionally, securities analysts at UBS published a report on July 27, 2023, titled *2Q23 Recap: Beat & Raise; Maintain Neutral Rating & $400 PT*, stating: "We are maintaining our $400 PT and Neutral rating following the 2Q beat and 2023 guidance raise. Shares traded off despite the beat and raise we believe expectations remain high given solid proprietary product demand and less impact destocking, biotech funding and China which have impacted peers. Execution on the operating margin guidance as well as base business growth was top of mind given the revenue headwinds and lost efficiencies as COVID products decline. [West] delivered a margin beat however reiterated previous margin guidance of 23.0% - 23.5%."

### b.    <u>August 16, 2023:</u> UBS Genomics 2.0 and MedTech Innovations Summit

374.    On August 16, 2023, Defendants participated in the UBS Genomics 2.0 and MedTech Innovations Summit.  During the question-and-answer portion, an analyst asked about the impact on HVPs and margin, to which Defendant Green replied that "***HVPs are going to be the driver of top line as well as gross and operating margin expansion***."

375.     Defendants' Margin Statement in ¶374 were materially false and misleading when made for the reasons set forth in ¶310-11, 322, 366.

376.     During the UBS Genomics 2.0 and MedTech Innovations Summit, Defendant Green also discussed the lack of impact of destocking on the business, stating: "***So right now, where we stand what we see is not a lot [of] destocking with our products***."

377.     During the UBS Genomics 2.0 and MedTech Innovations Summit, Defendant Green touted customer demand visibility in the Contract Manufacturing Segment:

> Q: John Newton Sourbeer, UBS: And Eric, you touched on this a little bit in the beginning, just in the overview on demand market. But, you recently increased the contract manufacturing piece to that mid-single-digit, high-single digit growth there. Just any additional color on what drove the increase in your outlook and execution for that segment of your business?
>
> A: Defendant Green: It's these long-term agreements that we're signing and starting to invest in. ***So, we do have visibility.*** That's one part of the business where the installed equipment, new facilities are really dedicated to a particular product and a customer. And these are very long-term, i.e., five, seven-plus year agreements. And so, with that being layered in and knowing that we are – we'll be turning those on and the requirement is get to close to 100% utilization as soon as possible. ***This is pretty good confidence of moving that up between mid to high single digits more longer term.***
>
> ***The particular area around auto injectors is probably the biggest driver. When you think about the injectable in medicine space we participate, the number of auto injectors, but that's probably the biggest area of growth we're seeing right now in [Contract Manufacturing].***

378.     During the question-and-answer portion of the conference, Defendant Green was asked which products have the most demand, to which he responded:

> ***So it is across the spectrum. But I would argue that most of the investments are more of the higher end of HVP, which is positive because as you know, we've been seeding the market, where we win is in the pipelines, and we continue to see the market with the highest end of our high-value products. We're seeing the high participation rate across the board, which is exciting. And we're***

> *preparing ourselves with customer conversations of additional launches that we're looking at that are on us today and also into 2024.*

379.    Defendant Green further emphasized the Company's visibility into customer demand and inventory trends, stating:

> *And so, we're in a much better position today and the visibility remains – continues to remain very high. We do interact with our customers frequently on not just current drug molecules in the marketplace, but also planning for future launches for near- and mid-term, because sometimes we will have to make investments in advance to make sure that we can handle the volumes that will be asked upon us. So, the lens is very good for us and we continue to build off of that.*

380.    Defendants' Demand Statements in ¶¶376-79 were materially false and misleading when made for the reasons set forth in ¶¶306-07, 330, 339, 357. Despite Defendants touting frequent interactions with customers and claiming visibility into customers' demand for West products, Defendants failed to disclose that customer ordering activity was slowing and that orders were being canceled because customers were still working through their bloated inventories.

381.    As a result of Defendants' misrepresentations and omissions on August 16, 2023, West's stock price was artificially inflated and/or artificially maintained.

        c.    **September 14, 2023: Bank of America Global Healthcare Conference**

382.    On September 14, 2023, Defendant Birkett attended the Bank of America Global Healthcare Conference and emphasized West's broad-based demand, stating:

> *We're seeing strong demand in our core business. . . . If you draw off COVID, we're seeing that double-digit growth. And it's across nearly all areas of our business. Everything is performing in the ways we would have expected this year, achieving all our targets. . . .*
>
> *The demand is strong. We see it from across a number of areas in our business. . . .*

> *. . . . And again, a lot of those investments are informed by what we're seeing from a customer perspective and the demand and the forecast that they're communicating to us. . . .*

383.    Defendants' Demand Statements in ¶382 were materially false and misleading when made for the reasons set forth in ¶¶306-07, 330, 339, 357.

384.    Defendant Birkett stated, in response to a question on margin expansion: "The typical driver for the 100 basis points is mix shift and driving high-value products. And that still stands, that is the main driver. There is some price in there as well and we have been able to get more price over the last number of years. This year, we're probably going to do between 5% to 6%. That's probably north of where we would typically be..."

385.    During the Bank of America Global Healthcare Conference, Defendant Birkett was asked to comment on the drivers of margin expansion:

> Q: Derik de Bruin, BofA Securities: . . . . And that 7% to 9% then sort of drives at least 100 basis points of op margin expansion. And clearly, you're adding capacity for your high-value products which is primarily going there. So, can we talk about the puts and takes on the margin in terms of you, obviously, have to absorb capacity, you've got the mix shift going on, you've got inflationary pressures, just sort of talk about how we sort of think about that 100 basis points?
>
> A: Defendant Birkett: . . . . *The typical driver for the 100 basis points is mix shift and driving high-value products. And that still stands, that is the main driver. . . . That's probably north of where we would typically be . . . given that we had to cover some of these inflationary pressures. And that was part of being able to do that and manage that cost base. But we're also driving a lot of cost efficiencies and operational excellence within our business. So, taking cost out, becoming a lot more efficient, introducing higher levels of automation, better throughput. So, there's a number of drivers there. So, you've got the mix, the price, and then the operational efficiencies that they are essentially the main drivers of that margin . . . but mix is always going to be the primary one.*

386.    Defendants' Margin Statements in ¶¶384-85 were materially false and misleading when made for the reasons set forth in ¶¶310-11, 322, 366.

112

387.    Additionally, former West employees and contractors confirm that, as of September 2023, Defendants failed to disclose the following adverse facts, which were known to or recklessly disregarded by them:

(a)    A significant number of defective SmartDose devices were being sent back to West, with West receiving approximately 50 to 100 failed SmartDose devices per day due to failed drug delivery (CW-7 ¶¶224-25); and

(b)    West was nowhere near fixing the persistent problems with SmartDose and had not developed, or even come close to developing, a viable solution to fix the problems (CW-7 ¶¶224-26).

388.    As a result of Defendants' misrepresentations and omissions on September 14, 2023, West's stock price was artificially inflated and/or artificially maintained.

389.    Analysts reacted favorably to Defendants' false statements.  For example, on September 21, 2023, Morningstar analysts published a report, titled *West's Organic Demand Shines as Pandemic Demand Winds Down; Raising FVE to $290*, which stated: "We think West's outlook looks good on a long-term basis, with West likely to have high win rates of new business and maintain dominant market share of injectable components for the foreseeable future."  The Morningstar analysts also proclaimed that, "[a]s the coronavirus pandemic has faded, we will see revenue growth and margin expansion begin to normalize with West's high-value product portfolio driving future growth."

d.    <u>October 26, 2023:</u> **Financial Results (Second Partial Disclosure)**

390.    On October 26, 2023, the Company filed a press release with the SEC on Form 8-K, signed by Defendant Birkett, announcing its financial results for the third quarter of 2023 (the "Q3 2023 Earnings Release").  The Q3 2023 Earnings Release reported that the Company had net sales of $747.4 million during the quarter, an increase of 8.8% compared to the same quarter in 2022,

net sales of $602.5 million in the Proprietary Products Segment, constituting growth of 6.3% from the same quarter in 2022, and net sales of $144.9 million for the Contract Manufacturing Segment, constituting growth of 20.8% from the same quarter in 2022. The Company lowered its net sale guidance for 2023 to a range of $2.950 billion to $2.960 billion, compared to the prior range of $2.970 billion to $2.995 billion.

391.    Defendant Green was quoted in the Q3 2023 Earnings Release, revealing in relevant part: "We are observing a slowdown in restocking trends by large Pharma and Generic customers, which is reflected in our revised guidance."

392.    On October 26, 2023, the Company hosted an earnings call for the third quarter of 2023 (the "Q3 2023 Earnings Call"), wherein Defendant Green highlighted the Company's growth, pointing to strong demand for HVP components, stating:

> Our ongoing success can be attributed to a well-established, market-led growth strategy, ***which allows us to take full advantage of our solid base customer demand . . . .***
>
> \*   \*   \*
>
> ***[I]n Proprietary Products, we had strong base demand of HVP components and devices. We continue to see certain customers experiencing strong uptake of their drugs as they accelerate and increase their replenishment orders with us.*** The greater than 20% growth in our base business was again led by our Biologics market unit, which had very strong double-digit growth in the quarter, excluding the impact of COVID 19-related sales.
>
> ***And as we have seen through much of the year, we also had accelerated growth from restocking long lead time HVP components that we've been able to produce through our capacity expansions. This fueled growth in our Generics and Pharma market units.***

393.    During the question-and-answer portion of the Q3 2023 Earnings Call, Defendant Green touted strong visibility into customer demand, stating:

But as the injectable space continues to grow on GLP-1 as new molecules are approved and launched, we're – and the investments we're making, both on Proprietary and CM side, *we have a good visibility of cadence of what we're being asked to build support through our global network to support the demand. I'll just be clear, one other aspect is that on the Proprietary side, we always enjoy a very high participation rate.*

*On the CM side, we've been very clear that our customers are looking at multiple supplies to support them, and we're one of them. So, we're positioned very well on both sides of the business.* Hopefully, that gives you some context of what we're seeing.

394.    Defendants' Demand Statements in ¶¶392-93 were materially false and misleading when made for the reasons set forth in ¶¶306-07, 330, 339, 357.

395.    During the Q3 2023 Earnings Call, Defendant Green emphasized that HVP growth was driving "*quite significant*" margin benefits for West:

> Q: Larry S. Solow, CJS Securities: . . . . And just shifting gears, just want to follow up just on the high-value solutions into that, obviously, that continues to be the driver. And it sounds like there hasn't been much slowdown there. . . . I think you said it was greater than 75% in the quarter for revenue. Can you remind us, approximately what it was last year? And more importantly, just I know it's a lot lower on volume. Can you just give us a kind of a guesstimate on where it is on a volume basis? And I imagine NovaPure still remains a minority piece of that. And that sounds like that's – potentially be the fastest-growing piece going forward. . . .

> \* \* \*

> A: Defendant Green: And one additional comment, the algorithm, Larry, of, if you think about the growth of HVP in the double-digits . . . that requires about 100 basis points increase year-over-year of volume for HVP. . . . So, we're still in the 23%, 24% corridor from a volume perspective. *But as – but because the way that Quintin articulated the ASP margins, it's actually quite significant impact on the overall portfolio.*

396.    Further, on the Q3 2023 Earnings Call, Defendant Lai stated, in part: "But as we look at it, next year, with the top line growth that we get led by HVP, you're going to see gross margins improve year-on-year."

397.    When asked about the Company's device portfolio, on the Q3 2023 Earnings Call, Defendant Lai touted customer uptake of West's SmartDose platform, stating, in part, "***we're seeing really active uptake***":

> Q: Matt Larew, William Blair: . . . . Obviously the focus in terms of the Contract Manufacturing and autoinjector investments right now are around GLP-1s, but there's growing interest, I think, more broadly in new delivery modalities and obviously you have your SmartDose platform. So, just curious if you can maybe update us on either the interest on all pipeline or more generally what discussions with customers are like and more of the device category that you've invested in?
>
> *    *    *
>
> A: Defendant Lai: ***And then on the SmartDose side, there, that is proprietary to us. . . .*** And that's when customers come to us and work with us to spec in that device with their drug to make a drug device combination therapy. ***And there, we're seeing really active uptake.*** We are up to four [new]drug approvals using our SmartDose platform. ***And we have a very active pipeline of customers that are evaluating the platform.***

398.    Defendants' Margin Statements in ¶¶395-97 were materially false and misleading when made for the reasons set forth in ¶¶310-11, 322, 366, 387.

399.    During the Q3 2023 Earnings Call, October 26, 2023, Defendant Green revealed an increase in destocking of inventory, mostly in low margin Proprietary Standard products, by certain West customers.  But Green downplayed the destocking, claiming it was mostly in Standard Products and that West was still seeing sales growth notwithstanding.  Green also falsely claimed the destocking only intensified starting in September 2023:

> **During September and October, we have started to see an increase in inventory management trends by certain large Pharma and Generics customers, especially for our standard products as they manage their safety stocks for the remainder of the year.** These issues have led us to temper our fourth quarter organic sales growth to 2% to 3%. Excluding COVID-related sales, we expect double-digit overall organic sales growth and double-digit Proprietary Products sales growth over the quarter.

\* \* \*

> *. . . . In a bit of a preview, despite the inventory management we are seeing by some of our large customers, we continue to expect to deliver our financial construct of 7% to 9% organic sales growth and 100 basis points of operating margin expansion. In addition, we anticipate that our pandemic-related sales are at a point, where we will no longer have to separate our base performance in 2024.*

400.    In response to an analyst question about destocking, Defendant Green falsely reiterated that destocking was concentrated in West's standard elastomer components not in its HVP products and it was not a matter of lost sales but only a sales timing issue:

> Q: Paul Richard Knight, KeyBanc: . . . . You mentioned this stocking issue was kind of in the standard products category, which leads to the question of in the high-value product category, are you – obviously, we know you're supplying GLP-1 products, but are you capacity constrained on that side of the business? If you could talk to that issue and how big is GLP-1, if you can or will? And then lastly, these CapEx numbers, what facilities open next year? Thanks.
>
> A: Defendant Green: . . . . *In regards to the restocking, you're absolutely correct. It's not as much in the HVP area, it tends to be – <u>it is really around our standard products. It's in categories around disposable medical devices, tends to be the standard elastomer components. And we're being asked to divert some of those orders into 2024</u>. So, that's the cadence, it's not a loss of share. And we continue to have a very healthy win ratio of new approved molecules, particularly in Biologics. And so, our position from a market position hasn't changed, but it is just a timing of inventory management with a few select customers.*

401.    During the Q3 2023 Earnings Call on October 26, 2023, a Jefferies analyst also asked about the potential effects of destocking on the Company, to which Defendant Lai responded that it was a "*slowing of a restock. It's not necessarily a destock situation*":

> Q: David Windley, Jefferies: . . . I wanted to start on stocking and just to understand some moving parts a little bit better. Understanding, I think, well, that you're talking today that within elastomers or components, the destocking is mostly standard. I think early in the year, we had understood that you had some areas that post pandemic – maybe Westar, for example, post pandemic, had not gotten the capital allocation, the growth allocation and were

understocked and catching up. And so, I guess, I wanted to try to understand better if those two factors were both at play and offsetting in the quarter or maybe the West was already done, and therefore, the standard destocking now is what we're feeling. I just – it feels like there have been through the year moving parts in both directions. And I just wanted to understand those and the cadence of them. Thanks.

\* \* \*

A: Defendant Lai: . . . . ***So maybe it's just a definition or just maybe when you say destocking, we think of it more as customers that are having a demand issue like in COVID-19. And what they're doing is they're not reordering. And they're taking down their safety stock and consuming their safety stock, and that's certainly happening in COVID-19, which we're seeing year-over-year declines.***

The other impact is the fact that we have been behind in terms of delivering because of our capacity constraints. ***And then as we've been able to restock, the base growth that you've seen in Generics and Pharma is well above the financial construct***. So, well, that has been going on for the first part of this year. What we're seeing now is that ***that base growth is going to temper. It's not declining.*** It's just not going to be as high as we thought it was going to be in Q4.

***That's why we're calling it a slowing of a restock. It's not necessarily a destock situation***. . . .

402.    On news of this continued destocking and lower sales volumes expected for Q4 2023, West's stock price dropped $30.68 per share, or approximately 8.57%, to close at $327.32 per share on October 26, 2023.  While this news partially revealed Defendants' fraud, Defendants continued to mislead investors.

403.    Indeed, Defendants' Demand Statements in ¶¶399-401 (in **bold and italics** above) were materially false and misleading when made for the reasons set forth in ¶¶306-07, 330, 339, 357.  In regard to the destocking trends, Defendants downplayed the issue, even characterizing it as "***not necessarily a destock situation***" but rather "***a slowing of a restock.***"  Defendants further claimed that the destocking was confined primarily to West's Standard Products and falsely

represented that it was merely a matter of "***timing of inventory management with a few select customers.***"

404.    Several analysts published reports commenting on West's disclosures.  On October 26, 2023, analysts at Jefferies published a report, titled *4 Key Insights: WST 3Q23*, stating that "[West] lowered FY23 sales guidance, citing slower customer restocking in its Pharma and Generics Units."  The Jefferies analysts stated that "[c]all [destocking] what you will, the effect is lower/slower order patterns from customers, resulting in the guidance cut."  Likewise, that same day, analysts at UBS published a note, titled *3Q23: Revenues Missed But Strong Margins Drive EBIT Beat; 2023 Guidance Lowered Due To Customer Restocking*, stating that West missed its 2023 Guidance "[d]ue to [c]ustomer [r]estocking" and that "[West] lowered revenue guidance due to a deceleration in restocking trends among Generics and Pharma customers."  Also, on October 26, 2023, analysts at Deutsche Bank published a note, titled *Decision Time*, and stated: "Because of customer manufacturing schedules, West anticipates a slowdown in customer restocking in the near term . . . ."

