## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NEW ENGLAND TEAMSTERS PENSION FUND, Individually and on Behalf of All Others Similarly Situated<br><br>Plaintiffs,<br><br>v.<br><br>WEST PHARMACEUTICAL SERVICES, INC., ERIC M. GREEN, BERNARD J. BIRKETT, QUINTIN J. LAI, and CINDY REISS-CLARK,<br><br>Defendants. | Case No. 2:25-cv-02285 |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ....................................................................................................... 1

BACKGROUND ......................................................................................................... 3

    A.  West's Products and Operations. ........................................................ 3

    B.  COVID-19's Impact on West's Industry. ........................................... 5

    C.  Plaintiffs' Allegations and Legal Claims. ......................................... 5

        1.  Alleged Misstatements. ........................................................... 5

        2.  Alleged Corrective Disclosures. .............................................. 7

        3.  Plaintiffs' Claims. ................................................................... 7

LEGAL STANDARD .................................................................................................. 8

ARGUMENT .............................................................................................................. 8

I.     Plaintiffs' Section 10(b) Claim For Alleged Misstatements Should Be Dismissed On Several Independent Grounds. ................................................ 8

    A.  Plaintiffs Fail to Plead Any Actionable Misstatements. ................... 9

        1.  Many of the statements are inactionable puffery. .................... 9

        2.  Many statements are forward-looking and fall under the PSLRA safe harbor. ..................................................................... 11

        3.  Plaintiffs allege no basis for finding any opinion statements false or misleading ................................................................. 16

        4.  Many of the purported misstatements are otherwise not alleged to be false or misleading with the particularity required by the PSLRA ............................... .20

    B.  Plaintiffs' Allegations Fail to Create a Strong Inference of Scienter. ......................... 27

        1.  Plaintiffs do not allege that the forward-looking statements were made with actual knowledge of their purported falsity, as the PSLRA requires. .......... 27

        2.  Even without the PSLRA safe harbor, Plaintiffs fail to allege a strong inference of scienter. ................................................. 33

            a.  Plaintiffs do not allege any motive or opportunity to defraud investors. ....... 33

            b.  Plaintiffs fail to plead facts supporting any inference of knowing fraud or extreme recklessness. ....................................... 38

               (1)  Vague statements about "visibility" do not support scienter. ............... 39

               (2)  Departures of some Individual Defendants do not support scienter. ................... 39

(3)   Alleged statements after the class period do not support scienter. ........ 40

3.   The more compelling inference here is that there was no securities fraud. ......... 40

C.   Plaintiffs Also Fail to Plead Loss Causation for the Final Corrective Disclosure. ................................................................................................. 41

II.   Plaintiffs' Control-Person Claim Under Section 20(a) Fails. ............................................. 42

III.   Plaintiffs' Insider-Trading Claims Fail. .......................................................................... 43

A.   The Court Should Dismiss Plaintiffs' Section 10(b) and Rule 10b-5 Insider-Trading Claim for Failure to Plead Trades Based on MNPI and Scienter. ................. 43

1.   Plaintiffs fail to plead that the 20A Defendants traded on the basis of MNPI. ................................................................................................. 44

2.   Plaintiffs fail to plead a strong inference of scienter because the 20A Defendants' trades are not suspicious in timing or amount. ................................ 46

B.   The Court Should Dismiss Plaintiffs' Section 20A Insider-Trading Claim for Failure to Plead a Predicate Exchange Act Violation. ................................................ 47

CONCLUSION ...................................................................................................................... 47

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Altayyar v. Etsy, Inc.*,
  242 F. Supp. 3d 161 (E.D.N.Y. 2017) ...................................................................24

*Baraka v. McGreevey*,
  481 F.3d 187 (3d Cir. 2007)...............................................................................8

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)..........................................................................................45

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................................8

*Belmont v. MB Inv. Partners, Inc.*,
  708 F.3d 470 (3d Cir. 2013)...............................................................................43

*Belodoff v. Netlist, Inc.*,
  2009 WL 1293690 (C.D. Cal. Apr. 17, 2009) ...................................................19

*Bldg. Trades United Pension Tr. Fund v. Kenexa Corp.*,
  2010 WL 3749459 (E.D. Pa. Sept. 27, 2010) .............................................. *passim*

*Buhrke Fam. Revocable Tr. v. U.S. Bancorp*,
  726 F. Supp. 3d 315 (S.D.N.Y. 2024).................................................................45

*Capri Optics Profit Sharing v. Digit. Equip. Corp.*,
  950 F.2d 5 (1st Cir. 1991).................................................................................21

*Carvelli v. Ocwen Fin. Corp.*,
  934 F.3d 1307 (11th Cir. 2019) .........................................................................18

*Chan v. New Oriental Educ. & Tech. Grp. Inc.*,
  2019 WL 2865452 (D.N.J. July 3, 2019).............................................................30

*City of Edinburgh Council v. Pfizer, Inc.*,
  754 F.3d 159 (3d Cir. 2014)......................................................................3, 20, 47

*City of Livonia Emps.' Ret. Sys. v. Boeing Co.*,
  711 F.3d 754 (7th Cir. 2013) .............................................................................38

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
　713 F. Supp. 2d 378 (D. Del. 2010) ....................................................................41

*City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*,
　412 F. Supp. 3d 206 (E.D.N.Y. 2019) .................................................................37

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
　70 F.4th 668 (3d Cir. 2023) ...................................................16, 17, 18, 20, 21, 24

*Eden Alpha CI LLP v. Polished.com Inc.*,
　763 F. Supp. 3d 270 (E.D.N.Y. 2025) .................................................................39

*Edward J. Goodman Life Income Tr. v. Jabil Cir.*,
　594 F.3d 783 (11th Cir. 2010) ............................................................................44

*Fadia v. FireEye, Inc.*,
　2016 WL 6679806 (N.D. Cal. Nov. 14, 2016) .......................................................9

*Fitzer v. Sec. Dynamics Techs., Inc.*,
　119 F. Supp. 2d 12 (D. Mass. 2000) ...................................................................10

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*,
　336 F. Supp. 3d 196 (S.D.N.Y. 2018) .................................................................18

*Glaser v. The9*,
　772 F. Supp. 2d 573 (S.D.N.Y. 2011) .................................................................37

*GSC Partners CDO Fund v. Washington*,
　368 F.3d 228 (3d Cir. 2004) ...............................................................................38

*Handal v. Innovative Indus. Props., Inc.*,
　157 F.4th 279 (3d Cir. 2025) ........................................................................18, 19

*Howard v. Arconic Inc.*,
　2021 WL 2561895 (W.D. Pa. June 23, 2021) ......................................................43

*Howard v. Liquidity Servs., Inc.*,
　177 F. Supp. 3d 289 (D.D.C. 2016) ....................................................................45

*In re Adams Golf, Inc. Sec. Litig.*,
　381 F.3d 267 (3d Cir. 2004) ...............................................................................15

*In re Advanta Corp. Sec. Litig.*,
　180 F.3d 525 (3d Cir. 1999) ...............................................................8, 9, 34, 38

*In re Aetna, Inc. Sec. Litig.*,
617 F.3d 272 (3d Cir. 2010) ................................................................9, 12, 42

*In re Ascena Retail Grp., Inc. Sec. Litig.*,
2022 WL 2314890 (D.N.J. June 28, 2022) ..................................................19

*In re Astea Int'l, Inc. Sec. Litig.*,
2007 WL 2306586 (E.D. Pa. Aug. 9, 2007) ............................................34, 35

*In re ATI Techs., Inc. Sec. Litig.*,
216 F. Supp. 2d 418 (E.D. Pa. 2002) ........................................................21

*In re Bristol-Myers Squibb Sec. Litig.*,
312 F. Supp. 2d 549 (S.D.N.Y. 2004) ....................................................36, 46

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997) ..............................................34, 35, 36, 44, 46

*In re Constellation Energy Grp., Inc. Sec. Litig.*,
738 F. Supp. 2d 614 (D. Md. 2010) ..........................................................19

*In re CRM Holdings, Ltd. Sec. Litig.*,
2012 WL 1646888 (S.D.N.Y. 2012) ..........................................................35

*In re Crocs, Inc. Sec. Litig.*,
774 F. Supp. 2d 1122 (D. Colo. 2011) ......................................................32

*In re DraftKings Inc. Sec. Litig.*,
2023 WL 145591 (S.D.N.Y. 2023) ............................................................41

*In re DVI, Inc. Sec. Litig.*,
2010 WL 3522090 (E.D. Pa. Sept. 3, 2010) ..............................................42

*In re Egalet Corp. Sec. Litig.*,
340 F. Supp. 3d 479 (E.D. Pa. 2018) ........................................................33

*In re eSpeed, Inc. Sec. Litig.*,
457 F. Supp. 2d 266 (S.D.N.Y. 2006) ........................................................35

*In re Farfetch Ltd. Sec. Litig*,
2021 WL 4461264 (S.D.N.Y. 2021) ..........................................................37

*In re Five Below, Inc. Sec. Litig.*,
2025 WL 2447794 (E.D. Pa. 2025) ..........................................................41

*In re Francesca's Holdings Corp. Sec. Litig.*,
  2015 WL 1600464 (S.D.N.Y. 2015) .......................................................41

*In re Gupta Corp. Sec. Litig.*,
  900 F. Supp. 1217 (N.D. Cal. 1994) ....................................................43

*In re Hebron Tech. Co, Ltd. Sec. Litig.*,
  2021 WL 4341500 (S.D.N.Y. Sept. 22, 2021) .......................................39

*In re Hertz Glob. Holdings, Inc.*,
  905 F.3d 106 (3d Cir. 2018) ..........................................8, 27, 33, 35

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
  2015 WL 4469143 (D.N.J. July 22, 2015) ............................................39

*In re Incyte S'holder Litig.*,
  2014 WL 707207 (D. Del. Feb. 21, 2014) ........................................9, 11

*In re Intelligroup Sec. Litig.*,
  468 F. Supp. 2d 670 (D.N.J. 2006) ....................................................41

*In re Lexar Media, Inc. Sec. Litig.*,
  2005 WL 1566534 (N.D. Cal. July 5, 2005) ........................................32

*In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*,
  2011 WL 3444199 (D.N.J. Aug. 8, 2011) .............................................46

*In re Mylan N.V. Sec. Litig.*,
  2023 WL 3539371 (W.D. Pa. May 18, 2023) ..................................18, 41

*In re Newell Brands, Inc. Sec. Litig.*,
  837 F. App'x 869 (3d Cir. 2020) .......................................................45

*In re Ocugen, Inc. Sec. Litig.*,
  659 F. Supp. 3d 572 (E.D. Pa. 2023) ..................................................47

*In re Pixar Sec. Litig.*,
  450 F. Supp. 2d 1096 (N.D. Cal. 2006) ..............................................36

*In re Party City Sec. Litig.*,
  147 F. Supp. 2d 282 (D.N.J. 2001) ...............................34, 35, 36, 46, 47

*In re Rackable Sys., Inc. Sec. Litig.*,
  2010 WL 199703 (N.D. Cal. Jan. 13, 2010) ..........................................10

- vi -

*In re Radian Sec. Litig.*,
    612 F. Supp. 2d 594 (E.D. Pa. 2009) ....................................................................27

*In re Sanofi-Aventis Sec. Litig.*,
    2009 WL 3094957 (S.D.N.Y. Sept. 25, 2009) ......................................................25

*In re Sierra Wireless, Inc. Sec. Litig.*,
    482 F. Supp. 2d 365 (S.D.N.Y. 2007) ..................................................................26

*In re Synchronoss Techs., Inc. Sec. Litig.*,
    2019 WL 2849933 (D.N.J. July 2, 2019) ..............................................................37

*In re Universal Health Servs., Inc., Derivative Litig.*,
    2019 WL 3886838 (E.D. Pa. Aug. 19, 2019) ........................................................45

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
    2024 WL 1975499 (D.N.J. May 3, 2024) ..............................................................42

*In re Williams Sec. Litig.—WCG Subclass*,
    558 F.3d 1130 (10th Cir. 2009) ............................................................................41

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
    620 F. Supp. 3d 167 (D.N.J. 2022) ......................................................................40

*Inst'l Invs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) ......................................................................... *passim*

*Kuriakose v. Freddie Mac*,
    897 F. Supp. 2d 168 (S.D.N.Y. 2012) ....................................................34, 44, 46

*Luo v. Spectrum Pharms., Inc.*,
    2024 WL 4443323 (D. Nev. Oct. 7, 2024) ..........................................................30

*Mart v. Tactile Sys. Tech., Inc.*,
    595 F. Supp. 3d 788 (D. Minn. 2022) ..................................................................37

*Martin v. GNC Holdings, Inc.*,
    2017 WL 3974002 (W.D. Pa. Sept. 8, 2017) ..........................................3, 28, 36, 47

*Martin v. GNC Holdings, Inc.*,
    757 F. App'x 151 (3d Cir. 2018) ..........................................................................30

*Martin v. Quartermain*,
    732 F. App'x 37 (2d Cir. 2018) ............................................................................20

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*,
  720 F. Supp. 2d 517 (D.N.J. 2010) ........................................................28, 29, 30, 31, 38, 41

*NECA-IBEW Health & Welfare Fund v. Pitney Bowes*,
  2013 WL 1188050 (D. Conn. Mar. 23, 2013) ........................................................12

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
  834 F.3d 481 (3d Cir. 2016)........................................................1, 8, 20

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
  300 F. Supp. 3d 551 (S.D.N.Y. 2018)........................................................19, 20

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)........................................................16, 18, 19, 20

*Ortiz v. Canopy Growth Corp.*,
  537 F. Supp. 3d 621 (D.N.J. 2021) ........................................................38

*Rahman v. Kid Brands, Inc.*,
  736 F.3d 237 (3d Cir. 2013)........................................................28, 38

*Reilly v. U.S. Physical Therapy, Inc.*,
  2018 WL 3559089 (S.D.N.Y. 2018)........................................................35

*Robeco Cap. Growth Funds v. Peloton Interactive, Inc.*,
  665 F. Supp. 3d 522 (S.D.N.Y. 2023)........................................................15

*Roofer's Pension Fund v. Papa*,
  2018 WL 3601229 (D.N.J. July 27, 2018)........................................................33

*Roofer's Pension Fund v. Papa*,
  687 F. Supp. 3d 604 (D.N.J. 2023) ........................................................36, 41, 47

*Rosenbaum & Co. v. H.J. Myers Co. Inc.*,
  1997 WL 689288 (E.D. Pa. Oct. 9, 1997)........................................................44

*S.E.C. v. Chappell*,
  107 F.4th 114 (3d Cir. 2024) ........................................................46

*S.E.C. v. Cooperman*,
  243 F. Supp. 3d 597 (E.D. Pa. 2017) ........................................................43

*S.E.C. v. Ginsburg*,
  362 F.3d 1292 (11th Cir. 2004) ........................................................44

*S.E.C. v. Lipson*,
    278 F.3d 656 (7th Cir. 2002) .................................................................44

*S.E.C. v. Mayhew*,
    121 F.3d 44 (2d Cir. 1997)....................................................................45

*Schiro v. Cemex, S.A.B. de C.V.*,
    396 F. Supp. 3d 283 (S.D.N.Y. 2019).......................................30, 32, 39

