**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| NEW ENGLAND TEAMSTERS PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>WEST PHARMACEUTICAL SERVICES, INC., ERIC M. GREEN, BERNARD J. BIRKETT, QUINTIN J. LAI, and CINDY REISS-CLARK,<br><br>Defendants. | Case No. 2:25-cv-02285-JS<br><br>Hon. Juan R. Sánchez<br>District Judge<br><br><u>CLASS ACTION</u> |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ........................................................................................... 1

II.   STATEMENT OF FACTS ............................................................................ 3

      A.    Relevant Background on West's Business ............................................. 3

      B.    Throughout the Class Period, Defendants Boasted of Robust Demand for West's Products and Strong, Growing Margins ......................................... 4

      C.    Behind the Scenes, West Suffered Slumping Demand Across Its Business........... 6

      D.    Defendants Failed to Disclose Endemic Problems with SmartDose That Diluted, Rather than Grew, Margins......................................................... 8

      E.    Defendants Cash In While West's Stock Price Is Artificially Inflated................. 10

      F.    The Relevant Truth Is Incrementally Revealed ..................................... 10

III.  LEGAL STANDARD................................................................................... 11

IV.   ARGUMENT................................................................................................. 11

      A.    The Complaint Adequately Alleges Material Misstatements .............................. 11

            1.    Plaintiffs Adequately Plead Falsity With the Requisite Particularity....... 15

            2.    Defendants' Misstatements Are Not Inactionable Puffery ...................... 17

            3.    Defendants' Misstatements Are Not Inactionable Opinions ................... 20

            4.    The Safe Harbor Does Not Protect the Alleged Misstatements................ 22

      B.    Plaintiffs Plead a Strong Inference of Scienter...................................... 26

            1.    Plaintiffs Adequately Allege Conscious Misbehavior or Recklessness .............................................................................. 27

                  a.    Defendants Knew Their Public Statements Were Not Accurate, Establishing Scienter ................................................... 27

                  b.    Further Allegations Bolster an Inference of Conscious Misbehavior or Recklessness......................................... 33

            2.    Plaintiffs Adequately Allege Motive, Supporting the Scienter Inference ............................................................................ 36

3.  Plaintiffs' Cogent and Compelling Scienter Allegations Satisfy *Tellabs* .................................................................................................. 41

C.  Plaintiffs Adequately Allege Loss Causation as to Every Corrective Disclosure .......................................................................................... 42

D.  Plaintiffs Adequately Allege Insider Trading Claims ............................................ 44

E.  The Complaint Adequately Alleges a Section 20(a) Claim ................................. 47

V.  CONCLUSION ..................................................................................................... 47

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adams Golf, Inc. Sec. Litig.*,
381 F.3d 267 (3d Cir. 2004)..............................................................................................25

*Allegheny Cty. Emps.' Ret. Sys. v. Energy Transfer LP*,
532 F. Supp. 3d 189 (E.D. Pa. 2021) .................................................................................22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).............................................................................................................11

*In re ATI Techs., Inc. Sec. Litig.*,
216 F. Supp. 2d 418 (E.D. Pa. 2002) .....................................................................16, 18, 24

*Belmont v. MB Inv. Partners, Inc.*,
708 F.3d 470 (3d Cir. 2013)...............................................................................................47

*Belodoff v. Netlist, Inc.*,
2009 WL 1293690 (C.D. Cal. Apr. 17, 2009) ...................................................................22

*Bing Li v. Aeterna Zentaris, Inc.*,
2016 WL 827256 (D.N.J. March 2, 2016)..........................................................................47

*In re BioScrip, Inc. Sec. Litig.*,
95 F. Supp. 3d 711 (S.D.N.Y. 2015)..................................................................................22

*Bldg. Trades United Pension Tr. Fund v. Kenexa Corp.*,
2010 WL 3749459 (E.D. Pa. Sept. 27, 2010) ............................................................ *passim*

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997)................................................................................. 23-24, 26

*Cal. Pub. Emps' Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004)..........................................................................................11, 14

*Carmignac Gestion, S.A. v. Perrigo Co. PLC*,
2019 WL 3451523 (D.N.J. July 31, 2019)..........................................................................32

*Carvelli v. Ocwen Fin. Corp.*,
934 F.3d 1307 (11th Cir. 2019) ..........................................................................................21

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*,
497 F.3d 546 (5th Cir. 2007) ..............................................................................................39

*City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*,
    412 F. Supp. 3d 206 (E.D.N.Y. 2019) ....................................................................40

*City of Warren Police and Fire Ret. Sys. v. Prudential Fin., Inc.*,
    70 F.4th 668 (3d Cir. 2023) ....................................................................16, 31, 32

*City of Warwick Ret. Sys. v. Catalent, Inc.*,
    2024 WL 3219616 (D.N.J. June 28, 2024)..............................................................30, 34

*In re Coinbase Glob., Inc. Sec. Litig.*,
    2024 WL 4053009 (D.N.J. Sept. 5, 2024) ..........................................................20, 36

*In re Constellation Energy Grp., Inc. Sec. Litig.*,
    738 F. Supp. 2d 614 (D. Md. 2010)....................................................................22

*Cont'l Gen. Ins. Co. v. Olafsson*,
    2024 WL 4263211 (D.N.J. Sept. 23, 2024) ..........................................................17

*In re CRM Holdings, Ltd. Sec. Litig.*,
    2012 WL 1646888 (S.D.N.Y. May 10, 2012) ..........................................................41

*Curran v. Freshpet, Inc.*,
    2018 WL 394878 (D.N.J. Jan. 12, 2018).................................................................23

*In re Dentsply Sirona, Inc. Sec. Litig.*,
    665 F. Supp. 3d 255 (E.D.N.Y. 2023) ..................................................21-22, 32-33

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)....................................................................................42

*Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*,
    595 F. Supp. 2d 1253 (M.D. Fla. 2009), *aff'd*, 594 F.3d 783 (11th Cir. 2010)........................44

*Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*,
    794 F.3d 297 (2d Cir. 2015)............................................................................39

*Emps.' Ret. Sys. of P.R. Elec. Power Auth. v. Conduent Inc.*,
    2020 WL 3026536 (D.N.J. June 5, 2020) ..........................................................22-23

*In re Envision Healthcare Corp. Sec. Litig.*,
    2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019) ..................................................21

*In re Enzymotec Sec. Litig.*,
    2015 WL 8784065 (D.N.J. Dec. 15, 2015)........................................ 17-18, 23, 24

*Fadia v. FireEye, Inc.*,
    2016 WL 6679806 (N.D. Cal. Nov. 14, 2016) ....................................................19

iv

*Feinberg v. Am. Express Co.*,
  2011 WL 4807916 (E.D. Pa. Oct. 7, 2011)................................................................35

*Fitzer v. Sec. Dynamics Techs., Inc.*,
  119 F. Supp. 2d 12 (D. Mass. 2000) ........................................................................19

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010)......................................................................36

*In re Galena Biopharma, Inc. Sec. Litig.*,
  117 F. Supp. 3d 1145 (D. Or. 2015) ........................................................................45

*Hall v. Johnson & Johnson*,
  2019 WL 7207491 (D.N.J. Dec. 27, 2019).........................................................13, 15

*Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.*,
  2022 WL 889158 (E.D. Pa. Mar. 25, 2022)..............................................................19

*Handal v. Innovative Indus. Props., Inc.*,
  157 F.4th 279 (3d Cir. 2025) ...................................................................................22

*In re HD Supply Holdings, Inc. Sec. Litig.*,
  341 F. Supp. 3d 1342 (N.D. Ga. 2018)................................................................38, 46

*In re Hebron Tech. Co., Ltd. Sec. Litig.*,
  2021 WL 4341500 (S.D.N.Y. Sept. 22, 2021).................................................... 35-36

*In re Hertz Glob. Holdings Inc*,
  905 F.3d 106 (3d Cir. 2018).....................................................................................40

*In re Immune Response Sec. Litig.*,
  375 F. Supp. 2d 983 (S.D. Cal. 2005).......................................................................27

*In re Incyte S'holder Litig.*,
  2014 WL 707207 (D. Del. Feb. 21, 2014).................................................................19

*Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*,
  45 F.4th 1236 (10th Cir. 2022) .......................................................................... 39-40

*Industriens Pensionsforsikring A/S v. Becton Dickinson & Co.*,
  620 F. Supp. 3d 167 (D.N.J. 2022) .................................................................. *passim*

*In re Innocoll Holdings Public Ltd. Co. Sec. Litig.*,
  2020 WL 1479128 (E.D. Pa. Mar. 25, 2020)........................................24, 25, 30

*Inst. Invs. Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009)............................................................................. *passim*

*In re Kenvue Inc. Sec. Litig.*,
  2025 WL 889640 (D.N.J. Mar. 24, 2025)................................................................15, 21

*Lefkoe v. Jos. A. Bank Clothiers*,
  2007 WL 6890353 (D. Md. Sept. 10, 2007) .....................................................................39

*Li v. Aeterna Zentaris, Inc.*,
  2016 WL 3583821 (D.N.J. June 30, 2016) .......................................................................26

*Lord Abbett Aff. Fund, Inc. v. Navient Corp.*,
  363 F. Supp. 3d 476 (D. Del. 2019)............................................................................31, 32

*Luo v. Spectrum Pharms., Inc.*,
  2024 WL 4443323 (D. Nev. Oct. 7, 2024) .......................................................................31

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
  601 U.S. 257 (2024)..........................................................................................................11

*Mart v. Tactile Sys. Tech., Inc.*,
  595 F. Supp. 3d 788 (D. Minn. 2022).............................................................................40

*Martin v. GNC Holdings, Inc.*,
  2017 WL 3974002 (W.D. Pa. Sept. 8, 2017)...................................................................40

*McCabe v. Ernst & Young, LLP*,
  494 F.3d 418 (3d Cir. 2007)........................................................................................42, 44

*McCullough v. Advest, Inc.*,
  754 F. App'x 109 (3d Cir. 2018) ......................................................................................27

*In re Merck & Co., Inc., Sec. Litig.*,
  2015 WL 2250472 (D.N.J. May 13, 2015)..................................................................21, 42

*In re Mylan N.V. Sec. Litig.*,
  2023 WL 3539371 (W.D. Pa. May 18, 2023)...................................................................21

*Nat'l Jr. Baseball League v. Pharmanet Dev. Grp. Inc.*,
  720 F. Supp. 2d 517 (D.N.J. 2010) ..................................................................................31

*In re New Century*,
  588 F. Supp. 2d 1206 (C.D. Cal. 2008) ...........................................................................40

*In re Novo Nordisk Sec. Litig.*,
  2018 WL 3913912 (D.N.J. Aug. 16, 2018) ................................................................ *passim*

*In re NUI Sec. Litig.*,
  314 F. Supp. 2d 388 (D.N.J. 2004) ..................................................................................36

*In re Omega Healthcare Invs., Inc. Sec. Litig.*,
    563 F. Supp. 3d 259 (S.D.N.Y. 2021)......................................................................25

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)................................................................................................20, 21

*In re Par Pharm. Sec. Litig.*,
    2009 WL 3234273 (D.N.J. Sept. 30, 2009) ........................................................ 41-42

*In re Party City Sec. Litig.*,
    147 F.Supp.2d 282 (D.N.J. 2001) .........................................................................41

*Pelletier v. Endo Int'l plc*,
    439 F. Supp. 3d 450 (E.D. Pa. 2020) ....................................................................14

*Plumbers & Pipefitters Loc. Union No. 719 Pension Tr. Fund v. Dick's Sporting
    Goods, Inc.*,
    2025 WL 2325122 (W.D. Pa. Aug. 12, 2025) .......................................................30

*In re Rackable Sys., Inc. Sec. Litig.*,
    2010 WL 199703 (N.D. Cal. Jan. 13, 2010) ..........................................................19

*Reilly v. U.S. Physical Therapy, Inc.*,
    2018 WL 3559089 (S.D.N.Y. July 23, 2018) .........................................................41

*Robeco Cap. Growth Funds SICAV v. Peloton Interactive, Inc.*,
    665 F. Supp. 3d 522 (S.D.N.Y. 2023)....................................................................25

*Roofer's Pension Fund v. Papa*,
    2018 WL 3601229 (D.N.J. July 27, 2018)..........................................................23, 27

*Roofer's Pension Fund v. Papa*,
    687 F. Supp. 3d 604 (D.N.J. 2023) .......................................................................39

*S.E.C. v. Lyon*,
    605 F. Supp. 2d 531 (S.D.N.Y. 2009)................................................................ 44-45

*In re Salix Pharms., Ltd.*,
    2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)........................................................25

*Schiro v. Cemex, S.A.B. de C.V.*,
    396 F. Supp. 3d 283 (S.D.N.Y. 2019)....................................................................36

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
    351 F. Supp. 3d 874 (E.D. Pa. 2018) ................................................. 1, 18, 33-34

*SEC v. Lipson*,
    278 F.3d 656 (7th Cir. 2002) .................................................................................45

*Shapiro v. UJB Fin. Corp.*,
    964 F.2d 272 (3d Cir. 1992)..................................................................................... *passim*

*Shulman v. Weston*,
    2025 WL 3754159 (D.N.J. Dec. 29, 2025)...............................................................19, 25, 40

*In re Silicon Graphics Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999) ............................................................................................40

*In re Silverlake Grp., L.L.C Sec. Litig.*,
    2022 WL 4485815 (N.D. Cal. Sept. 27, 2022) .........................................................45

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
    545 F. Supp. 3d 120 (S.D.N.Y. 2021).......................................................................25

*Stadium Cap. LLC v. Co-Diagnostics, Inc.*,
    2024 WL 456745 (S.D.N.Y. Feb. 5, 2024)................................................................34

*Steamfitters Loc. 449 Pension Fund v. Alter*,
    2011 WL 4528385 (E.D. Pa. Sept. 30, 2011) .........................................................41

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006)...................................................................26, 36, 37, 38

*Synchronoss Techs., Inc. Sec. Litig.*,
    2019 WL 2849933 (D.N.J. July 2, 2019)..................................................................40