405.    Securities analysts, however, continued to buy Defendants' false destocking story—hook, line, and sinker.  For example, analysts at Deutsche Bank published a report, titled *Decision Time*, stating: "From our perch, we believe the incremental growth drivers for West come more from a mix shift to HVP, strengthening price, and increased participation in both prop and contract manufacturing devices."  The Deutsche Bank analysts further stated that West's "pipeline for its proprietary SmartDose platform remains full."  Also on October 26, 2023, analysts at Stephens published a report, titled *WST 3Q23 Wrap: Disappointing 3Q23, 7%-9% FY24 Growth Not Nothing In this Macro*, which stated: "Given . . . the Company's FY24 commentary, we don't see widespread elevated inventories at this point."

406.    The next day, on October 27, 2023, analysts at William Blair published a report, titled *Post-Call Update: Fundamentals Intact, Stock Reaction Overdone*, and stated: "This quarter feels reminiscent to last year's third-quarter call (and stock reaction) where transitory ramp-up issues were perceived by investors to be indicative of demand issues. West delivered double-digit organic growth in the proprietary products base business, despite slower restocking at some large pharma and generic customers that should be resolved by early 2024. Management reiterated that it expects 2024 to be at least in line with its long-term growth target of 7%-9% organic growth. In our view, the sell-off presents an attractive entry point for a high-quality franchise . . . ."  The William Blair analysts also proclaimed: "We do not view [destocking] as a significant structural issue like the destocking faced by bioprocessing companies" and "[t]he overall strength of West's base business in proprietary products remains intact as it continues to deliver double-digit organic growth ex-COVID, and the company anticipates similar growth in the fourth quarter."

e.    <u>November 10, 2023:</u> **Baron Investment Conference**

407.    On November 10, 2023, the Company participated in the Baron Investment Conference.  During the conference, Defendant Green represented that HVPs were a key driver of the Company's revenue growth and margin expansion, stating:

> *. . . Our portfolio of products continues to move towards what you'll hear more about later in the presentation about high-value products. And what that allows us to do is capture higher ASP, higher revenues, but also higher margins in our portfolio.*
>
> . . . This is an interesting look at our portfolio and what the high-value product really means. So, what does that mean? On the bottom left-hand side, you see a bunch of elastomer components. Right now, out of the 47 billion components we produce, in the bottom left that's roughly around 75%, 76% of the volume, but only 25% of the revenue. *And the model that we have created is we continuously add capabilities and services to support the pharmaceutical customers, to basically take it out of their processes to make their end product higher quality, more effective. And that means*

*moving up West star, West vision all the way up to what we call NovaPure.*

To give you an example, a standard product might be $0.01 or $0.02 a piece. Not a lot. 25% to 30% margin. NovaPure per unit is over $1 plus 70% to 80% margin. ***So you can see the power of how biologics and HVP is driving top line growth and margin expansion in a market that injectable space is about 2% to 3% volume growth.***

***. . . One of the financial algorithms we've communicated that we will commit to and continue to hit or exceed is our top line growth of 7% to 9% organic growth plus operating margin expansion of 100 basis points plus year over year. And about 70% roughly of that operating margin expansion is coming from mix shift. So when I talk about going from standard products to high-value products, that's driving that mix shift, higher profitability, driving operating margins to be greater than 100 basis points per year.***

***. . . What you know is we're still growing even with this decline of COVID. . . And you can see it continue to climb above the 7% to 9% organic growth rate that we committed to. The two biggest drivers of that, one, biologics. And two, moving existing customers up the chain of high-value products. And it's a very durable model that we have in front of us.***

408.    Defendants' Margin Statements in ¶¶407 were materially false and misleading when made for the reasons set forth in ¶¶310-11, 322, 366, 387.

409.    As a result of Defendants' misrepresentations and omissions on November 10, 2023, West's stock price was artificially inflated and/or artificially maintained.

### f.     <u>November 14, 2023</u>: Jefferies London Healthcare Conference

410.    On November 14, 2023, the Company participated in the Jefferies London Healthcare Conference.  During the conference, Defendant Green was asked about "customer cadence around restocking."  In response, Green boasted that West had visibility of "four to eight quarters" (or, 1 to 2 years) of demand for its customers.  Green also stated that in 2023, destocking was causing an approximately $320 million headwind for West, pinning all of it on strictly COVID business, omitting the impact of destocking on the rest of the Company's product portfolio:

Q: David Windley, Jefferies: Getting a little more specific to the recent performance in the third quarter, you called out some weakness due to customer cadence around restocking. We kind of distinguish between restocking and destocking. I thought it might be a good opportunity to distinguish the difference, if it is important. And then what are those areas where you're seeing that stocking cadence change?

A: Defendant Green: And there's three areas that we are seeing movement when it comes to order patterns with our customers. So just to level set, we're made to order. ***So we have visibility over the next, call it, four to eight quarters of demand of our customers.***

And when you think about the three of them referenced. And one is there is a – ***there was a destocking effort this year around COVID.*** I think everybody understands that. So last year, we did about $388 million of COVID related materials. This year, we're guiding about $68 million. So that's $320 million headwind. ***Hence, we're still growing this business in 2023…***

411.    Defendant Green was also asked about customer visibility and ordering patterns, and he responded by assuring investors that ordering patterns were expected to normalize, stating "***we'll probably be back to reordering patterns consistent what we've seen before.***"

Q: David Windley, Jefferies: Is it possible to have visibility into how long this lower order pattern will last before these clients have gotten their inventory levels to what they want them to be?

A: Defendant Green: ***But when it's coming to restocking with our customers and just building up their safety stocks, that's why in the last call we had, we gave some indication that next year we'll be within – looking at our financial construct as intact, so the 7% to 9%.***

***So you can assume that goes back to kind of the traditional growth we're seeing with the low to mid for Pharma, mid to high for generics, and double digits for Biologics, and mid to high for CM, that algorithm.***

***So that whole building up of the safety stock, we're pleased.  We feel that we're close to competition there for our customers.  And now we'll probably be back to reordering patterns consistent what we've seen before.***

412. Defendants' Demand Statements in ¶¶410-11 were materially false and misleading when made for the reasons set forth in ¶¶306-07, 330, 339, 357.

413. During the Jefferies London Healthcare Conference on November 14, 2023, in response to a securities analyst's question about integrated delivery systems, Defendant Lai represented that the Company's SmartDose device was "*seeing good traction*" with an "*active pipeline.*"

> Q: David Windley, Jefferies: Let me just ask one more around, I'll call it, integrated delivery systems. So this is I think a long-term strategic evolution that you all are trying to pursue through things like SmartDose and partnerships with Corning on Valor Glass. Maybe just set the table on where you see the world going in terms of those integrated delivery systems. And how far along you are in terms of getting customer uptake.

> A: Defendant Lai: So twofold. On the area of wearables, Dave, that is a differentiated product. It is something that is relatively new for the marketplace. And it serves a purpose of enabling the transition from IV-based drugs to subcu-based drugs. And so it really gives the health care provider, as well as the patient, different options to get the drug. *And so we're seeing good traction there. We already have four approvals. We have an active pipeline.*

> *   *   *

> So again, we – it's a long-term process. It's going to take some validation. *But we believe that it could be the next rung for our HVP.*

414. Defendants' Margin Statements in ¶413 were materially false and misleading when made for the reasons set forth in ¶¶310-11, 322, 366, 387.

415. On November 14, 2023, analysts at Jefferies published a report, titled *2023 Jefferies London Health Conf: WST Takeaways*, nothing that "[s]lower order patterns in standard products cropped up in 3Q…[fortunately], most of the destocking areas are in lower priced, lower margin products. Only the COVID destocking creates a stiffer margin headwind. Investors are well aware of this."

416.     As a result of Defendants' misrepresentations and omissions on November 14, 2023, West's stock price was artificially maintained.

g.     **November 16, 2023:** **Stephens Investment Conference**

417.     On November 16, 2023, the Company participated in the Stephens Investment Conference.  During the conference, Defendant Lai responded to a securities analyst's question about destocking, stating that some customers who had been late getting West product supply post-COVID had only started to destock in Q4 2023, and for those customers only, West expected destocking to extend into 2024:

> *We saw some of it in Q3 and we expect some of it in Q4. Yeah. So, we don't think that's demand related. We think it's just more of the customers managing their inventory, especially as they end to – we get to the end of this calendar 2023. Then the other one is this restocking, right?*

> *Remember we had this list of companies who – we had long lead time items where they were having to deal with being on the lower end. Through the first nine months of this year, we were able to help them restock. And then as we got into Q4, some of those customers said, they're at sufficient places and that they'll probably resume ordering next year. We knew that eventually that restocking was up. And if you take a look at our lead times have come down.*

418.     Defendants' Demand Statements in ¶417 were materially false and misleading when made for the reasons set forth in ¶¶306-07, 330, 339, 357.

419.     During the Conference, Defendants also highlighted SmartDose's purported growth and margin expansion:

> Q: Jacob Johnson, Stephens: Got it. Kind of pivoting to a different topic, drug delivery devices. You've seen some really strong growth there this year. I think that may be related to some commercial approvals, but could you unpack that a bit?

> A: Defendant Reiss-Clark: Do you want to take that?

A: Defendant Lai: Sure. Yeah. So, first of all, in our delivery devices, it kind of spans various things. We've got admin systems, those are the transfer devices that if you have a lyophilized drug, freeze dried drug, you can have a transfer device to be able to add saline and avoid having to have any kind of finger sticks.

We have Crystal Zenith, which is an alternative to glass and is really good for places where glass are a suspect in, whether it be breakage, silicon well, et cetera. And so, we make cartridges and syringes and vials, that's had some good growth. And then on the delivery device side, we have SelfDose, which is a self-powered auto-injector **and then we have SmartDose, a wearable device. And last year, we had three commercial approvals. And so, when you look at it in totality, we don't give breakdowns, but we're seeing growth in all of those categories here this year.**

Q: Jacob Johnson, Stephens: Got it. And is there any way to think about margin across those categories?

A: Chad Winters [West, Chief Accounting Officer]: Yeah, it varies. But I mean, as Quintin laid out there, right, I mean different levels of maturity of those products, different levels of volumes, obviously. **So, we see them continuing to move up that HVP margin curve that I talked about earlier. So, as our volumes grow, we'll see that margin improvement follow.**

420.    Defendants' Margin Statements in ¶419 were materially false and misleading when made for the reasons set forth in ¶¶310-11, 322, 366, 387.

421.    As a result of Defendants' misrepresentations and omissions on November 16, 2023, West's stock price was artificially maintained.

    **h.**  <u>February 15, 2024:</u> **Financial Results (Third Partial Disclosure)**

422.    On February 15, 2024, the Company filed a press release with the SEC on Form 8-K, signed by Defendant Birkett, announcing its results for the fourth quarter and full year of 2023 (the "Q4 2023 Earnings Release"), where the Company reported net sales of $732 million during the fourth quarter and net sales of $2.95 billion for the full year of 2023.  The Q4 2023 Earnings Release also reported that net sales in the Proprietary Products Segment were $593.7 million, constituting growth of 1.5% from the same quarter in 2022, net sales in the Contract Manufacturing

Products Segment were $138.3 million, constituting growth of 11.6% from the same quarter in 2022, and that full-year 2024 guidance for net sales was expected to be in a range of $3.000 billion to $3.025 billion.

423.    Additionally, on February 15, 2024, the Company hosted an earnings call (the "Q4 2023 Earnings Call").  During the Q4 2023 Earnings Call, Defendant Green revealed that West "will not achieve our usual full year organic sales and margin expansion in 2024. **As I've outlined, outside of further COVID demand reduction, some of the impact is time related to new capacity and timing of customer upgrades.**  *As for destocking, this is an industry-wide situation, not a change in market share or patient demand for drug volumes.*"

424.    Defendant Birkett emphasized that the Company's order book remained stronger than pre-COVID and stated that destocking was not going to be a long-term problem:

> Q: Jacob Johnson, Stephens: Can you just talk about your visibility into that destocking concluding and maybe kind of the order book, how firm the order book is in the back half of this year?
>
> A: Defendant Birkett: *[J]ust on the order book, when we look at the order book for the back half of the year and compare where we are today versus where we were pre-COVID, the order book actually looks stronger. And so, we're a bit ahead of where we thought we would be on that compared to pre-COVID trends and rates. So that's giving us a level of confidence in the back half. And seeing that, I won't say rebound, but say acceleration back to – are trending back to our normal construct growth rates. And so based on that analysis, we don't see it as being a long-term problem, we would expect we get through it this year. And as we said in the back half, trending towards into that construct, particularly in Q4.*

425.    During the question-and-answer portion of the Q4 2023 Earnings Call on February 15, 2024, Defendant Birkett also highlighted the Company's visibility into demand within its Contract Manufacturing Segment:

> Q: Jacob Johnson, Stephens: [Contract Manufacturing is] a business maybe we don't have the most visibility into in terms of the growth

outlook. But clearly, you're deploying capital into that segment right now. So should we think about that business growing kind of above its historical range for the next couple of years?

\* \* \*

A: Defendant Birkett: Yeah. ***So we would expect Contract Manufacturing to be growing within our construct. The investments that we're making in that area are very specific and tied to specific customers and business. And as Eric said, before we make the investments, we have a level of visibility as to the type of commitment we're going to get and that that does support the long-term growth of the [Contract Manufacturing] business...***

426.    Defendants' Demand Statements in ¶¶423-25 (in **bold and italics**) were materially false and misleading when made for the reasons set forth in ¶¶306-07, 330, 339, 357.

427.    During the question-and-answer portion of the Q4 2023 Earnings Call, Defendant Green emphasized strong demand for West's HVPs, which he attributed in part to volume growth and increased manufacturing efficiencies related to SmartDose:

Q: Lawrence S. Solow, CJS Securities: [O]n the devices, reaching 10% of Proprietary to high-value product sales. I think that's a nice significant milestone. Is that driven more by SmartDose, SelfDose or is that a combination of the two? What's really driving that growth going forward?

A: Defendant Green: ***It's actually – it's interesting, it's actually through all of them. . . And then in SmartDose, it's an area that we've been focused on for a number of years, but we're at a point now of inflection on volume growth that we have to get ahead of the curve. And that is an area that we're laser focused on right now. We have a dedicated team with new automated equipment coming online so we can remove the manual processes, allow us to be more efficient, higher volume, higher quality that will support the growth of these launches….***

428.    Similarly, during the Q4 2023 Earnings Call, Defendant Green emphasized the Company's visibility into demand and its efforts to meet customer needs for HVPs, including SmartDose:

Q: Matt Larew, William Blair: And then another piece of this was, I think you said 1% from HVP manufacturing capacity. And I think if we dial back to Kinston and bring some of that capacity online, obviously you end up catching up a little quicker than you initially thought. What's sort of the scope of this capacity expansion and sort of the path here to get it back to where you want it to be?

A: Defendant Green: So specifically on the 1% down is new lines – also automation we're putting into our HVP devices. These are the proprietary devices that we manufacture like SelfDose and SmartDose for our customers and these are combination devices approved with a specific drug molecule with our customers. So when you think about that specific area, that that's going to be – that's ongoing right now of expansion, additional capacity we brought in, ***the demand is there in hand, and we need to able to get caught up to be able to support our customers.***

429.    During the question-and-answer portion of the Q4 2023 Earnings Call, on February 15, 2024, Defendant Birkett stated that margins within West's Proprietary Products Segment were expected to normalize quarter-over-quarter in 2024:

Q: Derik de Bruin, BofA Securities: So can we talk a little bit about the margin cadence and just how to think about this? And obviously, you're suffering from some headwinds from Kinston not being fully utilized, it sounds like you're taking some headwind from Proprietary Products. How should we think about the margin impact?

And exiting 2024, I mean, assuming that this doesn't linger, kind of to the last analyst question, that this doesn't linger and you do have some visibility on back half of the year? Are we back at a more normalized margin rate exiting the year?

A: Defendant Birkett: Yeah. Derik, that's what we would expect to see. Q1 obviously is going to be pressured from a margin point of view based on what we're seeing from a revenue perspective. We see a high correlation there. But again, ***we do see it trending back to more normal rates of operating margin as we progress through the year and it will be a gradual shift, I think quarter-over-quarter.***

430.    Defendants' Margin Statements in ¶¶427-29 were materially false and misleading for the reasons set forth in ¶¶310-11, 322, 387.

431.    In addition, Defendants failed to disclose the following adverse facts, which were known to or recklessly disregarded by them:

(a)    By 2024, large customers began to "pull back" from West due to quality issues and abnormally high price increases (up to three times greater than West's annual historical price increases) that the Company implemented in the second half of 2023. This included Amgen, who was walking away from SmartDose due to its 50% price increase, Eli Lilly, Roche, and other SmartDose customers, who left West in the latter part of 2023 and early 2024 (CW-1 ¶¶267, 288-91; CW-3 ¶¶259-61; CW-4 ¶270; CW-6 ¶¶262-66; CW-8 ¶¶268-69); and

(b)    West was dealing with a massive backlog of returned SmartDose devices caused by persistent quality and performance failures (CW-7 ¶¶224-26; 241).