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994)...................................................................32

*Silverstein v. Globus Med., Inc.*,
    2016 WL 4478826 (E.D. Pa. Aug. 25, 2016) .........................................32

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019)....................................................................20

*Steamfitters Local 449 Pension Fund v. Alter*,
    2011 WL 4528385 (E.D. Pa. Sept. 30, 2011) ........................................35

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)...............................................27, 33, 36, 40, 47

*United States v. Anderson*,
    533 F.3d 623 (8th Cir. 2008) .................................................................44

*United States v. Chan*,
    981 F.3d 39 (1st Cir. 2020)....................................................................45

*United States v. Durland*,
    65 F. 408 (E.D. Pa. 1894) .....................................................................38

*United States v. O'Hagan*,
    521 U.S. 642 (1997)...............................................................................44

*Utesch v. Lannett Co., Inc.*,
    316 F. Supp. 3d 895 (E.D. Pa. 2018) .....................................................31

*Waswick v. Torrid Holdings, Inc.*,
    2024 WL 3740052 (C.D. Cal. July 23, 2024).........................................10

*Westley v. Oclaro, Inc.*,
    897 F. Supp. 2d 902 (N.D. Cal. 2012) ...................................................39

*Williams v. Globus Med., Inc.*,
    869 F.3d 235 (3d Cir. 2017).................................................................11, 27, 32

*Winer Fam. Tr. v. Queen*,
    503 F.3d 319 (3d Cir. 2007)....................................................................1, 27, 40

*Wyche v. Advanced Drainage Sys., Inc.*,
    2017 WL 971805 (S.D.N.Y. Mar. 10, 2017) ...............................................31, 33

*Xerion Partners, I LLC v. Resurgence Asset Mgmt., LLC*,
    474 F. Supp. 2d 505 (S.D.N.Y. 2007).............................................................27

*Yates v. Mun. Mortg. & Equity, LLC*,
    744 F.3d 874 (4th Cir. 2014) ..........................................................................36

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ....................................................................29, 30

**STATUTES**

15 U.S.C. § 78u-4 ...............................................................................................8

15 U.S.C. § 78u-5 .............................................................................................11

**OTHER AUTHORITIES**

Fed. R. Civ. P. 9.....................................................................................8, 43, 45

Fed. R. Civ. P. 12..............................................................................................8

SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 .......................................................8, 43

SEC Rule 10b5-1, 17 C.F.R. § 240.10b5-1 .........................................36, 37, 44

## INTRODUCTION

In this case, Plaintiffs attempt to turn a series of stock drops into a long-running fraudulent scheme—but the Complaint exemplifies precisely the type of baseless shareholder litigation that the Private Securities Litigation Reform Act of 1995 ("PSLRA") exists to stop.  As the Third Circuit has explained, the PSLRA was enacted to stop reflexive shareholder litigation "in response to any significant change in [a company's] stock price." *Winer Fam. Tr. v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007).  "Only a complaint that provides sufficiently particularized factual pleading and gives rise to a strong inference of scienter can survive a motion to dismiss." *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 490 (3d Cir. 2016).  Plaintiffs flunk this standard.

Defendant West Pharmaceutical Services, Inc. ("West") is a global manufacturer and producer of healthcare products, including components for injectable medicines.  In the immediate aftermath of the COVID-19 pandemic, Defendants made various optimistic statements about West's business covering a wide range of topics.  Plaintiffs now insist that scores of these statements were knowingly misleading, essentially because West allegedly faced challenges with a small handful of particular products and customer segments.  Plaintiffs try to blame a series of drops in West's stock price on the purported revelation of these difficulties (which concerned tiny fractions of West's business)—while pretending that the stock drops had nothing to do with West's disappointing financial updates that were simultaneously announced.

But most of the purported misstatements *did not concern* Plaintiffs' narrow areas of focus—and Plaintiffs make no specific allegations suggesting that any of the statements were false or misleading.  Instead, Plaintiffs posit an exceedingly attenuated theory that tries to pin the disappointing performance of West's stock on issues about which Defendants never misled investors—much less did so knowingly.  On multiple grounds, the Complaint should be dismissed.

*First*, Plaintiffs do not adequately allege that any statement was actionably false or

misleading.    Plaintiffs largely target statements that are inactionable puffery—generalized, aspirational assertions that cannot be securities fraud.    Many other statements fall within the PSLRA's safe harbor for forward-looking statements—which precludes liability when, as here, cautionary language explains why the statements are at risk of being incorrect.    Still other statements are merely subjective opinions about West's business, which are actionable only in narrow, carefully defined circumstances that Plaintiffs have failed to plead.

On top of all that, Plaintiffs also have not alleged with the requisite particularity that Defendants' statements were false or misleading when made.    Plaintiffs essentially just identify a few purported snags with West's business and then challenge *nearly 90* rosy statements regardless of whether the statements addressed the underlying "facts" that Plaintiffs allege.    This is a fundamental mismatch between the scope of the alleged misstatements and the specifics of Plaintiffs' theory, and no particularized allegations bridge the gap between the two.

*Second*, even if there somehow were any actionable misstatements, Plaintiffs also have not adequately alleged a strong inference of scienter.    For the many forward-looking statements, Defendants need to have spoken with actual knowledge of their statements' falsity.    And for the other statements, Plaintiffs must allege facts approaching conscious deception.    Either way, this is a demanding standard.    Plaintiffs attempt to satisfy it with alleged accounts from supposed confidential witnesses—but most of these purported insiders never interacted with Defendants, and none offers anything concrete to suggest that Defendants fraudulently misled investors. Plaintiffs also offer a kitchen-sink of circumstantial allegations about scienter—Defendants' own sales of West stock, employee departures, etc.—but all of these run headlong into the ample precedent rejecting Plaintiffs' scattershot arguments.

At bottom, the most plausible inference here is that Defendants did not fraudulently

mislead investors at all—and that instead they simply tried to manage West's business in unprecedented, fluid circumstances following the COVID-19 pandemic. Even if the company may not have performed as well as hoped, that does not mean Defendants engaged in securities fraud.

*Third*, Plaintiffs fail to plead that any purported misstatements caused its losses from the final alleged corrective disclosure—which was a targeted assertion about West's SmartDose product becoming "margin dilutive" in the future. That forward-looking disclosure did not correct any prior statement made by Defendants.

*Finally*, Plaintiffs' remaining claims fall from there. Plaintiffs' Section 20(a) claim fails to allege an underlying 10(b) violation that others controlled—as well as Section 20(a)'s other requirements. And Plaintiffs' insider-trading claims fail to sufficiently allege trading on the basis of material nonpublic information or scienter (under Section 10(b)), and also fail to allege a Section 10(b) violation (under Section 20A). This Court should dismiss this lawsuit in full.

## BACKGROUND[1]

### A. West's Products and Operations.

West is a global manufacturer of containment and delivery systems for injectable medicines and other healthcare products. Am. Compl. ¶¶ 53–54. Across a worldwide network of facilities, West sells critical components for syringes, vials, and similar pharmaceutical products, and it also offers films, coatings, and sterilization, as well as analytical and integrated solutions. *Id.* ¶¶ 53–54, 60, 70. West also develops and manufactures proprietary delivery systems and

---

[1] The facts herein are from the Amended Complaint (which are taken as true solely for purposes of this motion) and the exhibits to the Declaration of Nina Yadava, which are referenced and incorporated in the Amended Complaint (Exs. 4–12, 14, 16, 18–36) or are judicially noticeable on a motion to dismiss (Exs. 1–3, 13, 15, 17, 37–48). *See, e.g.*, *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 163 n.3 (3d Cir. 2014) ("documents incorporated into the complaint" and SEC filings); *Martin v. GNC Holdings, Inc.*, 2017 WL 3974002, at *1 n.2 (W.D. Pa. Sept. 8, 2017), *aff'd*, 757 F. App'x 151 (3d Cir. 2018) ("SEC filings, press releases and earnings call transcripts").

provides contract manufacturing for complex medical and diagnostic devices. *Id.* ¶¶ 59, 75, 86. West's many customers span a wide range of different market segments, including leading biologic, generic, and pharmaceutical manufacturers. *Id.* ¶ 53. In 2024, West delivered tens of billions of components and other products annually to a diversified customer base. *Id.* ¶ 56.

For its many products and services, West reports its financial results through two segments: Proprietary Products and Contract Manufacturing. *Id.* ¶ 58. West's Proprietary Products segment includes three product categories, each of which includes different products: (1) standard products, (2) High-Value Product ("HVP") components, and (3) HVP delivery devices. *Id.* ¶ 68. One HVP delivery device is West's SmartDose system—a wearable injector that allows patients to self-administer certain biologic therapies outside of a clinical setting. *Id.* ¶¶ 75–76.

In West's Contract Manufacturing segment, the company provides design, molding, assembly, and other capabilities for customer-owned devices, for which West makes components that are integrated into their customers' manufacturing lines. *Id.* ¶¶ 86–88. This product segment has many products, including products for surgical, diagnostic, and diabetes care settings, and serves many customers. *Id.* ¶¶ 86–89. Continuous glucose monitoring devices ("CGMs") are one of West's product types in the diabetes care setting, and the companies Dexcom and Abbott were West's primary CGM customers during the relevant time period. *Id.* ¶¶ 93–96.

Plaintiffs have asserted claims against West and four Individual Defendants who served as senior executives at West during the class period. Eric M. Green served (and still serves) as West's President and CEO and also as Board Chair. *Id.* ¶ 38. Bernard J. Birkett served as Senior Vice President and Chief Financial Officer until April 2025, after which he became Senior Advisor to the CEO, a position he still holds today. *Id.* ¶¶ 39, 572; Ex. 1 at 3 (7/21/2025 8-K). Quintin J. Lai served as Vice President of Strategy and Investor Relations until July 2024. Am. Compl. ¶¶ 40,

570.  Cindy Reiss-Clark served as Chief Commercial Officer until March 2025.  *Id.* ¶¶ 41, 571.

**B.  COVID-19's Impact on West's Industry.**

The COVID-19 pandemic produced an extraordinary, industry-wide surge in demand for injectable drug components.  *Id.* ¶¶ 100–05.  Facing unprecedented uncertainty, West's customers lengthened order lead times and built up additional inventory to ensure no supply-chain disruption for both COVID-related and non-COVID therapies.  *Id.* ¶¶ 100, 105–06.  As pandemic conditions eased, customers reduced order volume while they worked through their built-up stocks—a well-recognized, industry-wide "destocking" process.  *Id.* ¶¶ 109, 113.  Indeed, West was not alone in facing these issues.  *Id.* ¶¶ 105, 367, 423, 466.

**C.  Plaintiffs' Allegations and Legal Claims.**

Plaintiffs represent a putative class of all persons and entities who purchased West stock between February 16, 2023 and February 12, 2025 (the "class period").  *Id.* ¶ 595.  Plaintiffs allege that West's stock price was inflated during this time because Defendants purportedly made nearly 90 false or misleading statements on a wide range of topics.  *Id.* ¶¶ 9–10, 301–526.

**1.  Alleged Misstatements.**

Plaintiffs' theories of liability are a jumble, but essentially they allege that any positive statements during the class period about West's current or future performance were false or misleading because of purported operational and/or sales difficulties at the company.  Broadly speaking, three purported "facts" are the fulcrum to Plaintiffs' case:  (1) operational and related sales issues with SmartDose, which is one of West's HVP delivery devices (and just a small piece of the HVP segment); (2) inventory build-ups and destocking with West's Generics customers (one small segment of West's customer base); and (3) the impending departure of Dexcom, which was one of West's primary customers for CGM devices, one of the many products in West's Contract Manufacturing segment.  *See id.* ¶¶ 13–15.  Plaintiffs contend that these issues made

scores of Defendants' public statements—which Plaintiffs categorize as either "Demand" or "Margin" statements, *id.* ¶¶ 9–10[2]—false or misleading.

First, Plaintiffs target generalized statements about company-wide performance. *See, e.g.*, *id.* ¶¶ 305, 325, 337, 340, 362, 376, 385, 399–401, 410, 419, 423, 432, 466–67, 470, 473. For example, Plaintiffs say Green misled investors on March 14, 2023, by stating that West has "very healthy participation in all areas" and is in "a very strong position" to grow. *Id.* ¶ 317. Similarly, Plaintiffs say Birkett misled investors on September 14, 2023, by stating that "we're also driving a lot of cost efficiencies and operational excellence within our business." *Id.* ¶ 385.

Second, Plaintiffs challenge general statements about HVPs, contending Defendants overstated the performance of and prospects for this product category as a whole. *See, e.g.*, *id.* ¶¶ 303–04, 327, 334, 341, 355, 360–61, 364, 374, 378, 392, 395–96, 407, 414, 428, 445, 447, 451–53, 470, 492, 496, 514. For example, Plaintiffs claim that Green misled investors on February 16, 2023, when he stated there was a "very, very healthy growth profile of the higher end of the HVPs." *Id.* ¶ 303. Plaintiffs also claim that Defendants made misleading statements about West's Generics customers when discussing HVPs more generally—such as Green's April 27, 2023 statement that "we obviously have high growth right now in Generics." *Id.* ¶ 334; *see id.* ¶¶ 333, 361, 392, 401.

Third, Plaintiffs target Defendants' statements about performance and prospects in West's Contract Manufacturing segment—because one subset of diabetes-related devices (which are a further subset of Contract Manufacturing) was facing the impending departure of its CGM customer, Dexcom. *See, e.g.*, *id.* ¶¶ 305, 333, 335, 377, 411, 425, 455, 499. Here, as an example, Plaintiffs claim that Birkett misled investors on February 15, 2024, when he stated that "we would expect Contract Manufacturing to be growing within our construct." *Id.* ¶ 425.

---

[2] Many of the statements do not fit these descriptions when examined in context.

Finally, Plaintiffs allege misstatements about SmartDose, which Plaintiffs claim were misleading in light of operational and pricing missteps that led to the product's underperformance. *See, e.g.*, *id.* ¶¶ 397, 413, 427–28, 445, 497, 505–06, 513–14.  For example, Plaintiffs claim that Green misled investors on February 15, 2024, when he stated that "SmartDose" is "an area that we've been focused on for a number of years, but we're at a point now of inflection on volume growth that we have to get ahead of the curve." *Id.* ¶ 427.

Notably, Plaintiffs never allege that any West financial statement or guidance was ever false or misleading in any respect.

### 2.    Alleged Corrective Disclosures.

Plaintiffs allege that the above statements' misleading nature was revealed via corrective disclosures on six dates between July 2023 and February 2025 that addressed destocking trends, HVP performance, and the Contract Manufacturing segment.  Am. Compl. ¶¶ 367–68, 399–400, 423, 432–34, 436, 449, 451, 478–85, 518, 580–85.  On each of those dates, West also announced negative financial results and updates to sales guidance—but Plaintiffs do *not* allege that any of these negative announcements were corrective disclosures.  Plaintiffs' position is that drops in West's stock price on or after each date were caused by the purported corrective disclosures, not by the negative financial results or updated sales guidance.