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)................................................................................... *passim*

*The Winer Family Trust v. Queen*,
    2004 WL 2203709 (E.D. Pa. Sept. 27, 2004) .........................................................47

*In re Toronto-Dominion Bank Sec. Litig.*,
    2018 WL 6381882 (D.N.J. Dec. 6, 2018)...............................................................16, 31, 32

*United States v. Anderson*,
    533 F.3d 623 (8th Cir. 2008) ...........................................................................................45

*United States v. Teicher*,
    987 F.2d 112 (2d Cir.1993)..............................................................................................45

*In re Urban Outfitters, Inc. Sec. Litig.*,
    103 F. Supp. 3d 635 (E.D. Pa. 2015) .........................................................................16, 35, 37

*In re Valeant Pharms. Int'l, Inc., Sec. Litig.*,
    2019 WL 2724075 (D.N.J. June 30, 2019)...........................................................................46

*In re Viropharma Inc. Sec. Litig.*,
   21 F. Supp. 3d 458 (E.D. Pa. 2014) ...............................................................17, 37

*In re Viropharma, Inc. Sec. Litig.*,
   2003 WL 1824914 (E.D. Pa. Apr. 7, 2003) .............................................................18

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
   2015 WL 3755218 (E.D. Pa. June 16, 2015)...................................................20, 35

*Weiner v. Quaker Oats Co.*,
   129 F.3d 310 (3d Cir. 1997)..........................................................................11, 20

*Williams v. Globus Med., Inc.*,
   869 F.3d 235 (3d Cir. 2017)..................................................................................29

*Wu v. GSX Techedu Inc.*,
   2024 WL 3163219 (D.N.J. June 25, 2024) .............................................................31

*Yates v. Mun. Mortg. & Equity, LLC*,
   744 F.3d 874 (4th Cir. 2014) ................................................................................40

*Zornberg v. NAPCO Sec. Techs., Inc.*,
   778 F. Supp. 3d 516 (E.D.N.Y. 2025) ...................................................................41

## Other Authorities

17 CFR § 240.10b5-1(b)...........................................................................................44

I.      **INTRODUCTION**

The Complaint alleges with particularity that West Pharmaceutical Services ("West") and four senior executives violated the fundamental rule that "once a company has chosen to speak on an issue . . . it cannot omit material facts." *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 897 (E.D. Pa. 2018). During the Class Period (February 16, 2023–February 12, 2025), Defendants boasted repeatedly about West's strong product demand (and resulting strong revenues) and profit margin expansion. As Defendants knew, however, the truth on the ground was far different—West's demand was suffering broad-based declines across several prominent business units due to excess customer inventories and other factors. Simultaneously, supposed engines of margin growth were beset with costly manufacturing problems, product failures, and customer losses. Instead of accurately disclosing these internally known, severe headwinds, Defendants concealed or materially downplayed them. At the same time, Defendants unloaded **over $122 million** worth of West stock at prices artificially inflated by their misrepresentations. As the market gradually learned the truth about West's flagging demand and margin conditions through six partial corrective disclosures, West's stock price plunged, causing massive investor losses.

Detailed allegations—including accounts from seven former West employees and one former contractor with highly relevant job responsibilities—reveal that Defendants knew West was suffering both a significant demand drop-off, and from substantial margin pressure driven by problems with its flagship SmartDose device. From meetings, reporting lines, and internal reporting systems, Defendants knew, by 2023, that West's customers were increasingly cancelling orders, new orders were down, and customers were refusing early delivery (which they typically sought). Each Defendant received detailed information showing that, in 2023, customer destocking of excess inventories would drive a $100 million revenue shortfall in West's Generics segment

1

alone. Defendants knew this dynamic continued months into 2024, and that demand was similarly slumping in other West business units. Defendants also knew (but did not disclose) that a key customer was ending its West dealings in 2023, and that inordinate price hikes West implemented in 2023 were driving customers away. SmartDose, which Defendants highlighted as a driver of margin expansion, was plagued by pervasive and costly design, manufacturing, and quality issues, which drove customers to flee. These problems, and West's failed campaign to correct them, made SmartDose margin **dilutive** by 2025.

Defendants' Motion to Dismiss should be denied. They were not free to repeatedly characterize West's demand and margin growth in glowing terms (in statements referred to in the Complaint as Demand Statements and Margin Statements) while leaving out material, adverse facts that would have provided investors with a complete and accurate picture. *See Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992) (statements that put topics "in play" are actionable if they omit contrary facts). Defendants claim that their misstatements were mere puffery, yet they lift statements out of context and disregard that they addressed concrete, verifiable points on matters of clear importance to investors. Similarly, Defendants' argument that their statements were protected as forward-looking fails for several reasons, including because the challenged statements omitted current or historical facts and lacked a reasonable basis, and thus fell outside the PSLRA's safe harbor. Defendants' purported "cautions" were also generic and described as merely hypothetical risks that had already come to pass. Defendants' misrepresentations were not opinions immunized from liability because they concealed myriad contrary material facts.

Regarding scienter, Defendants try to side-step extensive allegations showing their knowledge of material facts they failed to disclose by attacking the confidential witnesses' credibility. But the CW accounts are reliable, mutually corroborative, and rife with first-hand

2

information showing that Defendants knew facts they materially misrepresented. Further, Defendants cannot shrug off their enormous volumes of insider trades, which dwarfed their trading in prior years, before investors learned the truth. Defendants' suspicious stock sales at inflated prices, along with the CW allegations, support both a strong inference of scienter as well as Plaintiffs' insider trading claims. Defendants' Motion should be denied, allowing this case to proceed to discovery.

## II.    STATEMENT OF FACTS

### A.    Relevant Background on West's Business

West manufactures and sells containment and delivery systems for healthcare products within two business segments: Proprietary Products and Contract Manufacturing ("CM"). ¶¶53-58.[1] The Proprietary segment comprised around 80% of West's 2023 and 2024 annual sales (¶63), and houses two product groups—Standard Products and High Value Products ("HVP") (¶68). During the Class Period, the HVP group generated roughly 60% of West's total net sales. ¶74; *see also* ¶¶61, 68, 72. The HVP group includes HVP Delivery Devices, namely, West's "flagship" SmartDose product (¶¶75-76, 219), which Defendants touted as a significant margin and revenue growth driver (*e.g.*, ¶¶83-84). West sells its Proprietary Products to customers in three markets— Biologics, Generics, and Pharma. ¶64. Generics sales generated 20% and 17% of West's total sales in 2023 and 2024, respectively. *Id.*

West's CM segment manufactures and sells products according to customer specifications. ¶4. CM generated roughly 18% of West's total net sales in 2023, and 19% in 2024. ¶90. Continuous

---

[1] Citations to "¶[•]" refer to paragraphs in the Amended Complaint and "MTD" refers to Defendants' Brief in Support of their Motion to Dismiss the Amended Complaint (Dkt. No. 40-2). Unless otherwise noted: (i) all emphasis is added; (ii) all internal citations, quotations, and original emphasis are omitted; and (iii) original alterations are incorporated.

glucose monitors ("CGM") were a key CM offering, and the two dominant CGM makers, Dexcom and Abbott, generated over 20% of West's CM revenue in 2024. ¶¶96-99, 524.

**B.    Throughout the Class Period, Defendants Boasted of Robust Demand for West's Products and Strong, Growing Margins**

From 2020 to 2022, the COVID-19 pandemic caused a surge in demand, revenue, and profit margins at West. ¶¶100-08. Throughout the Class Period, in their Demand Statements, Defendants assured the market that post-pandemic, West was seeing continued broad demand for its products, which was driving revenue growth. For example, on February 16, 2023 (the first day of the Class Period), CEO Eric Green assured investors that "***driving [] base growth is demand for [West's] high-value product offerings***" (¶303), pointing to "***the growth of that order book***" (¶304). On April 27, 2023, Green emphasized the "***high growth right now in Generics and Pharma***" and a "***growth profile . . . around the Biologics***." ¶334.[2] On September 14, 2023, CFO Bernard Birkett declared: "***We're seeing strong demand in our core business. . . . If you draw off COVID, we're seeing that double-digit growth. And it's across nearly all areas of our business. Everything is performing in the ways we would have expected this year*** . . . ." ¶382. At the same time, Defendants emphasized CM demand, with Birkett stating in February 2023 that West was "***seeing mid-single-digit growth for our [CM]***." ¶305. On February 15, 2024, Birkett assured that customer commitments "***support[ed] the long-term growth of the [CM] business.***" ¶425.[3]

Defendants actively downplayed investor concerns over whether West's customers were destocking, or ordering less while using inventories left over from the pandemic (which was an industry-wide concern), portraying any instances of destocking as cabined to narrow bands of the

---

[2] Defendants made similar Demand Statements about Generics throughout the Class Period. *See* ¶¶320, 333, 355, 361, 392, 399, 401, 411, 436, 466.

[3] Defendants made similar Demand Statements regarding CM throughout the Class Period. *See* ¶¶328, 333, 335, 377, 393, 411, 455, 499.

business. ¶¶1, 113, 325, 333. For example, in May 2023, Birkett stated that destocking was confined and would not impact "*overall growth*." ¶¶350-51. Even after Defendants incrementally started to admit the negative revenue impacts from destocking in five alleged corrective disclosures from July 2023 to July 2024 (¶¶360-491), they continued to downplay it as limited in scope. *See*, *e.g.*, ¶376 (Green, August 2023: "*right now, where we stand what we see is not a lot [of] destocking with our products*"); ¶401 (Vice President of Strategy and Investor Relations Quintin Lai, October 2023: customer orders reflected "*a slowing of a restock. It's not necessarily a destock situation*."); ¶433 (Green, February 2024: calling destocking "*really a Q1 [2024] phenomenon*"); *see also* ¶¶367-68, 399-400, 423, 432, 434-36, 449, 451. At every turn, Defendants conveyed that their public representations about orders and demand had a reliable basis in West's extensive "visibility" into customer needs. *See* ¶¶336-37, 349, 410, 425, 428, 455, 465.

Defendants also consistently represented, in their Margin Statements, that West's margin growth would continue, driven by the HVP business, including SmartDose. On February 16, 2023, Birkett assured investors, "*margin is not stepping back to pre-COVID levels*." ¶309. Defendants highlighted West's "margin expansion" based on HVP sales, with Green stating on November 10, 2023, for example, that "*HVP is driving top line growth and margin expansion*." ¶407.[4] Defendants stressed SmartDose's role in this dynamic, with Green stating in November 2024, for example, "*the margin of this portfolio [SmartDose] is far greater than what we currently have.*" ¶507; *see also, e.g.*, ¶¶83, 397, 413, 419, 445, 497, 506, 510. Defendants pointed to supposed progress in automating SmartDose manufacturing as supporting significant margin growth. *See* ¶427 (Green, February 15, 2024: West's "*new automated equipment coming online*" would

---

[4] *See also, e.g.*, ¶¶308-09, 319-20, 324-25, 340-41, 364, 374, 384-85, 395-97, 407, 413, 419, 427-29, 444-47, 470-71, 492, 496-97, 505-07, 510, 513-14.

"*allow us to be more efficient, higher volume, higher quality*..."); *see also, e.g.*, ¶507 (Green, November 2024: a key to "*far greater*" SmartDose margins was "*driving more automation*").

### C. Behind the Scenes, West Suffered Slumping Demand Across Its Business

Throughout the Class Period, even as they publicly lauded robust demand, Defendants knew that West was experiencing flagging demand, including canceled orders and lost customers.

Major demand red flags were fully apparent by the start of the Class Period, as customers across West's business segments cancelled (and attempted to cancel) orders because they had excess inventory and did not need more. ¶¶113, 115-18, 132-34. CW-3 (Supply Chain Senior Executive) explained that cancellations, from both Branded and Generic customers, continued throughout 2023 and into 2024, and accelerated over time. ¶¶118-19. New orders were also declining. ¶¶117-19. Further, starting in 2022, West was increasingly offering to "pull forward" customer orders (*i.e.*, deliver them early) but customers refused as they no longer needed the product or did not need the product so soon, further reflecting lower demand. ¶¶114-15. CW-2 (Director of Global Marketing) explained that Birkett and Senior Vice President and Chief Commercial Officer Cindy Reiss-Clark were involved in discussions about pulling orders forward, which were conducted through Reiss-Clark's Commercial Department. ¶¶127-28. CW-3 confirmed that Green and Birkett (both of whom he met with regularly) knew of the accelerating order cancellations and reduced orders. ¶119. CW-3 recounted an early 2023 Town Hall where Birkett cited dropped orders and increasing cancellations as the reason for missed targets and bonus reductions for West employees. ¶120. Birkett also received reports about customer demand issues from CW-3's supervisor. ¶¶135-40.

One area substantially impacted by destocking was the Generics business, which delivered 20% of West's revenues. ¶64. In March 2023, CW-1 (Strategic Marketing Head, Generics) presented Reiss-Clark with an Inventory Build Analysis he had prepared at her request starting in

January 2023. ¶¶141-44, 147. Based on information received directly from multiple West customers, it revealed that Generics customers had "upwards of 9-months" of excess inventory and would therefore delay or forgo new orders through at least the end of 2023. ¶¶144-45. CW-1's analysis showed that the Generics destocking issue alone posed a *$100 million* revenue risk, with 90% certainty, in 2023. ¶¶144, 147-48.

In June 2023, CW-1 gave a presentation to all of the Individual Defendants, showing that Generics revenues would be down year-over-year in at least the next three quarters (*i.e.*, through Q1 2024) because (as he had told Reiss-Clark in March 2023) customers held more than nine months of excess inventory and would not be placing new orders for months, amounting to a $100 million revenue risk. ¶¶153-55. By the time of this June 2023 presentation, CW-1 found that customer destocking risk data had grown worse. ¶162. While the presentation focused primarily on Generics, CW-1 tried to show that these risks applied to all West divisions, based on his knowledge that Generics customers (e.g., Pfizer and Sanofi) who purchased from other divisions had similar issues with their other West product inventories, such as Branded. ¶¶142-43, 165-66.