432.    During the Q4 2023 Earnings Call, Defendant Birkett disclosed that "**we continue to experience a destocking of inventory by certain of our customers during the fourth quarter.**" Defendant Green also revealed, on February 15, 2024, that the destocking issues had been impacting unspecified "parts" of the HVP portfolio. However, Green continued to downplay the impact of destocking on West by representing that the "*bulk*" and "*primary area*" of destocking was limited to the Company's Standard Products:

> *[O]ne of the areas that [destocking] was more pronounced on the standard and bulk areas,* **but we're also seeing it in some cases in parts of our HVP portfolio. So, it is, I would say it's across a broader set,** *but I would say the primary area has been the bulk and other standard area.*

433.    During the Q4 2023 Earnings Call, Defendant Green further revealed that destocking would impact West's revenues in Q2 2024, but only on a more limited basis as compared to Q1 2024:

> *[B]ased on the conversations and the data we've been looking at with our customers,* **there will be some still in Q2 that have some**

**destocking**, *but not as pronounced in Q1. So, it's really most of it that we're seeing is really a Q1 phenomenon.*

434.    During the question-and-answer portion of the Q4 2023 Earnings Call, on February 15, 2024, Defendant Green attributed the majority of the Company's high single-digit decline in Proprietary Products to destocking, emphasizing that the impact was largely concentrated among only six of West's hundreds of customers, stating: **"[w]hile I mentioned two other factors, majority is destocking, and it's specifically 75% of the destocking has come from six customers."**

435.    When asked about the Company's visibility into how long destocking would last (a question really about whether the Company had visibility into customer inventories), Defendant Birkett stated that "*we don't see it as being a long-term problem.*"

436.    Defendant Green also revealed that the destocking was also affecting the Biologics segment, the largest segment in West's Proprietary Products segment, which made up close to 40% of the Proprietary products revenue during the Class Period:

> Q: John Newton Sourbeer, UBS: And then I guess just specific to the destocking trends in the various Proprietary Product segments, I think Pharma and Generic saw this impact first and then now it's more broad in the Biologics. Do you expect the Pharma side to recover faster, followed by Biologics or just any additional details on a segment perspective?
>
> A: Defendant Green: . . . . [T]hose are good questions. You're absolutely spot on. **But when we look at the destocking effect that's happened for us in the first half of this year, it is across multiple customer segments, market segments. So it's both – it's not just the Generics and Pharma, but also in some cases, in the Biologics.** So I would say that for us and where we are in the value chain is pretty much across the all three sectors. We talked about Biologics, Pharma and Generics.

437.    Defendants' Demand Statements in ¶¶432-33, 435 (in **bold and italics** above) were materially false and misleading when made for the reasons set forth in ¶¶306-07, 330, 339, 357.

While Defendants disclosed that destocking was affecting parts of the HVP portfolio, they continued to downplay the scope and duration of the destocking issue by representing that "***the primary area***" of destocking was still within the lower-margin Standard Products segment and that most of the destocking was limited to only six (6) customers.  Defendants further misled investors by falsely representing that the level of destocking would subside by Q2 2024, when in reality, Defendants knew or recklessly disregarded that destocking was impacting a much broader portion of West's business and was expected to continue for much longer.

438.    On news that destocking had expanded to the "parts of" the Company's higher margin HVP portfolio, West's stock price dropped $57.49 per share, or approximately 14.08%, to close at $350.70 per share on February 15, 2024.  While this news partially revealed Defendants' fraud, Defendants' reassurances continued to mislead investors.

439.    Indeed, securities analysts were surprised by the destocking disclosures.  For example, on February 15, 2024, analysts at Jefferies published a report, titled *First Take: WST 4Q23 "Ouch"*, and wrote that "[t]o state the reaction plainly, 2024 guidance is significantly worse than expected, and probably below most downside scenarios for 2024 with sales growth of 2-3% vs. the 7-9% construct, which mgt affirmed for 2024 last quarter. Mgt blames 'inventory mgt' by clients, including the largest, which suggests that the breadth has expanded vs. 3Q when the affected areas represented a small portion of sales. Expect a significant reset today."  Similarly, analysts at William Blair published a report, titled *First Look: Slight Miss and Guide Calls for Organic Growth of 2%-3%, Dreaded "Destocking" the Culprit*, and stated, "[w]e expect many investors in the space shudder at the sound of the word "destocking" given the elongated stumble-trip-fall that bioprocessing players went through over the past 18 months, so West will have to

work hard and fast to put some guard rails around the timeline and magnitude here and effectively communicate that there are no further cuts coming."

440.    However, analysts were reassured by Defendants' representations of purported continued demand for West's Proprietary Products and by the supposed limited nature of the destocking. For example, on February 15, 2024, Deutsche Bank analysts published a note, titled *Decision Time - Again*, and stated that "West expects to exit 2024 with better Proprietary Products growth and see the gross margin return towards historical ranges alongside overall consolidated gross margin." In their note, the Deutsche Bank analysts highlighted that "[t]he company is building out the footprints needed to support customer demand on the HVP and smart-dose / self-dose side and to fulfill discrete customer demand on the contract-manufactured side. These expansions should be accretive to revenue in 2025."

441.    Similarly, Morningstar analysts published a report on February 16, 2024, titled *West Pharmaceutical Earnings: 2024 Revenue Guidance Disappoints; Wide Moat Intact, Valuation Raised*, and noted that "West's fourth-quarter earnings were in line with expectations, but 2024 guidance disappointed due to revenue growth forecasts that were about six to seven percentage points lower than our expectations." However, they emphasized that "the headwinds that management highlighted are likely to be transitory[,]" and reaffirmed their positive long-term view, writing: "We have also reviewed our thoughts on the company and reaffirm our wide moat rating thanks to its very strong intangibles and switching costs."

442.    In a separate February 16, 2024 update, analysts a Stephens published a report, titled *WST 4Q23 Wrap: Destocking Weighs on WST FY24 Guide, LT Outlook Unchanged*, and noted that "[w]hile we hoped destocking would be removed from our vernacular this year, it made a cameo appearance in [West]'s FY24 outlook." In their note, the Stephens analysts explained

that "[West]'s 2-3% organic growth guidance fell well short of expectations largely due to intensifying destocking headwinds, which will particularly weigh on 1H24 results." The Stephens analysts further observed:

> We suspect it will take a quarter or two (concrete evidence) for investors to gain confidence destocking headwinds are abating. This could lead to [West] shares being rangebound in the NT. Over the long term, there are a variety of tailwinds at [West]'s back including growing injectable drug demand, GLP-1s, and now, Annex 1 (see pg. 3 for our math). In addition, [West] continues to invest in capacity to (presumably) meet growing future customer demand.

443.     The Stephens analysts summarized: "In short, our estimates are moving lower due to a transitory issue (destocking), while the LT opportunity for [West] is unchanged."

### i.      <u>April 25, 2024:</u> Financial Results (Fourth Partial Disclosure)

444.     On April 25, 2024, West filed a press release with the SEC on Form 8-K, signed by Defendant Birkett, announcing its results for the first quarter ended March 31, 2024 (the "Q1 2024 Earnings Release"), wherein the Company reported net sales of $695.4 million for the first quarter, a decline of 3% from the same quarter in 2023, net sales of $559.5 million for the Proprietary Products Segment during the quarter, a decline of 4% from the same quarter in 2023, and net sales of $135.9 million for the Contract Manufacturing Products Segment, an increase of 1.8% from the same quarter in 2023. Defendant Green was quoted in the Q1 2024 Earnings Release as stating:

> We had a solid start to the year and our full-year 2024 financial outlook remains unchanged[.] ***We are actively managing the timing of inventory decisions by some of our customers, and our recent order trends reinforce our prior outlook for stronger organic sales growth in the second half of the year.  As we navigate the near-term headwinds, we are controlling our costs*** while making strategic investments in new manufacturing capacity in both our Contract Manufacturing segment and our Proprietary Products segment, which positions us well for future organic sales growth.

445.     On the same day, the Company hosted an earnings call (the "Q1 2024 Earnings Call"). During the Q1 2024 Earnings Call, Defendant Green stated:

[W]e delivered a solid start to the year. ***During the quarter, we again saw growth in our top-tier HVP component, NovaPure, and our HVP devices, such as SmartDose. . . .***

\* \* \*

***. . . . Also, in the proprietary products segment, we are making progress with capacity expansion of our HVP devices, including SmartDose, SelfDose, and Admin Systems.***

***For the near term, we're working to layer in capacity through productivity optimization programs. And for the longer term, we are adding capacity that incorporates automation to complement our manual processes.***

446.    During the Q1 2024 Earnings Call, a securities analyst from BofA Securities asked about margin pressure, and Birkett responded that West expected margin improvement throughout the remainder of 2024:

> Q: Michael Ryskin, BofA Securities:  I just have a couple of quick follow-ups. One, I mean you talked about the cadence and the progression of revenues through the year. I want to focus a little bit more on the margin side of things. I think we previously looked for a little bit more of a jump from 1Q to 2Q on the gross margin on Proprietary Products and on operating margin as well. Is it fair to say that given your comments on timing of revenues from 1Q to 2Q, that the second quarter margins will be a little bit more subdued as well and it will be closer to the first quarter? And then I've got a follow-up.

> A: Defendant Birkett: ***We expect margin improvement sequentially as we move through the year, and that hasn't changed since we spoke about it in February, so we would see growth in operating margins step up quarter-over-quarter***.

447.    During the question-and-answer portion of the Q1 2024 Earnings Call, on April 25, 2024, Defendants were asked for additional clarity on how product mix was affecting West's margin profile, and Birkett responded that HVP growth was expected to accelerate through 2024, with that growth reflected in HVP margins:

> Q: David Windley, Jefferies: I was going to come back to the mix. I hope I don't confuse the situation further. But just trying to

understand the original question, I guess Jacob's question about the decremental margin and the moving parts there. I understand revenue was lower overall, and so you have absorption impacts from that. But NovaPure, you call out as strong, and we've identified that the margin contribution from that ought to be really, really high. And then it sounds like you have some other reasonably high margin contributors that are being destocked. And so I guess I wanted to make a plea for maybe a little bit more granularity, so we could understand the moving parts there. And then how that progresses as you see the sequential improvement through the balance of the year possibly?

A: Defendant Birkett: *So it was really in some of the other areas of high value products, where we saw some step back in Q1. But what we do expect to see as we progress through the year, the volumes around that business to increase again sequentially.* And that's when we talked about the destocking earlier on in the year, where we're seeing it was across all different parts of our business.

*So, we would expect that HVP growth to accelerate as we move through the year and then the margin-and that to be reflected in our margins.* And also, we'll get the pickup of incremental or increased throughput as we move through the year. I think Q1 was our lowest level of throughput, and we're a high volume business. So absorption does get impacted.

448.    Defendants' Margin Statements in ¶¶444-47 were materially false and misleading when made for the reasons set forth in ¶¶310-11, 322, 366, 387, 431.

449.    During the Q1 2024 Earnings Call, Defendant Green revealed to investors that the Company continued to see destocking by several of its customers in Q1 2024 and Q2 2024, with a return to more typical ordering patterns expected in Q4 2024. Green stated, in relevant part:

We also continue to see inventory management or destocking by our larger, mature customers that are working down their inventory closer to pre-pandemic levels. With that said, Q1 had a solid start due to favorable order timing of customer deliveries fulfilled in the quarter.

<u>**I want to address a question that many of you are asking. Are we seeing an inflection in destocking? The short answer is, not quite yet. Several customers are still working through their safety stock levels**</u>*, and we still expect Q2 to have an impact from customer destocking. And customer order trends continue to*

***indicate a stronger second half of 2024, with return to more typical order patterns in Q4.*** Therefore, after a solid quarter, we maintain our full-year net sales guidance.

450.    Defendant Green also touted West's visibility into customer demand stating that, "[o]ver the pandemic, we actually worked with our customers to make sure that we were able to continue to supply and that there wasn't any stockout with any particular customer[,]" and that "our interactions with our customers remain very strong."

451.    During the question-and-answer portion of the Q1 2024 Earnings Call, on April 25, 2024, Defendants were asked whether Standard Packaging was the weakest part of West's business and what products were driving that weakness.  In response, Defendant Green pointed out that destocking was affecting the Proprietary Products segment—particularly the elastomer side of West's business, including HVP components—but stated that the segment was expected to recover later in 2024 ("***However, that particular part of the portfolio will ramp up quite -- very nicely sequentially throughout the year.***").  Green stated, in relevant part:

> Q: Paul Richard Knight, KeyBanc: Which leaves, I guess, standard packaging, the weakest? Is that a fair assumption? And is standard -- what's in standard packaging to make that the weakest, if it is?
>
> A: Defendant Green: Well, if I -- let me rephrase that. **I think the HVP components for us, most of the destocking that we've experienced earlier this year is around that category.** ***However, that particular part of the portfolio will ramp up quite -- very nicely sequentially throughout the year.* So it is -- most of the -- if you look at the Q1, the Proprietary elastomer side, it really is due to destocking at this point in time** *but very strong outlook towards the end of the year and very strong obviously beyond that.*

452.    Defendant Birkett added:

> [O]n that, it's important to note that we don't anticipate any major mix shift. ***There's still the growth opportunities around HVP and in the Biologics space. And even in Q1, that continued to grow.*** And you could see the growth driven there by the growth in NovaPure. ***So from a mix perspective, I think when you look at it in the whole, areas are growing. And our growth potential, as we***

> *look out past 2024 around standard components and packaging and HVP, the trajectory is the same, that they are the growth drivers.*

453.     In response to an analyst's question about when customers would return to pre-pandemic safety stock levels (meaning regular inventory levels), Defendant Green stated that some destocking would continue in Q2 2024, but that Q2 2024 also marked a return to more normal inventory levels for West's customers.  Defendant Green stated, in relevant part:

> *So we're seeing some of that return in Q2 as we speak.* But as I mentioned in the prepared remarks that we're seeing – *we're still seeing some destocking occurring into Q2. And as we look at the order patterns in the second half of the year, and we – and obviously, we're – as you know, we're make-to-orders, so we get – we have purview to look out multiple quarters ahead of us. It is stronger than it has been in a number of years, if you normalize for COVID. So, we feel good about the – when we talk about sequential growth on the revenue for the next several quarters, we feel very good based on the order patterns we're currently seeing today.*

454.     In response to a Jefferies securities analyst's question about the impact of continued customer destocking, Defendant Green stated that, based on confirmed product orders, destocking was expected to lessen quarter over quarter in 2024, and that West would return to sequential growth quarter-over-quarter. Defendant Green stated: "*Yes, it is going to wane throughout – as you talked about throughout the year. . . . And that's supported by our confirmed orders as we think through the balance of 2024 and also the discussion we had about sequential growth quarter-over-quarter for the next four quarters.*"

455.     With respect to the Contract Manufacturing Segment, Defendant Green fielded a question from an analyst concerning West's visibility into Contract Manufacturing customer demand.  Green reiterated that West had good visibility into customer demand for contract manufacturing, and, in that that segment West had *"very strong, very long-term relationships with customers…"*  Specifically, Green stated:

137

Q: David Windley, Jefferies: As a follow-up, in these areas of higher demand, GLP-1s being one of the previous call outs that you responded to, it's increasingly apparent that the efforts of the sponsors to get those products ultimately to market are very multifactorial with so many different elements of the supply chain investing aggressively to bring up capacity, you all being an example of at least 2 different areas where you're investing. To what degree do you have dialogue with those clients or visibility to understand? You invest and you add NovaPure capacity and you add injection device capacity but fill-finish capacity is a challenge, for example, and that could be a rate-limiting step that you also need to anticipate relative to the order patterns. Like how are you able to do calculus around that?

A: Defendant Green: Yeah, David, that's a good observation is that not just upstream, but downstream, we have to be aware of. ***We do have very strong, very long-term relationships with customers that are in this space [Contract Manufacturing]. So those relations are very – are well established, where we do interact with them about their demand profiles, min-to-max type of conversation for the various drugs. And so we're sensitive towards that.***

456.    Defendants' Demand Statements in ¶¶449-55 (in **bold and italics** above) were materially false and misleading when made for the reasons set forth in ¶¶306-07, 330, 339, 357. While Defendants acknowledged that HVP was where "**most of the destocking that we've experienced earlier this year**" occurred (*see* ¶451), they falsely represented that there was a "***very strong outlook towards the end of the year and very strong obviously beyond that[,]***" and that, based on confirmed product orders, West could confirm that destocking would lessen quarter over quarter throughout 2024.

457.    On this news, West's stock price dropped $17.55 per share, or approximately 4.55%, to close at $368.18 per share on April 25, 2024. While this news partially revealed Defendants' fraud, Defendants' reassurances continued to mislead investors.

458.    Securities analysts reacted unfavorably to West's destocking news. For example, on April 25, 2024, analysts at Jefferies's published a report, titled *4 Key Insight: WST 1Q24*, stating: "Turning the Corner Slowly on Destocking; Mgt Reinforced 2H Order Strength. CEO

Green's remarks that destocking hasn't reached an inflection (rebound) point may have spooked some investors. However, 2Q was already expected to feel some impact from destocking, and revenues and margin should still be up sequentially. That said, we do think 2Q will be somewhat softer than previously thought."

459.    That same day, analysts at UBS published a report, titled *1Q24 Recap: Order Timing Drives Q1 Beat, but Some Destocking Uncertainty Remains; Maintain Neutral*, stating that "Destocking: The revenue beat for the quarter (see First Read) was said to be driven by favorable order timing. While some investors were hoping to see signs that destocking was coming to an end, management noted that they are not quite seeing an inflection yet" and noted that "Q1 results came in better than expected but destock uncertainty remains and some of the Q1 upside was timing-related."