Plaintiffs do not claim a corrective disclosure on October 24, 2024—even though that date also saw disclosures that (as analysts put it) showed West facing "destocking headwinds, margin pressures, and capacity constraints" that "could limit near-term upside."  Ex. 2 (10/24/2024 Analyst Report).  But on that date, West announced *positive* financial results and its stock price increased.  *Id.*; Ex. 3 (West Historical Stock Price Data).

### 3.    Plaintiffs' Claims.

Plaintiffs package these allegations into claims under Sections 10(b), 20(a), and 20A of the

Securities Exchange Act of 1934 and SEC Rule 10b-5.  With their primary claim under Section 10(b), Plaintiffs allege that Defendants knowingly or recklessly misled investors with the above statements.  With their Section 20(a) claim, Plaintiffs seek to hold the Individual Defendants liable for controlling others' purported violations of Section 10(b).  And with their second Section 10(b) claim and related Section 20A claim, Plaintiffs allege that certain Individual Defendants improperly traded West stock during the class period based on material nonpublic information.

## LEGAL STANDARD

To survive Rule 12(b)(6), Plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and the Court need not "accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations," *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007).  Plaintiffs' claims must also satisfy Rule 9(b)'s and the PSLRA's heightened pleading requirements.  *See Inst'l Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252–53 (3d Cir. 2009).  Plaintiffs must state "with particularity" the "circumstances constituting fraud," including the "who, what, when, where, and how," *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 531, 534 (3d Cir. 1999).  Plaintiffs must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *OFI*, 834 F.3d at 490 (citing 15 U.S.C. § 78u-4(b)(2)(A)).

## ARGUMENT

### I.  Plaintiffs' Section 10(b) Claim for Alleged Misstatements Should Be Dismissed on Several Independent Grounds.

To state a claim for misstatements under Section 10(b) and Rule 10b-5, Plaintiffs must allege "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *In re Hertz Glob.*

*Holdings, Inc.*, 905 F.3d 106, 114 (3d Cir. 2018).  Here, Plaintiffs do not adequately allege falsity, scienter, or loss causation—each of which provides independent grounds for dismissal, as this Court has previously recognized.  *See, e.g.*, *Bldg. Trades United Pension Tr. Fund v. Kenexa Corp.*, 2010 WL 3749459, at *4–15 (E.D. Pa. Sept. 27, 2010) (Sanchez, J.); *In re Incyte S'holder Litig.*, 2014 WL 707207, at *5–14 (D. Del. Feb. 21, 2014) (Sanchez, J.).

## A.    Plaintiffs Fail to Plead Any Actionable Misstatements.

First, all of the nearly 90 statements at issue are either (1) puffery that is immaterial as a matter of law; (2) forward-looking statements that are protected by the PSLRA's safe harbor; (3) inactionable opinions; or (4) statements otherwise lacking particularized allegations of falsity. Indeed, many of the alleged misstatements fail on multiple grounds.

### 1.    Many of the statements are inactionable puffery.

To begin, Plaintiffs target many statements that are simply "general statements of optimism" or otherwise "too vague to be actionable" and thus "puffery."  *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 283 (3d Cir. 2010); *see also Incyte*, 2014 WL 707207, at *14.  "Such statements, even if arguably misleading, do not give rise to a federal securities claim because they are not material."  *Advanta*, 180 F.3d at 538.  This well-settled principle knocks out wide swaths of the Complaint, which repeatedly challenges statements that simply expressed vague optimism about West's business—whether about demand or margin.

With respect to demand, Plaintiffs target various statements expressing general optimism about West's growth prospects—for example, noting that West is poised for "very strong growth," Am. Compl. ¶ 333; *see also id.* ¶ 317 ("very healthy participation" and "very strong position"); ¶ 319 ("very good position"); ¶ 320 ("we'll continue to be able to leverage our organization" and "more opportunities ahead of us"); ¶ 355, ¶ 382, ¶ 452, ¶ 473 (all similar).  This is all puffery.  *See, e.g.*, *Fadia v. FireEye, Inc.*, 2016 WL 6679806, at *8–9 (N.D. Cal. Nov. 14, 2016) (statements

about business being "very healthy" were puffery).  The same is true for statements about West customers' inventory levels.[3]  *See, e.g.*, *Waswick v. Torrid Holdings, Inc.*, 2024 WL 3740052, at *7 (C.D. Cal. July 23, 2024) (statement that company was "comfortable with" its inventory levels was puffery).  Likewise for statements about West's visibility into these issues.[4]  *See, e.g.*, *Fitzer v. Sec. Dynamics Techs., Inc.*, 119 F. Supp. 2d 12, 26 (D. Mass. 2000) (demand statements were puffery where they did "not specify a particular market demand, a market share figure, or represent that the market demand is static, shrinking, or growing"); *In re Rackable Sys., Inc. Sec. Litig.*, 2010 WL 199703, at *6 (N.D. Cal. Jan. 13, 2010) (statements characterizing relationship with customers as "pretty strong" and "solid" were puffery).

The same goes for alleged misstatements about particular product segments.  For example, Plaintiffs target many vaguely optimistic statements about HVPs overall.[5]  So too for alleged misstatements about SmartDose.[6]  And likewise for alleged misstatements about Contract

---

[3] *See, e.g.*, Am. Compl. ¶ 367 (West had "a good handle" on destocking); ¶ 400 ("very healthy win ratio" for destocking); ¶ 411 (West is "pleased" with "that whole building up of the safety stock"); ¶ 424 (West "trending back to [its] normal construct growth rates" and thus does not view destocking as a "long-term problem"); ¶ 444 (West is "actively managing" destocking); ¶ 449 (West "expects" a "return to more typical order patterns"); ¶ 453 (West "feel[s] good about" destocking situation); ¶ 467 ("we would expect to see things improve" with regard to destocking).

[4] *See, e.g.*, Am. Compl. ¶ 328 (West "ha[s] really strong visibility"); ¶ 349 ("I believe that we're much closer to our customers"); ¶ 379 (similar); ¶ 382 (similar); ¶ 393 (similar).

[5] *See, e.g.*, *id.* ¶ 303 ("very, very healthy growth profile"); ¶ 328 (noting "high participation rate"); ¶ 334 ("order book continues to be strong"); ¶ 355 ("very, very healthy participation rate" and "excite[ment]"); ¶ 360 ("continued stability in both near- and long-term"); ¶ 361 ("solid order book"); ¶ 364 ("positive impact" related to HVPs and margin); ¶ 378 ("I would argue that most of the investments are more of the higher end of HVP" and "high participation rate across the board" is "exciting"); ¶ 392 ("strong base demand," "strong uptake," and "fueled growth"); ¶ 428 ("demand is there in hand"); ¶ 445 ("making progress" with investment on HVP devices); ¶ 451 (HVP portfolio "will ramp up quite—very nicely"); ¶ 452 ("growth opportunities," "areas are growing," and "growth potential"); ¶ 453 ("we feel good about" growth and "we feel very good based on the order patterns"); ¶ 492 ("margin profile of those products . . . should shift[] in a positive way for us"); ¶ 496 (West "making significant progress in ramping up production" and "anticipate this ramp-up to continue").

[6] *See, e.g.*, *id.* ¶ 319 (investment in wearables "exciting" and "[w]e're in a very good position to support" customers); ¶ 320 (similar); ¶ 397 ("really active uptake" and "very active pipeline of customers . . . evaluating the platform"); ¶ 413 (similar); ¶ 427 (SmartDose "an area that we've been focused on," at "inflection," and "laser focused on right now"); ¶ 497 (SmartDose "meeting expectations and I'm really proud of that team" and "very pleased"); ¶ 505 (similar).

Manufacturing.[7] These statements are quintessential puffery. *See, e.g.*, *Incyte*, 2014 WL 707207, at *14 (statements about product launch "going well" and "encouraging" were puffery).

The trend continues for alleged misstatements about West's margins, where again Plaintiffs frequently go after vague statements of general optimism. Some of these statements were about West's margins generally. *See, e.g.*, Am. Compl. ¶ 385 ("we're also driving a lot of cost efficiencies and operational excellence within our business"); ¶ 308 (referencing the "strength of our financial construct" and "base momentum"). Others were about specific margin-enhancing goals like "automation" and "efficiency."[8] All of this is inactionable puffery, and so Plaintiffs' claims about these statements should be dismissed.

### 2. Many statements are forward-looking and fall under the PSLRA safe harbor.

Separately, many of the alleged misstatements are protected by the PSLRA safe harbor for forward-looking statements—which are a "broadly defined" category, *Avaya*, 564 F.3d at 255, that includes goals, "plans and objectives of management for future operations," disclosures about "future economic performance," and assumptions underlying such statements, 15 U.S.C. § 78u-5(i)(1). Such statements cannot give rise to liability so long as either "the statement is identified as [forward-looking] and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Williams v. Globus Med., Inc.*, 869 F.3d 235, 245 (3d Cir. 2017) (quoting *Avaya*, 564 F.3d at 254).

Here, all three independent triggers for the safe harbor exist. As discussed below, most of the forward-looking statements at issue were identified as such and accompanied by meaningful

---

[7] *See, e.g., id.* ¶ 455 ("very strong, very long-term relationships" that are "well established"); ¶ 377 ("pretty good confidence").

[8] *See, e.g., id.* ¶ 324 ("we continue to have opportunities to invest further around automation, give us more higher quality, better safety, better yield and actually, better productivity for our cost base" and "a lot more to come"); ¶ 340 (similar); ¶ 341 (similar).

cautionary language.  *See* Am. Compl. ¶¶ 303, 305, 308, 317, 319–20, 333–37, 340–41, 355, 360–61, 396, 399, 401, 407, 424–25, 427, 429, 435, 445–47, 449, 451–54, 473.[9]  Separately, as discussed in Part I.B, no forward-looking statements are adequately alleged to have been made with "actual knowledge" of their purported falsity.  And as discussed in Part I.A.1, many of the forward-looking statements at issue are puffery and thus "immaterial" as a matter of law.

**Demand Statements.**  Most of the Demand statements are forward-looking—as they not only address future events but also use future-oriented language like "expect" and "opportunity."  *See NECA-IBEW Health & Welfare Fund v. Pitney Bowes*, 2013 WL 1188050, at *17 (D. Conn. Mar. 23, 2013) (similar "linguistic cues" identified forward-looking statements); *Aetna*, 617 F.3d at 281 (statements are forward-looking when accuracy depends on events that "could not be ascertained until later"); *Avaya*, 564 F.3d at 273 ("[P]rojections are a classic forward-looking statement.").  And these statements were also identified as forward-looking when made.

This is the case for many purported misstatements about demand generally as well as about West's expectation for future performance.[10]  It also applies to statements predicting the scope and

---

[9] For all of these forward-looking statements, cautionary language was incorporated by reference.  *See In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 282 (3d Cir. 2010) (cautionary statements incorporated by reference "do not have to be in the same document as the forward-looking statements") (citation omitted); *see also* Ex. 4–9 at 4 (Quarterly Earnings Calls from Q4 2022 to Q1 2024) (incorporating cautionary language from 10-K and 10-Q); Ex. 10 at 5 (7/27/2023 Earnings Press Release) (same); Ex. 11 at 5 (4/25/2024 Earnings Press Release) (same); Ex. 12 at 4 (3/14/2023 Conference) (referencing accompanying slide deck); Ex. 13 at 2 (3/14/2023 Slide Deck) (incorporating cautionary language from 10-K and 10-Q); Ex. 14 at 4 (6/6/2023 Conference) (referencing accompanying slide deck); Ex. 15 at 2 (6/6/2023 Slide Deck) (incorporating cautionary language from 10-K and 10-Q); Ex. 16 at 4 (6/4/2024 Conference) (referencing accompanying slide deck); Ex. 17 at 2 (6/4/2024 Slide Deck) (incorporating cautionary language from 10-K and 10-Q); Ex. 49 at 3 (11/10/2023 Conference) (incorporating cautionary language from SEC filings available on West website).

[10] *See, e.g.*, Am. Compl. ¶ 303 ("Looking ahead, we remain well-positioned with the right growth strategy around execute, innovate, and grow."); ¶ 308 (West "expect[s] certain margins" and "we're planning for further additional growth"); ¶ 317 ("[W]e're projecting growth in 2023."); ¶ 333 ("We continue to expect . . . growth for the year."); ¶ 336 ("[W]e'll continue [to] respond to our customers' forecasted demand"); ¶ 361 ("we continue to work closely with customers to update demand trends for the near and long term"); ¶ 473 ("[O]ur guidance suggests that you think about this that second half is going to be stronger than the first half for 2024").

duration of destocking-related problems and anticipated customer demand.[11]  It applies to HVP statements anticipating strength, demand, and sales for the various products within the segment.[12] It also applies to expectations for Generics and other customer segments.[13]  And it applies to statements of expectations for Contract Manufacturing.[14]

These statements were also accompanied by cautionary language identifying the very risks that Plaintiffs claim later materialized.  For example, Plaintiffs allege that Defendants' forward-looking statements were misleading because of customer inventory build-up after the COVID-19 pandemic.  *See* Am. Compl. ¶ 13.  But West warned about *exactly that issue* when the statements were made.  *See, e.g.*, Ex. 18 at 11 (2024 10-K) ("General global economic downturns and

---

[11] *See, e.g., id.* ¶ 336 ("we'll continue" to "respond to our customers' forecasted demand" and "plan[] ahead" related to future demand); ¶ 337 (customers' future demand and West will "plan accordingly" related to "forecast or guidance for the full year"); ¶ 399 ("In a bit of a preview . . . we continue to expect to deliver our financial construct" and "we anticipate that our pandemic-related sales are at a point, where we will no longer have to separate our base performance in 2024"); ¶ 401 (forecasting that "base growth is going to temper" and "[i]t's not declining . . . It's not necessarily a destock situation"); ¶ 424 ("we don't see [destocking] as being a long-term problem, we would expect we get through in this year" and West is "trending towards into that construct"); ¶ 435 ("we don't see [destocking] as being a long-term problem"); ¶ 449 (West has not yet seen an "inflection in destocking" and "we still expect Q2 to have an impact from customer destocking" but "customer order trends continue to indicate a stronger second half of 2024"); ¶ 453 ("we feel good about" the "sequential growth on the revenue for the next several quarters"); ¶ 454 (destocking "is going to wane throughout" the year).

[12] *See, e.g., id.* ¶ 303 ("estimate" of sales growth based on "demand for [HVPs]"); ¶ 319 (West "in a very good position" to support transition from IV to wearables); ¶ 334 ("We'll continue to see" growth "over the course of 2023" and "really, as you think about the future long-term, it is around the Biologics" because "it tends to be the higher end of [HVPs]"); ¶ 341 ("we do believe there's opportunities to continue" growth in Biologics); ¶ 355 (Biologics as source of growth "when you think about the long-term construct"); ¶ 360 ("We see continued stability in both near- and long-term demand trends for [HVPs]"); ¶ 396 ("But as we look at it, next year, with the top line growth that we get led by HVP, you're going to see gross margins improve"); ¶ 407 (HVPs "allow[] us" to "capture higher ASP, higher revenues, but also higher margins in our portfolio" and "we will commit to and continue to hit or exceed" growth related to HVPs); ¶ 427 (future automation and efficiency aims for SmartDose); ¶ 445 (goals "[f]or the near term" and "for the longer term"); ¶ 447 ("expect to see as we progress through the year, the volumes around [HVPs] to increase again sequentially" and "we would expect that HVP growth to accelerate"); ¶ 451 (HVP "portfolio will ramp up . . . very nicely sequentially throughout the year" and "very strong outlook towards the end of the year and very strong obviously beyond that"); ¶ 452 (similar).