In preparing them for West's October 2023 earnings call, CW-1 provided Green, Birkett, and the rest of the C-Suite with materials showing that the Generics destocking issue led to a roughly $37 million miss in Q3 2023, and was "absolutely" the reason Generics missed its Q3 targets. ¶¶170-71. CW-1 confirmed that by the end of 2023, destocking caused a $400 million revenue shortfall across West, $80–$90 million of which was in Generics. ¶166. CW-1 included data reflecting that the negative impact continued into 2024 in materials used to prepare senior management for West's April 2024 earnings call. ¶¶169 (Green participated in preparatory meetings for earnings calls), 172, 445.

Beyond all that, CW-3 explained that Defendants knew months before the Class Period

started that CGM maker Dexcom, a critical CM customer, was ending its business with West in 2023. ¶¶173-79. CW-3 had discussions with Green and Birkett about not renegotiating with Dexcom, which was "ramping down" with West as of February 2023. ¶¶176-77.

Further signals of demand loss abounded. In March 2023, CW-1 presented Reiss-Clark with an analysis showing that a proposed 10% global price increase created at least a $50 million revenue risk in Generics alone due to lost orders from price sensitive customers. ¶¶274-80. West implemented the increase in 2023 anyway, leading customers to flee, and causing negative financial impacts from Q3 2023 into 2024 and 2025. ¶¶283, 286-93. CW-1 noted the price hike impacted other business areas as well, such as HVP, Biologics, and Branded (Pharma). ¶¶267, 286-88, 293.

Major issues with the HVP product SmartDose significantly impacted West's margins (as detailed in Section II(D), *infra*) and also added to its demand loss. With respect to demand, West's staggering 50% price increase on SmartDose in 2023 drove customers away (¶¶267, 286, 288), while manufacturing and quality issues also caused an exodus of many SmartDose customers in 2023 and beyond (as well as canceled orders), amounting to potentially hundreds of millions of dollars in lost revenue (¶¶189, 258-70).

### D.    Defendants Failed to Disclose Endemic Problems with SmartDose That Diluted, Rather than Grew, Margins

Meanwhile, Defendants assured investors about West's strong margins and trumpeted SmartDose, while failing to disclose significant problems plaguing the product and West's costly, failed attempts to address them, which decimated SmartDose margins.

SmartDose suffered from design, manufacturing, supply, and quality issues, resulting in a "mountain" of scrap and "piles" of nonworking devices (¶¶180-214), and significant amounts of expired and written-off SmartDose materials, such as batteries (¶¶123-24). CW-5 (Value Stream

Manager, SmartDose Production Line) recalled that the SmartDose sub-assembly (a part of the device) had a roughly 80% "scrap rate" in 2023, while the remaining sub-assemblies that moved to the next manufacturing stage failed at a high rate, which was "very costly" to West. ¶¶197-200. Attempts to automate production—touted by Defendants as a key to margin growth—also failed, further squeezing SmartDose margins. ¶¶271-73.

These issues were so pervasive that Abbvie, West's largest SmartDose customer, stationed its own employees on site to conduct quality control, and pressured West to improve and lower device costs. ¶¶244-45, 253, 260. West also resorted to paying "crazy" rates to contractors and consultants in an unsuccessful effort to catch up on SmartDose remediation, adding further costs. ¶¶221-26 ("throwing away money"). Indeed, in 2023, West's Vice President, Devices and Delivery Systems, Atul Patel (who reported to Reiss-Clark (¶176)), told CW-3 that SmartDose's cost to customers needed to be $20 or less, but was over $100 due to high production costs. ¶250.

Defendants had in-depth knowledge about the SmartDose problems. West maintained a "massive" database of SmartDose complaint and device failure information from customers and regulators. ¶227. CW-6 (Director of Regulatory Affairs) explained that from late 2022 into 2023, SmartDose complaints increased significantly, and that West's Executive Leadership Team (including Green (¶194)) knew of the failure data directly, because it had to review and certify it. ¶¶228-29. West also tracked its SmartDose production lines and scrap rates. ¶¶232, 243; *see also, e.g.*, ¶¶235-41 (reports and meetings concerning SmartDose issues).

CW-3 discussed significant SmartDose problems with Birkett and Green directly and repeatedly. Before the Class Period, CW-3 discussed with Green and Birkett "pulling the plug" on SmartDose. ¶247. In early 2023, CW-3 told Green and Birkett that SmartDose was "a black hole" and West was not making any money on it. *Id.* Starting in February 2023 and throughout that year,

9

CW-3 "challenged" Green and Birkett to subcontract SmartDose production (¶¶247, 251), and in mid-2023, CW-3 traveled with Birkett to evaluate potential subcontractors because West could not make SmartDose on its own (¶254).

**E.    Defendants Cash In While West's Stock Price Is Artificially Inflated**

During the two-year Class Period, the Individual Defendants collectively sold **over $122 million** worth of West stock while in possession of material nonpublic information, and while the stock price was inflated by their misstatements. ¶¶542-52; Compl., App'x A. Green alone opportunistically unloaded **more than $100 million** worth of West stock. ¶545; Compl., App'x A. Defendants sold roughly 500% more shares, and took home 800% more proceeds, during the Class Period than they did in the coextensive Control Period that preceded it. ¶551.

**F.    The Relevant Truth Is Incrementally Revealed**

Investors learned the relevant truth through a series of partial disclosures beginning in July 2023. Defendants incrementally revealed how destocking was impacting West demand and performance on July 27, 2023 (¶¶16, 367-68, 580), October 26, 2023 (¶¶17, 399-400, 581), February 15, 2024 (¶¶18, 423, 432-34, 436, 582), April 25, 2024 (¶¶19, 449, 451, 457, 583), and July 25, 2024 (¶¶20, 475-82, 485, 584). Each of these partial disclosures caused West's stock price to decline (¶¶16-20, 369, 402, 438, 457, 486, 580-84) and elicited dismay from analysts. *See*, *e.g.*, ¶¶404-06, 439, 458-60, 487-99 ("[West] missed both our and Street expectations as results and the outlook continue to be impacted by destocking").[5]

Finally, on February 13, 2025, Defendants revealed the full truth about the Company's reduced demand and margin performance. ¶¶21, 517, 585. West issued 2025 earnings and revenue

---

[5] In complaining that Plaintiffs do not claim a corrective disclosure about destocking on October 24, 2024, MTD 7, Defendants ignore Plaintiffs' allegations that West had "**fully revealed** the truth about Defendants' misstatements and omissions **relating to destocking**" as of July 25, 2024. ¶486; *see also* ¶20 ("on this news … the truth about destocking was fully revealed").

guidance below expectations, attributing the reduction to (1) the loss of its only two CGM customers in CM, and (2) problems causing SmartDose to be "margin dilutive." ¶¶21, 518-20, 585. On this news, West's stock fell over 38%. ¶¶21, 521, 585. These disclosures stunned analysts. *See* ¶524 (William Blair report stating investors were "sell[ing]-off" West shares in "reaction to the very disappointing guide . . . disclosure that the company is walking away from renewals of two large CGM contracts . . . and acknowledgment that . . . the SmartDose manufacturing ramp . . . is going worse than expected"); *see also* ¶¶522-25.

## III.    LEGAL STANDARD

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint meets this standard if it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court considers the entire complaint, takes factual allegations as true, and construes them "in the light most favorable to plaintiffs." *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 315 (3d Cir. 1997).

## IV.    ARGUMENT

### A.    The Complaint Adequately Alleges Material Misstatements

To plead falsity, a complaint need only allege facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Cal. Pub. Emps' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004). When a defendant chooses to speak, they are "bound to speak truthfully." *Shapiro*, 964 F.2d at 282. "Half-truths," which "state the truth only so far as it goes, while omitting critical qualifying information" are actionable. *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024).

Throughout the Class Period, in the Demand Statements, Defendants repeatedly told investors that West's demand was broadly strong and growing and that any destocking was

contained and limited to narrow pockets of its business. *See* ¶¶303-05, 317, 327-28, 333-37, 349-51, 355, 360-62, 367-68, 376-79, 382, 392-93, 399-401, 410-11, 417, 423-25, 432-33, 435, 449-55, 464-67, 473, 499. Defendants represented that these claims were based on their own deep insight into customer demand. Simultaneously, Defendants' Margin Statements claimed that West's margins were increasing, lauding that West's margin expansion was driven by higher-margin HVPs, and stressing that SmartDose was a key driver of margin performance. *See* ¶¶308-09, 319-20, 324-25, 340-41, 364, 374, 384-85, 395-97, 407, 413, 419, 427-29, 444-47, 470-71, 492, 496-97, 505-07, 510, 513-14. Plaintiffs adequately plead that these assertions were false and misleading because Defendants omitted and misrepresented material, contrary facts.

Defendants' Demand Statements were false and misleading because they concealed that West suffered from major demand headwinds throughout the Class Period, including that:

- Starting in 2022 and continuing into 2024, West experienced an accelerating number of cancelled orders from both Branded and Generics customers ("everybody"), fewer new orders, and customers refusing to "pull forward" orders. *See*, *e.g.*, ¶¶113-19, 132-34.

- By March 2023, West knew of a nine-month buildup of customer inventory in Generics alone, meaning customers would delay or forgo new orders through at least the end of 2023. ¶¶141-48. By June 2023, West knew this would continue into Q1 2024. ¶¶153-55.

- Prior to the Class Period, West knew it was losing Dexcom, one of only two CM CGM customers, in 2023. ¶¶173-86.

- Price hikes implemented in 2023 caused customers to leave West, and impacted Generics, SmartDose, and other West business groups. ¶¶267, 274-80, 283, 286-93.

Defendants' Margin Statements were false and misleading because they failed to disclose that, *inter alia*:

- SmartDose suffered from pervasive design, manufacturing, and quality issues that led to costly scrapping and rework, increasing production expense. *See* ¶¶180-214; *see also* ¶250.

- Customers left West due to these manufacturing and quality issues (this fact also made Defendants' Demand Statements false and misleading). *See*, *e.g.*, ¶¶189, 258-70.

- West paid "crazy" rates to outside contractors and consultants to try and resolve SmartDose

12

complaint and compliance issues, further increasing SmartDose production cost. ¶¶221-26.

- Protracted efforts to automate SmartDose production processes (which were effectively manual), and thus improve margins, failed. *See, e.g.*, ¶¶271-73.

Defendants' failure to disclose these material, adverse facts gave investors the misleading impression that West's demand was robust, the Company was not experiencing any appreciable destocking, and its margins remained strong and poised for continued growth, partly due to SmartDose uptake. *See, e.g., Industriens Pensionsforsikring A/S v. Becton Dickinson & Co.*, 620 F. Supp. 3d 167, 186 (D.N.J. 2022) ("Defendants may not describe a favorable picture of a material issue without including the details that would have presented a complete and less favorable one."). By affirmatively putting those subjects "in play, Defendants were also required to disclose certain facts contradicting those representations." *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *16 (D.N.J. Dec. 27, 2019). The Court should find that Plaintiffs have adequately pled falsity, and should reject Defendants' arguments for dismissal.

Indeed, many of the contemporaneous material adverse facts contrary to Defendants' public representations are supplied by **first-hand** accounts from seven former employees and one former contractor. In assessing such accounts, courts consider the "detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Bldg. Trades United Pension Tr. Fund v. Kenexa Corp.*, 2010 WL 3749459, at *7 (E.D. Pa. Sept. 27, 2010) (citing *Chubb*, 394 F.3d at 147). The Complaint's CW allegations satisfy this standard by "includ[ing] sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged," *In re Novo Nordisk Sec. Litig.*, 2018 WL 3913912, at *7 (D.N.J. Aug. 16, 2018). The Complaint sets forth each CW's tenure, job title, and specific responsibilities, providing

the basis for the information the CWs provided. ¶¶45-52. Further, it contains dozens of paragraphs of accounts from the CWs recounting specific meetings and presentations, and their attendees,[6] reports, forecasts, and tracking mechanisms,[7] and other detailed information they learned through performing their day-to-day job responsibilities at West, including issues with specific customers, products, and business segments.[8]

The CW allegations should be fully credited because they "are specific, mutually consistent, and plausibly within the scope of knowledge each [CW] would have acquired during his or her employment." *See Pelletier v. Endo Int'l plc*, 439 F. Supp. 3d 450, 468 n.8 (E.D. Pa. 2020); *see also Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 264 (3d Cir. 2009) (crediting "CW statements identifying deep and unusual discounting [that] directly conflict with [Defendant's] repeated assurances throughout the class period that pricing remained 'fairly steady'"); *Chubb*, 394 F.3d at 155 ("large number of varied sources may in some instances help provide particularity, as when the accounts supplied by the sources corroborate and reinforce one another"). For example, several CWs discuss order delays and cancellations across West's business groups between 2022 and 2024. ¶¶105-08, 113-17 (CW-2), ¶¶118-22 (CW-3), ¶¶123-24 (CW-8). Several CWs told of SmartDose customers cancelling or declining to renew contracts due to production and pricing issues. ¶¶267, 286, 288-91 (CW-1), ¶¶259-61 (CW-3), ¶270 (CW-4), ¶¶262-66 (CW-6), ¶¶268-69 (CW-8). Several reported that information about customer orders was tracked and shared at West's senior levels. ¶¶147-72 (CW-1), ¶¶125-29 (CW-2), ¶¶130-40 (CW-3).

---

[6] *See, e.g.*, CW-1 (¶¶147, 153), CW-2 (¶¶125-28), CW-3 (¶¶130-35, 176, 178), CW-5 (¶¶203-04), CW-6 (¶¶193-94), CW-7 (¶¶237-38), CW-8 (¶270).
[7] *See, e.g.*, ¶¶121, 126, 129, 140, 204-05, 229, 239-41.
[8] *See generally, e.g.*, ¶¶113-79, 181-293.