460.    Similarly, analysts at William Blair published a report, on April 25, 2024, titled *Post-Call Update: Destocking Inflecting? "Not Quite Yet"*, stating that "[t]he print itself looked good, but shares were off 4.5% given management's discussion around destocking timing and the acknowledgement that some of the first-quarter beat came from order timing."

461.    Even though West's news was largely negative, analysts reacted positively to certain of Defendants' statements.  For example, on April 25, 2024, analysts at Deutsche Bank published a report, titled *Accelerated Order Conversion Flattens 2Q Ramp; 2H Outlook Intact*, stating that "Contract Manufacturing capacity additions are ongoing, with customer commitments, which along with healthier pricing post pandemic provides greater visibility into the building blocks to return to the long-term growth construct[,]" and noting that "West reaffirmed its expectation of sequentially improving margins and messaged that as HVP product growth accelerates, margins should reflect the growth."

462.    Similarly, on April 25, 2024, analysts at Jefferies published a report, titled *4 Key Insights: WST 1Q24*, and wrote that "revenues and margin should still be up sequentially" and noted that "[West] also said expectations for a strong 2H recovery are unchanged, supported by a healthier order book." In their note, the Jefferies analysts highlighted that "[g]reater mix of HVP is one of the main drivers of [West]'s 7-9% growth construct, which is why [West] needs to build ahead of demand in PP (capacity expansions take 24+ months). In [Contract Manufacturing] [West] builds capacity after customers contract for the capacity, so the Grand Rapids and Dublin expansions are catch-up for a 'diabetes and obesity customer' (aka GLP-1 injectors)." Finally, the Jefferies analysts praised "[West's] HVP mix shift [a]s highly durable and consistent at >100 bps annually; growing number of biologic injectables drives [West] revenues as these new approvals are spec'ing in high-end HVP (i.e, NovaPure). GLP-1s accelerate mix shift towards HVP and are a durable growth driver for the next several years."

463.    Additionally, on April 25, 2024, analysts at William Blair published a report, titled *Post-Call Update: Destocking Inflecting? "Not Quite Yet"*, and wrote: "Gross margins to ramp up sequentially on volume and mix improvements. Gross margin of 33.1% came in ~90 basis points above our forecast for the quarter but were down ~480 basis points due to unfavorable mix and lower absorption of capacity. Despite growth in some of the higher-end HVP products (devices/NovaPure), destocking in FluroTec and Westar components (largely reflected in the double-digit organic decline in generics) was a key contributor to the margin degradation year-over-year. Gross margins should ramp up throughout the year driven by volumes in HVP returning in the second half of the year contributing both to mix and overhead absorption."

**j.    May 14, 2024: BofA Securities Health Care Conference**

464.    On May 14, 2024, Defendants participated in the BofA Securities Health Care Conference.    During the conference, an analyst asked about the Company's order book and visibility:

> Q: Michael Ryskin, BofA Securities: [A]nything you can say in terms of order books, how things have trended, visibility into end markets?...
>
> A: Defendant Birkett: Yeah. I think it's the same as what we've been communicating over the last couple of months. *As we move into the second half of the year, when we look at our orders on hand as a percent of forecast for the second half of the year, that's trending a little bit ahead of where we were at this point in time in 2019, pre-COVID. So, we've seen that continue as we've moved through the last number of months. So, again, no change there. And that ties into how we're guiding for the year.*

465.    In response to an analyst question about destocking, Defendant Birkett reiterated the Company's visibility into and close monitoring of customer inventory and demand, stating, in relevant part:

> Q: Michael Ryskin, BofA Securities: Okay. All right. And probably the high debate point on the stock these days is destocking situation. What you're seeing in the end market? We've heard mixed commentary from some of your other packaging component manufacturers. Could you give us an update into visibility into customer levels? How do you manage that? And how do you gain confidence that you've got a good sense of what's going on there?
>
> A: Defendant Birkett: Yeah. *So, we are constantly in communication with our customers assessing where they are, what is their demand, what is the timing of that demand. So, that's an ongoing process. And then, we correlate that to what we're seeing in actual orders coming through. As I just mentioned, as we were seeing what's coming through in the back half of the year and does all of that tie together. But again, it's evolving. It's something that we monitor very closely.*

466.    Defendant Lai added that destocking was a sector trend that was happening across several types of pharma customers which none of them being "overly impactful":

And, Mike, maybe I'll just add to that, because we've had some questions earlier this – today, customer concentration with respect to this destocking. ***And what we've seen is that it's across the board for us. It's pharma companies. It's generic companies. It's biologic companies. There isn't a single customer that we would call out as being an overly impactful in destocking. It's several customers, which makes it more of a sector-wide trend that we're seeing and not just specific to a customer or customers.***

467.    Additionally, during the BofA Securities Health Care Conference, an analyst asked whether the Company's timeline for the "inventory drawdown" had changed, to which Birkett responded: "***we would expect to see things improve as we move through the year and quarter-over-quarter.***"

468.    Defendants' Demand Statements in ¶¶464-67 were materially false and misleading when made for the reasons set forth in ¶¶306-07, 330, 339, 357.

469.    Additionally, information from a former West employee confirms that Defendants failed to disclose the following adverse facts which were known to or recklessly disregarded by them:

(a)    That an internal pricing analysis for the Generics segment (which included a survey of customers such as Pfizer and Sanofi that also purchased West products in other segments besides Generics), presented to Defendant Reiss-Clark in March 2023, demonstrated that raising prices in late 2023, by 10% or more than triple West's annual, historical prices increases, and even higher price increases for SmartDose, would cause significant risk of lost orders and customers fleeing West. The pricing analysis further showed an at least $50 million revenue risk in Generics alone from an approximate 10% price increase. Despite this analysis, West implemented company-wide price increases in late 2023 causing customers to leave the Company. (CW-1 ¶¶274-93).

470.    During the BofA Securities Health Care Conference, on May 14, 2024, Defendant

Birkett also touted that HVPs would drive both revenue growth and margin expansion, stating:

> *So, as we move through the year, we do see margins improving through higher levels of production and the mix shift being addressed, more high-value products coming through. So, that ties into greater revenue growth, but also margin expansion. And I think if you look back at the last number of years when we were driving a lot of margin improvement, it was really higher volumes around higher value products. And that shows the power of it once it kicks in. So, once we transition into the back half of the year, that's what we should see materialize.*

471.    Birkett further represented that margin expansion was primarily driven by a product

mix shift toward HVPs, stating: "The HVP mix shift is really the biggest driver of the margin

expansion, and we see it predominantly within the Biologics market segment."

472.    Defendants' Margin Statements in ¶¶470-71 were materially false and misleading

when made for the reasons set forth in ¶¶310-11, 322, 366, 387, 431.

### k.    June 4, 2024: William Blair Growth Stock Conference

473.    On June 4, 2024, Defendants participated in the William Blair Growth Stock

Conference.  At the conference, Defendant Green stated: "*We're seeing a slowdown in the first*

*half of this year. But our guidance suggests that you think about this that second half is going*

*to be stronger than the first half for 2024 for West.*"

474.    Defendants' Demand Statements in ¶473 were materially false and misleading

when made for the reasons set forth in ¶¶306-07, 339, 357, 469.

### l.    July 25, 2024: Financial Results (Fifth Partial Disclosure)

475.    On July 25, 2024, West filed a press release with the SEC on Form 8-K, signed by

Defendant Birkett, announcing its results for the second quarter ended June 30, 2024 (the "Q2

2024 Earnings Release"), wherein the Company reported net sales of $702.1 million for the

quarter, a decline of 6.9% from the same quarter in 2023, net sales of $559.7 million for the

Proprietary Products Segment, a decline of 9.4% from the same quarter in 2023, and net sales of $142.4 million for the Contract Manufacturing Products Segment.  The Company also lowered its full-year net sales guidance for 2024 to a range of $2.870 billion to $2.900 billion, compared to the prior range of $3.000 billion to $3.025 billion.

476.    The Q2 2024 Earnings Release quoted Defendant Green as stating that "[t]he second quarter continued to be impacted by an elevated level of customer destocking."

477.    Additionally, on July 25, 2024, the Company hosted an earnings call for the second quarter of 2024 (the "Q2 2024 Earnings Call").  During the Q2 2024 Earnings Call, Green stated:

> We had a lower-than-expected second quarter impacted by continued customer destocking. That being said, we are seeing promising signs from our customers that give us confidence of a turning point in this trend. Looking ahead, we expect the second half of the year to be stronger than the first half with a return to year-over-year organic growth in the fourth quarter led by our Proprietary Products segment, specifically Biologics.

478.    During the question-and-answer portion of the Q2 2024 Earnings Call, Defendants were asked about inventory levels and visibility into destocking. In response, Green revealed that destocking would continue into Q3:

> [I]n the beginning of the year, after having discussions with our customers that we had an indication that the return will be a little bit sooner than we anticipated. What I mean by that is a little more pronounced back to normalized demand curves in the second half of this year. **As we progressed through Q2, we started seeing the intra-quarter demand slightly less than we anticipated, and we see that persisting a little bit into Q3.**
>
> So we do see sequential improvements over the next couple quarters, and as I mentioned, returning back to growth in Q4. And that is really our customers are gradually going back to where they were pre-COVID. So we don't see any variations below or any variations slightly above. It's just pretty much consistent when a customer tells us what they're targeting, i.e., 12 months or 9 months or 16 months.

479.    During the question-and-answer portion of the Q2 2024 Earnings Call, Defendants were asked about the continued impact of destocking, its effect on product mix and margins, and any changes in customer ordering patterns.  In response, Birkett revealed that destocking was now impacting the Company's margins:

> So on the destocking, [ ] when we look at that, we have been seeing that in our Biologics segment and in Generics, that's where we saw the biggest impacts here in the second quarter. And you know that's really where-as we were going through COVID, that's where we saw the most pressure also around lead times where customers really had to manage their supply chains. And that's where we believe the safety stock built over time. So that's why we are seeing destocking in those areas right now to a larger extent versus comparing this to our other market units. **And you can see that play through then on the impact on our gross margin and operating margin is that that's impacting our mix. So we're having, one, volume impact because of that, but we're also having a mix impact**.

480.    Also, during the question-and-answer portion of the Q2 2024 Earnings Call, on July 25, 2024, Defendants revealed that destocking would continue to impact Q3 2024 and persist into Q4 2024. Birkett stated:

> So what we are seeing is that, **for Q3, we don't see any major step up, I mean, they're continuing the way we're – we've been going. Some sequential improvement, as Eric mentioned, and then a step up into Q4.** And that step up in Q4 is really driven by the customer segments within Biologics and a reasonable improvement in generics, but the main driver is around the Biologics market. And that's what we're seeing and that's the information we're getting from our customers, and that informs the basis of our guide at this point. And as Eric said, then there are metrics around that which are giving us confidence that that will actually materialize.

481.    Green added:

> **It became more of a gradual recovery, I believe, in what we're seeing versus a more pronounced Q3 recovery.** And that's actually one of the drivers of why, based on the customer conversations, it's a still similar group of customers across multiple segments. **Yes, there's some of the larger ones we highlighted**

**earlier in the year that they're actually going through the process and they're getting closer to the end of that process.**

But as we look through with these discussions, we look at where they are in their process, where we are with our – able to produce the products in the very short period of lead times, we are confident moving back to long-term construct. And that will – **it's going to take a little more time than we anticipated, but as indicated in the guidance that we gave, we're getting closer to that in Q4,** and we believe that will carry on going forward.

482.    During the question-and-answer portion of the Q2 2024 Earnings Call, Defendants were asked to clarify the extent of customer destocking and whether prior guidance had adequately incorporated the expected inventory reductions. In response, Birkett stated:

> What we did see, **as we were progressing through Q2, the level of intra-quarter orders that we would have anticipated to materialize in that period of time, it wasn't at the rate that we would have expected it to be. So - and then there was some timing with customers moving some orders out late in the quarter that has impacted us.**
>
> **And then, as we've looked at the balance of the year and as we've rolled through the end of June and practically through July, what we're seeing in Q3 is that orders that we would have anticipated materializing for the period and even some for Q4, they just weren't coming through. And when we assess what was happening there, it's still really related to levels of destocking. So it's gone longer than we would have originally anticipated. And that is essentially the main driver.**
>
> **And when we had looked at it originally, our coverage rate for Q3 and Q4 was pretty much in line or a little bit ahead of pre-COVID levels. But what hasn't happened then is filling in between the actual orders confirmed and the forecast that we had that hasn't accelerated in the way that we would have anticipated that, that would take place. And so, when we did the assessments, we felt that we have to be transparent and do the right thing and take the guide down and do it with the right level Where – we don't want to be in the position where we're cutting and cutting and cutting. So, hence, the reason why the drop in the guide is pretty significant. It's not something we want to do, but it's reality that we're dealing with today.**

483.    During the Q2 2024 Earnings Call, on July 25, 2024, Birkett also discussed the sales decline in the Company's Proprietary Products Segment, stating: **<u>High-value products, which made up approximately 71% of Proprietary Products sales in the quarter, declined by double digits, primarily due to decreased sales of our Westar, Daikyo Crystal Zenith and FluroTec products.</u>**

484.    When a securities analyst from Jefferies asked about customer order visibility and its relationship to West's adjusted guidance, Birkett, while still misrepresenting that West had previously known regarding customer demand, revealed that "**<u>we had a level of confidence around it and anticipated a certain conversion rate, obviously, that hasn't materialized in the way we would have anticipated. So we have adjusted our guidance to reflect that and give us confidence about being able to deliver on the numbers, now that we're guiding to</u>**."

485.    During the question-and-answer portion of the Q2 2024 Earnings Call, on July 25, 2024, Defendants were asked to explain the Company's deteriorating margins in light of prior guidance and its long-term financial model, and to clarify expectations for margin expansion as revenue growth recovered:

> Q: Jacob Johnson, Stephens: Maybe just to go back to the EPS guidance, you're pointing to kind of down 1% to 2% organic growth this year. And I think it would seem to apply probably like 300 to 400 bps of operating margin contraction, which is kind of greater decremental margins than the long-term algo would suggest. Can you just flesh that out a bit more, some of that capacity additions, et cetera?
>
> And then, I think I heard Bernard mention earlier, perhaps as revenues recover, maybe we could see something better than 100 bps of margin expansion. Can you just talk about the incremental margins as we return to growth in 4Q and beyond?
>
> A: Defendant Birkett: **<u>Yeah. So the major impacts on margin that we've seen here in Q2 is really driven by volume and mix. And for high-volume manufacturing operation, any decrease in volume like that is going to have a significant impact. And what</u>**

**- where we're seeing it, Jacob, is really in HVP. So the drop is in biologics and generics. And so we're getting this kind of outsized impact on margin where, if you look back at - take the COVID years when we were getting a large amount of expansion in HVP and growth in that area, we were getting outsized margin expansion well beyond our 100 basis points.**

**So essentially, what we're seeing now is the reverse of that.** So when things normalize, we start to see growth again and getting back into our long-term construct, that volume growth will be driven within HVP. And then also that aligns with the mix shift as well improving where our HVP was in the kind of mid-70s as a percent of proprietary revenues. And today, what we're saying it's about 71%. And that's the type of impact it has on our business. So when we're returning to growth, we would expect to see that margin recover pretty much - pretty quickly and in line with that growth, particularly around biologics and the generics space. . . . It's all in gross margin. The OpEx was pretty tight.

486.    On this news, West's stock price dropped $46.61 per share, or approximately 14.4%, to close at $277.16 per share on July 25, 2024. While this news fully revealed the truth about Defendants' misstatements and omissions relating to destocking, including that the destocking was now impacting the Company's margins, Defendants continued to conceal the Company's deteriorating CGM business—including that its major customer, Dexcom, had already wrapped up its business with West—and the true condition of its purported flagship product, SmartDose, which was plagued with pervasive quality and manufacturing deficiencies.

487.    Securities analysts were shocked by this news.  On July 25, 2024, analysts at Jefferies published a report, titled *First Take: WST 2Q24*, noting there was "[n]o Improvement in Destocking;  . . . We knew that destocking was still happening in 2Q, but PP revenues were supposed to be up sequentially, not flat. PP rev missed cons[ensus] by 5%."  Similarly, on July 25, 2024, analysts at William Blair published a report, titled *Post-Call Update: Destocking Leads to Another Miss and Guide Down; Return-to-Normal Pushed Out Another Couple of Quarters*, and stated that "West's second-quarter print missed both our and Street expectations as results and the

outlook continue to be impacted by destocking and limited near-term visibility." In their note, the analysts at William Blair noted that "[o]ur checks on the space over the past year-plus clearly have not helped us call the weeks and months making up the now several-quarters-long road down on destocking[.]"

488.    Likewise, on July 25, 2024, Deutsche Bank analysts published a report, titled *Coming Full Circle*, in which they reduced their price target and EPS estimates for West, and stated that "[t]here are a number of differences of now vs then, namely: an extended destocking period; non-recurring business; sponsor supply chain management; participation in high growth programs; and, drug containment industry participant tactics during and exiting the pandemic etc."

489.    Similarly, on July 25, 2024, UBS analysts published a report, titled *Q2 Miss and Guidance Reduction; Reducing Forecasts to Reflect Slower Recovery*, in which they lowered their price target and EPS estimates for West, and stated that "[o]ur Neutral rating on West Pharmaceutical Services (WST) reflects our view that destocking headwinds, margin pressures, and capacity constraints could limit near-term upside. Worse-than-expected destocking trends leading to a Q2 miss and 2024 guidance reduction support our thesis." In their note, the UBS analysts wrote that "[the miss] was driven by worse-than-expected destocking." However, the UBS analysts also acknowledged constructive signs for the longer term, noting that "West saw positive signals of improving customer demand, but orders did not accelerate as quickly as previously expected as customers continue to reduce safety stock levels given West's now shorter lead times." The UBS analysts further emphasized that, "[d]espite the temporary destocking driven slowdown, West continues to invest in future growth and has accelerated some CapEx to ensure two new contract manufacturing sites – Grand Rapids and Dublin – are able to fulfill contracted customer demand."