[13] *See, e.g., id.* ¶ 334 ("We'll continue to see that [growth in Generics] over the course of 2023."); ¶ 320 (similar).

[14] *See, e.g., id.* ¶ 305 ("[W]hat we would expect as we move into 2023 . . . for our contract manufacturing"); ¶ 333 ("Contract Manufactured is now expected to be double-digit growth compared to prior high-single digit outlook."); ¶ 335 (similar); ¶ 425 (similar).

macroeconomic trends . . . could negatively affect demand for our products due to customers decreasing their inventories in the near-term or long-term.");[15] Ex. 21 at 35 (Q1 2025 10-Q) (warning that "actual results [could] differ from our expectations" because of "customers' changing inventory requirements and manufacturing plans that alter existing orders or ordering patterns" and "interruptions or weaknesses in our supply chain, including from reasons beyond our control such as . . . pandemic").[16] And as Plaintiffs recognize, dating back to some of the earliest alleged earnings calls during the class period, West and its executives acknowledged that there were "some inventory management [issues]." Am. Compl. ¶ 367. These destocking problems were discussed extensively over various calls and with regard to various market segments. *See, e.g.*, *id.* ¶¶ 368, 399–400, 432–34, 436, 449, 451, 478–83.

Plaintiffs also allege that forward-looking statements were misleading because of product-quality issues with SmartDose that affected customer demand. *Id.* ¶ 15. But again, West warned about potential "product quality and safety issues" that could affect "financial condition[s]." Ex. 18 at 16 (2024 10-K); *see also id.* (warning about "risks" with "design, manufacturing and marketing of pharmaceutical packaging and medical devices," such as "[m]anufacturing or design defects").[17] And West cautioned about the possibility of "lower-than-expected sales growth of [its] high value proprietary product offerings." Ex. 21 at 35 (Q1 2025 10-Q).[18]

As for potential customer issues, where Plaintiffs allege that statements about Contract Manufacturing were misleading because of the impending departure of one of West's CGM

---

[15] *See also* Ex. 19 at 11 (2023 10-K) (same); Ex. 20 at 12 (2022 10-K) (same).

[16] Identical language appears in all Forms 10-Q that West issued during the class period. *See* Exs. 22–27 (10-Qs for Q1 2023 to Q3 2024).

[17] *See also* Ex. 19 at 16 (2023 10-K) (same); Ex. 20 at 16 (2022 10-K) (same).

[18] Identical language appears in all Forms 10-Q that West issued during the class period. *See* Exs. 22–27 (10-Qs for Q1 2023 to Q3 2024).

customers (Dexcom), *see* Am. Compl. ¶ 12, West repeatedly warned that competition and various other factors could cause customers to leave West.[19] And West explained that certain customers, including in the Contract Manufacturing segment, contributed significant portions of net sales.[20]

Taken together, "[t]hese cautionary statements are not vague or blanket disclaimers, but instead are substantive, extensive, and tailored to the future-looking statements they reference." *Avaya*, 564 F.3d at 258; *see also, e.g.*, *Robeco Cap. Growth Funds v. Peloton Interactive, Inc.*, 665 F. Supp. 3d 522, 539 (S.D.N.Y. 2023) (safe harbor applied where language "warned of the very risk" alleged); *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 279 (3d Cir. 2004) (dismissal where "the cautionary statements relate directly to the claim on which plaintiffs allegedly relied"). The PSLRA safe harbor accordingly precludes liability for all of these forward-looking statements.

**Margin Statements.** Many of Plaintiffs' purported Margin statements are similarly forward-looking—as Defendants were describing expectations on margins and related topics, both generally and for SmartDose.[21] Plaintiffs allege that these statements were misleading because of

---

[19] *See, e.g.*, Ex. 21 at 35 (Q1 2025 10-Q) ("[C]ompetition from other providers in our businesses, including customers' in-house operations, and from lower-cost producers in emerging markets, which can impact unit volume, price and profitability."); Exs. 22–27 (10-Qs for Q1 2023 to Q3 2024) (same); Ex. 18 at 13 (2024 10-K) ("We compete with several companies across our major product lines . . . Companies often compete on the basis of price . . . If we are unable to resist or offset the effects of continued pricing pressure . . . or if we have to reduce our prices, our sales and profitability may suffer."); Exs. 19–20 (10-Ks for 2022-23) (same); Ex. 18 at 14 (2024 10-K) ("The development of new or improved products, processes or technologies by other companies . . . may reduce customer demand for our products or render some of our products or proposed products obsolete or less competitive."); Exs. 19–20 (10-Ks for 2022-23) (same).

[20] *See* Exs. 18–20 at 7 (10-Ks for 2022-24) ("Our ten largest customers accounted for [~41%–46%] of our consolidated net sales, and one . . . accounted for more than 10% . . . contributing to net sales in both the Proprietary and Contract Manufacturing segments.").

[21] *See, e.g.*, Am. Compl. ¶ 320 ("So, as we go forward and continue to the market" around certain injectables, "we believe that we'll continue to [be] able to leverage our organization with a mix shift and other initiatives like automation, pricing, gives us continued expansion on margin here at West"); ¶ 340 ("[W]e're confident on" the company's future "guidance" related to margins); ¶ 341 (similar); ¶ 396 ("But as we look at it, next year, with the top line growth that we get led by HVP, you're going to see gross margins improve year-on-year."); ¶ 429 ("[W]e do see it trending back to more normal rates of operating margin as we progress through the year and it will be a gradual shift."); ¶ 446 ("We expect margin improvement sequentially as we move through the year . . . so we would see growth in operating margins step up quarter-over-quarter.").

operational inefficiencies with the production of SmartDose. *See id.* ¶ 15. But again, these statements were accompanied by cautionary language that warned about the risks that West's margins would suffer because of the alleged issues. *See, e.g.*, Ex. 18 at 17 (2024 10-K) ("We may be unable to increase capacity or efficiency at our own manufacturing facilities, which could adversely affect our business, financial condition, and results of operations.").[22] These forward-looking statements are thus protected by the safe harbor. *See Avaya*, 564 F.3d at 258.

### 3. Plaintiffs allege no basis for finding any opinion statements false or misleading.

Plaintiffs also target many statements of opinion—which can be false or misleading only under specific, narrow circumstances that are not alleged here. An opinion statement "is not misleading just because external facts show the opinion to be incorrect," since "[r]easonable investors do not understand such statements as guarantees." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188 (2015). Instead, opinions are actionable only in three circumstances. *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 686 (3d Cir. 2023). *First*, if the opinion "was not sincerely believed," *id.*; *second*, if the opinion "contains an expressly embedded, untrue factual assertion," *id.*; or, *third*, if the opinion "omits material facts about the [speaker's] inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself," *Omnicare*, 575 U.S. at 189. None of these circumstances is adequately alleged here.

*a. Many of the alleged misstatements are opinions.* To begin, many of the alleged misstatements plainly qualify as opinions here—because they address "'a belief[,] a view,' or a

---

[22] *See also, e.g.*, *id.* ("[S]hifts of product mix and complexity, may result in more frequent equipment change-overs and potentially increased costs because of the high fixed cost nature of our business, causing lower gross margins due to under-absorption of those fixed costs."); *id.* ("[Profitability] is affected by product and geographic sales mix, realized pricing of our products, the efficiency of our manufacturing operations . . . ."). Identical language appears in all Forms 10-K that West issued during the class period. *See* Exs. 19–20 (10-Ks for 2022-23).

'sentiment which the mind forms,'" rather than "'a thing done or existing.'"  *Id.* at 183.  Indeed, statements that require subjective judgment or that make predictions are opinions.  *See Warren*, 70 F.4th at 684 (statements regarding operational adequacy "are opinions," because they "reflect[] . . . judgment, based on a variety of complex assumptions").

Many Demand statements used subjective language—*e.g.*, that West "believe[d]" demand would reach certain levels and that West would get closer to targets "going forward."  *See, e.g.*, Am. Compl. ¶¶ 355, 492.[23]  West and its executives also framed their statements about inventory in subjective terms—understandably in light of uncertainty surrounding COVID and its lasting effects.[24]  The same goes for statements about HVP products, including stated beliefs about SmartDose's prospects of success.[25]  Likewise for statements about Contract Manufacturing.[26]

So too with Margin statements.  For example, Defendant Birkett cabined his outlook by saying "I would expect" efficiency in manufacturing to make for "a good start for the year."  *Id.* ¶ 340; *see also id.* ¶ 324 (similar "belie[f]" about automation).  The same subjective hedging was

---

[23] *See also, e.g., id.* ¶ 308 ("strength of our financial construct" and "base momentum"); ¶ 317 (West is "projecting growth in 2023" and that it "anticipate[s]" that several initiatives to "continue on"); ¶ 333 (suggesting "very strong growth" and "what we expect in the market").

[24] *See, e.g., id.* ¶ 349 ("I believe that we're much closer to our customers now than we have been in the past."); ¶ 361 (order book "solid"); ¶ 411 ("pleased" with "that whole building up of the safety stock," "[w]e feel that we're close to competition there for our customers," and "we'll probably be back to reordering patterns consistent with what we've seen before"); ¶ 435 (similar).

[25] *See, e.g., id.* ¶ 320 ("we believe" injectable medicine is area where "we'll continue to [be]" able to leverage our organization" with "initiatives," "I'd say early on in the automation journey and we're excited that this is an enabler for us to support our customers and mitigate risk"); ¶ 334 ("[A]s you think about the future longer-term, it is around the Biologics."); ¶ 355 (participation in certain HVPs "very, very healthy," expressing "excite[ment] with our R&D focus, with our product expansion," and calling HVP growth "really exciting" and "faster than we believe"); ¶ 378 ("I would argue that most of the investments are more of the higher end of HVP" and developments "exciting"); ¶ 396 ("you're going to see gross margins improve"); ¶ 397 ("we're seeing really active uptake" and "have a very active pipeline of customers" for SmartDose); ¶ 452 ("I think when you look at it in the whole, areas are growing."); ¶ 510 (SmartDose "can get to HVP margins over time"); ¶ 514 ("we do certainly see that ramp providing a growth opportunity, and that will continue for a period of time" and "we do believe that this is a growth area, but we've got to get new customers" and "we've got to make sure we've got the scale to support them").

[26] *See, e.g., id.* ¶ 335 ("So if I'm looking out past our 2023, I would see kind of more the mid-single, high-single-digit growth rate" for Contract Manufacturing); ¶ 499 (similar).

used for statements about SmartDose's margins and production efficiency.[27]

All told, then, these are all quintessential statements of opinion.  *See Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 226 (S.D.N.Y. 2018) ("[E]xpressions of optimism [and] projections about the future are typical types of opinion statements.").

**b.  *None of these opinions is actionable.***  Plaintiffs allege no facts suggesting the makers of these statements did not truly believe them.  Nor are any of the challenged statements alleged to have contained "an expressly embedded, untrue factual assertion."  *Warren*, 70 F.4th at 686. Thus, Plaintiffs' only path to liability is to plead that these opinions were misleading under the narrow "falsity-by-omission scenario."  *Id.*  But as the Supreme Court has emphasized, alleging this theory "is no small task." *Omnicare*, 575 U.S. at 194.  Plaintiffs cannot simply allege that "the issuer knows, but fails to disclose, some fact cutting the other way," *id.* at 176, because investors "understand that opinions sometimes rest on a weighing of competing facts," *id.* at 189–90.  Even if "opinions plausibly were ill-advised or wrong, such qualities do not make them fraudulent under the securities laws."  *Handal v. Innovative Indus. Props., Inc.*, 157 F.4th 279, 287 (3d Cir. 2025). Instead, falsity-by-omission for an opinion "could only arise if the undisclosed fact *made it impossible* for the speaker's opinion to be correct."  *In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, at *13 (W.D. Pa. May 18, 2023) (emphasis added); *see also, e.g.*, *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1329 n.13 (11th Cir. 2019) (no falsity for opinions without "facts strongly supporting the inference that it was *impossible*" for statement to be true).

Plaintiffs do not allege anything close to this.  Many of Plaintiffs' alleged omissions are instead just inactionable "failure[s] to predict the future"—instances where the opinions may have

---

[27] *See, e.g.*, *id.* ¶ 320 ("we believe" injectable medicine is an area where "we'll continue to [be] able to leverage our organization" with various "initiatives," "I'd say early on in the automation journey and we're excited that this is an enabler for us to support our customers and mitigate risk of their supply chain."); ¶ 506 (similar "excite[ment]").

proved wrong, but not where the speaker omitted facts that refuted the opinion. *Belodoff v. Netlist, Inc.*, 2009 WL 1293690, at *8 (C.D. Cal. Apr. 17, 2009) (dismissing such a claim). This includes several subjective beliefs about future growth or demand, *see, e.g.*, Am. Compl. ¶ 492; opinions about future inventory levels, *see, e.g.*, *id.* ¶¶ 411, 435; beliefs about the future sales of certain products, *see, e.g.*, *id.* ¶¶ 320, 355; and expectations for future margins, *see, e.g.*, *id.* ¶¶ 324, 340. Such predictions cannot give rise to liability here. *See, e.g.*, *Belodoff, Inc.*, 2009 WL 1293690, at *8. Other opinions at issue do not offer any "meaningful, objective data that an investor would rely upon." *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 570 (S.D.N.Y. 2018). This includes, for example, nebulous statements about West's "health," and potential "growth," around certain products. *See, e.g.*, Am. Compl. ¶¶ 355, 452.

Otherwise, Plaintiffs at most point to purported data "cutting the other way"—which does not suffice for opinion liability, particularly when that data is not impossible to square with the opinion. *Omnicare*, 575 U.S. at 176; *see also, e.g.*, *In re Ascena Retail Grp., Inc. Sec. Litig.*, 2022 WL 2314890, at *6 (D.N.J. June 28, 2022) ("An investor . . . may not predicate a claim for securities fraud merely by 'second-guess[ing] inherently subjective and uncertain assessments.'"). For example, operational snags with regard to one product (SmartDose) or one customer (Dexcom) are perfectly compatible with broader opinions about company-wide or segment-wide performance. *See Kenexa Corp.*, 2010 WL 3749459, at *8 (Sanchez, J.) (no falsity because one customer's "termination of [Defendant's] services does not render the company's forecast" as "knowingly false" when Defendant "earned a significant amount of revenue from" other sources). Indeed, a "reasonable investor could not assume from" statements about West's expectations "that the company would never lapse in" reaching targets. *In re Constellation Energy Grp., Inc. Sec. Litig.*, 738 F. Supp. 2d 614, 631 (D. Md. 2010); *see Handal*, 157 F.4th at 294 (no basis to infer

that opinions were affirmative warranties).