14

Notably, Defendants barely mention the CWs in their falsity arguments.[9] Given their demonstrable reliability and the scant opposition by Defendants, the Court should fully credit the CWs when assessing whether the Complaint adequately pleads false and misleading statements.

### 1.    Plaintiffs Adequately Plead Falsity With the Requisite Particularity

Defendants argue that the alleged problems with West's particular business units do not render their Demand Statements and Margin Statements false because the problems were effectively too insignificant to matter, as—according to Defendants—they impacted only specific products, customers, or business segments. MTD 21-26. In essence, they argue that they were not required to disclose known problems with the products, customers, and business segments detailed in the Complaint because those facts did not bear on the truth or accuracy of their Demand and Margin Statements. Defendants are incorrect. Plaintiffs have sufficiently alleged that the serious problems in multiple West business lines were material facts that needed to be disclosed when Defendants chose to speak about demand and margins.

Contrary to Defendants' suggestion, statements are not required to reference a specific product or business segment, rather than a company's overall financial health, in order to be false or misleading. *See In re Kenvue Inc. Sec. Litig.*, 2025 WL 889640, at *11 (D.N.J. Mar. 24, 2025) (finding falsity sufficiently alleged and stating "[i]t is immaterial that the statements did not specifically mention" product by name); *Hall*, 2019 WL 7207491, at *16 (statements actionable "although they did not specifically reference the Talc Products"). Instead, Plaintiffs' detailed allegations regarding the extent of the undisclosed demand and margin headwinds and their impact

---

[9] The lone reference to CWs in Defendants' falsity arguments (MTD 9-26) appears when they dismiss CW-1 as a "lower-level" employee with a mere difference of opinion regarding the extent of destocking (MTD 20). But CW-1 was only two levels below West's C-Suite (¶45) and delivered presentations directly to the Individual Defendants. ¶¶147-70. In any event, courts regularly reject arguments that "low level" CW allegations should be discounted. *See*, *e.g.*, *Avaya*, 564 F.3d at 265-66 (crediting "relatively low-level former employees").

on West, "accept[ed] as true," *Novo Nordisk*, 2018 WL 3913912, at *4, establish material falsity. *See In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 647 (E.D. Pa. 2015) (sufficient particularity when retailer stated broadly that there was "a reduction in merchandise markdowns" for the company as a whole and did not disclose it actually had one underperforming brand).[10]

Plaintiffs allege that Defendants concealed negative facts about significant drivers of West's financial performance, including HVPs (which generated ~60% of net sales (¶¶61, 68, 72, 74)), Generics (which generated between 17%–20% of sales (¶64) and where one or two orders could significantly impact a quarter (¶125)), a "flagship" product, SmartDose (¶¶72, 75-76, 83-84, 219), and the complete loss of a key CM customer (¶¶96-99, 524).[11] These problems, which were all happening simultaneously during the Class Period, bear on the demand and margins of West as a company. At a minimum, Defendants' argument that allegations of problems in a number of business areas do not render their Demand and Margin Statements false is a challenge to the materiality of the omitted facts, which is inapt at this stage. *See Shapiro*, 964 F.2d at 280 n.11 (dismissal on materiality grounds appropriate only if information is "so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality"); *In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *11 (D.N.J. Dec. 6, 2018) (materiality "not typically a matter for Rule 12(b)(6) dismissal").

---

[10] None of Defendants' authorities (MTD 21) stands for a general rule that issues in specific parts of a larger business cannot render broader statements false or misleading, particularly where, as here, the identified issues impacted multiple important business lines and the Defendants knew of the problems. Rather, this raises a case-specific inquiry. For example, in *In re ATI Techs., Inc. Sec. Litig.*, 216 F. Supp. 2d 418, 434 (E.D. Pa. 2002), narrow statements about two customers were not misleading due to "other adverse sales trends." In *City of Warren Police and Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 686 (3d Cir. 2023), issues identified in one division of a business segment did not show that defendants did not sincerely hold an opinion as to the segment.

[11] Defendants' concession that "certain customers . . . contributed significant portions of net sales" (MTD 15), undermines their effort to cast customer loss as immaterial. The loss of a dominant CGM maker was particularly impactful, as analysts acknowledged. *See* ¶¶96, 524-25.

16

Defendants' argument that Plaintiffs have not pled that their SmartDose-specific statements are false also is plainly wrong. MTD 26-27. Among other representations, Defendants promised "***margin improvement***" from SmartDose in November 2023 (¶419), stated that SmartDose automation was "***coming online***" in February 2024 (¶427), said that West saw "***growth***" in SmartDose in April 2024 (¶445), and emphasized ramp-up in SmartDose production and "***far greater***" "***expectations of margin***" from SmartDose in November 2024 (¶¶506-07). The Complaint sets forth detailed facts that were directly at odds with these claims at the times they were made. For example, SmartDose was plagued with "design, manufacturing, supply, and quality issues from the start of the project" resulting in a costly "mountain" of scrap and "piles" of nonworking devices (*see* ¶¶185-93, 201, 215-20, 224-25, 271-72), customers threatened to, and did in fact, leave West due to the persistent and unresolved SmartDose quality and manufacturing problems and huge price increases (*see* ¶¶189, 226-29, 244-45, 253, 259-69, 288-91), and West was forced to expend substantial sums and hire outside contractors to attempt to remediate the SmartDose issues, all of which undermined SmartDose margins (*see* ¶¶221-26). Defendants had no license to speak about SmartDose while omitting such adverse material facts. *See Shapiro*, 964 F.2d at 282 (defendant who chooses to speak is "bound to speak truthfully"). Defendants' argument that statements about SmartDose's margins and automation were not misleading because SmartDose sales had increased at some point (MTD 26-27) injects a factual dispute that is "for the trier of fact." *In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 472 (E.D. Pa. 2014).

### 2.     Defendants' Misstatements Are Not Inactionable Puffery

Defendants wrongly contend that roughly half of the alleged misstatements are inactionable puffery. MTD 9-11. Puffery is a statement "too vague to ascertain anything on which a reasonable investor might rely." *Cont'l Gen. Ins. Co. v. Olafsson*, 2024 WL 4263211, at *11 (D.N.J. Sept. 23, 2024). "[A] statement is considered puffery only when it is immaterial," and materiality

17

determinations "are peculiarly for the trier of fact." *In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *14 (D.N.J. Dec. 15, 2015); *see also Shapiro*, 964 F.2d at 280 n.11.

To evaluate whether a statement is puffery, courts "must examine the context in which the statement was made." *In re Viropharma, Inc. Sec. Litig.*, 2003 WL 1824914, at *6 (E.D. Pa. Apr. 7, 2003). Yet, Defendants repeatedly challenge words and phrases in isolation, stripping them of necessary context. *See generally* MTD 9-10 nn.3-6. When considered in their proper context—as alleged in the Complaint—Defendants' statements were not puffery because they provided investors with verifiable, "concrete information." *In re ATI Techs.*, 216 F. Supp. at 436 (describing demand as "solid," "good," and "strong," when sales were disappointing, not puffery); *Endo*, 351 F. Supp. 3d at 900 (describing opioid testing results as "robust" and "very encouraging" when abuse rates were increasing, not puffery). For example, Defendants contend statements about West's "***very, very healthy participation rate***" and "***exciting***" growth are puffery. MTD 10 n.5 (citing ¶355). But they omit the concrete information (underlined here) accompanying those words. ¶355 *("And with a very, very healthy participation rate in Biologics, what you're seeing here is that more demand of our products is higher up on the high-value product curve.*"; "*what's really exciting about this growth, while the Pharma and the Generics continue to grow faster than we believe the market . . . the Biologics continues to be double-digits and that's the main thrust of growth*."). Similarly, Defendants argue that the words "***strength of our financial construct***" and "***base momentum***" are general optimism (MTD 11), but fail to note that Green provided concrete information around those words. ¶308 (West's "***expected margins for this year are significantly above pre-pandemic 2019 levels. This underscores the strength of our financial construct with annual margin expansion of 100 basis points or more per year. In 2023, we expect operating margin of 23% to 24%, which would represent an increase of approximately 800 basis***

18

*points over a four-year period … as you can see from our guidance, we see continued base*

*momentum.*"). Read in context, these statements are firm, factual assertions.

Other statements Defendants claim are puffery are likewise accompanied by concrete, verifiable statements about, e.g., the growth of specific market segments and products (¶¶317, 333, 355, 364, 382, 411, 452); supposedly limited destocking (¶¶367, 300); the nature of customer demand for HVPs (¶¶334, 355, 360-61, 378, 392); West's insight into customer demand (¶¶382, 393, 424, 444, 449, 453); and West's margins (¶¶320, 324, 385, 427, 445, 496). *See Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.*, 2022 WL 889158, at *8, 10 (E.D. Pa. Mar. 25, 2022) (statements not puffery where they "were made in connection with other statements" attributing product's "success" to certain factors but omitting the true reason for product's success). Moreover, statements depicting a thriving company are not puffery when Plaintiffs allege that "Defendants likely knew contradictory facts and/or acted recklessly in making such statements," as set forth in Section IV(A), *supra*. *Shulman v. Weston*, 2025 WL 3754159, at *9-10 (D.N.J. Dec. 29, 2025).[12]

Moreover, by repeatedly commenting on West's order book (¶¶334, 360-61, 367, 424, 444, 449), customer inventories (¶¶328, 349, 367, 379, 382, 393, 400, 411, 444, 449, 453), the Generics segment (¶¶320, 333-34, 355, 361, 392, 411), and SmartDose production improvements (¶¶320,

---

[12] Cases cited by Defendants are inapposite. In *In re Rackable Sys., Inc. Sec. Litig.*, 2010 WL 199703, at *6 (N.D. Cal. Jan. 13, 2010), the statements "pretty strong" and "solid" were puffery because foundation for those statements was not provided. *Fadia v. FireEye, Inc.*, 2016 WL 6679806 (N.D. Cal. Nov. 14, 2016) involved a company that, unlike West, was not a make-to-order business with insight into future demand based on its order book. In *Fitzer v. Sec. Dynamics Techs., Inc.*, 119 F. Supp. 2d 12, 26 (D. Mass. 2000), the statement "continued market demand" referenced broad macroeconomic conditions and demand for a forthcoming product, while West's demand statements refer to demand for existing products in specific business segments as informed by communications with its own customers. *In re Incyte S'holder Litig.*, 2014 WL 707207 (D. Del. Feb. 21, 2014) is similar.

19

324, 385, 427, 445, 496-97), Defendants "created the reasonable understanding among investors" that these topics possessed "considerable significance." *Weiner*, 129 F.3d at 317. Further, a large number of Defendants' statements were made in direct response to analyst questions, demonstrating their materiality to investors. ¶¶305, 309, 325, 333-35, 340-41, 362, 374, 377-78, 385, 395, 397, 400-01, 410-11, 413, 417, 419, 424-25, 427-29, 446-47, 451, 453-55, 464-65, 467, 484, 492, 497, 499, 506-07, 510, 513-14; *see Becton*, 620 F. Supp. 3d at 196 (that analysts frequently asked about a topic "underscor[ed] the importance" of it); *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2015 WL 3755218, at *13 (E.D. Pa. June 16, 2015) (statements not puffery when they addressed "fundamental aspect of [defendant's] business [] of vital importance to investors"). Finally, the negative market reactions that occurred in response to the corrective disclosures revealing the truth about West's flagging demand and depressed margins demonstrates that Defendants' statements were material. *See*, *e.g.*, *In re Coinbase Glob., Inc. Sec. Litig.*, 2024 WL 4053009, at *10 (D.N.J. Sept. 5, 2024) ("the materiality of this information was evidenced by the disclosure's significant impact on the market").

### 3.    Defendants' Misstatements Are Not Inactionable Opinions

Defendants wrongly assert that many misstatements are inactionable opinions. MTD 16-20.[13] "A fact is a thing done or existing or an actual happening," whereas an opinion is "a belief[,] a view, or a sentiment." *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015). Some statements challenged as opinions are not because they do not even contain subjective language. *See*, *e.g.*, ¶492; *contra* MTD 17. Others are not opinions because Defendants again omit surrounding context (underlined here) that grounded the contested statements in fact. *See*, *e.g.*, ¶378 ("***I would argue that most of the investments are more of the***

___

[13] Defendants challenge the following statements as inactionable opinion: ¶¶308, 317, 320, 324, 333-35, 340, 349, 355, 361, 378, 396, 411, 435, 452, 492, 499, 506, 510, 514.

***higher end of HVP*** . . . <u>***We're seeing the high participation rate across the board***</u>***, which is***

***exciting.***"); ¶452 ("<u>***There's still the growth opportunities around HVP and in the Biologics***</u>

<u>***space. And even in Q1, that continued to grow***</u>***. I think when you look at it in the whole, areas***

***are growing.***"); *In re Merck & Co., Inc., Sec. Litig.*, 2015 WL 2250472, at *11 n.7 (D.N.J. May

13, 2015) (*Omnicare* inapplicable where statements "ma[de] direct assertions.").[14]

Any arguable opinion statements are nonetheless actionable under *Omnicare* because they

(i) "omit[ted] material facts about [Defendants'] inquiry into or knowledge concerning" the

statement; and (ii) the omitted facts "conflict[ed] with what a reasonable investor would take from

the statement." *Omnicare*, 575 U.S. at 189.[15] At the time of their misstatements, Defendants had

contemporaneous data demonstrating that their statements were materially misleading. Section

IV(A), *supra*. For example, Defendants' Demand Statements were contradicted by facts provided

to them by CW-1, including detailed analyses, backed up by data, that revealed significant

destocking headwinds and further negative demand developments based on West's large price

increases. ¶¶153-70. In addition, CW-3, who met regularly with Green and Birkett (¶¶47, 130-31),

reported that Green and Birkett knew about the high and accelerating rate of order cancellations

from the start of 2023 (¶¶118-20). *See Kenvue*, 2025 WL 889640, at *10 (statements that

defendants "believe[d] our products are reliable, safe and effective" actionable where defendants

failed to disclosed studies finding ingredient was not safe or effective); *In re Dentsply Sirona, Inc.*

---

[14] "[M]erely appending 'we believe' or 'we think'" in front of statements "does not automatically render statements non-actionable." *In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254, at *11 (M.D. Tenn. Nov. 19, 2019) (such a rule would "nullify that statutory requirement for all sentences starting with the phrases 'we believe' or 'we think'").