490.    Despite the bad news, analysts were reassured by Defendants' representations regarding the strength and outlook of the Company's Contract Manufacturing Products Segment. For example, on July 25, 2024, analysts at MorningStar published a report, titled *West Pharmaceutical Facing Headwinds in 2024, but Long-Term Growth and Margin Expansion Story Intact*, and stated that "[a]lthough the guidance is a negative surprise, we believe these headwinds are transitory and maintain our view that the company can grow in the high single digits over the long run. The core driver of this is the market for injectable drugs, which enjoys secular growth trends due to increasing use of biologic drugs."

491.    Similarly, on July 25, 2024, analysts at KeyBanc published a report, titled *WST 2Q24: Share Price Weakness but Customer Orders Building*, and stated that "the highlight was an increase in capex for the year ($250M to $275M) due to customer demand building and orders cited as improving" and noted "[t]hese tailwinds instill confidence in the 7-9% LT guide, and we see WST growing in the DD range. Additionally, we see upside to current margins as destocking of HVPs have contracted margins significantly (650 bps y/y)."

m.    <u>September 18, 2024:</u> BofA Global Healthcare Conference

492.    On September 18, 2024, Defendants participated in the BofA Global Healthcare Conference.  During the conference, an analyst asked about the impact of recent regulatory changes on West's financial model:

> Q: Michael Ryskin, BofA Securities: And when we think about the impact to the financial model from something like this, talking about the various components of the model, right? You're thinking mostly from a mix perspective, from a pricing perspective, is that how we should be thinking about the contribution?
>
> A: Defendant Birkett: Yeah, essentially there's – ***it will be converting existing volumes of standard product to HVP. So, then you're picking it up on the pricing as that dynamic changes. And then, really on the margin profile of those products, should shifts in a positive way for us.***

493.     Defendants' Margin Statements in ¶492 were materially false and misleading when made for the reasons set forth in ¶¶310-11, 322, 366, 387, 431.

494.     As a result of Defendants' misrepresentations and omissions on September 18, 2024, West's stock price was artificially inflated and/or artificially maintained.

### n.     **October 24, 2024:** Financial Results

495.     On October 24, 2024, West filed a press release with the SEC on Form 8-K, signed by Defendant Birkett, announcing its results for the third quarter ended September 30, 2024 (the "Q3 2024 Earnings Release").  The Q3 2024 Earnings Release reported net sales of $746.9 million for the quarter, a 0.1% decline from the same quarter in 2023, net sales of $601.4 million for the Proprietary Products Segment, a decline of 0.2% from the same quarter in 2023, and net sales of $145.5 million for the Contract Manufacturing Products Segment.  The Company also increased its full year net sales guidance range and adjusted-diluted EPS range.

496.     The same day, the Company hosted an earnings call (the "Q3 2024 Earnings Call").  During the Q3 2024 Earnings Call, Green stated:

> *We are also making significant progress in ramping up production of HVP delivery devices.*
>
> *The strong increase with on-body's self-injection devices during the quarter was driven by a combination of capital investment, improved utilization and the implementation of a new production line. We anticipate this ramp-up to continue into the fourth quarter as we execute on our expansion plans. We have initiatives in place to improve the margin, including optimizing our manufacturing process, driving efficiency through automation and scaling to fulfill customer demand.*

497.     Later, during the question-and-answer portion of the Q3 2024 Earnings Call, an analyst from KeyBanc asked Defendants about the ramp-up of the Company's SmartDose device:

> Q: Paul Richard Knight, KeyBanc: Hi, Eric. The comment about wearable injection devices, does that mean Phoenix line is building,

producing? And then kind of a follow-up is could we get an update on Grand Rapids, Michigan and the Dublin facility as well?

A: Defendant Green: Yeah. Yeah. Good morning, Paul, and thanks for the question. Twofold. The first one on SmartDose, particularly our Phoenix facility, you're correct, that ramp-up started in Q3, where we did receive FDA approval for commercial manufacturing into the market. And we're really excited about that new team that's been put together and just the level of capability of the ramp-up. ***They're meeting expectations and I'm really proud of that team to really go from a brand new facility and now producing high-quality product that's going to the market. So I'm very pleased with that.***

498.    Defendants' Margin Statements in ¶¶496-97 were materially false and misleading when made for the reasons set forth in ¶¶310-11, 322, 366, 387, 431.

499.    During the question-and-answer portion of the Q3 2024 Earnings Call, an analyst from William Blair asked Defendants about their outlook for the Company's Contract Manufacturing Products Segment:

Q: Matt Larew, William Blair: . . . . I wanted to ask about Contract Manufacturing gross margins there were up nearly 400 basis points sequentially. You've referenced, obviously, scaling capacity at – in Dublin and Grand Rapids and also adding new capabilities with higher revenue margin potential. Most of the story over the last, call it, five or seven years has been margin expansion on the Proprietary Products side. Just wonder if you could maybe, using this quarter as a window into what the potential is for Contract Manufacturing moving forward?

A: Defendant Birkett: Yeah, Matt, ***I think if we're looking out over the next, like, 12 to 24 months, we see a slight uptake on the Contract Manufacturing as drug handling business comes onboard because that is a very different margin profile for current Contract Manufacturing business. But for us to scale that, it's going to take a little bit of time. So, I would anticipate the margins around Contract Manufacturing to be relatively consistent with what they are now***.

***We get a little bit of variability between quarters depending on product mix and the level of kind of DA or engineering work that's involved, that's pretty consistent, within the high teens.***

* * *

> *So, it's more in the longer term where we would see a – like a significant step-up in the margins within CM.*

500.    Defendants' Demand Statements in ¶¶499 were materially false and misleading when made for the reasons set forth in ¶307(e)-(g).

501.    As a result of Defendants' misrepresentations and omissions on October 24, 2024, West's stock price was artificially inflated and/or artificially maintained.

502.    Securities analysts responded positively to Defendants' statements about HVP growth.  On October 24, 2024, analysts at Jefferies published a report, titled *First Take: WST 3Q24*, and stated that "[West]'s 3Q beat on all measures, driven by strength in its proprietary product segment, particularly self-injection devices (e.g., SmartDose/SelfDose)."  The Jefferies analysts also highlighted that "[West] attributes the recovery in HVP sales, from 71% of PP to 75%+, to strong demand for self-injection device platforms (i.e., proprietary devices)."  The Jefferies analysts also noted that "CM has capacity coming online in both Grand Rapids and Dublin, which may drive YoY growth in 4Q."

503.    Likewise, on October 24, 2024, analysts at KeyBanc published a report, titled *WST: Strong 3Q24 Indicates Building GLP-1 Demand, Less Destocking, and Improving Biotechnology*, and stated: "In what is likely one the more impressive earnings reports this season, [West] posted a top-to-bottom beat. [West] was able to deliver 6.4% sequential growth (~$42M) from biologics and GLP-1 demand. With $19M of the $42M beat related to incentive payments linked to the delivery of 'wearable' devices (injection of traditional biotechnology monoclonal antibodies)[.]"  In their note, the KeyBanc analysts praised "the contract manufacturing site expansion in 4Q24 (Grand Rapids, MI) and 2025 (Dublin, Ireland)" and noted that "[w]e estimate these two facilities

will add an incremental ~$300M of GLP-1 revenues ($200M in Dublin and $100M in MI) and provide contract manufacturing margin accretion."

504.    Similarly, on October 25, 2024, analysts at William Blair published a report, titled *Post-Call Update: Destocking Easing Through HVP Device Growth, Order Timing, and Foreign Exchange Drove Upside in Quarter*, and stated that "the beat was driven by significant upside in HVP device growth, a customer incentive payment, order timing, and foreign exchange," and noted that "[o]n the print, HVP device growth associated with a new customer product launch yielded all the proprietary products upside in the quarter (HVP components were essentially in line with our target and up sequentially for the first time in three quarters, while standard products missed)."  In their note, William Blair analysts also proclaimed: "[W]hile a surprise, the upside from HVP devices is part of the long-term thesis around West's increasing economic opportunity as drugs and drug delivery becomes more complex."

### o.    November 12, 2024: UBS Global Healthcare Conference

505.    On November 12, 2024, West participated in the UBS Global Healthcare Conference.  During the conference, Green stated: "And last but not least, but we had significant ramp-up of a new site in Phoenix with our – one of our wearables SmartDose to build, support a customer on their launch of important drug molecule in the market with already a captive patient population. And that site was commissioned in Q3, ***and we're very pleased that they are meeting and exceeding expectations on the ramp-up as we speak, but that will continue over several quarters.*** So there's a lot of highlights about the quarter, some tailwinds, some headwinds, but pleased with the results."

506.    During the UBS Global Healthcare Conference, an analyst from UBS asked Defendants about the Company's SmartDose device:

Q: Dan Leonard, UBS: . . . [H]ow broad or narrow is the growth from SmartDose?

A: Defendant Green: . . . . The capacity that we put into Phoenix, which is an existing site that we have, but we repurposed it particularly for wearable manufacturing. It basically doubles our capacity between – from Scottsdale. So between Scottsdale to Phoenix, we have 2x the volume. ***And we're excited that – and it's still a semi-manual process, and we have invested in a fully automated line that will be in our facility in Phoenix early 2025 with the intent to have ramp up for commercialization towards the end of the year. Obviously, through various regulatory and quality checks jointly with our customer. So, we're excited with – be able to support our customer, but we do have three products in the market, but this clearly will be the largest that we have to date.***

507.    Later, during the UBS Global Healthcare Conference, that same analyst also asked

about the automation of SmartDose production:

Q: Dan Leonard, UBS: . . . coming in 2025, what are the implications in terms of narrowing the margin gap on the product category . . . for you compared to the balance of the business?

A: Defendant Green: . . . . ***We called out the margin and we want to be very clear that our expectations of the margin of this portfolio is far greater than what we currently have***. And there's really three drivers for that.

***One of them is driving more automation. You can imagine if you're producing product and it's a highly manual process, go into a fully automated process with no human interaction other than engineers to support the line, it's a tremendous accomplishment in throughput, yield, quality and that will be obviously a driver for margin expansion.***

***Another is we're starting to get scale. When you start to get scale, you're able to drive more lean practices in these facilities, which we didn't have before. We had the principles, but when you have scale, it's harder to get that leverage.***

And the third is, they continue to make sure that we are creating the value for our customers and their patients, so we can capture more of that. And that's also ongoing as we speak.

155

508.    Defendants' Margin Statements in ¶¶505-07 were materially false and misleading when made for the reasons set forth in ¶¶310-11, 322, 366, 387, 431.

509.    As a result of Defendants' misrepresentations and omissions on November 12, 2024, West's stock price was artificially inflated and/or artificially maintained.

        **p.**      <u>**November 19, 2024:**</u> **Jefferies London Healthcare Conference**

510.    On November 19, 2024, West participated in the Jefferies London Healthcare Conference.  During the conference, an analyst from Jefferies asked Birkett a question about SmartDose's margin profile:

> Q: David Windley, Jefferies: . . . I'm going to ask one more, and that is around the high-value devices. Those devices in the third quarter were described as, like, 20% margin, which is not particularly a high-value margin profile. Does that include the $19 million of incentive fees to get to that margin? Or would that be upside to those margins?
>
> A: Defendant Birkett: With that in there, they – ***it'd be like between 20 and 30% margin.*** The – where we're going to see that incentive, again, repeat itself and – not the exact same figure, but repeat here in Q4. And ***what we – we know with the SmartDose device, it can get to HVP margins over time. It's just scaling the product to the right level of the volumes. Plus, at the moment, it's being built on manual lines. And with a fully automated line, that will be onboarding as we move through 2025 and into production late 2025, early 2026.***
>
> Q: David Windley, Jefferies: And we're getting to HVP like margins would be roughly 50%?
>
> A: Defendant Birkett: Yeah. We will be targeting like that 50% range.

511.    Defendants' Margin Statement in ¶510 was materially false and misleading when made for the reasons set forth in ¶¶310-11, 322, 366, 387, 431. Despite Defendants' representations that SmartDose "***can get to HVP margins over time***[,]" Defendants knew that SmartDose would

not be margin accretive due to pervasive manufacturing and quality issues, which had caused SmartDose customers to flee West.

512.     As a result of Defendants' misrepresentations and omissions on November 19, 2024, West's stock price was artificially inflated and/or artificially maintained.

**q.     November 21, 2024: Stephens Investment Conference**

513.     On November 21, 2024, West participated in the Stephens Investment Conference. During the conference, an analyst from Stephens asked Defendant Reiss-Clark, West's Chief Commercial Officer, about SmartDose:

> Q: Jacob Johnson, Stephens:  So, I promise for everybody in the audience, we'll get to GLP-1 dynamics, but I want to go to a different area of growth that, I think, has become a little more topical recently, but I think at times it's kind of flown under the radar, and that's the delivery devices. Those have been really strong in recent years. Can you talk about what's driving that? And then, is there any way to kind of frame up the number of commercial drugs that SmartDose/SelfDose support?
>
> A: Defendant Reiss-Clark: Yeah. So, I'll take that one. So, *we're currently supporting three customers with drugs on the market, and those drugs are in various stages in their product launches, but we have seen some recent success with a customer that has a blockbuster drug, and so we're supporting that ramp*. And in the call, we did speak about a new line in our Arizona manufacturing network coming online. And so, we were able to see that come through in Q3. *And we also have additional investments around an automated line that will be coming in towards the very tail end of fiscal year 2025, really benefiting in 2026.*

514.     The same analyst from Stephens also asked about the automation of West's facilities, which Reiss-Clark touted as a growth opportunity:

> Q: Jacob Johnson, Stephens: . . . . You mentioned the new capacity, and you're working to add automation, which seems to suggest you see additional volumes coming. So, is it fair to assume that drug delivery devices [*i.e.*, SmartDose] can remain accretive to the growth profile at West in coming years?

A: Defendant Reiss-Clark: So, right now, with the current customer that we're supporting, *we do certainly see that ramp providing a growth opportunity, and that will continue for a period of time.* But with the trend of you kind of moving from infusion centers or hospital treatments into more of a home setting, we certainly see this as an area of opportunity in the market overall. *And so, we certainly have a pipeline of customers that we're working with to be able to help those customers bring different treatment options to their patients.* Obviously, this follows the FDA regulatory approval where you've got to get the drug approved, you've got to get that drug approved with the delivery device that it's going to treat the patient with.

*So, this is somewhat of a long cycle, but we do believe that this is a growth area, but we've got to get new customers, we've got to have those customers be successful. And then, clearly, we've got to make sure we've got the scale to support them in the market.*

515.    Defendants' Margin Statements in ¶¶513-14 were materially false and misleading when made for the reasons set forth in ¶¶310-11, 322, 366, 387, 431.

516.    As a result of Defendants' misrepresentations and omissions on November 21, 2024, West's stock price was artificially inflated and/or artificially maintained.

### 8.    The Truth Is Fully Revealed

517.    On February 13, 2025, West filed a press release with the SEC on Form 8-K, signed by Defendant Birkett, announcing the Company's fourth quarter and full year of 2024 results.  The Company also revealed its revenue forecast for 2025 was in the range of $2.875 billion to $2.905 billion and adjusted-diluted EPS expected to be in the range of $6.00 or $6.20, both of which were significantly below previously stated expectations.

518.    During the accompanying earnings call held on the same day to discuss the Company's financial results (the "Q4 2024 Earnings Call"), the Company attributed the disappointing guidance in part to the Contract Manufacturing headwinds, including the loss of two major CGM customers because West "made the decision to not participate going forward as our

financial thresholds cannot be achieved." The Company also revealed that its SmartDose wearable injector will become **<u>margin dilutive</u>** in 2025 due to lower pricing.

519.    On the Q4 2024 Earnings Call, Defendant Green stated that "While we categorize and view SmartDose as an HVP product, we expect that in 2025 it will be margin dilutive. We are taking steps to improve our delivery device economics and all options are on the table." This statement revealed the truth that SmartDose was not, in fact, going to be margin accretive.

520.    Defendant Green also revealed: "There are two large continuous glucose monitoring customers that we serve. In both cases, these customers develop next-generation devices. We have made the decision to not participate going forward as our financial thresholds cannot be achieved. One of these customers has started to exit and the other has let us know of their intention to exit in mid-2026. We're actively pursuing opportunities in CM that more closely align with our margin and capital return requirements."

521.    On this news, West's stock dropped $123.17 per share, a decline of approximately 38.22%, to close at $199.11 on February 13, 2025.

522.    These revelations came as a shock to the investing public, and analysts responded negatively. On February 13, 2025, analysts at KeyBanc published a report, titled *WST: 4Q24 and 2025 Guide, We Like Shares on Weakness as GLP-1 Momentum Can Overtake CM Headwind*, cutting their price targets for West stock from $470 to $325. In their note, the KeyBanc analysts stated that West had issued "disappointing FY25 guidance" and the Company's "Contract Manufacturing (CM) and Proprietary Delivery systems… had problems with the Company moving away from lower-margin glucose monitors in Dublin."