This principle dispenses with Plaintiffs' allegations that a lower-level West employee (identified in the complaint as CW-1) expressed different views about the scope of potential destocking, Am. Compl. ¶¶ 150–51, or that a single "inventory analysis" of certain customers was pessimistic, *see id.* ¶ 330. Even if an opinion was not uniformly held or supported within West, that does not mean the opinion was *misleading* under the securities laws. *See, e.g.*, *Warren*, 70 F.4th at 687 (omission not misleading when it is "only one of many factors" related to an opinion); *Omnicare*, 575 U.S. at 189–90 (similar); *Martin v. Quartermain*, 732 F. App'x 37, 40–42 (2d Cir. 2018) (defendant company's opinion statements about its expert's reports were not misleading based on failure to disclose other consultant's opposing opinion); *see also Okla. Firefighters Pens.*, 300 F. Supp. 3d at 575–77 (statements that initiative was "going well" not actionable despite failure to disclose "litany of current adverse facts known" to speaker). Indeed, Plaintiffs do not even identify what opinions were actually rendered misleading by these purported internal views. On this basis, too, Plaintiffs' claims about these opinions can be dismissed.

### 4.  Many of the purported misstatements are otherwise not alleged to be false or misleading with the particularity required by the PSLRA.

Plaintiffs also fail to provide a "sufficiently particularized factual pleading" alleging that any of the challenged statements were false or misleading when made. *OFI*, 834 F.3d at 490. In assessing whether falsity has been adequately alleged, this Court must look at the purported misstatements at the time they were made and in their full context. *See, e.g.*, *City of Edinburgh*, 754 F.3d at 168–69; *see also Singh v. Cigna Corp.*, 918 F.3d 57, 63–64 (2d Cir. 2019) (statements must be "evaluated . . . by . . . 'context'"). Even accepting the Complaint's allegations as true, scores of the alleged misstatements were not false or misleading when made "and thus cannot create liability." *Kenexa Corp.*, 2010 WL 3749459, at *12 (Sanchez, J.).

 *a. Statements about West's overall performance.* First, for both demand and margins, Plaintiffs target many statements that broadly address West's overall performance—for example, a statement related to the company's overall "order book" or overall margins.  Am. Compl. ¶¶ 304, 309; *see also, e.g.*, *id.* ¶¶ 305, 317, 325, 328, 337, 340, 350, 351, 362, 376, 485, 399, 400, 401, 410, 419, 423, 432, 466, 467, 470, 473.  Plaintiffs contend that these statements were all false or misleading based on allegations about either (1) operational and sales issues with the SmartDose device, (2) backed-up inventory at and reduced orders from West's Generics customers, or (3) the impending departure of Dexcom, one of West's CGM customers.  *See id.* ¶¶ 13–15.

 But the Complaint lacks the factual allegations necessary to establish that these granular issues—about either specific products (SmartDose), specific market segments (Generics), or specific customers (Dexcom) that were just a small slice of West's business—somehow made broader, more generic statements about West overall false or misleading.  Even if West was facing challenges with specific products or customers, that does not make broader statements concerning the company's overall performance false or misleading—as the Third Circuit (and other courts) have made clear.  *See, e.g.*, *Warren*, 70 F.4th at 686 (plaintiffs failed to show that "Hartford Block's problems had affected Individual Life to the point that the reserves for the entire business segment were deficient"); *In re ATI Techs., Inc. Sec. Litig.*, 216 F. Supp. 2d 418, 434 (E.D. Pa. 2002) (disclosure of company "wins" not misleading despite omission of "other adverse sales trends at the company"); *Capri Optics Profit Sharing v. Digit. Equip. Corp.*, 950 F.2d 5, 10 (1st Cir. 1991) (statements about "[b]usiness overall" not false or misleading despite some matters "going less well" because "[t]his is precisely what is meant by 'overall'").

 Nor do Plaintiffs offer any particularized allegations to bridge these gaps.  To the contrary, the Complaint's allegations only confirm that Plaintiffs' theories reflect a fundamental mismatch

between generalized statements and far narrower concerns.  For example, SmartDose is a single device within the broader portfolio of HVP delivery devices—and Plaintiffs themselves acknowledge that this *entire category* generated at most 14% of revenues during the class period. Am. Compl. ¶ 68.  Plaintiffs allege no particularized basis for why issues for just one product within that whole category—which itself is just a small component of revenue—somehow makes broad statements about company-wide performance false or misleading.

The same is true for Plaintiffs' theory about Generics customers, for which the allegations invoke inventory issues.  *See id.* ¶ 13.  No allegations explain how these Generics-specific issues make any company-wide statements false or misleading—particularly when Plaintiffs acknowledge that Generics was West's smallest market group among Biologics, Generics, and Pharma, and just a small fraction of overall revenue.  *See id.* ¶ 63–64 (17% of 80.7% of revenues).

Likewise for the impending departure of Dexcom.  While Plaintiffs allege that Dexcom was one of two major customers for West's CGM product, *id.* ¶ 99, they do not connect how any issues with this *one* customer for *one* product line within *one* product segment made broad *company-wide* statements false or misleading.

On this basis, across the board, Plaintiffs have failed to adequately allege that any company-wide statements were false or misleading.  But Plaintiffs' theory for many of these statements fail for other reasons, too.  For example, Plaintiffs challenge statements that compared expected demand or destocking to those figures at earlier times[28]—but the Complaint neither disputes the veracity of the stated figures nor alleges exactly what older data was used as a benchmark, which leaves no basis to conclude that these comparisons were false or misleading.

---

[28] *See, e.g., id.* ¶ 308 (margins compared to 2019); ¶ 309 (same); ¶ 367 (stocking compared to order book); ¶ 368 (destocking quarter to quarter); ¶ 424 (order book compared to pre-COVID); ¶ 433 (destocking compared to prior quarter); ¶ 444 (second half sales compared to first); ¶ 449 (same); ¶ 453 (same); ¶ 464 (comparing demand to 2019).

Plaintiffs also target various general statements about West's relationships with its customers—concerning things like what some of the "customers said," *id.* ¶ 417, monitoring its customers' actions, *id.* ¶¶ 351, 465, having good "visibility," *id.* ¶¶ 379, 393, 410, "interact[ing] with our customers," *id.* ¶ 379, or being "closer to our customers now than we have been in the past," *id.* ¶ 349. But Plaintiffs do not allege how any of these generalized statements were false or misleading because of specific purported issues with SmartDose, Generics, or Dexcom, when none of these statements said anything about any of those topics.

Additionally, Plaintiffs go after certain statements that broadly discussed "customers' forecasted demand"—which Plaintiffs say misleadingly omitted information on looming destocking issues. But those statements concerned particular topics (like GLP-1 drugs) that Plaintiffs do not challenge under any of their theories of falsity.[29]

***b. HVP statements.*** Plaintiffs also allege there were misstatements addressing the demand and margins for HVP segments and products. Many of these statements were undifferentiated assertions—whether about growth, demand, or order books—about the HVP portfolio as a whole or about multiple segments of the portfolio.[30] Here, again, Plaintiffs insist that these statements were false or misleading based on the same purported issues with SmartDose (one of many HVP products) as well as the same inventory issues for Generics customers. Here as well, the Complaint lacks particularized allegations to support Plaintiffs' theory.

Plaintiffs provide no basis—let alone a particularized one—for why any such broad HVP

---

[29] *Compare id.* ¶¶ 336–37 (excerpted to discuss customers' forecasted demand generally), *with* Ex. 5 at 11 (Q1 2023 Earnings Call) (showing that Green was discussing customers' demand for *GLP-1-related products specifically*—which Plaintiffs do not contest—not demand generally).

[30] *See, e.g.*, Am. Compl. ¶ 304 (looking "overall" at "composite of the growth of that order book"); ¶ 327 ("demand . . . particularly around [HVPs]" and "what's informing our whole process at West"); ¶ 361 (HVPs as "key levers of growth"); ¶ 364 (discussing "continued growth in [HVPs] ex COVID"); ¶ 392 ("strong base demand of" HVPs); ¶ 428 (responding to question about "HVP manufacturing capacity"); ¶ 447 (discussing "other areas of [HVPs]" and "HVP growth"); ¶ 451 ("HVP components" and "proprietary elastomer side"); ¶ 470 ("higher volumes around [HVPs]").

statements were somehow false or misleading based on certain underlying issues with one product (SmartDose) within one segment of the HVP portfolio (delivery systems). The same goes for statements about how HVPs will affect the overall portfolio, *id.* ¶¶ 374, 395, 407; investments in HVPs generally, *id.* ¶ 378; and margins generally, *see, e.g.*, *id.* ¶ 492. Nothing about those broad statements was false or misleading because of alleged issues with one product or segment. That is particularly so when Plaintiffs never challenge many of the positive statements related to other product lines within the HVP business. *See, e.g.*, *id.* ¶ 319 (NovaPure product); ¶ 334 (NovaPure and FluroTec products); ¶ 419 (Crystal Zenith product).

Moreover, as judicially noticeable materials disclose (and Plaintiffs do not challenge), HVP delivery devices (which include SmartDose) actually *increased* in revenue during the class period. Ex. 18 at 44, 53 (2024 10-K) (net sales of approximately $405 million in 2024; $295 million in 2023; and $144 million in 2022). Against this backdrop, the Complaint falls well short of alleging that the purported narrow issues with SmartDose made the broader HVP statements false or misleading. *See Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 179–80 (E.D.N.Y. 2017) ("company's disclosure of accurate historical data" not false or misleading even if more could be disclosed).

The same is true for allegations about Generics customers—one customer segment within the Proprietary Products portion of West's business (which itself has standard and HVP products)—where Plaintiffs seem to think that isolated data about that limited customer segment somehow tainted any broad statements related to all HVP products. *See, e.g.*, *Warren*, 70 F.4th at 686. Plaintiffs again rely heavily on an "inventory analysis" that purportedly suggested less demand from Generics customers, Am. Compl. ¶ 330—but Generics customers are the *smallest subset* of reported market segments, *id.* ¶ 64, and the financials for these specific *customers* (who also purchase non-HVP products) say nothing about sales for HVPs in particular. Plaintiffs do not

allege how this data would undermine statements discussing HVPs more generally. Even the few statements referencing Generics in particular (rather than HVPs generally) are not alleged to have been false or misleading when made. *See, e.g.*, *id.* ¶¶ 333, 334, 392, 411. These are statements about "growth" in this area, which Plaintiffs say were misleading because there was "inventory build-up" at the time. *See id.* ¶¶ 334, 392, 411; *see also id.* ¶ 154. But "growth" and "inventory build-up" can happen at the same time—and, indeed, customers' "inventory build-up" often *explains* "growth," because it reflects customers purchasing more products.[31]

   *c. Contract Manufacturing statements.* In a similar move, Plaintiffs challenge statements touting expectations for the ongoing and future prospects of West's Contract Manufacturing segment. According to Plaintiffs, these statements were somehow false or misleading because an important customer (Dexcom) for one of West's diabetes products (CGM) informed West that it would eventually stop using West for this product. Am. Compl. ¶ 12. But Plaintiffs again fail to explain with any particularity how this narrow issue made these broader statements false or misleading. This includes statements concerning specific financial figures about overall growth in Contract Manufacturing, *id.* ¶¶ 333, 335, 355, 425; statements about how West was supporting its customers in the Contract Manufacturing space (when referencing GLP-1 drugs), *id.* ¶ 393; and statements about how injectable medicine could be a driver of growth in Contract Manufacturing, *id.* ¶ 377. Even if West was eventually losing *one* of its customers for *one* of its products within *one* of its Contract Manufacturing segments—in other words, just a small fraction of West's

---

[31] In fact, at the same time as the earliest statement, Plaintiffs do not challenge that the "[g]enerics . . . market units delivered an especially strong quarter of double-digit organic growth." Ex. 5 at 4 (Q1 2023 Earnings Call). Nor do Plaintiffs challenge any of the available revenue figures attributable to the Generics segment, *see* Am. Compl. ¶¶ 361, 392, 401, 411—and "characterizations" of such "publicly available data" are "not actionable" as a matter of law. *In re Sanofi-Aventis Sec. Litig.*, 2009 WL 3094957, at *5 (S.D.N.Y. Sept. 25, 2009). And if Plaintiffs' theory is that "inventory build-up" made it misleading to suggest *future* Generics growth, that is not alleged with sufficient particularity—and, regardless, runs headlong into the PSLRA safe harbor as well as the demanding standard for opinion liability.

sales—that does not turn broader statements about segment-wide financials, customers, or injectable medicine into falsehoods.  Nor do Plaintiffs allege otherwise with any particularity.

> ### d.   *SmartDose statements.*     Finally, Plaintiffs do target a handful of purported misstatements about SmartDose specifically—which they allege are false or misleading based on manufacturing and operational issues with the product.  But this theory of falsity does not align with the statements made.  Most of these statements discuss how West intended to ramp up production for HVP delivery devices like SmartDose, *id.* ¶ 496, or note past or anticipated growth in SmartDose, *id.* ¶¶ 419, 427, 445.  Other statements loosely discuss the performance or prospects of wearable products generally (not just SmartDose).  *Id.* ¶¶ 413, 514.  Still others discuss customers *evaluating* SmartDose, *id.* ¶ 397, or West's general ability to support customers for wearables, *id.* ¶ 319.  But Plaintiffs allege no facts indicating that these statements were false or misleading when made—as the Complaint fails to allege that SmartDose sales or production was not growing at the time, that customers were not evaluating the product, etc..  *See, e.g.*, *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 369 (S.D.N.Y. 2007) (company's failure to win new business did not make it misleading to reference "growing roster" of customers).

> Similar problems sink Plaintiffs' theory for statements about SmartDose's automation and efficiency, which Plaintiffs allege were misleading because of purported operational issues (*e.g.*, its "manufacturing and quality issues" and costs to "fix defective equipment").  *See, e.g.*, Am. Compl. ¶¶ 310–11.  These statements expressed broadly how West sought to improve margins, reduce costs, or increase efficiencies with SmartDose—including "opportunities to invest further around automation," *id.* ¶ 324, and increasing "efficiency through [its] plants," *id.* ¶ 340; *see also, e.g.*, *id.* ¶¶ 325, 385.  Nothing about those assertions was false or misleading based on purported problems with the product.  Even if SmartDose had manufacturing troubles, that does not make

statements about *investing* in SmartDose and seeking to *improve* its manufacturing processes false or misleading.  *See, e.g.*, *id.* ¶¶ 506, 507, 510, 513.  Plaintiffs thus do not "plead with particularity sufficient facts to show why any of the statements . . . were false when made."  *Xerion Partners, I LLC v. Resurgence Asset Mgmt., LLC*, 474 F. Supp. 2d 505, 518 (S.D.N.Y. 2007).

### B.  Plaintiffs' Allegations Fail to Create a Strong Inference of Scienter.

Separate from their failure to allege falsity, Plaintiffs have also failed to adequately plead scienter.  Section 10(b) requires a state of mind "embracing [an] intent to deceive, manipulate, or defraud, either knowingly or recklessly."  *Hertz*, 905 F.3d at 114 (citation modified).  Recklessness here requires a mental state that "closely approaches that which attaches to conscious deception." *In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 613 (E.D. Pa. 2009).  Moreover, for forward-looking statements, liability attaches "only upon proof of knowing falsity."  *Avaya*, 564 F.3d at 274.