[15] To the extent *In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, at *13 (W.D. Pa. May 18, 2023) (MTD 18) suggests opinions are actionable only if they are "impossible" to achieve, Plaintiffs respectfully submit that *Mylan* impermissibly narrows the *Omnicare* standard and has not been adopted. *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1329 n.13 (11th Cir. 2019) is similarly unavailing, as the portion of that decision Defendants cite is *dicta*.

*Sec. Litig.*, 665 F. Supp. 3d 255, 292-93 (E.D.N.Y. 2023) (not disclosing sales of excess inventory and "lack of end-user demand" rendered opinions misleading).[16] Plaintiffs have not alleged a mere "failure to predict" the future (MTD 18-19) or the omission of minor facts "cutting the other way" (MTD 18, 19-20), but rather a host of material facts regarding broad declines in customer demand and pervasive SmartDose issues, which contradicted the misimpressions created by Defendants' statements. Courts regularly hold similar statements to be actionable. *See*, *e.g.*, *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 212 (E.D. Pa. 2021) ("Plaintiffs are not . . . merely alleging that the speakers offered opinions which later turned out to be wrong. They present numerous facts on the ground that directly contradicted the statements"); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 729-30 (S.D.N.Y. 2015) (no subjective belief in company's legal compliance where company was in receipt of civil investigative demand).

### 4.    The Safe Harbor Does Not Protect the Alleged Misstatements

Defendants' alleged misstatements are not protected forward-looking statements under the PSLRA safe harbor. MTD 11-16 & nn. 10-14, 21.[17]

Many of the alleged misstatements that Defendants claim are forward looking are not protected because they addressed "historical facts or a then-present state of affairs," *Emps.' Ret.*

---

[16] Defendants' authorities (MTD 19-20) are inapposite. The cited portion of *Belodoff v. Netlist, Inc.*, 2009 WL 1293690 (C.D. Cal. Apr. 17, 2009) concerned the bespeaks caution doctrine, not opinions. The opinion statements in *Handal v. Innovative Indus. Props., Inc.*, were not actionable because when defendants spoke, they "could not have 'sa[id] one thing and [held] back another'; there was nothing for them to hold back." 157 F.4th 279, 297-98 (3d Cir. 2025). Here, by contrast, the Complaint details many undisclosed facts about West's demand and margins that Defendants "held back." Also off-point are cases that did not analyze whether opinion statements were actionably false. *See In re Constellation Energy Grp., Inc. Sec. Litig.*, 738 F. Supp. 2d 614, 631 (D. Md. 2010) (citing court's analysis concerning puffery); *Kenexa Corp.*, 2010 WL 3749459, at *8 (analyzing scienter).

[17] Many statements, like those made at investor conferences, had no associated safe harbor language, as Defendants do not dispute. *See*, *e.g.*, ¶¶349, 382, 410, 417, 419, 464-67, 470, 492, 505-07, 510, 513-14.

*Sys. of P.R. Elec. Power Auth. v. Conduent Inc.*, 2020 WL 3026536, at \*6 (D.N.J. June 5, 2020), or were "mixed present/future statement[s]", *Avaya*, 564 F.3d at 255. *See, e.g.*, ¶336 ("***we'll continue – we respond to our customers' forecasted demand*.** ***And again, it's more than just one customer, it's multiple customers***") (present statement underlined); ¶337 ("***our customers are giving us visibility of their demands over the next several quarters***, and then we plan accordingly"); ¶303 ("***Looking ahead, we remain well-positioned with the right growth strategy around execute, innovate, and grow.*** ***Our solid order book of committed orders reinforces the criticality of West components and devices to address our customers' growing injectable drug demand.***"); ¶473 (***We're seeing a slowdown in the first half of this year.*** ***But our guidance suggests that you think about this that second half is going to be stronger than the first half for 2024 for West.***"). *See, e.g.*, *Curran v. Freshpet, Inc.*, 2018 WL 394878, at \*4 (D.N.J. Jan. 12, 2018) ("we have enhanced our strategic manufacturing infrastructure capabilities" encompassed "representations of present fact"); *Enzymotec*, 2015 WL 8784065, at \*11 ("[S]tatements relating to . . . being 'well positioned for future growth' . . . or 'increased market penetration' . . . relate to then-existing conditions as opposed to future projections.").

Moreover, the "safe harbor does not apply" where, as here, Plaintiffs "challenge defendants' alleged omission of present facts with respect to the challenged statements." *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at \*7 (D.N.J. July 27, 2018). As explained above, Defendants' statements omitted mountains of internally-known material facts contradicting Defendants' public pronouncements that destocking was limited, demand outlook was strong, and margins were set to improve. *See* Section IV(A), *supra*. Plaintiffs have alleged, at a minimum, that Defendants' projections or forecasts were issued "without a reasonable basis," which renders them "susceptible to attack." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427 (3d Cir.

1997); *see also Becton*, 620 F. Supp. at 191 (projection "lacks a reasonable basis if it was made after inadequate consideration of available information.").

Further, for the safe harbor to apply to a forward-looking statement, it must be accompanied by meaningful, cautionary language that is "substantive and tailored"; "vague" or "boilerplate" disclaimers are insufficient. *Enzymotec*, 2015 WL 8784065, at *11. Defendants' boilerplate cautions are insufficient. Their "generic warning[s]" are not meaningful because they are "inherently true" of all manufacturing companies. *In re Innocoll Holdings Public Ltd. Co. Sec. Litig.*, 2020 WL 1479128, at *18 (E.D. Pa. Mar. 25, 2020); *see, e.g.*, MTD 13-14 ("General global economic downturns and macroeconomic trends . . . could negatively affect demand for our products due to customers decreasing their inventories in the near-term or long-term"); *see also id.* 14-16.[18]

The cautions are also insufficient because they warned of nebulous risks that "may" or "could" occur (MTD 13-16) when specific risks had already materialized. For example, Defendants contend that West disclosed the possibility that "customers decreasing their inventories in the near-term or long-term" "**could** negatively affect demand for our products." MTD 14; *see also* MTD 15 (arguing West "warned that competition and various other factors **could** cause customers to leave"). But the Complaint alleges that prior to and throughout the Class Period, massive destocking was occurring, and customers were already defecting en masse. *See* Section II, *supra*. Likewise, West's disclosure stating "We **may** be unable to increase capacity or efficiency at our own manufacturing facilities, which could adversely affect our business, financial condition,

---

[18] One example of cautionary language Defendants cite that is plainly deficient states only, "I do want to just quickly state the Safe Harbor Statement" with a suggestion to look at West's website. Ex. 49. *See In re ATI Techs.*, 216 F. Supp. 2d at 443 n.18 (risk disclosure insufficient where defendants referenced "filings with the securities regulatory authorities" but "did not specify the documents or even the regulatory agencies").

and results of operations" (MTD 16), treats as speculative the fact that, throughout the Class Period, West was plagued by SmartDose manufacturing and quality issues that depressed its profit margins. "Defendants' failure to update these statements . . . renders them meaningless in light of the changing circumstances and risks," which had already hit home. *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *12 (S.D.N.Y. Apr. 22, 2016); *Innocoll*, 2020 WL 1479128, at *18 (same); *Shulman*, 2025 WL 3754159, at *8 (cautions insufficient where they did not "inform investors that liquidity was already severely strained"); *Becton*, 620 F. Supp. 3d at 191-92 (cautions "not meaningful" where "risks the 10-K warned of had already materialized").[19] [20]

Lastly, the safe harbor is inapplicable because, as discussed below, Section IV(B), *supra*, Defendants' statements were "made with actual knowledge of [their] falsehood." *Avaya*, 564 F.3d at 254; *see also Shulman*, 2025 WL 3754159, at *8 (complaint "plausibly indicates [d]efendants' actual knowledge of the Company's dire financial straits, thereby removing the statements from the protection of the Safe Harbor provision").

---

[19] *Robeco Cap. Growth Funds SICAV v. Peloton Interactive, Inc.*, 665 F. Supp. 3d 522, 539 (S.D.N.Y. 2023) and *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 279 (3d Cir. 2004) (MTD 15) are inapt. Neither involved the situation present here, where putative cautions are not meaningful because they warned of potential risks that had already materialized.

[20] Defendants also argue that partial and limited acknowledgments of destocking amount to cautionary language that renders their misstatements about destocking inactionable. MTD 14 (citing ¶¶367-68, 399-400, 432-34, 436, 449, 451, 478-83). But Defendants cannot show as a matter of law that any cautionary language about destocking was "meaningful" where Plaintiffs allege that Defendants' destocking statements materially downplayed the extent of the issue, which misled the market until the full truth about destocking was revealed on July 25, 2024. *See* ¶¶370, 403, 437, 456. *See Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 545 F. Supp. 3d 120, 149–50 (S.D.N.Y. 2021) (denying motion to dismiss because "effect of [partial] disclosures were at least partially diminished by Goldman's repeated statements during the Class Period downplaying its knowledge of, and role in, the 1MDB scandal"); *In re Omega Healthcare Invs., Inc. Sec. Litig.*, 563 F. Supp. 3d 259, 271 (S.D.N.Y. 2021) (disclosures that "downplayed the full extent of issues" were actionable).

25

### B.        Plaintiffs Plead a Strong Inference of Scienter

The Complaint sufficiently pleads scienter, "a mental state embracing intent to deceive, manipulate, or defraud," by amply alleging that Defendants made material misstatements with a "knowing or reckless state of mind." *Avaya*, 564 F.3d at 252.[21] "[C]ircumstantial evidence of reckless or conscious misbehavior" suffices to plead scienter. *Burlington Coat Factory*, 114 F.3d at 1422. And allegations showing "sales of company stock by insiders that are 'unusual in scope or timing . . . may support an inference of scienter.'" *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277 (3d Cir. 2006).

At the pleading stage, courts evaluate scienter through a "comparative assessment of plausible inferences, while constantly assuming the plaintiff's allegations to be true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326-27 (2007). In this holistic analysis, the court considers "whether all of the facts alleged, taken **collectively**, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (emphasis in original). Scienter allegations need only be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. "The inference . . . need not be irrefutable, i.e., of the smoking gun genre, or even the most plausible of competing inferences." *Id.*

As detailed below, Plaintiffs plead an uncommonly compelling inference of scienter, with strong allegations of conscious misbehavior and recklessness, as well as motive.

---

[21] Each Individual Defendant's scienter, once established, is imputed to West. *See Li v. Aeterna Zentaris, Inc.*, 2016 WL 3583821, at *2 (D.N.J. June 30, 2016) (scienter adequately alleged as to one executive imputed to corporation; motion to dismiss denied).

26

      **1.      Plaintiffs Adequately Allege Conscious Misbehavior or Recklessness**

          **a.      Defendants Knew Their Public Statements Were Not Accurate, Establishing Scienter**

Plaintiffs adequately plead scienter by alleging that Defendants "knew facts or had access to information suggesting that their public statements were not accurate." *McCullough v. Advest, Inc.*, 754 F. App'x 109, 113 (3d Cir. 2018). The Complaint is replete with allegations "that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete[, which] is classic evidence of scienter." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1022 (S.D. Cal. 2005). Allegations showing that the Individual Defendants personally received information contrary to their public statements in presentations and meetings, and had access to such information in West's systems and reports, is sufficient to establish their scienter. *Papa*, 2018 WL 3601229, at *18 (scienter established by allegations showing "defendants' knowledge of facts or access to information contradicting their public statements . . . [i.e., that] defendants knew or, more importantly, should have known that they were misrepresenting material facts").

Indeed, detailed allegations show that Defendants knew of material adverse information that they misrepresented during the Class Period, or at minimum, had access to information suggesting that their public statements were not accurate. For example, CW-3, who met regularly with Green and Birkett (¶¶47, 130-31), reported that Green and Birkett knew from the start of 2023 that West's Branded and Generic customers were canceling orders or reducing orders at a high and accelerating rate, causing West to miss targets and bonus thresholds. *See* ¶¶118-20. Birkett specifically spoke about the dropped and cancelled orders and missed targets in a Town Hall Meeting in early 2023, which confirms his knowledge of these issues. ¶120. Birkett and Reiss-Clark received information on the demand drop-off (including cancelled orders and declines in

pull-forwards), including, in Birkett's case, from Birkett's direct report, Oberlee, following Operations team meetings. ¶¶126-28, 137-39.

From the very start of the Class Period, CW-3 also discussed with Birkett and Green the major issues affecting SmartDose margins and demand, including the efforts of customers like Abbvie to leave West and the fact that SmartDose was "like a black hole" on which West was not making any money. ¶¶244-45, 247; *see also* ¶¶259-61 (CW-3 detailing most SmartDose customers, including Roche, leaving West in 2023).[22] CW-3 stated that Green and Birkett's statements to the market about SmartDose in 2023 and early 2024 did not reflect "the facts on the ground" and were "overly positive" (¶257), and that while West publicly touted its growth, it was not growing and growth had stalled (¶122). West's Executive Leadership Team (or XLT), which included Green, also knew about the costly SmartDose failures driving customers away because the XLT was required to review and certify customer complaint and failure reports, which reflected a massive increase in SmartDose problems in 2023 that remained elevated "well beyond an acceptable failure rate" through 2024. ¶¶194, 228-29.