523.    On February 13, 2025, analysts at Wolfe Research published a report, titled *Shocking Guidance & Uncertainty About Growth & Margin Outlook Drive Notable Selloff*, and

stated that "[t]he quarter was good… but the guide was shockingly lower than expected" and noted that "[p]ending better visibility on growth drivers and the margin outlook, we remain on the sidelines." Similarly, on February 13, 2025, analysts at Deutsche Bank published a report, titled *Pitchers and Catchers Report to Spring Training*, and stated that "[i]nvestors are disappointed with West's 2025 guidance." Likewise, on February 14, 2025, analysts at BofA Securities published a report, titled *FY25 Guide Delivers a Shock With a Major Reset to Numbers*, and stated that guidance "setback was disappointing and requires a serious re-evaluation of the business visibility and year-to-year consistency."

524.    Similarly, on February 14, 2025, analysts at William Blair published a report, titled *Post-Call Update: Recalibrating Our Compass After a Disorienting Update*, and wrote that the "sell-off was a reaction to the very disappointing guide (~22% below consensus), disclosure that the company is walking away from renewals of two large CGM contracts that make up around 20% of the contract manufacturing business, and acknowledgment that excluding some recent one-off cash incentive payments, the SmartDose manufacturing ramp (including completion of and conversion to an automated line) is going worse than expected – to the extent that management is contemplating whether it makes sense for West to continue to own and invest in that product line." In their note, the William Blair analysts stated that "[c]ollectively, and quite surprisingly given lack of historical disclosure, these customers made up slightly more than 20% of contract manufacturing revenue in 2024."

525.    Also, on February 14, 2025, analysts at MorningStar published a report, titled *West Earnings: Valuation Lowered After Guidance Disappoints and Recovery Trajectory Delayed*, and stated that "[t]he disappointing guidance is primarily due to margin dilution from its SmartDose wearable injector and loss of sales of continuous glucose monitoring, or CGM, devices" and noted

160

that "they do raise questions about the magnitude of margin expansion that is achievable." Similarly, on February 14, 2025, analysts at Deutsche Bank published a report, titled *Stepping in the Batter's Box; Upgrade to Buy*, and stated that "[w]e agree that communication around [the exit of two large customers] would have better prepared investors to brace for the potential range of outcomes[.]"

526.    As a result of Defendants' wrongful acts, misrepresentations, and omissions, and the resulting precipitous decline in the market value of the Company's stock, Plaintiffs and other Class members suffered significant losses and damages.

## VII.    POST-CLASS PERIOD STATEMENTS

527.    In the months following the end of the Class Period, Defendants continued to make statements acknowledging that customer destocking materially impacted West's business well into 2025.  These statements—made during investor conferences and earnings calls—further confirm that destocking was not the short-lived, limited, or temporary issue Defendants had portrayed during the Class Period.  These subsequent statements are relevant in showing that Defendants belatedly acknowledged facts that were inconsistent with their prior representations.

528.    First, on March 19, 2025, during the KeyBanc Healthcare Forum, Defendant Birkett acknowledged that West "went through the backend of 2024, we continue to see destocking in our Generics business and also within our Biologics unit market."  He further stated that, "[a]s we roll into 2025, we would expect to see continued destocking within our Generics market unit . . . and we're seeing some bleed into Q1 of Biologics destocking."

529.    Second, on April 24, 2025, during West's Q1 2025 Earnings Call, Defendants Green and Birkett repeatedly acknowledged that destocking materially affected the Company's business well beyond the Class Period.  Green admitted that Biologics HVP Components were "pacing negative in the first and second quarters of 2025, a function of tail-end destocking[,]" and

Birkett added that returning to West's targeted operating margin of 23% would require "a similar mix profile compared to what we experienced . . . in the early part of destocking in the 2023 timeframe." Green also confirmed that "destocking [would] continue in the first part of 2025" in Biologics, while Generics "will persist throughout 2025."

530.    Third, on June 5, 2025, during the William Blair Growth Stock Conference, Green stated that West's business had been materially affected by pandemic demand and "the destocking era after the COVID pandemic[,]" describing 2025 as "a year of transition back to more normalized market conditions[.]" Green further acknowledged that operating margins were structurally dependent on the Company's HVP mix, noting that although HVP represented "about 25% of our products. . . from a unit perspective," they generated disproportionately higher revenues and drove "about 100-plus basis points" of margin movement annually. Green also stated that the Company had faced "a challenge" from destocking over "the last two years."

531.    Fourth, on July 24, 2025, during the Company's Q2 2025 Earnings Call, Green stated that "a majority of the customers who have showed growth were those who experienced destocking in the first-half of the prior year[,]" and further acknowledged that "we believe there are some destocking headwinds to work through in generics and to a lesser extent in biologics[.]" Green also stated that "we have seen continued destocking effect in 2025" in the Generics market, and that West "expect[s] that to continue somewhat in the second-half of the year."

532.    Fifth, on September 24, 2025, during the BofA Global Healthcare Conference, Green admitted that "I wouldn't say we're entirely out of the destocking environment" and that "[West] learned from the event of buildup of COVID vaccines and then the destocking period of time. We're engaged with our customers looking at future forecasts[]. . . and we'll continue to build on that as we go forward." Additionally, Green stated that "if you think about the core

underlying growth of our customers and such in the biologics, in the pharma, in the generics, those are returning back to normal growth patterns that we expected." Green further emphasized the importance of conversations with customers and understanding their expectations for demand, stating: "Yeah, it is. I mean, that's critical. . . . [A]s we think about investments, particularly around the HVP components, we need to be able to make sure we're ahead of the curve. And we're taking in the volume commitments in consideration as we make those investments."

533.    These post-Class Period statements confirm that the effects of customer destocking were neither transitory nor immaterial, as Defendants had represented during the Class Period, but instead continued to materially impact West's financial performance for months after the Class Period ended, well into 2025.

## VIII.  ADDITIONAL EVIDENCE OF SCIENTER

534.    As alleged herein, Defendants acted with scienter throughout the Class Period, in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued or disseminated in the name of the Company, or in their own names, were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants—by virtue of their receipt of or access to information reflecting the true facts regarding West, their control over, or receipt, or modification of West's allegedly misleading misstatements and omissions—were active and culpable participants in the fraudulent scheme alleged herein.

535.    Defendants knew or recklessly disregarded the false and misleading nature of the information that they caused to be disseminated to the investing public. The ongoing fraud described herein could not have been perpetrated throughout the Class Period without the

knowledge and complicity, or at least, the reckless disregard, of West personnel at the highest levels of the Company.

536.    The Individual Defendants permitted West to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated and/or artificially maintained the price of West securities throughout the Class Period.

537.    As set forth herein, the Individual Defendants—by virtue of their receipt of information reflecting the true facts concerning West, their control over, receipt of, and/or modification of West's materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information regarding West—participated in the fraudulent scheme alleged herein.

538.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of West securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The fraudulent scheme deceived the investing public regarding West's business, operations, and management as well as the intrinsic value of West securities, and caused Plaintiffs and members of the Class to purchase West securities at artificially inflated or artificially maintained prices.

539.    The following allegations support a strong inference of scienter:

(a)    Statements by former West employees and contractors corroborate that Defendants knew or recklessly disregarded the falsity of Defendants' statements and omissions during the Class Period at the time such statements were made;

(b)    The Individual Defendants' stock sales during the Class Period were unusual and suspicious in timing and amount;

(c)    The Individual Defendants spoke frequently about their strong visibility into customer inventory levels and demand trends;

(d)    Numerous Defendants—all members of senior management—departed from West, including Defendant Lai in the middle of the Class Period, Defendant Reiss-Clark one month after the final corrective disclosure, and Defendant Birkett, whose departure was announced just two months after the final corrective disclosure; and

(e)    Defendants' admissions after the Class Period support an inference of scienter.

A.    **Statements by Former West Employees Corroborate that Defendants Knew or Recklessly Disregarded the Falsity of Their Statements and Omissions during the Class Period at the Time Such Statements Were Made.**

540.    The witness accounts detailed in Section V (¶¶100-293) provide factual support for both the falsity of Defendants' material misstatements and omissions and for a strong inference of scienter on Defendants' part regarding the false and misleading nature of their statements and omissions during the Class Period.  The witnesses detail that:

(a)    during the COVID-19 pandemic, and prior to the Class Period, customers had overordered West's products (due to supply issues and longer manufacturing lead times at West) and had built up unusually large stockpiles of inventory of West products (CW-2 ¶¶105-07; CW-8 ¶¶101, 110-11);

(b)    because customers had built up stockpiles of West inventory, customers delayed placing new orders and/or canceled existing orders with West beginning in late 2022 and continuing through 2024 (CW-2 ¶¶105-08, 113-117; CW-3 ¶¶118-22; CW-8 ¶¶123-24);

(c)    the rate of reduction in order volumes that West received increased during 2023, meaning that the decline in orders was accelerating, and Defendants were aware of this accelerating pace (CW-3 ¶¶118, 130-40);

(d)    West's Generics customers had 9 or more months of inventory of West components and products on hand as of January and February 2023, and had informed West that they would not be placing new orders for several quarters while they worked through their existing inventories (CW-1 ¶¶141-72);

(e)    Defendant Reiss-Clark knew no later than March 2023 (when she received the Inventory Build Analysis she had requested), that West's Generic customers had built up approximately 9 months or more of inventory of West components, and would not be ordering additional West products until their inventory levels returned to normal (CW-1 ¶¶141-72);

(f)    according to the Inventory Build Analysis, because of anticipated reduced order volume based on customer inventory buildup, for fiscal year 2023, West projected a revenue shortfall of $90 to $100 million in Generic orders as compared to internal West targets for the Generics business (CW-1 ¶¶141-72);

(g)    a presentation given to Defendants Green, Birkett, Lai, and Reiss-Clark in June 2023 (which included similar information previously presented to Reiss-Clark months earlier, in March 2023, in the Inventory Build Analysis) identified a 9-month plus inventory buildup in Generics as a major risk and Defendants were informed that, because of that massive inventory buildup, Generics revenues over the next several quarters would be down, and that the revenue risk to the target forecast was $130 to $140 million, with $100 million of that risk due to the inventory buildup (CW-1 ¶¶141-72);

(h)    the Generic revenue shortfall, compared to targets, shown in the internal Inventory Build Analysis proved remarkably accurate for fiscal year 2023. Of the approximately $400 million total revenue shortfall, between $80 and $90 million of the shortfall was due to

reduced and canceled orders resulting from the inventory buildup in the Generic business (CW-1 ¶166);

(i)    information regarding West's product orders and demand planning was tracked and shared at senior levels of the Company, including with the Individual Defendants (CW-1 ¶¶147-72; CW-2 ¶¶125-29; CW-3 ¶¶130-40);

(j)    West's top CGM customer, Dexcom, informed the Company prior to the Class Period that it was ending its partnership with West and would be "ramping down" its orders and business in 2023 (CW-3 ¶¶173-79);

(k)    the reason Dexcom ended its partnership with West was, in part, because West's costs were too high (CW-3 ¶¶173-79);

(l)    serious and recurring quality issues and nonconformances in West's manufacturing of SmartDose forced the Company to spend substantial money on outside contractors to help address nonconformances, product return and failure reports, and persistent manufacturing problems, delays, and cost overruns (CW-3 ¶¶185-89, 221-22; CW-4 ¶¶205-08, 223; CW-6 ¶¶227-31; CW-7 ¶¶209-12, 224-25);

(m)    the equipment used by West to manufacture SmartDose consistently failed function testing and did not perform adequately either in assembling SmartDose components or in manufacturing the final product (CW-5 ¶¶195-204);

(n)    in 2023, there was an approximate 80% "scrap rate" in the sub-assembly manufacture of SmartDose components (the manufacture of the components before the finished device is assembled) (CW-5 ¶¶197-200);

(o)    for the 20% of SmartDose devices that survived sub-assembly, the finished devices ultimately failed at an unreasonably high rate (CW-5 ¶¶197-200);

(p)    there was a "mountain" of SmartDose component scrap piles littering West's SmartDose manufacturing facility in Phoenix, AZ (CW-3 ¶186);

(q)    SmartDose had become a "disaster" and West "took its eye off the ball" (CW-3 ¶¶187-88);

(r)    West maintained a "massive" database of complaint data for SmartDose 3.5 and SmartDose 10, which included customer failure report data that members of West's Executive Leadership Team were required to review and certify (CW-6 ¶¶227-31);

(s)    West implemented a 50% price increase for SmartDose in August 2023—a price that customers were not willing to pay and resulted in customers leaving West (CW-1 ¶¶267, 286, 288-91; CW-3 ¶¶259-61; CW-4 ¶270; CW-6 ¶¶262-66; CW-8 ¶¶268-69);

(t)    because of recurring and significant quality issues, along with price increases, the largest SmartDose customers canceled or declined to renew their contracts with West during the latter half of 2023 and into 2024 (CW-1 ¶¶267, 286, 288-91; CW-3 ¶¶259-61; CW-4 ¶270; CW-6 ¶¶262-66; CW-8 ¶¶268-69);

(u)    West refused to outsource SmartDose manufacturing despite chronic problems and costs, while executives—including Defendants Birkett and Green—remained directly involved in efforts to find ways to manufacture the device more reliably, including exploring outside options (CW-3 ¶¶242-56);

(v)    West's attempt to change the SmartDose sub-assembly production line from manual to automated was failing, as the automated line could not pass validation testing (CW-5 ¶¶271-72);

(w)   SmartDose 10, the second generation of West's SmartDose delivery system, could not pass regulatory requirements and could not be commercially launched, except for sale with a single customer, Furoscix, which was approved in October 2022 (CW-6 ¶¶215-17);

(x)   these recurring problems with SmartDose were reported up to West's Executive Leadership Team, which closely monitored the progress of "their flagship device" (CW-6 ¶¶192-94, 219-20, 228); and

(y)   the Individual Defendants were updated throughout the Class Period about the extensive SmartDose manufacturing problems and SmartDose's persistent and costly quality problems (CW-3 ¶¶187-89, 242-57; CW-6 ¶¶227-28).

541.   In addition, witnesses cited herein had direct contact and meetings with the Individual Defendants, including a business trip to Ireland, and other travel, with Birkett and CW-3, one-on-one meetings with Green and CW-3, as well as with Birkett and CW-3, and a presentation of an Inventory Build Analysis and a pricing analysis by CW-1 to Defendant Reiss-Clark in March and a further presentation to the Individual Defendants in June of 2023 (CW-1 ¶¶141-72, 274-93; CW-3 ¶¶242-56).   The witnesses further detailed the reporting structures, shared databases, and meetings attended by West's executive team that provided Defendants with the information detailed above and in Section V.

**B.   The Individual Defendants' Stock Sales During the Class Period Were Unusual and Suspicious in Timing and Amount.**

542.   Defendants Green, Birkett, Lai, and Reiss-Clark engaged in stock sales during the Class Period that were suspiciously timed and dramatically out of line with their prior trading practices.   As a result of these Class Period trades, the Individual Defendants profited from the artificial inflation embedded in the trading price of West stock caused by their false and misleading statements and omissions to investors during the Class Period.

### 1. The Value and Amount of Trading by the Individual Defendants Was Highly Unusual

543. The Class Period sales of West stock by Defendants Green, Birkett, Lai, and Reiss-Clark were highly unusual and suspicious as measured by: (i) the total amount of shares sold; (ii) the percentage of shares sold compared to the number of total shares available for sale during the Class Period; (iii) the contrast with the Individual Defendants' own prior trading history; and (iv) the timing of the Individual Defendants' sales. Such sales therefore raise a strong inference of scienter.

544. To evaluate the Individual Defendants' selling activity, Plaintiffs used the publicly available trading data that the Individual Defendants are required to report to the SEC on Form 4. Plaintiffs analyzed the trading by the Individual Defendants during the Class Period (between February 16, 2023 and February 12, 2025, inclusive) and during the equal-length period immediately preceding the Class Period beginning February 18, 2021 to February 15, 2023 (the "Control Period").[5] The Individual Defendants' Form 4s filed during the Class Period and Control Period are hereby incorporated by reference, and a summary of the relevant transactions are set forth in Appendix A and Appendix B, annexed hereto.

545. To analyze the Individual Defendants' sales, Plaintiffs calculated the total sales by each of the Individual Defendants, together with the proceeds from such sales, during the Control Period and the Class Period. Those totals were then compared to identify whether Individual Defendants' sales during the Class Period were consistent with their sales during the Control Period. The Individual Defendants' specific trading dates were also evaluated compared to the

---

[5] Defendant Reiss-Clark was promoted to a Section 16 officer on May 12, 2022. Consequently, Reiss-Clark's compensation and ownership data is not available for the entire Control Period. However, her only sale during the period that Plaintiffs have access to (May 12, 2022 to March 7, 2025) was on August 22, 2023.

dates on which the truth was revealed.  All of these analyses reveal that the Class Period sales by

Defendants Green, Birkett, Lai, and Reiss-Clark were large, highly unusual, and suspicious.