A complaint must "state with particularity facts giving rise to a strong inference" of scienter, *Avaya*, 564 F.3d at 253, that is "more than merely 'reasonable' or 'permissible'"—it must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged," *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007).  If the "most plausible inference" is not culpable, dismissal is required.  *Winer Family Tr.*, 503 F.3d at 328.

#### 1.  Plaintiffs do not allege that the forward-looking statements were made with actual knowledge of their purported falsity, as the PSLRA requires.

To begin, Plaintiffs do not adequately allege that any forward-looking statement "was made with *actual knowledge* of its falsehood."  *Williams*, 869 F.3d at 245 (emphasis added); *see* Am. Compl. ¶¶ 303, 305, 308, 317, 319–20, 324–25, 328, 333–37, 340–41, 351, 355, 360–61, 374, 377–79, 396, 399, 401, 407, 410–11, 413, 417, 419, 424–25, 427, 429, 435, 445–47, 449, 451–54, 464–65, 467, 470, 473, 492, 496, 499, 505–07, 510, 513–14.  From Plaintiffs' purported bases for scienter (*see* Am. Compl. ¶ 539), Plaintiffs' only possible avenue for alleging actual knowledge

flows through the alleged confidential witnesses (CW-1 through CW-8). But none of these accounts suggest that any forward-looking statement was a knowing falsehood.

Courts cannot accept the accounts of alleged "confidential witnesses" uncritically. *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 244 (3d Cir. 2013). Instead, "courts should assess the 'detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia.'" *Id*. And even if credible, a confidential witness's account can support scienter here only if it suggests that a defendant *knew* a statement was false or misleading. None of the alleged witnesses here clear this bar.

Start with an initial flaw. Six of the eight purported witnesses—CW-2, CW-4, CW-5, CW-6, CW-7, and CW-8—are not even alleged to have communicated with any of the Individual Defendants. *See* Am Compl. ¶¶ 46, 48–52.[32] This alone undercuts Plaintiffs' reliance on their alleged accounts for scienter. *See, e.g.*, *Nat'l Junior Baseball League v. Pharmanet Dev. Grp.*, 720 F. Supp. 2d 517, 555 (D.N.J. 2010) (rejecting scienter because "not one witness claims to have met, emailed with, spoken to, or otherwise heard or read anything by, either of the Individual Defendants about [the alleged falsity] which would sufficiently raise a strong inference of scienter"); *Martin*, 2017 WL 3974002, at *17 (discounting witnesses where none "indicate that they . . . communicated directly with any of the Individual Defendants"). Nor were any of these witnesses even employed at West during the entire class period.[33] *See Kenexa Corp.*, 2010 WL

---

[32] Without any direct communications, some of these witnesses allege that certain bits of limited information would (or might) have also been seen by certain Individual Defendants, the "C-Suite," or the "XLT." *See id.* ¶¶ 104, 107, 128–29 (CW-2); *id.* ¶¶ 204, 236 (CW-5); *id.* ¶¶ 219–220, 227–29 (CW-6). But none of these allegations provide the requisite particularity as to when, how, and what information was provided to Individual Defendants to show scienter.

[33] *See* Am. Compl. ¶¶ 46, 48–52. CW-2, for example, left West in June 2023—meaning he left before over 60 of the alleged misstatements were made and thus cannot establish any of the Defendants' mental states after that time. *Id.* ¶ 46.

3749459, at *7 (discounting witnesses on this basis).

Separately, these six witnesses merely described their purported opinions about topics like SmartDose, certain customer orders and trends, and West's performance—but without any specific allegations showing that this information was actually known to any of the Individual Defendants. *See, e.g.*, Am. Compl.¶¶ 190–91, 204, 208, 219–20, 228, 236, 241.[34]  These generalized, post hoc accounts cannot establish what any Defendant knew at the time of the alleged misstatements.

The remaining two witnesses (CW-1 and CW-3) do not offer much better.  CW-1 had a very limited window of information:  He worked in Generics, *id.* ¶ 45, and had personal insight into only this portion of West's customer base.  His only purported knowledge about non-Generics comes from vaguely referenced conversations with unnamed "peers"—and a conclusory assertion that some Generics customers bought products in other segments—without any particularity about that information.  *Id.* ¶¶ 142, 164–165, 284–85, 289.  His opinions on topics other than Generics thus warrant no weight.  *See, e.g.*, *Nat'l Junior Baseball League*, 720 F. Supp. 2d at 540 (discounting witnesses who "were not employed in a position to know" whether statements were false); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009) (same).

As for his information about Generics, the Complaint alleges that CW-1 presented a detailed "Inventory Build Analysis" to one Defendant—Reiss-Clark—in March 2023.  *Id.* ¶ 147.  But Reiss-Clark's only two alleged misstatements have *nothing to do* with Generics.  *Id.* ¶¶ 513–14.  Moreover, Reiss-Clark made these statements on November 21, 2024, approximately one-and-a-half years after CW-1's alleged presentation.  *Id.*  By that point, any information from the

---

[34] A lack of particularity pervades many of these witnesses' statements as well.  For example, CW-2 says that order data "would have been seen by at least Reiss-Clark," *id.* ¶ 107, but fails to explain how he knows that or exactly what data would have been shown.  So too with other statements regarding what Reiss-Clark and Birkett "knew" at undefined times.  *Id.* ¶ 128.  Similarly, CW-6 says that he developed information for "XLT" presentations (to which Green was allegedly a member).  *Id.* ¶ 194.  But this witness does not allege that he presented any of this information himself or what exactly would have been presented to Green and when.

"Inventory Build Analysis" would have been outdated; certainly the Complaint alleges no reason to think otherwise. *See, e.g.*, *Luo v. Spectrum Pharms., Inc.*, 2024 WL 4443323, at *14 (D. Nev. Oct. 7, 2024) (no falsity based on "outdated" information from witness).

For the other three Individual Defendants, in June 2023, CW-1, who worked in marketing, purportedly told them his belief that "revenues in the next three quarters, at least, would be down compared to the previous year." Am. Compl. ¶ 45, 154. But none of those Defendants made any predictions about revenues for Generics after June 2023—so CW-1's purported views on that topic do not conflict with Defendants' statements. *Id.* ¶¶ 361, 392, 401, 411, 466.[35]

As for CW-3, he worked remotely in "supply chain" and departed West in "early 2024," halfway through the class period. Am. Compl. ¶ 47; *cf. Nat'l Junior Baseball League*, 720 F. Supp. 2d at 540; *Zucco Partners*, 552 F.3d at 996. His purported account relies on vague attributions and sweeping characterizations (*e.g.*, that problems were "widely known" or that "people on the team" knew of certain issues) but provides little particularized information, which does not suffice. *See Chan v. New Oriental Educ. & Tech. Grp. Inc.*, 2019 WL 2865452, at *12 (D.N.J. July 3, 2019) ("[I]t is not enough for plaintiffs to merely allege [through a confidential witness] that defendants 'knew' their statements were fraudulent or that defendants 'must have known' their statements were false." (citation omitted)). Similarly, his reports that "everybody" "cancelled orders" or that "growth was stalled," Am. Compl. ¶¶ 118–34, are too generic and hyperbolic to support scienter, *see Martin*, 757 F. App'x at 154 (holding that confidential-witness allegations about "widely distributed" reports that caused "significant concern" lacked

---

[35] For the same reasons, CW-1 fails to explain how his meetings with Birkett and one meeting with Green regarding revenue targets for Generics would have provided those Defendants with any knowledge on issues beyond just the Generics business. *Id.* ¶ 168. Similarly, too, CW-1's allegations about preparing Green for earnings calls lack any particularity as to what information was discussed. *See Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 305–06 (S.D.N.Y. 2019) ("vague," "generic," and "conclusory" confidential witness allegations that lack "further details or explanations . . . do not raise a strong inference of scienter").

particularity required for scienter); *Utesch v. Lannett Co., Inc.*, 316 F. Supp. 3d 895, 904 (E.D. Pa. 2018) (confidential-witness allegations that "sound[] in exaggeration" should be disregarded).[36]

As for CW-3's allegations that Dexcom "informed West that it would end its partnership with West," Am. Compl. ¶¶ 173–79, the Complaint does not allege how any Defendant *knew* that this departure meant their broader statements (which did not mention Dexcom) were misleading.

CW-3's statements regarding SmartDose also do not support scienter. His recommendations that West "pull[ ] the plug on SmartDose," *id.* ¶ 427, and the like have no bearing on scienter, because there are not particularized allegations that any Individual Defendant actually shared those views, *see, e.g.*, *Wyche v. Advanced Drainage Sys., Inc.*, 2017 WL 971805, at *15 (S.D.N.Y. Mar. 10, 2017) ("[D]ifferences of opinion . . . do not reveal scienter."), *aff'd*, 710 F. App'x 471 (2d Cir. 2017). Nor do CW-3's allegations that Abbvie raised concerns about SmartDose carry weight, because Abbvie is not alleged to have even reduced its ordering. Am. Compl. ¶¶ 189, 244, 253, 259–60.[37] Finally, CW-3's allegation that the Individual Defendants were considering sub-contracting or outsourcing manufacturing does not suffice to establish scienter, Am. Compl. ¶¶ 247, 251, 254–55, given that the Individual Defendants are not alleged to have misled the market about what options West considered for manufacturing the product.

Apart from the witnesses' individual flaws, these witnesses collectively still do not support any strong inference of scienter—let alone the actual knowledge that is required for forward-

---

[36] Moreover, CW-3's statements on this score focus heavily on certain customers that purchased products related to COVID-19 (such as Pfizer and Moderna). Am. Compl. ¶¶ 119–120, 133. But Plaintiffs' theory is that statements regarding customer demand and inventory were false or misleading because of areas *outside* of the COVID-19 segment where destocking was occurring. *See id.* ¶¶ 17, 371–72, 583. CW-3 often does not address those other areas.

[37] Although CW-3 also claims that "Roche" and "others" "left West in the latter part of 2023," Am. Compl. ¶ 261, CW-3 does not explain with any particularity how any of the Individual Defendants would have known of this specific fact at the time of any of the alleged misstatements. *See Nat'l Junior Baseball League*, 720 F. Supp. 2d at 555. Nor is there any allegation explaining why this information would have made any Defendant aware that a statement was false or misleading, as there were no alleged misstatements about Roche or other specific customers.

looking statements.  None of them actually suggest information that conflicts with any of the purported misstatements.  *See supra*, Part I.A.4.  Instead, many of the confidential-witness statements merely suggest *less certainty* (as compared to Defendants' statements) about the company's future performance based on certain limited (and often informal) observations.  *See, e.g.*, Am. Compl. ¶¶ 107, 119–21, 125–28, 135–36, 149–150, 174–75, 212, 287, 289.  Nothing suggests that the confidential witnesses had *all* of the necessary information to determine whether Defendants said something false—let alone that Defendants *knew* their statements were false.

Indeed, courts regularly hold that scienter is not adequately alleged when it rests on similar confidential-witness allegations.  *See, e.g.*, *Williams*, 869 F.3d at 246 ("[A]ctual knowledge that sales from one source might decrease is not the same as actual knowledge that the company's overall sales projections are false."); *Silverstein v. Globus Med., Inc.*, 2016 WL 4478826, at *8 (E.D. Pa. Aug. 25, 2016) ("[S]imply knowing that the loss of a distributor may cause a drop in sales does not mean that [defendant] failed to account for this drop in its projections."); *Schiro*, 396 F. Supp. 3d at 305–06 ("vague," "generic," and "conclusory" confidential witness allegations that lack "further details or explanations . . . do not raise a strong inference of scienter").

Similarly, scienter cannot rest on allegations that executives held a rosy outlook despite a few isolated contrary indications, none of which directly undermined the statements being made.  *See, e.g.*, *In re Crocs, Inc. Sec. Litig.*, 774 F. Supp. 2d 1122, 1150 (D. Colo. 2011) (where complaint lacked allegations regarding "internal predictions of future demand," inventory write-down "cannot support an inference of scienter"); *In re Lexar Media, Inc. Sec. Litig.*, 2005 WL 1566534, at *5 (N.D. Cal. July 5, 2005) (declining to infer scienter based on allegations of "dramatic overstock of inventory" because "[i]ncreased inventory levels would be exactly what one would expect if executives forecast strong demand"); *Shields v. Citytrust Bancorp, Inc.*, 25

F.3d 1124, 1129 (2d Cir. 1994) ("[M]isguided optimism is not a cause of action, and does not support an inference of fraud").  Certainly there is no allegation that the Individual Defendants also held the confidential witnesses' pessimistic opinions about sales targets or pricing strategy. *See, e.g.*, *Wyche*, 2017 WL 971805, at *15 ("[D]ifferences of opinion . . . do not reveal scienter.").

In sum, none of the confidential witnesses—or any other facts—support a strong inference of actual knowledge that the forward-looking statements were false or misleading.

### 2.   Even without the PSLRA safe harbor, Plaintiffs fail to allege a strong inference of scienter.

Plaintiffs also fail to adequately allege scienter for the alleged misstatements that are not forward-looking.  Here, Plaintiffs attempt to meet the high bar for scienter with allegations of (a) motive or opportunity to defraud and (b) circumstantial evidence to create a strong inference of scienter.  *See, e.g.*, *Tellabs*, 551 U.S. at 325.  But neither route works for Plaintiffs here.

### a.   Plaintiffs do not allege any motive or opportunity to defraud investors.

Although motive does not suffice as an "independent route to scienter," *Avaya*, 564 F.3d at 277, Plaintiffs attempt to allege that Defendants had a motive to defraud investors—no doubt recognizing that the "absence [of motive] can raise a 'compelling inference *against* scienter.'" *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *17 (D.N.J. July 27, 2018) (citation modified); *see also In re Egalet Corp. Sec. Litig.*, 340 F. Supp. 3d 479, 508 (E.D. Pa. 2018) (similar).  But Plaintiffs do not remotely allege any motive to commit securities fraud.

To show motive, Plaintiffs allege that Individual Defendants' stock sales on nine dates during the class period allowed them to "profit[] from the artificial inflation" of West's stock price. Am. Compl. ¶ 542; Appx. A.  But "[t]he mere fact that an insider sold corporate stock . . . is not enough to give rise to an inference of scienter."  *Hertz*, 905 F.3d at 119.  Instead, because "corporate executives" routinely "will trade [a company's] securities in the normal course," stock

sales may support motive only when "unusual in scope or timing." *Advanta*, 180 F.3d at 540–41.

But for many reasons, the facts undercut any such motive here. *First*, the Individual Defendants' sales during the class period took place shortly after West disclosed quarterly earnings, during designated "trading windows" under the Company's Securities Trading Policy. *See* Ex. 18 at 22 (2024 10-K). Because insiders are generally permitted to trade after public announcements, such trading "simply evidences compliance with the securities laws." *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 312 (D.N.J. 2001) (holding that stock sales after public disclosure did not support scienter). And seven of the nine sales came *after* at least one of the alleged corrective disclosures. *See* Am. Compl. ¶ 16; Appx. A. It is implausible that the Individual Defendants, if seeking to capitalize on undisclosed negative information, would trade only *after* the market has learned such information and reacted to the purported fraud. *See, e.g.*, *Kuriakose v. Freddie Mac*, 897 F. Supp. 2d 168, 185 (S.D.N.Y. 2012), *aff'd* 543 F. App'x 72 (2d Cir. 2013).