CW-1's analysis showing approximately $100 million of destocking-related revenue shortfall in 2023—in Generics alone—that he delivered to Reiss-Clark at her request in March 2023 (and to all of the Individual Defendants in June) further highlights Defendants' scienter. ¶¶141-48, 153-55. The June 2023 presentation showed that West's top customers warned that **nine-plus months** of excess inventories of West products would limit new orders through at least

---

[22] Defendants' assertion that "Abbvie is not alleged to have even reduced its ordering," MTD 31, is wrong. *See* ¶269 ("Abbvie . . . began winding down its orders throughout 2024."). Their argument that the Complaint does not allege that Defendants specifically knew in advance that Roche would leave misses the mark. MTD 31 n.37. CW-3 advised Birkett of the risk that Roche (and Abbvie) would leave West due to concerns about the quality of SmartDose, yet the risk that important customers would leave was not disclosed. *See* ¶189.

the first quarter of 2024, which drove large revenue misses in West's next three quarters. ¶¶153-54. Notably, CW-1's presentation did not apply to Generics only; it aimed to show that the analysis was a "holistic" approach to West as a company. ¶165. Defendants knew destocking was a major, broad-based, and prolonged problem.

CW-1 also directly warned Reiss-Clark in March 2023 that a planned Company-wide price increase of 10%—three times larger than its peers'—would dampen West demand, create revenue risk of roughly $50 million, and cause departures of price sensitive customers in the following quarters. ¶¶275-79. The price hike was implemented nevertheless, and drove revenue and customer losses starting in Q3 2023. ¶¶283, 286, 288-91.

Further showing Defendants' knowledge, CW-1 personally joined Green, Birkett and the other Individual Defendants' to prepare for West's quarterly earnings calls in February and October, 2023, and provided analysis of the revenue shortfalls from customer destocking and pricing in slides at the October 2023 meeting. ¶¶169-70. CW-1 provided similar points to the C-Suite as they prepared for the Q1 2024 earnings call. ¶172.

Defendants also knew at the start of the Class Period that Dexcom, one of only two CGM customers in West's CM segment, had not renewed its contract and was winding down its business with West. ¶¶173-74, 176-78. Analysts' shock at learning this, ¶¶524-25, belies Defendants' suggestion (MTD 31-32) that they innocently considered that the loss of Dexcom was not material information.[23]

The foregoing examples establish that the Individual Defendants received contrary, material, adverse information regarding the demand and margin topics they misrepresented to

---

[23] *Williams v. Globus Med., Inc.*, 869 F.3d 235, 246 (3d Cir. 2017), is inapposite because West was not simply suffering loss of sales "from one source," but from customers across its Generics, Branded, HVP, and CM businesses.

investors. *See* Section IV(A), *supra*; *see also* ¶540(i), (l), (x) & (y). The information they received was not "isolated" or "limited," MTD 32, but specific, detailed, and from multiple sources. These facts demonstrate recklessness, at a minimum. *See, e.g.*, *Innocoll*, 2020 WL 1479128, at *12-13 (recklessness alleged where plaintiffs "specifically alleged defendants' knowledge of facts or access to information contradicting their public statements"); *City of Warwick Ret. Sys. v. Catalent, Inc.*, 2024 WL 3219616, at *14-15 (D.N.J. June 28, 2024) (scienter alleged by showing defendants were presented with and had access to facts contrary to their public statements, including through meetings and reports); *Plumbers & Pipefitters Loc. Union No. 719 Pension Tr. Fund v. Dick's Sporting Goods, Inc.*, 2025 WL 2325122, at *7 (W.D. Pa. Aug. 12, 2025) (CWs describing inventory issues "along with their assertions that Defendants had access to this information via tracking and reporting systems, support Plaintiffs' position that Defendants were aware of excess inventory").

Defendants' challenges to the various CWs fail, particularly at the motion to dismiss stage when Plaintiffs' allegations are taken as true and inferences drawn in Plaintiffs' favor.[24] Defendants argue that CW-1's information about weakened demand from non-Generics customers should be completely disregarded because CW-1 did not provide some unspecified level of granularity that Defendants deem sufficient. MTD 29. But CW-1's information about non-Generics customers is based on his own discussions with them and with his colleagues while

---

[24] Defendants' unsupported assertion that "a confidential witness's account can support scienter here only if it suggests that a defendant *knew* a statement was false or misleading," MTD 28, is incorrect. Courts regularly credit CWs as supportive of scienter when they show that a defendant knew facts at odds with their public statements, demonstrating that their statements were reckless. *See, e.g.*, *Avaya*, 564 F.3d at 264, 269 (strong inference of scienter even without a "direct link" between CWs and defendants because "CW statements identifying deep and unusual discounting" gave "rise to a strong inference that [defendant's] discounting statements were at least reckless").

30

fulfilling Reiss-Clark's directive. ¶¶141-42. CW-1 also identified specific Generics customers (Sanofi and Pfizer) that had inventory issues that extended into non-Generic segments. ¶165. That first-hand knowledge suffices. *See Prudential*, 70 F.4th at 691-92 (refusing to "discount[]" detailed account from former employee "to the point of insignificance"); *Wu v. GSX Techedu Inc.*, 2024 WL 3163219, at *8 (D.N.J. June 25, 2024) (witness "allegations rest on sturdy-enough ground— direct knowledge"); *Toronto-Dominion*, 2018 WL 6381882, at *5 (not requiring "alleged bad actors [to] step[] forward and provide[] statements concerning the specific date, location, and product").[25] Defendants' claim that CW-1's account of preparing the C-Suite for earnings calls lacks sufficient detail about what was discussed (MTD 30 n.35), ignores the allegations that, in those meetings, he directly warned Defendants of inventory build-up and pricing issues, and provided a presentation containing graphs with his price and inventory risk analysis. ¶¶147-50, 169-72. And Defendants' self-serving spin that CW-1's Inventory Build Analysis purportedly became "outdated" at some point during the Class Period (MTD 29-30) cannot be squared with the Complaint's allegations that destocking continued unabated **through 2025**, well after CW-1 presented his analysis. *See, e.g.*, ¶¶449, 476, 528-32. It also improperly injects a factual dispute on a motion to dismiss. *See Novo Nordisk*, 2018 WL 3913912, at *4.[26]

Defendants' attacks on CW-3 fare no better. That CW-3 left West before the end of the Class Period affords no basis to discount his information. *See Lord Abbett Aff. Fund, Inc. v. Navient*

---

[25] By contrast, in *Nat'l Jr. Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 540 (D.N.J. 2010), none of the confidential witnesses provided "first-hand" knowledge.

[26] In *Luo v. Spectrum Pharms., Inc.*, 2024 WL 4443323, at *14 (D. Nev. Oct. 7, 2024) a former employee's information about issues impacting the company did not support falsity where he left the company months before the alleged misstatements, and there were no allegations he knew the issues persisted after he left. By contrast, CW-1 was employed at West through May 2024 (¶45), during which time Defendants made scores of statements misrepresenting material facts about demand, including facts that CW-1 provided directly to the Individual Defendants.

*Corp.*, 363 F. Supp. 3d 476,493 (D. Del. 2019) (declining to "steeply discount[]" CW allegations because they "were not employed for the full class period."); *contra* MTD 30. Nor were CW-3's characterizations about slowing demand "generic and hyperbolic." MTD 30. Rather, CW-3 backed up his statements that "cancelled orders were coming from 'everybody'" and that "growth had stalled" (¶¶119, 122) with specifics, including by naming specific customers (Pfizer and Moderna), recalling Birkett's discussion of lowered post-COVID demand on West's business during a 2023 Company Town Hall, and that order and demand planning information was tracked at the senior level. ¶¶119-21. Importantly, CW-3's account is consistent with, and corroborated by, the accounts of CW-1 and other CWs. *See*, *e.g.*, ¶¶119, 142-45 (CW-1 and CW-3 identifying the same customers, including Pfizer, who were cutting back orders), ¶¶187, 189, 244-45, 253, 258-65, 269 (CW-3, CW-6, CW-8 all detailing complaints from Abbvie about SmartDose and attempts to find an alternate supplier). Given the "consistency of the statements between different levels of employees at different locations," *Toronto-Dominion*, 2018 WL 6381882, at *7, the CW allegations should be credited. *See also Prudential*, 70 F.4th at 692 (crediting CW facts that "fit[] within a coherent narrative").

Defendants do not dispute that CW-2 and CWs-4-8 occupied positions in which they would possess the information provided. Instead, Defendants ask the Court to discount those CWs' accounts because, unlike CW-1 and CW-3, they did not communicate directly with the Individual Defendants and were not employed at West for the entire Class Period. MTD 28, 30. Courts routinely reject such arguments. *See*, *e.g.*, *Carmignac Gestion, S.A. v. Perrigo Co. PLC*, 2019 WL 3451523, at *14 (D.N.J. July 31, 2019) ("that the [CWs] did not have contact with [the defendants] does not render their statements immaterial"); *Lord Abbett*, 363 F. Supp. 3d at 493; *Dentsply*, 2026 WL 124581, at *10 ("Two years, or even four months, is enough time to understand the workflows,

32

culture, and policies relevant a confidential source's day-to-day tasks.").[27] Plaintiffs plead the basis

for these CWs' reports that the Defendants knew of widespread problems at West that they hid

from the market. *See*, *e.g.*, ¶¶127-29 (CW-2 aware that Birkett and Reiss-Clark had information

from regular meetings); ¶¶203-04 (CW-5 alleging that Birkett and the C-Suite were aware of

SmartDose problems from regular meetings); ¶¶219-20 (CW-6 reported SmartDose problems to

his supervisor, who reported it to the leadership team, of which Defendants were members; and

CW-6 attended Town Hall meetings where Green admitted knowledge of SmartDose problems).

In any event, Defendants' scattershot attacks on each of the eight CWs fail because

Plaintiffs' scienter allegations must be viewed collectively, not in isolation. *See Tellabs*, 551 U.S.

at 310 ("The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong

inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that

standard."). Consistent and corroborative allegations from seven well-placed former employees

and a contractor who recount how the Defendants had actual knowledge and access to information

contrary to their public statements, establishes a strong inference of scienter.

### b.     Further Allegations Bolster an Inference of Conscious Misbehavior or Recklessness

Additional circumstantial evidence bolsters the inference of scienter. Defendants spoke

repeatedly and authoritatively on the matters they misrepresented, often touting their own access

to information and enhanced insight into the topics in question. *Endo*, 351 F. Supp. at 906

(defendants' public comments supported scienter because they "confirm they had intimate

knowledge of the data. Indeed, that is what they wanted the public, particularly investors, to think.

These officers were speaking as authoritative sources who possessed the information to support

---

[27] The confidential witness allegations in *Kenexa*, 2010 WL 3749459, at *7, were inadequate because they did not provide any information about a specific issue at a specific point in time; the detailed allegations here do not suffer from that deficiency.

their statements."). Throughout the Class Period, Defendants talked in granular detail about factors affecting West's margins (*see*, *e.g.*, ¶¶309, 320), customer dynamics in contract manufacturing (*see*, *e.g.*, ¶¶305, 393), and purported demand drivers in West's various business units (*see*, *e.g.*, ¶¶333, 401), often touting their "visibility" and information from customers as indicia of the reliability of their claims (*see*, *e.g.*, ¶349 ("***we're much closer to our customers now***"), ¶367 ("***Fortunately, we have a good lens with our customers*…*. We have a good handle on it***"), ¶379 ("***visibility remains … very high***"), ¶425 ("***we have a level of visibility*…**")).[28] Defendants described their own active monitoring of the drivers affecting demand and margins. *See*, *e.g.*, ¶427 ("***[SmartDose] is an area that we are laser focused on right now***"), ¶465 ("***we are constantly in communication with our customers* … *[i]t's something that we monitor very closely***"). Defendants' claims about their own "hands-on," "active" involvement in demand and SmartDose matters further bolster the inference of scienter. *See*, *e.g.*, *Catalent*, 2024 WL 3219616, at \*14; *Stadium Cap. LLC v. Co-Diagnostics, Inc.,* 2024 WL 456745, at \*6 (S.D.N.Y. Feb. 5, 2024) (assertions that "we keep a close eye" on orders and that defendants were "able to monitor . . . daily . . . demand" supported scienter).[29]

Beyond that, more than 40 of Defendants' misrepresentations came in direct response to questions from investment analysts covering West. *See* Section IV(A)(2), *supra*. Analysts repeatedly pressed Defendants for further detail on, e.g., the extent of customer destocking (*see*,

---

[28] *See also* ¶¶ 336-37, 349, 410, 425, 428, 455, 465, 557-68.

[29] Defendants cite no case in support of their argument that statements claiming visibility cannot be both part of misleading statements and also evidence of scienter. *See* MTD 39. Repeated statements boasting of visibility are evidence of scienter, and also communicated to investors that statements regarding demand were grounded in fact, not opinions. Defendants also mischaracterize the allegations: Plaintiffs allege that Defendants' representations of their visibility into the topic in question support an inference that they must have known of, or recklessly disregarded, the facts they misrepresented—not that they had "clairvoyance about future performance." *Id.*

*e.g.*, ¶¶367, 401, 411, 424, 453, 465), and adopted Defendants' statements regarding demand, destocking, margin growth, and SmartDose (*see*, *e.g.*, ¶316 (Williams Blair analyst stating that "heading into 2024 West is a faster growing, higher margin business than pre-COVID"); ¶354 (BofA Securities analyst reporting on statements, and noting West "has not seen Inventory Issues that have plagued some … companies"); ¶84(d) (Citi reporting that automation could increase SmartDose margins to "~50% vs. 20-30% currently"); ¶¶314, 346, 354, 371, 373, 389, 489). Defendants' focus on issues raised by analysts supports a scienter inference: courts recognize that "maybe the most powerful evidence of scienter is the content and context of the statements made by [defendants] in response to . . . analysts' questions." *Urban Outfitters*, 103 F. Supp. 3d at 653; *see also Avaya*, 564 F.3d at 270 ("focused [analyst] questions [] mark an important distinction between this case and those in which defendants win dismissal . . . . Given the specificity and repetition of the analysts' questions, . . . there is a strong inference that [the defendant's] behavior" was reckless).