### CLASS PERIOD TRADING BY INDIVIDUAL DEFENDANTS

| West Insider | Shares Sold | Proceeds |
|---|---|---|
| Eric M. Green (Chief Executive Officer) | 292,864 | $104,171,303 |
| Bernard J. Birkett (Chief Financial Officer) | 22,334 | $8,272,216 |
| Quintin J. Lai (Vice President of Investor Relations) | 21,101 | $ 8,337,487 |
| Cindy Reiss-Clark (Chief Operating Officer) | 3,477 | $1,367,643 |
| **TOTAL** | **339,776** | **$122,148,649** |

### CONTROL PERIOD TRADING BY INDIVIDUAL DEFENDANTS

| West Insider | Shares Sold | Proceeds |
|---|---|---|
| Eric M. Green (Chief Executive Officer) | 44,000 | $10,515,518 |
| Bernard J. Birkett (Chief Financial Officer) | 14,174 | $4,836,074 |
| Quintin J. Lai (Vice President of Investor Relations) | 17,688 | $7,435,943 |
| Cindy Reiss-Clark (Chief Operating Officer) | N/A | N/A |
| **TOTAL** | **71,247** | **$22,787,536** |

> **2.    The Nominal Amount and Percentage of West Stock Sold During the Class Period Were Extremely Large**

546.    The proceeds from shares sold during the Class Period by Defendants Green,

Birkett, Lai, and Reiss-Clark were large.

547.    Defendant Green sold 292,864 shares of West stock during the Class Period for a

value of approximately $104 million.  All of these sales were the result of exercising options and

selling the resulting shares. In every case, Green exercised his options early.  Each exercised option

had nearly a year until they expired, with some as many as two years until expiration. Moreover,

many of these options were exercisable as early as 2016.  Nevertheless, Green waited until the

Class Period to exercise these options and sell the resulting shares.  Through these transactions,

Green disposed of approximately 37% of the total shares, including options, that he had available

for sale at the start of the Class Period.  Indeed, even after accounting for additional stock-based

compensation during the Class Period, Green's total ownership (including exercisable options) declined by approximately 28% during the Class Period.

548.    Defendant Birkett sold 22,334 shares of West stock during the Class Period for a value of approximately $8.3 million. Through these transactions, Birkett disposed of approximately 43% of the total shares, including options, that he had available for sale at the start of the Class Period. After accounting for additional stock-based compensation during the Class Period, Birkett's total ownership (including exercisable options) increased by approximately 4% during the Class Period.

549.    Defendant Lai sold 21,101 shares of West stock during the Class Period for a value of approximately $8.3 million. Through these transactions, Lai disposed of approximately 53% of the total shares, including options, that he had available for sale at the start of the Class Period. Lai ceased to be a named executive officer of West by 2024. Consequently, compensation and ownership data is not available for Lai in 2024 and onward.

550.    Defendant Reiss-Clark sold 3,477 shares of West stock during the Class Period for a value of approximately $1,367,643. Through these transactions, Reiss-Clark disposed of approximately 21% of the total shares, including options, that she had available for sale at the start of the Class Period.

### 3.    The Individual Defendants' Stock Sales During the Class Period Were Inconsistent with Their Prior Trading Practices

551.    The Class Period stock sales of Defendants Green, Birkett, Lai, and Reiss-Clark were not only large in terms of value, but also inconsistent with their prior selling activity during

the Control Period. For example, by number of shares sold, Green's stock sales increased by 566% during the Class Period, as compared to the Control Period.[6]

| West Insider | Increase in Shares Sold During Class Period Relative to Control Period (%) | Increase in Sales Proceeds During Class Period Relative to Control Period (%) |
|---|---|---|
| Eric M. Green (Chief Executive Officer) | +566% | +891% |
| Bernard J. Birkett (Chief Financial Officer) | +58% | +71% |
| Quintin J. Lai (Vice President of Investor Relations) | +19% | +12% |

552.    Figure 1 shows the stock price of West at the end of every month during the Control Period and the Class Period, in black.  Red bars indicate the number of shares sold by the Individual Defendants each month during the respective periods.  Figure 1 highlights the dramatic increase in stock sales during the Class Period (when the Individual Defendants were in possession of MNPI), despite the fact that the stock price during the Class Period was similar to the Control Period.

---

[6] Defendant Reiss-Clark sold 3,477 shares of her West holdings on August 22, 2023, for a value of approximately $1.4 million. This represented 21% of her West stock ownership at the start of the Class Period (including holdings and options).  Because Reiss-Clark was only promoted to a Section 16 officer position on May 12, 2022, she was not required to file Reports on Form 4 prior to that time. Thus, Plaintiffs lack sufficient data for a more fulsome analysis of Reiss-Clark's trading in West securities during the Control Period.

FIGURE 1



### 4.    The Presence of 10b5-1 Trading Plans Adopted by the Individual Defendants Does Not Absolve the Individual Defendants of Liability

553.    SEC Rule 10b5-1 (17 C.F.R. § 240.10b5-1) provides that a person will be deemed to have traded "on the basis of material nonpublic information" if the person engaging in the transaction was "aware of" that information at the time of the trade.   To provide a safe harbor under the "aware of" standard, the SEC created an affirmative defense to insider trading claims for trades made pursuant to a binding agreement or plan ("10b5-1 Plans" or "Plans").   *See Selective Disclosure and Insider Trading,* 65 Fed. Reg. 51716, at 51727-28 (Aug. 24, 2000).   Pursuant to SEC Rule 10b5-1(c), a 10b5-1 Plan is a defense to insider trading liability **only** if it is entered into by an insider "**[b]efore becoming aware**" of inside information and was established "in good faith and not as part of a plan or scheme to evade the prohibitions" against insider trading.

554.    Because of this, insiders are advised to "design a trading plan with the intention that it will not be modified or amended frequently, since changes to the plan will raise issues as to a person's good faith." Thomson Reuters, *Corporate Counsel's Guide to Insider Trading and Reporting,* Ch. 12:26 (2018).  Conversely, the adoption and/or modification of 10b5-1 Plans while in possession of MNPI is highly suspicious and supports a strong inference of scienter.

555.    Although some of the Individual Defendants' stock sales may have been made pursuant to 10b5-1 Plans, the circumstances of those sales are sufficiently suspicious to overwhelm any exculpatory inference that might otherwise have been available to pre-planned sales based on such Plans.  Indeed, even if the Individual Defendants had entered into 10b5-1 Plans prior to the Class Period and traded within those same plans throughout the Class Period, such plans are under heavy SEC scrutiny in light of a *Wall Street Journal* investigation that found that insiders who were trading pursuant to 10b5-1 Plans were still trading at opportune times and reaping better-than-expected results.  According to the November 27, 2012 *Wall Street Journal* article, titled "Executives' Good Luck in Trading Own Stock," executives trading pursuant to 10b5-1 Plans are still able to time their trades to avoid losses and increase earnings because trading plans are not public and can be canceled or amended at any time without disclosure.

556.    Accordingly, the trading behavior of Defendants Green, Birkett, Lai, and Reiss-Clark during the Class Period raises a strong inference of suspicious and unusual trading activity and their trading plans, if any, do not provide these Defendants with a safe harbor.

**C.    The Individual Defendants Spoke Frequently About Their Strong Visibility into Customer Inventory Levels and Demand Trends.**

557.    Throughout the Class Period, the Individual Defendants repeatedly assured investors that the Company had strong visibility into customer inventory levels and demand trends.

These assurances, which were intended to downplay concerns about reduced order volumes and destocking, support a strong inference of scienter.

558.    For example, at the March 22, 2023 KeyBanc Life Sciences and MedTech Forum, Defendant Green touted "**strong visibility**" into customer demand, explaining that the Company had "**really strong visibility of that particular market**" and that "**the learnings of COVID has given us confidence we're able to scale it at the right pace with our customers as they launch new molecules.**" Relating to margins and inflation, Defendant Birkett stated that "**this year, we're forecasting 5% to 6%, and a lot of those conversations [have] already . . . taken place with our customers.**"

559.    On the Q1 2023 Earnings Call, on April 27, 2023, Green touted the Company's improved visibility into customer demand, stating: "**[W]e're back into the environment, have better visibility, better – as we do make to order, our customers are giving us visibility of their demands over the next several quarters**, and then we plan accordingly in our global operations." Green then stated: "**[W]e respond to our customers' forecasted demand. And again, it's more than just one customer, it's multiple customers. So, that's one. It's around the conversations with our customers, planning ahead, not on just existing solutions in the market but future drug launches that they're planning, that's where our conversation is.**"

560.    At the May 11, 2023 Bank of America Healthcare Conference, Birkett emphasized West's visibility into customer demand, stating, "**I believe that we're much closer to our customers now than we have been in the past and understanding their inventory position.**"

561.    On the Q2 2023 Earnings Call, on July 27, 2023, Defendants reiterated their visibility into customer demand. Defendant Green stated that "**we continue to work closely with customers to update demand trends for the near and long term**." In response to a question

about destocking and inventory issues, Green responded that, "**[f]ortunately, we have a good lens with our customers**" and "**we're keeping an eye on and having conversations with customers**" relating to destocking.  Defendant Birkett later stated that West was "**getting indications from our customers on what their demand is across a number of different therapeutics**."

562.    Then, at the UBS Genomics 2.0 and MedTech Innovations Summit, on August 16, 2023, in response to a question regarding products in high demand, Defendant Green stated that, "**We're seeing the high participation rate across the board, which is exciting. And we're preparing ourselves with customer conversations of additional launches that we're looking at that are on us today and also into 2024**."  Green later stated that *"***we're in a much better position today and the visibility remains – continues to remain very high. We do interact with our customers frequently on not just current drug molecules in the marketplace, but also planning for future launches for near- and mid-term, because sometimes we will have to make investments in advance to make sure that we can handle the volumes that will be asked upon us. So, the lens is very good for us and we continue to build off of that***.***"

563.    On September 14, 2023, at the BofA Global Healthcare Conference, while touting "strong demand in our core business," Defendant Birkett stated that "a lot of those investments are informed by what we're seeing from a customer perspective and the demand and the forecast that they're communicating to us."

564.    On the Q3 2023 Earnings Call on October 26, 2023, Defendant Green further touted West's customer demand visibility, stating: "[W]e have a good visibility of cadence of what we're being asked to build support through our global network to support the demand." Defendant Lai later stated that "And then on the SmartDose side, there, that is proprietary to us. . . . [W]hen

customers come to us and work with us to spec in that device . . . we're seeing really active uptake. . . . And we have a very active pipeline of customers that are evaluating the platform."

565.    On November 14, 2023, at the Jefferies London Healthcare Conference, Defendant Green further touted West's customer demand visibility, stating: "**So we have visibility over the next, call it, four to eight quarters of demand of our customers.**"

566.    On April 25, 2024, Defendants continued to emphasize their visibility into customer demand on the Q1 2024 Earnings Call.  For example, Green explained that, "**[o]ver the pandemic, we actually worked with our customers to make sure that we were able to continue to supply and that there wasn't any stockout with any particular customer**[,]" and that "**our interactions with our customers remain very strong**."

567.    On July 25, 2024, during the Q2 2024 Earnings Call, Defendants addressed the destocking activity that West was experiencing and stated that, "**in the beginning of the year, after having discussions with our customers**" that West "**had an indication that the return will be a little bit sooner than we anticipated.**"  Additionally, Defendant Green stated that "**customer[s] tell us what they're targeting, i.e., 12 months or 9 months or 16 months**." Defendant Birkett further stated, in regard to a "**step up in Q4**" within Biologics, that "**that's what we're seeing and that's the information we're getting from our customers, and that informs the basis of our guide at this point.**"

568.    The disconnect between Defendants' particularized claims of visibility and its operational challenges support a strong inference that Defendants either knew or were reckless in not knowing that their statements were materially misleading.

### D.    The Departures of Defendants Lai, Reiss-Clark, and Birkett Support an Inference of Scienter.

569.    The abrupt departures of Defendants Lai, Reiss-Clark, and Birkett in or immediately after the Class Period support an inference of scienter.  Indeed, these resignations are temporally connected to significant events in Defendants' fraud.

570.    In approximately July 2024, approximately halfway through the Class Period and right before the fifth corrective disclosure, Defendant Lai, who served as Vice President of Investor Relations, left the Company.

571.    Then, on March 7, 2025, less than a month after the Class Period, West announced that Defendant Reiss-Clark, the Senior Vice President and Chief Commercial Officer, departed the Company, effective the same day. Given Reiss-Clark's role overseeing West's commercial operations and the announcement of her departure less than one month after West's final corrective disclosure, her departure gives rise to an inference of scienter.

572.    Then, on April 24, 2025, just two months after the end of the Class Period, West announced the departure of Defendant Birkett, the Senior Vice President, Chief Financial Officer. The Company announced that Birkett would remain in his position as CFO until his successor was in place, and as an advisor to West to facilitate the transition.  During his time as CFO, Birkett oversaw the Company's financial strategy, global operations, and supply chain.  In light of these responsibilities and the sudden departure of Birkett just two months after the full truth was revealed, his departure gives rise to an inference of scienter.

### E.    Defendants' Admissions After the Class Period Support an Inference of Scienter.

573.    Defendants' admissions about SmartDose after the Class Period support an inference of scienter.

574.    For example, on March 12, 2025, during the Barclays Global Healthcare Conference, Defendant Green admitted that West's SmartDose wearable injector platform was "creating the most headwind for us" as the Company set guidance, acknowledging that the product was still being "scal[ed] up in a manual process" and that "where we are with the cost to produce a product is imbalanced[,]" while emphasizing the "urgency to get this rectified." Defendant Birkett likewise conceded that the Company was "resolving the issues . . . around SmartDose and the economics," and admitted the platform was a "drag . . . in 2025."

575.    Then, on June 5, 2025, during the William Blair Growth Stock Conference, Defendant Green revealed that SmartDose was "the least profitable part" of West's drug delivery device portfolio, explaining that it remained "a highly manual process" requiring a "cost down" transition to automation and that management was considering "other options around portfolio fit." Green also stated that the Company had faced "a challenge" from destocking over "the last two years."

## IX.    LOSS CAUSATION/ECONOMIC LOSS

576.    Defendants' misstatements and omissions, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class. Throughout the Class Period, Defendants made materially false and misleading statements and omissions and engaged in a scheme to defraud investors. Defendants' misstatements and omissions artificially inflated and/or artificially maintained the price of West common stock and operated as a fraud and deceit on the Class. During the Class Period, Plaintiffs and the Class purchased West common stock at artificially inflated and/or artificially maintained prices and were damaged thereby when the price of West common stock declined and when the truth was revealed and/or the risks concealed by Defendants' misrepresentations and omissions materialized.

577.    When Defendants' prior misrepresentations and fraudulent conduct were disclosed to investors, the price of West common stock dropped significantly.

578.    As a result of the gradual disclosure of the truth of Defendants' fraud and/or materialization of the risks through the series of disclosures described below, investors incurred hundreds of millions of dollars in losses.

579.    As described below, Defendants' misrepresentations and omissions were revealed to the market through a series of six partial disclosures from July 27, 2023 through February 13, 2025.

A.    <u>July 27, 2023:</u> Q2 2023 Financial Results (First Partial Disclosure)

580.    The truth behind Defendants' misrepresentations and omissions began to come to light on July 27, 2023, when Defendants revealed that West was experiencing demand impacts in West's base business from customer destocking.  On this news, West's stock price dropped $24.52 per share, or approximately 6.46%, to close at $354.90 per share on July 27, 2023.

B.    <u>October 26, 2023:</u> Q3 2023 Financial Results (Second Partial Disclosure)

581.    The truth behind Defendants' misrepresentations continued to come to light on October 26, 2023, when Defendants revealed that West was facing continued demand issues related to destocking, was behind on delivering products due to manufacturing constraints, and was anticipating lower volumes for the fourth quarter.  On this news, West's stock price dropped $30.68 per share, or approximately 8.57%, to close at $327.32 per share on October 26, 2023. While this news further partially revealed Defendants' fraud, Defendants' reassurances continued to mislead investors about West's demand woes.

### C.    **February 15, 2024:** Q4 and Full Year 2023 Financial Results (Third Partial Disclosure)

582.    On February 15, 2024, the truth was further revealed when Defendants announced that West was continuing to experience some level of destocking.  Defendants revealed for the first time that customer destocking was affecting demand in the Company's Proprietary Products Segment.  On this news, West's stock price dropped $57.49 per share, or approximately 14.08%, to close at $350.70 per share on February 15, 2024.  While this news partially revealed Defendants' fraud, Defendants' reassurances continued to mislead investors.

### D.    **April 25, 2024:** Q1 2024 Financial Results (Fourth Partial Disclosure)

583.    Defendants' gradual revelation of the truth continued on April 25, 2024, when Defendants revealed that "most of the destocking" it had experienced earlier in the year was concentrated in West's HVP Components category.  This disclosure revealed that destocking was not limited to the Company's lower-margin products, but was in fact concentrated in their higher-margin HVP segment.  On this news, West's stock price dropped $17.55 per share, or 4.55%, to close at $368.18 per share on April 25, 2024. However, Defendants continued to mislead investors.

### E.    **July 25, 2024:** Q2 2024 Financial Results (Fifth Partial Disclosure)

584.    On July 25, 2024, Defendants admitted that West had a "lower-than-expected second quarter, impacted by continued customer destocking," that the destocking was now impacting the Company's margins, and that the third quarter of 2024 would also be impacted by reduced customer demand due to destocking. On this news, West's stock price dropped $46.61 per share, or 14.4%, to close at $277.16 per share on July 25, 2024.

### F.    **February 13, 2025:** Q4 and Full Year 2024 Financial Results (Final Disclosure)

585.    The full truth finally emerged on February 13, 2025, when West issued its 2025 earnings guidance in the range of $6.00 to $6.30 per share, with its 2025 revenue forecast in the

range of $2.88 billion to $2.91 billion, significantly below expectations. West attributed the disappointing reduced guidance in part to the Contract Manufacturing headwinds, including the loss of two major CGM customers. Defendants also revealed that West's SmartDose device would be margin dilutive in 2025. On this news, West's stock dropped $123.17 per share, a 38.22% decline, to close at $199.11 on February 13, 2025.