*Second*, all of the sales at issue were the result of the Individual Defendants exercising stock options and then selling some or all of the resulting shares on the same date. Am. Compl. at App'x A; Exs. 28–36 (Corresponding Forms 4).[38] But sales related to the exercise of stock options—which are a routine component of executive compensation—generally do not support an inference of scienter. *See In re Advanta*, 180 F.3d at 541; *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1424 (3d Cir. 1997); *In re Astea Int'l, Inc. Sec. Litig.*, 2007 WL 2306586, at *14 (E.D. Pa. Aug. 9, 2007).

*Third*, Green, Birkett, and Reiss-Clark actually *increased* their holdings of West stock during the class period, as the chart below shows.[39] *Compare* Ex. 38 (Green 2/23/2023 Form 4)

---

[38] App'x A details all trades made by the Individual Defendants during the class period.

[39] As Plaintiffs note, Defendant Lai was not a named executive officer by 2024, and thus his compensation and ownership data is not publicly available for 2024 and onward. Am. Compl.

with Ex. 36 (Green 8/8/2024 Form 4); *compare* Ex. 30 (Birkett 2/23/2023 Form 4) *with* Ex. 43

(Birkett 2/20/2024 Form 4); *compare* Ex. 40 (Reiss-Clark 2/23/2023 Form 4); *with* Ex. 46 (Reiss-

Clark 2/22/2024 Form 4).

| Individual Defendant | Shares at Start of the Class Period | Shares at End of the Class Period | Delta |
|---|---|---|---|
| Eric M. Green | 114,922.0865 | 167,898.1245 | + 52,976.0380 |
| Bernard J. Birkett | 795 | 6,889.42 | + 6,094.4200 |
| Cindy Reiss-Clark | 3,350.1611 | 4,884.346 | + 1,534.1849 |

That these Individual Defendants substantially increased their "beneficial ownership of [the

company's] stock during [the class period]" undermines any case for scienter. *In re eSpeed, Inc.*

*Sec. Litig.*, 457 F. Supp. 2d 266, 290–91 (S.D.N.Y. 2006).[40]

*Fourth*, the significant delay between many of Individual Defendants' trades and later stock

drops tied to alleged corrective disclosures defeats any inference of scienter. *See In re Party City*,

147 F. Supp. 2d at 313 (scienter inadequately alleged where stock sales occurred twelve, four, and

three months before correctives); *Steamfitters Local 449 Pension Fund v. Alter*, 2011 WL

4528385, at *10 (E.D. Pa. Sept. 30, 2011) (scienter inadequately alleged where stock "purchases

occurred months prior to the public announcements which caused stock prices to fall"). As the

Third Circuit has held, an "inference of scienter from insider trading is lessened when, as here, the

class period is well over a year" because "it is not unusual for insiders to trade at some point during

their tenure with a company." *Hertz*, 905 F.3d at 120. Plaintiffs allege a mere nine trades across

---

¶ 549. But all of the sales that Plaintiffs identify for Lai resulted from exercising stock options and immediately selling those shares—which, as explained, does not support scienter.

[40] Plaintiffs attempt to distort the Defendants' class-period holdings by including unexercised options and alleging that Green's holdings decreased by 28%, Lai's holdings decreased by 53%, and Reiss-Clark disposed of 21% of her total shares available. Am. Compl. ¶¶ 547, 549–50; *see also Burlington*, 114 F.3d at 1424; *Astea*, 2007 WL 2306586, at *14. But even these inflated percentages do not warrant a finding that Plaintiffs have pled scienter. *Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *15 (S.D.N.Y. 2018) (no scienter despite alleging that defendants sold around 40% to all or nearly all their shares); *In re CRM Holdings, Ltd. Sec. Litig.*, 2012 WL 1646888, at *23 (S.D.N.Y. 2012) (no scienter for sales of 100%, 36%, and 26% of defendants' shares, for $37 million in collective proceeds).

four individuals spread throughout a two-year class period, all of which aligns most plausibly with ordinary, non-fraudulent trading. *See Tellabs*, 551 U.S. at 323–24. It is inconceivable to think that these Defendants somehow had an illicit motive for *dozens of statements* spanning *two years* to facilitate these isolated transactions. These facts are "wholly inconsistent with fraudulent intent." *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004).

*Fifth*, trading is suspicious only when "dramatically out of line with prior trading practices." *Roofer's Pension Fund v. Papa*, 687 F. Supp. 3d 604, 618 (D.N.J. 2023) (citation omitted); *see also Burlington*, 114 F.3d at 1423 (scienter not alleged where plaintiff did not allege facts to show whether "trades were normal or routine"); *Party City*, 147 F. Supp. 2d at 313 (scienter not alleged where "[defendant]'s trading during the Class Period was consistent with his stock sales in previous years"). To show such a shift, Plaintiffs contrast trades during the class period with trades during a purported "Control Period." But Birkett's class period sale of 22,334 shares resembles his Control Period sale of 14,174 shares, and Lai's class period sale of 21,101 shares resembles his Control Period sale of 17,688 shares. *See, e.g.*, *In re Pixar Sec. Litig.*, 450 F. Supp. 2d 1096, 1104–05 (N.D. Cal. 2006) (50% increase in shares sold during class period was not "dramatically out of line with . . . prior trading practices"). Plaintiffs also do not and cannot plead that Reiss-Clark's trading practices diverged from prior trading. *See* Am. Compl. ¶ 544 n.5.

And while Plaintiffs stress the volume of Green's trades, "large dollar amounts, standing alone, typically do not suffice to establish motive"—especially where, as here, the trade timing weighs against an inference of scienter. *Kenexa Corp.*, 2010 WL 3749459, at *9. All of Green's trades were also made under a 10b5-1 plan. Contrary to Plaintiffs' bare assertions, Am. Compl. ¶¶ 553–56, that plan undermines any inference of scienter, *Martin*, 2017 WL 3974002, at *15 (dismissal because 10b5-1 plan weighed against scienter); *Yates v. Mun. Mortg. & Equity, LLC*,

- 36 -

744 F.3d 874, 891 (4th Cir. 2014) (similar).  And there are no specific allegations to support Plaintiffs' empty assertion that this plan was "highly suspicious." *Id.* ¶ 554; *see Mart v. Tactile Sys. Tech., Inc.*, 595 F. Supp. 3d 788, 818 (D. Minn. 2022); *City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d 206, 226 (E.D.N.Y. 2019).  All of Green's sales during the class period were pre-determined *before* he allegedly learned, for example, of CW-1's pessimistic views in June 2023 and other purported information.  Am. Compl. ¶ 154; *see also id.* ¶ 553 (trading plan is defense when entered into "'before becoming aware' of inside information").

Specifically, the first two of Green's six trades during the class period were made pursuant to a Rule 10b5-1 plan adopted on September 14, 2022.  *See* Ex. 28 (Green 3/9/2023 Form 4); Ex. 29 (Green 5/11/2023 Form 4).  Green entered into a new plan on May 5, 2023, which "provide[d] for the purchase and sale of an aggregate number of 234,864 shares of the Company's common stock . . . (of which Mr. Green will sell 204,864 shares and retain the rest immediately following the exercise) between August 8, 2023 and August 6, 2024."  Ex. 19 at 89 (2023 10-K). This is *exactly how many* shares Green sold during this window—pursuant to both this trading plan as well as a superseding November 17, 2023 trading plan that prescribed the *exact same* trading volume and timing.  *Id.*; Am. Compl. at App'x A; *see also* Ex. 47 at 2–4 (Green 5/5/2023 Trading Plan); Ex. 48 at 4–8 (Green 11/17/2023 Trading Plan).[41]  The plans accordingly preclude any attempt to suggest that Green's stock sales suggest a motive to defraud investors.  *See In re Synchronoss Techs., Inc. Sec. Litig.*, 2019 WL 2849933, at *17 (D.N.J. July 2, 2019) (holding that plaintiff failed to sufficiently allege scienter in light of Rule 10b5-1 trading plan).

---

[41] These plans are properly considered on a motion to dismiss.  *See, e.g.*, *In re Farfetch Ltd. Sec. Litig*, 2021 WL 4461264, *4 n.1 (S.D.N.Y. 2021); *Glaser v. The9*, 772 F. Supp. 2d 573, 592 n.14 (S.D.N.Y. 2011).

Having failed to allege any "non-generic motive to misrepresent" anything, *see Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621, 674 (D.N.J. 2021), Plaintiffs' theory is that Defendants committed grave misconduct—violating Section 10(b) can be prosecuted as a felony— for no evident reason, and then suffered losses alongside West's other shareholders on stock they knowingly accumulated at artificially inflated prices.  That theory is not at all "cogent" or "compelling," because "[w]ithout a motive to commit securities fraud, businessmen are unlikely to commit it."  *City of Livonia Emps.' Ret. Sys. v. Boeing Co.*, 711 F.3d 754, 756, 758 (7th Cir. 2013); *see also, e.g.*, *United States v. Durland*, 65 F. 408, 412 (E.D. Pa. 1894).  Plaintiffs' failure to allege any motive thus counters an inference of scienter.  *See Rahman*, 736 F.3d at 245.

### b.   Plaintiffs fail to plead facts supporting any inference of knowing fraud or extreme recklessness.

Aside from attempting to allege motive, Plaintiffs rely exclusively on circumstantial evidence to support scienter.  But where, as here, plaintiffs allege no cognizable motive, they must "allege specific facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 238 (3d Cir. 2004) (citation modified); *see also Nat'l Junior Baseball League*, 720 F. Supp. 2d at 553.  To meet this demanding standard, "[g]eneralized imputations of knowledge do not suffice, regardless of the defendants' positions within the company."  *Advanta*, 180 F.3d at 539.

Plaintiffs have "little documentary evidence" for scienter, so their other allegations must carry this heavy burden for this case to proceed.  *Kenexa Corp.*, 2010 WL 3749459, at *7 (Sanchez, J.).  Plaintiffs' confidential witnesses fail on that front for the reasons explained above, even under the recklessness standard.  *See supra*, Part I.B.1.  The Individual Defendants' stock sales also do not support scienter.  *See supra*, Part I.B.2.a.  None of Plaintiffs' other circumstantial grounds for scienter clear the high bar required by the PSLRA, either.

### (1) Vague statements about "visibility" do not support scienter.

Plaintiffs discuss certain statements that touted "visibility" into customers' inventory levels and demand trends to suggest that Defendants somehow knew or were reckless about the falsity of their statements. Am. Compl. ¶ 539(c); *see also id.* ¶¶ 557–68. But Plaintiffs simultaneously claim that these statements about "visibility" were *themselves* false or misleading—which undercuts Plaintiffs' view that these statements demonstrate Defendants' knowledge for purposes of other statements. Regardless, a vague assertion of having "visibility" into customers (which is puffery, *see supra*, 10) does not mean that one has clairvoyance about future performance, especially coming out of a once-in-a-lifetime pandemic. *See Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 928 (N.D. Cal. 2012) (claims of "customer visibility" insufficient for scienter).

### (2) Departures of some Individual Defendants do not support scienter.

Plaintiffs next conclusorily suggest that the departures of Defendants Lai and Reiss-Clark and the purported departure of Defendant Birkett (which never occurred) support an inference of scienter. Am. Compl. ¶¶ 569–72.[42] But "terminations or resignations of corporate executives are insufficient alone to establish an inference of scienter." *In re Hebron Tech. Co, Ltd. Sec. Litig.*, 2021 WL 4341500, at *23 (S.D.N.Y. 2021). Executives can leave a company for countless reasons, so "a resignation can establish scienter only if the plaintiff alleges independent evidence corroborating that the employee who resigned held a culpable state of mind." *Schiro*, 396 F. Supp. 3d at 303. Plaintiffs allege no such evidence here. *See In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2015 WL 4469143, at *21 (D.N.J. 2015) (rejecting reliance on "the timing of the resignation—two days before" class period ended); *Eden Alpha CI LLP v. Polished.com Inc.*, 763 F. Supp. 3d

---

[42] Plaintiffs allege that "the sudden departure of Birkett just two months after the full truth was revealed . . . gives rise to an inference of scienter." *Id.* ¶ 572. This is incorrect. While Birkett advised West in April 2025 of his intent to leave the CFO role, he then transitioned to the role of Senior Advisor to the CEO, a role he still holds today. Ex. 1 at 3 (7/21/2025 8-K).

270, 315 (E.D.N.Y. 2025) (departures were "at least as consistent with punishing those at the helm for their poor judgment and leadership" as with "relating to concocting a scheme to defraud shareholders"). This is especially true for Birkett, who is still employed at West. *Supra*, n.42.

### (3)    Alleged statements after the class period do not support scienter.

Plaintiffs cursorily suggest that a handful of statements made after the class period support an inference of scienter. Am. Compl. ¶¶ 539(e), 573–575. But none of these post hoc statements about the company's later performance reveals anything about Defendants' knowledge of the falsity of any prior statements. *See, e.g.*, *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 196 n.29 (D.N.J. 2022) ("post-Class Period statements" "do not suggest" defendants had requisite knowledge). For example, even if Green stated in March and June of 2025 that products like SmartDose faced certain difficulties, that does not show that Defendants knowingly or recklessly defrauded investors at *earlier* times. Am. Compl. ¶¶ 574–575. Instead, it just underscores that Plaintiffs are making an "impermissible attempt to prove fraud by hindsight" when earlier expectations proved too optimistic. *Winer*, 503 F.3d at 332.

### 3.    The more compelling inference here is that there was no securities fraud.

A court evaluating scienter must "consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Tellabs*, 551 U.S. at 314. Here, Plaintiffs' asserted inference "is neither cogent, nor compelling, nor strong in light of competing inferences." *Winer*, 503 F.3d at 329. The far more—indeed only—compelling inference is that Defendants were trying to evaluate business prospects in unprecedented circumstances after the COVID-19 pandemic and held a good-faith judgment that West was well-positioned to meet expectations. Whereas the contrary inference—that Defendants knowingly or recklessly misled investors—makes no sense. Defendants had no motive to commit fraud, which would inevitably be discovered and risk their reputations and credibility with shareholders.

Defendants also promptly disclosed the issues West faced at various points over the course of two years.  *See, e.g.*, Am. Compl. ¶¶ 360, 367, 399–400, 410 432–36, 478–85, 495, 517–520.  So there is no "cogent" or "compelling" inference that they sought to deceive investors.[43]

C.    **Plaintiffs Also Fail to Plead Loss Causation for the Final Corrective Disclosure.**

Plaintiffs also have not adequately alleged loss causation for at least the final corrective disclosure.  Loss causation requires that "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  *Nat'l Junior Baseball League*, 720 F. Supp. 2d at 559.  Plaintiffs thus must allege sufficient facts "support[ing] an inference that [defendants'] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of . . . that loss absent the fraud."  *In re DraftKings Inc. Sec. Litig.*, 2023 WL 145591, at *17 (S.D.N.Y. 2023).  And because corrective disclosures must "relate back to the misrepresentation," courts "must . . . be careful not to connect each and every bit of negative information about a company to an initial misrepresentation that overstated the company's chances for success."  *In re Williams Sec. Litig.—WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009).  Rather, a complaint must allege that a corrective disclosure actually revealed the truth about earlier misstatements.