The abrupt, unplanned departures of Lai in July 2024, Reiss-Clark in March 2025 (less than one month after the final corrective disclosure), and Birkett in April 2025, also are indicia of scienter. ¶¶26, 39-41, 569-72; *See DFC*, 2015 WL 3755218, at *17 ("the resignation of key executives . . . bolsters the evidence of [scienter]"); *Novo Nordisk*, 2018 WL 3913912, at *8 (departures of multiple officers "contribute to a finding of scienter").[30]

---

[30] Defendants ask the Court to interpret Birkett's departure as CFO soon after the end of the Class Period (when the fraud was corrected) as innocuous, because Birkett stayed in an advisory role until West found a new CFO. MTD 39-40. "The Court may not consider defendant's version of the facts at the motion-to-dismiss stage." *Feinberg v. Am. Express Co.*, 2011 WL 4807916, at *3 (E.D. Pa. Oct. 7, 2011). Regardless, there is no basis to infer that Birkett's abrupt step-down as CFO, with no ready replacement for this essential position, is innocent, especially given the many other allegations showing his scienter (including his knowledge of, e.g., order cancellations, customer losses, and destocking impacts, and his large insider sales). Unlike *In re*

Further, Defendants' post-Class Period admissions support an inference of scienter. Green conceded in March 2025 that SmartDose was still subject to an "imbalanced" "cost to produce," and admitted in June 2025 that West was considering selling the asset (i.e., "other options around portfolio fit")—and that destocking had afflicted the Company for "the last two years." ¶¶527-33, 574-75. These acknowledgments of facts Plaintiffs claim were long known internally support a recklessness finding. *See Coinbase*, 2024 WL 4053009, at \*15 (scienter supported by post-class period acknowledgment of facts allegedly hidden earlier); *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 183 (S.D.N.Y. 2010) ("plaintiffs may rel[y] on postclass period [statements] to confirm what a defendant should have known during the class period").

**2.    Plaintiffs Adequately Allege Motive, Supporting the Scienter Inference**

Although motive is not required to plead scienter, the Complaint powerfully pleads that the Individual Defendants were financially motivated to inflate West's stock price for their own benefit. *See Tellabs*, 551 U.S. at 325 ("personal financial gain may weigh heavily in favor of a scienter inference"); *In re NUI Sec. Litig.*, 314 F. Supp. 2d 388, 415 (D.N.J. 2004) ("insider trading [is] a powerful motive to commit fraud"). Insider sales that are "unusual in scope or timing" can support scienter. *Avaya*, 564 F.3d at 279. Relevant factors include: the "amount of profit made, the amount of stock traded, the portion of stockholdings sold, [] the number of insiders involved," "whether the sales were normal and routine," and whether the profits were "substantial relative to the seller's ordinary compensation." *Suprema*, 438 F.3d at 277.

Plaintiffs allege that the Individual Defendants engaged in highly unusual stock sales during the Class Period. After making misleading statements that artificially inflated West's stock

---

*Hebron Tech. Co., Ltd. Sec. Litig.*, 2021 WL 4341500, at \*23 (S.D.N.Y. Sept. 22, 2021), Plaintiffs do not allege that the multiple departures "alone" support scienter; and, consistent with *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 303 (S.D.N.Y. 2019), allege independent evidence showing Birkett's "culpable state of mind."

price, but before the truth was fully disclosed, the Individual Defendants pocketed more than $122 million from sales of their West stock, with Green alone reaping more than **$104 million** during the 24-month Class Period. ¶545. These sales are objectively massive and significantly larger than sales that courts in this Circuit have deemed suspicious and evidence of scienter. *See*, *e.g.*, *Suprema*, 438 F.3d at 278 (defendants earning $2.3 million and $627,000 in profits, respectively, probative of scienter); *Urban Outfitters*, 103 F. Supp. 3d at 655 ($50 million in profits); *Viropharma*, 21 F. Supp. 3d at 474 ($8 million in profits). Yet Plaintiffs do not rely only on the large-dollar proceeds to show motive. *See Kenexa*, 2010 WL 3749459, at *9; MTD 33. Defendants' Class Period sales were highly unusual in comparison with their transactions during the two-year Control Period, i.e., they collectively **sold more than four times the number of shares and garnered more than five times the proceeds**. ¶¶545; 551-52. Green's sales increased by 566% and his proceeds increased by 891% compared with the Control Period. *Id.*[31] These facts strengthen the inference of scienter. *See Suprema*, 438 F.3d at 277-78 (sales five times amount during control period probative of scienter); *see also Viropharma*, 21 F. Supp. 3d at 474 ($8 million profit compared with $400,000 the year before not normal or routine).

Defendants' stock sales also dwarfed their non-stock compensation. Green's stock sales ($104,171,303) were more than 44 times his combined salary in 2023 and 2024 ($2,320,290). Compl. App'x A; 2025 Proxy Statement ("2025 Proxy") at 56.[32] Birkett's 2023 stock sales ($8,272,216) yielded him over 11 times his 2023 salary ($700,000). Compl. App'x A; 2025 Proxy at 56. In 2023, the proceeds from Reiss-Clark's sales ($1,367,643) were three times her salary

---

[31] Birkett's stock sales increased by 58%, and his proceeds increased by 71%. ¶551. Lai's sales increased by 19% and his proceeds increased by 12%. *Id.*

[32] West's 2025 Proxy Statement (Ex. A) and 2024 Proxy Statement (Ex. B) are subject to judicial notice and are properly considered here as responsive to Defendants' argument and related exhibits that their Class Period stock sales are not evidence of motive.

($475,000). Compl. App'x A; 2024 Proxy Statement at 59.[33] These spreads are strong evidence of scienter because the stock sale proceeds are "substantial relative to the seller's ordinary compensation." *Suprema*, 438 F.3d at 277-78 (stock sale profits of four times salary unusual, supporting scienter); *Novo Nordisk*, 2018 WL 3913912, at *4 (scienter pled where defendants "double[d] their compensation through receipt of shares.").

Defendants fail to undercut these strong motive allegations. *First*, that some of their stock sales came after one or more corrective disclosures (MTD 34) is immaterial because all of the sales occurred when prices remained inflated from fraud, well before the final corrective disclosure.[34] *See In re HD Supply Holdings, Inc. Sec. Litig.*, 341 F. Supp. 3d 1342, 1348, 1363 (N.D. Ga. 2018) (insider trading after first corrective disclosure but before second supported strong inference of scienter). Moreover, the average price of shares sold by the Individual Defendants during the Class Period was $355.69 (Green); $370.38 (Birkett); $395.12 (Lai); and $393.33 (Reiss-Clark) (*see* Compl. Appendix A), all much closer to the Class Period high of $415.73 than to the price after the final corrective disclosure ($199.11). By selling before the subsequent corrective disclosures, Defendants increased their profits by tens of millions of dollars.[35]

---

[33] Because Birkett and Reiss-Clark are only alleged to have sold stock in 2023, their 2023 salary is the appropriate comparator. Even if Birkett's 2024 salary is included, he earned more than five times his salary in stock sales during the Class Period. Lai's salary is not publicly available.

[34] Birkett, Lai, and Reiss-Clark sold their stock in August 2023, after only West's first partial and incomplete corrective disclosure—which included false reassurances regarding the extent of destocking and made no corrective mention of SmartDose margins or CM customer losses—and before the remaining five corrective disclosures. Compl. App'x A; ¶¶360-73. $30,160.053 of Green's stock sales came before **any** corrective disclosure; an additional $17,369,820 occurred after just the first corrective disclosure; and a total of $94,806,894 of Green's stock sales occurred before the July 25, 2024 corrective disclosure that fully revealed the destocking issue (but which still did not disclose SmartDose or CM issues). Compl. App'x A; ¶¶360-73; 475-91; 517-25.

[35] The fact that Defendants refrained from trading during blackout periods does not weigh against inferring motive from their stock sales when West's stock price was inflated. *See* MTD 34.

*Second*, Defendants' Class Period stock sales—especially Green's—are "dramatically out of line with prior trading practices." *Roofer's Pension Fund v. Papa*, 687 F. Supp. 3d 604, 618 (D.N.J. 2023). Tellingly, Defendants do not contest Plaintiffs' allegations that Green's Class Period stock sales were highly unusual compared with the Control Period.[36] MTD 36; ¶¶545, 547.

That some of Green's trades were made pursuant to a 10b5-1 plan does not undercut the Complaint's particularized allegations of suspicious trading. *See* MTD 36-37.[37] Importantly, 71% of Green's sales were made pursuant to plans that he established during the Class Period. MTD 37; Exs. 19, 29, 48. Such 10b5-1 plans, entered after a fraudulent scheme began, "provide[] no defense to scienter." *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015); *see also Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 554 (5th Cir. 2007) (rejecting argument that 10b5–1 plan rendered trading non-suspicious where, *inter alia*, defendant entered into plan during class period); *Kenexa*, 2010 WL 3749459, at *10 n.23 (not considering 10b5-1 plan adopted during class period); *see also* ¶¶553-57. To the extent Green made some trades pursuant to a 10b5-1 plan implemented before the Class Period, nothing stops a corporate insider "from setting up automatic trades and then making false statements to artificially inflate the stock price to trigger those automatic trades." *Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*,

---

As West's own Securities Trading Policy provided, "[t]he existence of an open Trading Window is not a safe harbor protecting Directors or Continuing Insiders from charges of unlawful trading if the Director or Continuing Insider possesses Material Non-Public Information at the time of the trade even if made during a Trading Window." ¶296.

[36] During the Class Period, Birkett earned from stock sales approximately 1.7 times what he earned during the pre-Class Period control period. Compl. App'x A.

[37] "Raising the affirmative defense of trading under a 10b5-1 trading plan … is typically premature in a motion to dismiss," when plaintiff's allegations are taken as true and inferences drawn in its favor, and the record is undeveloped about the timing, nature, and reasons for the plan. *Lefkoe v. Jos. A. Bank Clothiers*, 2007 WL 6890353, at *6 n.11 (D. Md. Sept. 10, 2007).

45 F.4th 1236, 1266 (10th Cir. 2022).[38]

*Third*, Defendants sold significant portions of their stock holdings. While Defendants dispute Plaintiffs' formula for evaluating the change in their stock holdings over the Class Period (MTD 34-35), dividing the shares sold by the sum of the shares held at the start of the Class Period **and** options that were exercisable within 60 days of the start of the Class Period, is how the Third Circuit assesses holdings, and is how West itself communicates stock ownership to investors. *See In re Hertz Glob. Holdings Inc*, 905 F.3d 106, 121 (3d Cir. 2018) ("In calculating the percent of holdings sold, . . . it is appropriate to consider not only the shares of stock that [a defendant] held prior to [his] sales, but also the shares that [he] could have sold through the exercise of options[.]"); 2025 Proxy at 38 (beneficial ownership includes both stock held and options exercisable within 60 days).[39] Allegations that Defendants sold 37% (Green), 43% (Birkett), and 53% (Lai) of their shares available for sale at the start of the Class Period (¶¶547-50), should be credited, and support a scienter inference. *See Shulman*, 2025 WL 3754159, at *12 (sales of 20% and 24% of defendants' stock holdings); *In re New Century*, 588 F. Supp. 2d 1206, 1232 (C.D. Cal. 2008) (sale of 31%,

---

[38] Defendants' cases do not support their argument that Green's 10b5-1 plans weaken the scienter inference. In *Martin v. GNC Holdings, Inc.*, 2017 WL 3974002, at *15 & n.21 (W.D. Pa. Sept. 8, 2017), the court found no inference of scienter because the plaintiff did not allege irregular stock sales; the court did not rely on the defendant's 10b5-1 plan. In *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 891 (4th Cir. 2014), preexisting 10b5-1 plans, in combination with a pattern of trading that was more routine than the Individual Defendants' trading, weakened the scienter inference, but the court noted that a plan instituted after the start of the class period was less supportive of defendants' arguments. *City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d 206, 226 (E.D.N.Y. 2019), *Mart v. Tactile Sys. Tech., Inc.*, 595 F. Supp. 3d 788, 818 (D. Minn. 2022), and *Synchronoss Techs., Inc. Sec. Litig.*, 2019 WL 2849933, at *17 (D.N.J. July 2, 2019), all held that 10b5-1 plans entered into during the class period do not weaken scienter.

[39] *See also In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986-87 (9th Cir. 1999) ("Actual stock shares plus exercisable stock options represent the owner's trading potential more accurately than the stock shares alone.").

37%, and 77% of stock holdings supported scienter).[40]

*Fourth*, the timing of Defendants' Class Period stock sales supports a scienter inference. *See* MTD 35-36. All of the Defendants' trades occurred within several months of a corrective disclosure. All four insiders sold stock in August 2023, less than three months before the October 2023 corrective disclosure, and Green also sold stock in May 2023 (less than three months before the July 2023 corrective disclosure), in May 2024 (less than three months before the July 2024 corrective disclosure), and in February 2024 (less than two months before the April 2024 corrective disclosure). *See*, *e.g.*, *Zornberg v. NAPCO Sec. Techs., Inc.*, 778 F. Supp. 3d 516, 527 (E.D.N.Y. 2025) (rejecting argument that sales six or nine months before disclosure undermined scienter).[41]

**3.    Plaintiffs' Cogent and Compelling Scienter Allegations Satisfy *Tellabs***

Taken collectively, *Tellabs*, 551 U.S. at 322-23, Plaintiffs' detailed factual allegations of at least recklessness (if not conscious misbehavior) based on Defendants' contemporaneous possession of material information at odds with their public pronouncements; their motive from massive insider trades during the Class Period; and the other facts detailed above, give rise to an unusually compelling inference of scienter. *See In re Par Pharm. Sec. Litig.*, 2009 WL 3234273,

---

[40] Defendants' cases are inapposite. MTD n.40. *Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *15 (S.D.N.Y. July 23, 2018) and *In re CRM Holdings, Ltd. Sec. Litig.*, 2012 WL 1646888, at *23 (S.D.N.Y. May 10, 2012), merely stand for the rule that the amount of stock sold, without more, is not evidence of scienter. Unlike the plaintiffs in those cases, Plaintiffs here have alleged that Defendants' stock sales were unusual and suspicious for several reasons, not based on their amount alone.