586. It was entirely foreseeable to Defendants that their materially false and misleading statements and omissions would artificially inflate and artificially maintain the price of West's common stock. It was also foreseeable to Defendants that the revelation of the truth about the issues described herein, or the materialization of the risks concealed by Defendants, would cause the price of the Company's securities to fall as the artificial inflation caused by Defendants' misstatements and omissions was removed.

587. Plaintiffs and other Class members suffered actual economic losses and were damaged when the foreseeable risks materialized through the partial disclosures of new information concerning the alleged fraud. Thus, the stock price declines described above were directly and proximately caused by Defendants' materially false and misleading statements.

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

588. To the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

589. Further, Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    Defendants' omissions and misrepresentations were material;

(c)    the Company's common stock traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)    Plaintiffs and other members of the Class purchased West common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

590.    At all relevant times, the market for West securities was efficient for the following reasons, among others:

(a)    as a regulated issuer, West filed periodic public reports with the SEC;

(b)    West regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)    West was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)    West securities were actively traded on the NYSE.

591.    As a result of the foregoing, the market for West securities promptly digested current information regarding West from all publicly available sources and reflected such information in West's stock price.  Under these circumstances, all purchasers of West securities

during the Class Period suffered similar injury through their purchase at artificially inflated prices and the presumption of reliance applies.

## XI.    NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE

592.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made. Further, to the extent that any of the false or misleading statements alleged herein could be construed as forward-looking, the statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

593.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speaker knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of West who knew that the statement was materially false or misleading when made.

594.    Additionally, the risk disclosures included in West's public filings were inadequate, obfuscated the truth, and did not inform investors of the true facts and actual risks already occurring.

## XII.    CLASS ACTION ALLEGATIONS

595.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of a Class consisting of all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of West during the period from February 16, 2023 through February 12, 2025, inclusive (the "Class Period"), and were damaged thereby.

Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director, and/or control person of West during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling or beneficial interest; (v) West's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or entity, in their capacities as such.

596.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, West common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by West or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. According to the Company's SEC filings, as of October 22, 2024, there were 72,422,349 shares of West common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

597.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

598.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

599.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the Exchange Act was violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

(c)    whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether the Defendants caused the Company to issue false and misleading filings, including but not limited to filings with the SEC, during the Class Period;

(e)    whether Defendants acted knowingly or recklessly in issuing false filings;

(f)    whether the prices of West common stock during the Class Period were artificially inflated or artificially maintained because of the Defendants' conduct complained of herein; and

(g)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

600.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible or impractical for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### COUNT I

**For Violations of
Section 10(b) and SEC Rule 10b-5
Promulgated Thereunder Against All Defendants**

601.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

602.    This Count is asserted against Defendants based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

603.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which Defendants knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

604.    Defendants violated § 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of West common stock during the Class Period.

605.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; Defendants knew that such statements or documents would be issued or disseminated to the investing public; and Defendants knowingly and substantially participated in or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  Defendants—by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company—participated in the fraudulent scheme alleged herein.

606.    The Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when Defendants failed to ascertain and disclose the true facts in the statements made by them or other West personnel to members of the investing public, including Plaintiffs and the Class.

607.    As a result of the foregoing, the market price of West common stock was artificially inflated or artificially maintained during the Class Period.  In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of West common stock during the Class

Period in purchasing West common stock at prices that were artificially inflated and/or artificially maintained as a result of Defendants' false and misleading statements.

608.    Had Plaintiffs and the other members of the Class been aware that the market price of West common stock had been artificially and falsely inflated by Defendants' misleading statements and omissions and by the material adverse information which Defendants did not disclose,  Plaintiffs and the other members of the Class would not have purchased Company common stock at the artificially inflated (or artificially maintained) prices that they did, or at all.

609.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

610.    By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of West securities during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

611.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

612.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  Because of their senior positions, the Individual Defendants knew the adverse non-public information about the Company's misstatement of revenue and profit and false financial statements.

613.    As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to promptly correct any public statements issued by the Company which had become materially false or misleading. The Individual Defendants also had a duty under Sections 10(b) and 20A of the Exchange Act to either not trade on MNPI or disclose that information before trading.

614.    Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of West common stock.

615.    By reason of the above conduct, the Individual Defendants are jointly and severally liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

### COUNT III

**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5
Against the 20A Defendants (Green, Birkett, and Reiss-Clark)**

616.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

617.    This claim is brought under §10(b) of the Exchange Act, 15 U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against the 20A Defendants.

618.    The information provided to the 20A Defendants about reduced customer demand and about West's inability to grow its margins (see *supra* Section V), was material and non-public. In addition, the 20A Defendants' conduct violated West's own Securities Trading Policy, which prohibits Employees and Directors from trading when one is "in possession of non-Material Non-Public Information."

619.    The 20A Defendants obtained the MNPI from West and in the context of their roles as insiders of West. The 20A Defendants had a duty to disclose this information before trading or to refrain from trading.

620.    While in possession of MNPI, Defendant Birkett on August 2, 2023 sold 22,334 shares of class A common stock at an average value of about $371 per share, for a total value of $8,272,216 million.

621.    While in possession of MNPI, Defendant Green on August 8, 2023 sold 44,000 shares of class A common stock at an average value of about $395 per share, for a total value of $17,369,820 million.

622.    While in possession of MNPI, Defendant Reiss-Clark on August 22, 2023 sold 3,477 shares of class A common stock at $393.34 a unit, for a total value of $1,367,643 million.

623.    By virtue of the foregoing, the 20A Defendants, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b) omitted to disclose information that they had a duty to disclose;

and/or (c) engaged in acts, practices, or courses of business that operated, or would have operated, as a fraud or deceit upon persons.

624.    By virtue of the foregoing, the 20A Defendants, directly or indirectly engaged in conduct that constituted a violation of §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

625.    Plaintiff MS PERS and members of the Class purchased West common stock without access to this material, non-public, adverse information. Plaintiff MS PERS and members of the Class purchased West stock contemporaneously with the 20A Defendants' sales of that stock on or around August 8, 2023 (Defendant Green).

626.    Plaintiff Akademiker and members of the Class purchased West common stock without access to this material, non-public, adverse information. Plaintiff Akademiker and members of the Class purchased West stock contemporaneously with the 20A Defendants' sales of that stock on or around August 2, 2023 (Defendant Birkett), and August 22, 2023 (Defendant Reiss-Clark).

627.    When the material adverse information was eventually revealed, West's stock price declined precipitously and investors suffered economic losses, i.e. damages.

## COUNT IV

### Against the 20A Defendants
### for Violations of Section 20A of the Exchange Act

628.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

629.    This claim is brought under §20A of the Exchange Act, 15 U.S.C. §78t-1 against the 20A Defendants.

630.    The information provided to or possessed by the 20A Defendants about reduced customer demand and about West's inability to grow its margins (*see supra* Section V), was material and non-public. In addition, the 20A Defendants' conduct violated West's own Securities Trading Policy, which prohibits Employees and Directors from trading when one is "in possession of non-Material Non-Public Information."

631.    The 20A Defendants obtained the MNPI from West and in the context of their roles as insiders of West.  The 20A Defendants had a duty to disclose this information before trading or to refrain from trading.

632.    While in possession of MNPI, Defendant Birkett on August 2, 2023 sold 22,334 shares of class A common stock at an average value of about $371 per share, for a total value of $8,272,216 million.

633.    While in possession of MNPI, Defendant Green on August 8, 2023 sold 44,000 shares of class A common stock at an average value of about $395 per share, for a total value of $17,369,820 million.

634.    While in possession of MNPI, Defendant Reiss-Clark on August 22, 2023 sold 3,477 shares of class A common stock at $393.34 a unit, for a total value of $1,367,643 million.

635.    By virtue of the foregoing, the 20A Defendants, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly engaged in conduct that constituted a violation of §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5.

636.    Plaintiff MS PERS and members of the Class purchased West common stock without access to this material, non-public, adverse information. Plaintiff MS PERS and members

of the Class purchased West stock contemporaneously with the 20A Defendants' sales of that stock on or around August 8, 2023 (Defendant Green).

637.    Plaintiff Akademiker and members of the Class purchased West common stock without access to this material, non-public, adverse information. Plaintiff MS PERS and members of the Class purchased West stock contemporaneously with the 20A Defendants' sales of that stock on or around August 2, 2023 (Defendant Birkett) and August 22, 2023 (Defendant Reiss-Clark).

638.    By virtue of the foregoing, the 20A Defendants are jointly and severally liable to Plaintiffs MS PERS, Akademiker, and the Class for the 20A Defendants' insider sales pursuant to §20A of the Exchange Act, 15 U.S.C. §78t-1.

639.    When the material adverse information was eventually revealed, West's stock price declined and investors suffered economic losses, i.e., damages.

640.    Plaintiffs MS PERS, Akademiker, and members of the Class are therefore entitled to the measure of damages delineated under 15 U.S.C. §78t-1(b)(1).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a)    declaring this action to be a proper class action, certifying Plaintiffs as Class Representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Co-Lead Counsel as Class Counsel;

(b)    awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c)    awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: October 15, 2025

*/s/ Christine M. Fox*

Christine M. Fox (admitted *pro hac vice*)
Emily N. Gault (admitted *pro hac vice*)
Lucas Knoll (admitted *pro hac vice*)
**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
cfox@labaton.com
egault@labaton.com
lknoll@labaton.com

Joshua E. D'Ancona (PA 206438)
Dylan J. Isenberg (PA 333996)
**KESSLER TOPAZ MELTZER**
  **& CHECK LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
jdancona@ktmc.com
disenberg@ktmc.com

*Counsel for Lead Plaintiffs and*
*Lead Counsel for the Class*

196

**Appendix A**

**CLASS PERIOD TRADING OF INDIVIDUAL DEFENDANTS**
February 16, 2023 to February 12, 2025, inclusive

| Defendant | Number of Shares | Transaction Type | Price | Transaction Value[7] | Transaction Date |
|---|---|---|---|---|---|
| Eric M. Green | 1,131 | Sale | $324.29 | $366,772 | 3/7/2023 |
| Eric M. Green | 3,154 | Sale | $320.60 | $1,011,173 | 3/7/2023 |
| Eric M. Green | 5,277 | Sale | $323.38 | $1,706,478 | 3/7/2023 |
| Eric M. Green | 7,685 | Sale | $321.61 | $2,471,602 | 3/7/2023 |
| Eric M. Green | 26,753 | Sale | $322.49 | $8,627,505 | 3/7/2023 |
| Eric M. Green | 500 | Sale | $365.46 | $182,729 | 5/9/2023 |
| Eric M. Green | 4,133 | Sale | $364.76 | $1,507,572 | 5/9/2023 |
| Eric M. Green | 12,562 | Sale | $362.93 | $4,559,085 | 5/9/2023 |
| Eric M. Green | 12,648 | Sale | $363.94 | $4,603,055 | 5/9/2023 |
| Eric M. Green | 14,157 | Sale | $361.95 | $5,124,081 | 5/9/2023 |
| Eric M. Green | 100 | Sale | $398.87 | $39,887 | 8/8/2023 |
| Eric M. Green | 1000 | Sale | $389.62 | $389,620 | 8/8/2023 |
| Eric M. Green | 1,100 | Sale | $397.90 | $437,686 | 8/8/2023 |
| Eric M. Green | 4,500 | Sale | $392.16 | $1,764,699 | 8/8/2023 |
| Eric M. Green | 6,700 | Sale | $396.13 | $2,654,040 | 8/8/2023 |
| Eric M. Green | 7,055 | Sale | $393.13 | $2,773,539 | 8/8/2023 |
| Eric M. Green | 7,532 | Sale | $397.18 | $2,991,531 | 8/8/2023 |
| Eric M. Green | 7,684 | Sale | $395.07 | $3,035,743 | 8/8/2023 |
| Eric M. Green | 8,329 | Sale | $394.17 | $3,283,075 | 8/8/2023 |
| Eric M. Green | 64,132 | Sale | $359.85 | $23,077,971 | 2/27/2024 |
| Eric M. Green | 9,316 | Sale | $366.64 | $3,415,636 | 5/7/2024 |
| Eric M. Green | 15,684 | Sale | $366.66 | $5,750,678 | 5/7/2024 |
| Eric M. Green | 41,000 | Sale | $366.65 | $15,032,736 | 5/7/2024 |
| Eric M. Green | 30,732 | Sale | $304.71 | $9,364,409 | 8/6/2024 |
| | | | | | |
| **Total** | **292,864** | | | **$104,171,303** | |
| | | | | | |
| Bernard Birkett | 200 | Sale | $371.03 | $74,205 | 8/2/2023 |
| Bernard Birkett | 22,134 | Sale | $370.38 | $8,198,011 | 8/2/2023 |
| | | | | | |

---

[7] Note:  Individual Transaction Values in this column have been rounded to the nearest dollar. Total Transaction Values reflect the *un-rounded* dollar amounts listed on the corresponding Form 4s for each Transaction.

| Defendant | Number of Shares | Transaction Type | Price | Transaction Value[7] | Transaction Date |
|---|---|---|---|---|---|
| **Total** | **22,334** | | | **$8,272,216** | |
| | | | | | |
| Quintin J. Lai | 1,741 | Sale | $396.12 | $689,650 | 8/11/2023 |
| Quintin J. Lai | 8,635 | Sale | $395.54 | $3,415,510 | 8/11/2023 |
| Quintin J. Lai | 10,725 | Sale | $394.62 | $4,232,326 | 8/11/2023 |
| | | | | | |
| **Total** | **21,101** | | | **$8,337,487** | |
| | | | | | |
| Cindy Reiss-Clark | 3,477 | Sale | 393.34 | $1,367,643 | 8/22/2023 |
| | | | | | |
| **Total** | **3,477** | | | **$1,367,643** | |
| | | | | | |
| **Total Shares Sold During Class Period and Proceeds** | **339,776** | | | **$122,148,649** | |

**Appendix B**

**CONTROL PERIOD TRADING OF INDIVIDUAL DEFENDANTS**
February 17, 2021 to February 15, 2023, inclusive

| Defendant | Number of Shares | Transaction Type | Price | Transaction Value[8] | Transaction Date |
|---|---|---|---|---|---|
| Eric M. Green | 1,100 | Sale | $241.46 | $265,611 | 12/5/2022 |
| Eric M. Green | 6,312 | Sale | $238.83 | $1,507,475 | 12/5/2022 |
| Eric M. Green | 6,746 | Sale | $236.95 | $1,598,457 | 12/5/2022 |
| Eric M. Green | 9,408 | Sale | $237.67 | $2,235,977 | 12/5/2022 |
| Eric M. Green | 9,682 | Sale | $240.73 | $2,330,775 | 12/5/2022 |
| Eric M. Green | 10,752 | Sale | $239.70 | $2,577,224 | 12/5/2022 |
| **Total** | **44,000** | | | **$10,515,518** | |
| | | | | | |
| Bernard Birkett | 1,100 | Sale | $343.38 | $377,723 | 8/2/2022 |
| Bernard Birkett | 1,708 | Sale | $341.97 | $584,083 | 8/2/2022 |
| Bernard Birkett | 2,007 | Sale | $342.59 | $687,574 | 8/2/2022 |
| Bernard Birkett | 9,359 | Sale | $340.50 | $3,186,695 | 8/2/2022 |
| **Total** | **14,174** | | | **$4,836,074** | |
| | | | | | |
| Quintin J. Lai | 1,500 | Sale | $462.63 | $693,946 | 9/10/2021 |
| Quintin J. Lai | 3,100 | Sale | $460.80 | $1,428,494 | 9/10/2021 |
| Quintin J. Lai | 5,072 | Sale | $460.18 | $2,334,012 | 9/10/2021 |
| Quintin J. Lai | 200 | Sale | $374.92 | $74,984 | 3/14/2022 |
| Quintin J. Lai | 405 | Sale | $367.94 | $149,017 | 3/14/2022 |
| Quintin J. Lai | 446 | Sale | $370.94 | $165,441 | 3/14/2022 |
| Quintin J. Lai | 600 | Sale | $371.89 | $223,132 | 3/14/2022 |
| Quintin J. Lai | 900 | Sale | $372.92 | $335,632 | 3/14/2022 |
| Quintin J. Lai | 1,254 | Sale | $369.86 | $463,801 | 3/14/2022 |
| Quintin J. Lai | 1,271 | Sale | $367.12 | $466,604 | 3/14/2022 |
| Quintin J. Lai | 2,940 | Sale | $374.45 | $1,100,881 | 3/14/2022 |
| | | | | | |
| **Total** | **17,688** | | | **$7,435,943** | |
| Cindy Reiss-Clark | N/A | Sale | N/A | N/A | N/A |
| | | | | | |
| **Total** | **N/A** | | | **N/A** | |

---

[8] Note: Individual Transaction Values in this column have been rounded to the nearest dollar. Total Transaction Values reflect the *un-rounded* dollar amounts listed on the corresponding Form 4s for each Transaction.

| Defendant | Number of Shares | Transaction Type | Price | Transaction Value[8] | Transaction Date |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
| **Total Shares Sold During Control Period and Proceeds** | **75,862** |  |  | **$22,787,536** |  |

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 15th day of October 2025, a true and correct copy of the foregoing document was filed electronically with the Clerk of the Court using the ECF system, and it is available for viewing and downloading from the ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

<div align="center" style="margin-left:50%">

<u>*/s/ Christine M. Fox*</u>
Christine M. Fox (admitted *pro hac vice*)

</div>