Under this rubric, courts routinely dismiss complaints that do not adequately allege a fraud tied to the alleged corrective disclosures.  *See, e.g.*, *Nat'l Junior Baseball League*, 720 F. Supp. 2d at 561; *In re Intelligroup Sec. Litig.*, 468 F. Supp. 2d 670, 694 (D.N.J. 2006); *DraftKings*, 2023 WL 145591, at *17; *In re Francesca's Holdings Corp. Sec. Litig.*, 2015 WL 1600464, at *22

---

[43] With no specific allegations of any individual's scienter, there is also no basis to infer scienter for the company.  *See City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 403 (D. Del. 2010); *Roofer's*, 687 F. Supp. 3d at 631.  Nor are there the types of allegations that would satisfy any form of the "corporate scienter" doctrine (which the Third Circuit has not adopted), *see Mylan*, 2023 WL 3539371, at *17, including because virtually all of the statements "are attributed to individual defendants," rendering the corporate-scienter doctrine inapplicable.  *In re Five Below, Inc. Sec. Litig.*, 2025 WL 2447794, at *29 n.42 (E.D. Pa. 2025).

(S.D.N.Y. 2015).  And courts also dismiss specific corrective disclosures that do not support loss causation, even if loss causation is adequately alleged through other corrective disclosures.  *See, e.g.*, *In re DVI, Inc. Sec. Litig.*, 2010 WL 3522090, at *23 (E.D. Pa. Sept. 3, 2010); *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, 2024 WL 1975499, at *5–6 (D.N.J. May 3, 2024).

Plaintiffs have not alleged loss causation for at least their final corrective disclosure, which occurred on February 13, 2025.  All that Plaintiffs allege was corrective here are the words "margin dilutive" in the following sentence:  "The Company also revealed that its SmartDose wearable injector will become '**margin dilutive**' in 2025 due to lower pricing."  Am. Compl. ¶¶ 518, 519.[44]  But a prospective assertion that SmartDose would become margin dilutive in 2025 cannot possibly have revealed that earlier statements about SmartDose were false or misleading, because *none* of those earlier statements made any contrary assertions about what SmartDose's margins would be in 2025.[45]  And even if any of these statements could be characterized as somehow expressing some sentiment about what SmartDose's margins might be in 2025, that would plainly be a forward-looking opinion that is not actionable for other reasons.  *Supra*, Part I.A.2.

## II.  Plaintiffs' Control-Person Claim Under Section 20(a) Fails.

Plaintiffs' Section 20(a) claim should also be dismissed.  Section 20(a) "creates a cause of action against individuals who exercise control over a 'controlled person,' including a corporation, that has committed a violation of Section 10(b)."  *Avaya*, 564 F.3d at 252.  Because Plaintiffs' Section 10(b) claim fails, so too does their Section 20(a) claim.  *See Aetna*, 617 F.3d at 285.

---

[44] Plaintiffs allege that only "[s]tatements in **bold and underlined**" in the Complaint "provided corrective information to the market."  *Id.* ¶ 359 n.4.

[45] *Cf., e.g.*, *id.* ¶ 419 ("So, we see them continuing to move up that HVP margin curve" and "as our volumes grow, we'll see that margin improvement follow."); ¶ 496 ("We have initiatives in place to improve the margin . . . driving efficiency through automation and scaling to fulfill customer demand."); ¶ 510 (SmartDose "can get to HVP margins over time" after "scaling the product to the right level of the volumes" and "it's being built on manual lines," so "with a fully automated line . . . as we move through 2025 and into production late 2025, early 2026.").

Separately, Plaintiffs do not allege any control of a Section 10(b) violator. *See Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 484 (3d Cir. 2013). Nearly all of the alleged misstatements were specifically attributed to the Individual Defendants, and such statements are "presumed to be the actions of those individuals only." *In re Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217, 1243 (N.D. Cal. 1994). Indeed, Plaintiffs make a conclusory assertion of Defendants' "control" over "various reports, press releases, and public filings" from West, Am. Compl. ¶ 614, but Plaintiffs *do not allege* that any "reports, press releases, and public filings" give rise to liability.

Moreover, Section 20(a) requires the defendant to "have been a 'culpable participant' in the act or acts constituting the violation," which requires knowledge of the fraud. *Belmont*, 708 F.3d at 484 (quotation marks omitted); *see also Howard v. Arconic Inc.*, 2021 WL 2561895, at *29 (W.D. Pa. June 23, 2021) (collecting cases). They do not allege that any Individual Defendant had such knowledge or was otherwise a culpable participant. *See supra*, Part I.B.

### III. Plaintiffs' Insider-Trading Claims Fail.

Plaintiffs also assert claims for insider trading under (A) Section 10(b) and Rule 10b-5 and (B) Section 20A. Those claims must be alleged with particularity under Rule 9(b). *See S.E.C. v. Cooperman*, 243 F. Supp. 3d 597, 607 (E.D. Pa. 2017) (Sanchez, J.). They also fail.

### A. The Court Should Dismiss Plaintiffs' Section 10(b) and Rule 10b-5 Insider-Trading Claim for Failure to Plead Trades Based on MNPI and Scienter.

Plaintiffs' Section 10(b) and Rule 10b-5 insider-trading claim concerns only Birkett, Green, and Reiss-Clark (the "20A Defendants")—and only three trading days in August 2023 (rather than trades over the entire class period). Plaintiffs allege that the 20A Defendants made these August 2023 trades based on nonpublic material information concerning "reduced customer demand and . . . West's inability to grow its margins." Am. Compl. ¶ 618. But Plaintiffs fail to plead: (1) that each 20A Defendant traded on the basis of "material, nonpublic information"

("MNPI"), *see, e.g.*, *Edward J. Goodman Life Income Tr. v. Jabil Cir.*, 594 F.3d 783, 793 (11th Cir. 2010); *Rosenbaum & Co. v. H.J. Myers Co. Inc.*, 1997 WL 689288, at *3 (E.D. Pa. Oct. 9, 1997); or (2) that the August 2023 trades were sufficiently suspicious in timing or amount to raise a strong inference of scienter, *see, e.g.*, *Burlington*, 114 F.3d at 1423–24.

### 1.    Plaintiffs fail to plead that the 20A Defendants traded on the basis of MNPI.

To adequately plead insider trading, Plaintiffs must allege with specificity that the 20A Defendants "traded on the basis of material, nonpublic information." *United States v. O'Hagan*, 521 U.S. 642, 653 (1997); *see also Goodman*, 594 F.3d at 793; *Rosenbaum*, 1997 WL 689288, at *2–3 (E.D. Pa. Oct. 9, 1997). "This requires that the defendant[s] did not just possess the information but *actually used* the information." *United States v. Anderson*, 533 F.3d 623, 630 (8th Cir. 2008) (emphasis added); *S.E.C. v. Lipson*, 278 F.3d 656, 660 (7th Cir. 2002) (plaintiff has burden of showing that the insider's trades "had been influenced by the inside information that he possessed—the burden, in other words, of proving that inside information had played a causal role in [the insider]'s decision to sell the shares in the amount, and when, he did"). "[T]he closer in time the trader's exposure to the insider, the stronger the inference that the trader was acting on the basis of inside information." *S.E.C. v. Ginsburg*, 362 F.3d 1292, 1299 (11th Cir. 2004).

Plaintiffs' only specific allegations about the 20A Defendants learning MNPI concern what CW-1 purportedly told Reiss-Clark in March 2023 and told Green and Birkett in June 2023.  Am. Compl. ¶ 147–48, 154.  But Green's August 8, 2023 trade was prearranged in a Rule 10b5-1 plan that was adopted in May 2023—one month *before* CW-1's alleged communication.  *See supra*, Part I.B.1.  And Plaintiffs do not allege with particularity that Reiss-Clark and Birkett traded "on the basis" of this MNPI where several months passed—and an alleged corrective disclosure occurred—between their supposed receipt of the MNPI and their challenged trades.  *See Kuriakose*, 897 F. Supp 2d at 185 ("[i]t defies logic [] that executives who are seeking to perpetrate

fraud[]" would wait to trade until after disclosing information); *cf. United States v. Chan*, 981 F.3d 39, 60 (1st Cir. 2020) (defendant traded based on MNPI where "trading activity began within 10 days of [the defendant]'s receipt of MNPI and ended before" alleged MNPI disclosed).

Plaintiffs also cannot show that the alleged information CW-1 relayed was material—that is, that there is a "substantial likelihood that [the information] . . . would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988).  As described in Part I.B.1, CW-1's analysis focused only on West's Generics customers.  Plaintiffs have not alleged with particularity how this single inventory analysis on Generics would have "altered the total mix of information made available," particularly when Generics customers were a limited piece of West's overall business. *Basic*, 485 U.S. at 231–32; *see In re Newell Brands, Inc. Sec. Litig.*, 837 F. App'x 869, 875 n.4 (3d Cir. 2020) (dismissing complaint that lacked "well-pleaded facts to link the alleged problems to material financial impacts"); *Buhrke Fam. Revocable Tr. v. U.S. Bancorp*, 726 F. Supp. 3d 315, 355 (S.D.N.Y. 2024) (dismissing complaint that failed to allege issues with one of the defendant's business divisions was material to the company as a whole); *Howard v. Liquidity Servs., Inc.*, 177 F. Supp. 3d 289, 311 (D.D.C. 2016) ("[I]nformation regarding a small business segment that is unlikely to affect the future of the entire company is generally not material.").

Finally, information that has been "disclosed . . . to the investing public" cannot be MNPI. *S.E.C. v. Mayhew*, 121 F.3d 44, 50 (2d Cir. 1997); *see also In re Universal Health Servs., Inc., Derivative Litig.*, 2019 WL 3886838, at *43 (E.D. Pa. Aug. 19, 2019).  All of the August 2023 trades were made *after* the first alleged corrective disclosure on July 27, 2023, on which date Plaintiffs claim that the Defendants informed the market of "destocking activity impacting West's 'base business.'"  Am. Compl. ¶¶ 367, 369.  Rule 9(b) applies to this claim, yet the Complaint

does not allege with particularity exactly what MNPI was possessed by Defendants in August 2023 that was not previously disclosed to the market.

### 2. Plaintiffs fail to plead a strong inference of scienter because the 20A Defendants' trades are not suspicious in timing or amount.

A Section 10(b) insider-trading claim requires allegations supporting a strong inference of scienter. *In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*, 2011 WL 3444199, at *1 (D.N.J. Aug. 8, 2011). The mere fact that corporate officers sold stock is inadequate; the sales must be sufficiently suspicious in timing or amount. *See S.E.C. v. Chappell*, 107 F.4th 114, 135 (3d Cir. 2024); *Burlington Coat Factory*, 114 F.3d at 1423–24; *Kenexa Corp.*, 2010 WL 3749459, at *9. The August 2023 trades do not create a strong inference of scienter for largely the same reasons discussed for the class-period trades, *see supra*, Part I.B.2.a.

*First*, the timeline of these trades is "wholly inconsistent with fraudulent intent." *Bristol-Myers Squibb*, 312 F. Supp. 2d at 561. Plaintiffs' theory of scienter "defies logic": they allege that the 20A Defendants inexplicably did not trade until months after learning MNPI—and even after a corrective disclosure that caused a 6.46% stock drop. *Kuriakose*, 897 F. Supp 2d at 185.

*Second*, these purportedly improper trades were the result of the 20A Defendants exercising stock options (*see* Am. Compl. ¶¶ 547–48, 550; App'x A), which again do not suggest scienter. *See supra*, Part I.B.2.a. Indeed, executives compensated with stock options routinely possess MNPI, so it would be improper to view the exercise of those options as suspicious.

*Third*, the 20A Defendants maintained large holdings of West stock after the August 2023 trades—indeed, Birkett, Green, and Reiss-Clark retained 16%, 76%, and 55% of their respective holdings—which is wholly incompatible with an inference that they sought to "cash out" by trading on nonpublic information. *See* App'x A; *see also Party City*, 147 F. Supp. 2d at 313 ("Low aggregate sales and large retained aggregate holdings rebut an inference of motive, even where

some defendants have sold significant percentages.").  And each 20A Defendant maintained substantial holdings throughout the class period and through numerous later corrective events (including a 38.22% stock drop on February 13, 2025).  Am. Compl. ¶¶ 580–85; *see Tellabs*, 551 U.S. at 323–24; *see also supra*, Part I.B.2.a.

*Fourth*, the Defendants' pre-class period trading patterns hardly diverge from those in August 2023: Birkett's August 2, 2023, sale of 22,334 shares resembles his August 2, 2022, sale of 14,174 shares; Green's August 8, 2023 sale of 44,000 shares mirrors his December 5, 2022 sale of the same number of shares; and while Reiss-Clark's only recorded sale is the August 22, 2023 sale at issue, that lone transaction, which disposed of only 3,477 shares, occurred after she became an officer in 2022.  *See* Am. Compl. at App'x A; App'x A; Part I.B.2.a; *see also Roofer's Pension Fund*, 687 F. Supp. 3d at 618; *Party City*, 147 F. Supp. 2d at 313.

*Finally*, Green's August 2023 trade was made under a Rule 10b5-1 plan, which mitigates an inference of scienter.  *Martin*, 2017 WL 3974002, at *15; *see also supra*, Part I.B.2.a.  All of this defeats Plaintiffs' insider-trading claim.

## B.  The Court Should Dismiss Plaintiffs' Section 20A Insider-Trading Claim for Failure to Plead a Predicate Exchange Act Violation.

A Section 20A insider-trading claim requires a predicate violation of the Exchange Act.  *See, e.g.*, *City of Edinburgh*, 754 F.3d at 175.  Because Plaintiffs have failed to plead any primary Exchange Act violation, their Section 20A claim must also be dismissed.  *Id.*; *see also, e.g., In re Ocugen, Inc. Sec. Litig.*, 659 F. Supp. 3d 572, 598 (E.D. Pa. 2023), *aff'd*, 2024 WL 1209513 (3d Cir. 2024).

## CONCLUSION

For these reasons, this Court should dismiss this lawsuit with prejudice.

Dated: December 18, 2025

*s/ Margaret C. Gleason*
Margaret C. Gleason (PA 201742)
**JONES DAY**
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Telephone: (412) 394-7235
Facsimile: (412) 394-7959
mcgleason@jonesday.com

Nina Yadava (*pro hac vice*)
Rajeev Muttreja (*pro hac vice*)
Sarah D. Efronson (*pro hac vice*)
**JONES DAY**
250 Vesey Street
New York, NY 10281
Telephone: (212) 326-3746
Facsimile: (212) 755-7306
nyadava@jonesday.com
rmuttreja@jonesday.com
sefronson@jonesday.com

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 18th day of December, 2025, a true and correct copy of the foregoing document was filed electronically.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF system.

*s/ Margaret C. Gleason*
Margaret C. Gleason (PA 201742)
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Telephone: (412) 394-7235
Facsimile: (412) 394-7959
Email: mcgleason@jonesday.com