[41] *In re Party City Sec. Litig.*, 147 F.Supp.2d 282, 313 (D.N.J. 2001) suggests that a gap of 3-12 months between stock sales and a corrective disclosure will not support an inference of scienter, but here most of the stock sales were less than three months before a disclosure (and many other factors also support scienter). *See Steamfitters Loc. 449 Pension Fund v. Alter*, 2011 WL 4528385, at *8 (E.D. Pa. Sept. 30, 2011) ("[A] gap [of four or more months may be] significant enough to defeat an inference of scienter if other facts do not give rise to such an inference.") (citing *In re Party City*). In *Steamfitters*, stock sales months before a corrective disclosure by individuals not alleged to have had insider knowledge were not suspicious. 2011 WL 4528385, at *10. Here, by contrast, each of the Individual Defendants had insider knowledge when trading.

at \*10 (D.N.J. Sept. 30, 2009) (significant insider sales "in combination with [p]laintiffs' other allegations . . . reinforce the Court's conclusion that the [complaint] states a claim"). The competing inference Defendants urge—that they were merely "trying to evaluate business prospects in unprecedented circumstances . . . and held a good-faith judgment that West was well-positioned to meet expectations" (MTD 40) ignores all of the adverse facts that Plaintiffs allege, in detail, that Defendants knew or recklessly disregarded. *Cf. Tellabs*, 551 U.S. at 326-27 (court makes comparative assessment "while constantly assuming the plaintiff's allegations to be true"). Likewise, their claim that they "had no motive to commit fraud" (MTD 40) ignores the $122,000,000 they personally obtained through suspicious insider trades. The inference of scienter is at least as strong as Defendants' counter-inference.

C.     **Plaintiffs Adequately Allege Loss Causation as to Every Corrective Disclosure**

To plead loss causation, a complaint must contain a "short and plain statement" that gives the defendant "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005). A plaintiff accomplishes this by alleging that "the truth became known" upon a corrective disclosure, "causing a stock price drop" and a loss. *Becton*, 620 F. Supp. 3d at 199. Applying "a practical approach," courts review whether loss causation allegations indicate that "the misrepresentation touches upon the reasons for the investment's decline." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 426, 428 (3d Cir. 2007). This "highly factual" analysis is "often unsuited to disposition" on the pleadings. *Merck*, 2011 WL 3444199, at \*29.

Plaintiffs meet these requirements by alleging that Defendants' misrepresentations were revealed to the market through six partial corrective disclosures that caused significant stock price declines between July 27, 2023 and February 13, 2025. ¶¶16-21, 579-85. Plaintiffs further allege

42

that investment analysts covering West viewed the alleged partial corrective information as negative, value-relevant news. *See*, *e.g.*, ¶¶369-71; 402, 404; 438-43; 457-60; 486-89; 521-25.

Defendants' argument that Plaintiffs do not adequately plead loss causation as to the sixth corrective disclosure—the only one they challenge (MTD 41-42)—is meritless. Their contention that "all that Plaintiffs allege was corrective" in the February 13, 2025 disclosure "are the words 'margin dilutive'" that appear in Paragraphs 518 and 519, is mistaken. The next paragraphs state that West's stock dropped on the news that "Green also revealed" West's current and impending loss of CGM business. ¶¶520-21. The Complaint then details how the margin dilution and CGM "revelations came as a shock to the investing public," citing analyst reports noting, e.g., West's "CM Headwind" (¶522), its disclosed loss of "CGM contracts that make up around 20% of the contract manufacturing business," and that its "disappointing guidance is primarily due to margin dilution" from SmartDose and loss of CGM sales. ¶¶524-25. Other allegations in the Complaint confirm that Plaintiffs allege this disclosure revealed the truth about both SmartDose margins and CGM customer losses. *See* ¶21 (referencing revelation of both headwinds in CM business and SmartDose margin problems), ¶585 (same).[42] These allegations provide ample notice of the nature of this corrective disclosure, in satisfaction of Rule 8(a).

Defendants' argument that the February 2025 disclosure was not corrective of earlier statements that SmartDose would improve margins because those earlier statements did not pertain to 2025, also fails. MTD 42. Defendants' Margin Statements often referred to SmartDose margin effects **in 2025**, and came in response to questions about margins **in 2025**. *See*, *e.g.*, ¶507

---

[42] Defendants' argument exalts form over substance and asks the Court to ignore paragraphs of allegations. MTD 42 n.44. Moreover, the Complaint does not state that only underlined and bolded words were corrective, Compl. n.4 (page 105), nor does any case or rule require such a convention.

(answering question about "narrowing the margin gap . . . in 2025"); ¶510 ("*[T]he SmartDose device, it can get to HVP margins over time* . . . *as we move through 2025 and into production late 2025, early 2026*"). These statements clearly "touch[] upon" the topic of the February 13, 2025 disclosure and the "reason for" the stock price decline. *McCabe*, 494 F.3d at 428; *see also* ¶¶524-25 (attributing "sell-off" in part to SmartDose manufacturing issues and "margin dilution").

### D.  Plaintiffs Adequately Allege Insider Trading Claims

Plaintiffs have properly and adequately alleged Section 10(b) and Section 20A violations premised on insider trading by Green, Birkett, and Reiss-Clark.

The elements for an insider trading claim under Rule 10b-5, as alleged in Count III, are: "(1) that the defendant traded on the basis of material, non-public information, (2) that the defendant knew the information was material and non-public (scienter), and (3) that the plaintiff traded contemporaneously with the defendant." *Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 595 F. Supp. 2d 1253, 1287 (M.D. Fla. 2009), *aff'd*, 594 F.3d 783 (11th Cir. 2010). Defendants do not dispute contemporaneity. *See* ¶¶625-26. Defendants' argument that Plaintiffs' allegations do not sufficiently plead scienter is a repetition of their argument that their immense stock sales (and all of the other facts that Plaintiffs allege to demonstrate scienter) do not support an inference of scienter with respect to Count I, and fails for the same reasons.[43] *See* Section IV(B), *supra*.

Defendants' argument that Plaintiffs have not pled that they traded based on MNPI also fails. Trading "on the basis of" MNPI simply means that "the person making the purchase or sale was aware of the material nonpublic information when the person made the purchase or sale." 17 CFR § 240.10b5-1(b); *see also S.E.C. v. Lyon*, 605 F. Supp. 2d 531, 547 (S.D.N.Y. 2009) (plaintiff

---

[43] To the extent Defendants contend that only suspicious trading itself can be considered as scienter for a 10b-5 insider trading claim, they are incorrect. *See, e.g., Edward J. Goodman*, 594 F.3d at 794 (in assessing scienter for 10b-5 claim, considering whether the defendants knew about accounting errors when trading).

not required "to establish the defendant actually 'used' the information in question, but rather that the defendant was knowingly in possession of the information at the time the trading occurred") (citing *United States v. Teicher*, 987 F.2d 112, 119–20 (2d Cir.1993)); *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1203 (D. Or. 2015) (same).[44] Plaintiffs allege exactly that: in August 2023, while aware of MNPI about significant demand and margin headwinds, the Individual Defendants collectively sold over 69,000 shares of West stock. ¶¶630-35.[45]

Defendants' claim that the "only specific allegations about the 20A Defendants learning MNPI" concern what CW-1 told them in March and June 2023 ignores extensive allegations about MNPI they knew in 2023 from other sources. For example, beyond CW-1's inventory build analysis, Plaintiffs allege that Green and Birkett knew throughout 2023 that order cancellations were coming from both generic and branded customers (¶¶118-21), and Birkett and Reiss-Clark knew about pull-forward issues (¶128). *See also supra* at 6-10, 26-33; ¶¶109-293. Even if Defendants were correct that the only allegations about the Defendants learning MNPI concerned CW-1, those 30 detailed paragraphs alone are more than sufficient to plead that Defendants traded on the basis of MNPI. ¶¶141-71. CW-1 communicated MNPI comprising granular details and risk analyses to each Defendant in the spring and summer of 2023. *Id.* Further, information about destocking and Generics customers was material to investors. *See* ¶¶11-12, 23, 306, 339, 352, 356,

---

[44] The Court should reject Defendants' attempt to rewrite the rule to require Plaintiffs to allege that Defendants "actually used" the MNPI. MTD at 44. The language they quote from *SEC v. Lipson*, 278 F.3d 656, 660 (7th Cir. 2002) referred to a jury instruction made obsolete by the subsequent enactment of 17 CFR § 240.10b5-1(b). *Id.* ("[S]everal months after Lipson's trial, the Commission promulgated a regulation that is in the spirit of . . . *Teicher*) (citing 17 CFR § 240.10b5–1(b)). *United States v. Anderson*, 533 F.3d 623, 630 (8th Cir. 2008) states the standard required in a **criminal** case; the standard in a **civil** case requires mere possession. *See In re Silverlake Grp., L.L.C Sec. Litig.*, 2022 WL 4485815, at *8 (N.D. Cal. Sept. 27, 2022) (declining to adopt criminal standard that defendant "actually used" MNPI in a civil case.

[45] Plaintiffs' detailed allegations regarding MNPI possessed by defendants, *see* ¶¶109-293, are incorporated by reference in the Section 20A and 10(b) allegations, *see* ¶¶616, 628.

363, 370, 383, 394, 403, 437, 468.

The existence of one limited corrective disclosure between the receipt of MNPI and Defendants' trading does not defeat Plaintiffs' claim because the July 27, 2023 partial disclosure was incomplete and continued to mislead investors, and the stock price remained inflated through February 2025. *See HD*, 341 F. Supp. 3d at 1348, 1363; ¶¶360-73.[46] Finally, Defendants' assertion that the Complaint fails to allege with particularity what MNPI Defendants had in August 2023 that was not previously disclosed to the market (MTD 45-46) ignores that the Complaint alleges precisely what Defendants protest is missing: at the end of July 2023, "Defendants knew that customers had accumulated nine months plus worth of inventory and were reducing or outright canceling orders. Yet, Defendants failed to disclose the true extent of the destocking or how many quarters it was expected to persist." ¶370. The court should deny Defendants' motion to dismiss Plaintiffs' insider trading-based 10(b) claim, as stated in Count III.

The Court should also sustain Plaintiffs' Section 20A insider trading claim (Count 4). "To state a claim for a violation of Section 20A plaintiffs must allege (1) a predicate violation of the Exchange Act; (2) that the plaintiff traded contemporaneously with the insider; and (3) that the insider was in possession of material nonpublic information (MNPI)." *In re Valeant Pharms. Int'l, Inc., Sec. Litig.*, 2019 WL 2724075, at *5 (D.N.J. June 30, 2019). Defendants do not challenge contemporaneity and possession of MNPI. ¶¶630-37.[47] Because Plaintiffs have pled an Exchange

---

[46] Further, the July 27, 2023 partial corrective disclosure addressed just one facet of the alleged fraud—destocking—and Plaintiffs do not allege that the truth regarding that aspect of the fraud was fully revealed until July 25, **2024**. *See* ¶¶20, 486. The July 27, 2023 corrective disclosure did not address the margin-related aspects of the fraud or the known headwinds in West's CM business at all.

[47] Section III(A) of Defendants' brief, which seeks dismissal of the 10(b) count, argues that Plaintiffs failed to allege trading on the basis of MNPI (MTD 44-46), but Section III(B), which argues for dismissal of the 20A count, does not (MTD 47). To the extent the Court construes

Act violation, Sections IV(A)-(C), *supra*, they have also adequately alleged a Section 20A violation.

### E.    The Complaint Adequately Alleges a Section 20(a) Claim

To plead a claim under Section 20(a), "plaintiffs must establish (1) an underlying violation by the company; and (2) circumstances establishing defendant's control over the company's actions." *Bing Li v. Aeterna Zentaris, Inc.*, 2016 WL 827256, at *4 (D.N.J. March 2, 2016). "[T]he overwhelming trend in this circuit is that culpable participation does not have to be pled[.]" *Id.*[48] Claims under Section 20(a) are subject to Fed. R. Civ. P. 8's notice pleading standards. *The Winer Family Trust v. Queen*, 2004 WL 2203709, at *22 (E.D. Pa. Sept. 27, 2004) (collecting cases).

The Individual Defendants—West's senior-most officers, who frequently made public statements on its behalf—were plainly control persons.[49] Extensive scienter allegations amply establish culpable participation. Section IV(B), *supra*. Because Plaintiffs have adequately pled a predicate Section 10(b) claim, the Court should sustain the Section 20(a) claim.

## V.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss.[50]

---

Defendants' 20A challenge as including an argument as to the MNPI element, that challenge should be rejected for the same reasons as Defendants' 10(b) challenge.

[48] *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 484 (3d Cir. 2013) held that culpable participation needs to be proven, not that it needs to be pled. *Id.* at 484 n.20.

[49] Contrary to Defendants' argument, MTD 43, there is no rule in this Circuit that oral misstatements spoken by individuals cannot be the basis for control person liability. Plaintiffs also allege that reports, press releases, and public filings give rise to liability. *See*, *e.g.*, ¶¶360; 444. These misstatements are attributable to West as well as the Individual Defendants.

[50] If the Court grants Defendants' motion to dismiss, Plaintiffs respectfully request leave to amend.

Dated: February 24, 2026

Respectfully submitted,

**KESSLER TOPAZ**
 **MELTZER & CHECK LLP**


*/s/ Daniel A. Friedman*
Daniel A. Friedman (PA # 338791)
Joshua E. D'Ancona (PA # 206438)
Evan R. Hoey (PA # 324522)
Alec S. Garber (PA # 338378)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706


**LABATON KELLER SUCHAROW LLP**
Christine M. Fox (admitted *pro hac vice*)
Emily N. Gault (admitted *pro hac vice*)
Lucas Knoll (admitted *pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
cfox@labaton.com
egault@labaton.com
lknoll@labaton.com

*Counsel for Lead Plaintiffs and Lead Counsel for the Class*

48

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of February, 2026, a true and correct copy of the foregoing document was filed electronically. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

*/s/ Daniel A. Friedman*
Daniel A. Friedman (PA # 338791)
KESSLER TOPAZ
 MELTZER & CHECK, LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706