**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| NEW ENGLAND TEAMSTERS PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>          Plaintiffs,<br><br>     v.<br><br>WEST PHARMACEUTICAL SERVICES, INC., ERIC M. GREEN, BERNARD J. BIRKETT, QUINTIN J. LAI, and CINDY REISS-CLARK,<br><br>          Defendants. | Case No. 2:25-cv-02285 |

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.    Plaintiffs' Section 10(b) Claim for Alleged Misstatements Should Be Dismissed. ............. 2

    A.    Plaintiffs Fail to Plead Any Actionable Misstatements. ................................................. 2

        1.    Many of the statements are inactionable puffery. .................................................. 2

        2.    Many statements are forward-looking and fall under the PSLRA safe harbor. ...................................................................................................................... 4

        3.    Plaintiffs allege no basis for finding any opinion statements false or misleading. ............................................................................................................. 6

        4.    Many statements are not alleged to be false or misleading with particularity. ........................................................................................................... 9

    B.    Plaintiffs' Allegations Fail to Create a Strong Inference of Scienter. .......................... 11

        1.    Plaintiffs all but concede that they do not allege the forward-looking statements were made with actual knowledge of their purported falsity. ............ 11

        2.    Plaintiffs do not allege that any statement was made with the requisite scienter based on confidential-witness statements, stock trades, or other indicia. ...................................................................................................................... 12

    C.    Plaintiffs Also Fail to Plead Loss Causation for the Final Corrective Disclosure. ....................................................................................................................... 21

II.    Plaintiffs' Control-Person Claim Under Section 20(a) Fails. .............................................. 22

III.    Plaintiffs' Insider-Trading Claims Fail. ............................................................................... 23

    A.    Plaintiffs' Section 10(b) and Rule 10b-5 Insider-Trading Claims Fail. ....................... 23

        1.    Plaintiffs must allege actual use, not "mere possession," of MNPI. .................... 23

        2.    Even applying a "mere possession" standard, Plaintiffs' claim still fails. ........... 24

    B.    The Section 20A Claim Also Fails. ............................................................................... 25

CONCLUSION .................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Belmont v. MB Inv. Partners, Inc.*,
708 F.3d 470 (3d Cir. 2013)......................................................................................22

*Bldg. Trades United Pension Tr. Fund v. Kenexa Corp.*,
2010 WL 3749459 (E.D. Pa. Sept. 27, 2010) ...........................................................18

*Carmignac Gestion, S.A. v. Perrigo Co. PLC*,
2019 WL 3451523 (D.N.J. July 31, 2019)................................................................13

*Carvelli v. Ocwen Fin. Corp.*,
934 F.3d 1307 (11th Cir. 2019) ...................................................................................7

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*,
497 F.3d 546 (5th Cir. 2007) .....................................................................................18

*Chan v. New Oriental Educ. & Tech. Grp. Inc.*,
2019 WL 2865452 (D.N.J. July 3, 2019)..................................................................25

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
70 F.4th 668 (3d Cir. 2023) ......................................................................7, 9, 10, 13

*City of Warwick Ret. Sys. v. Catalent, Inc.*,
2024 WL 3219616 (D.N.J. June 28, 2024) ...............................................................20

*Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*,
595 F. Supp. 2d 1253 (M.D. Fla. 2009)....................................................................25

*Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*,
794 F.3d 297, 309 (2d Cir. 2015)..............................................................................18

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010).......................................................................21

*Fried v. Stiefel Laboratories, Inc.*,
814 F.3d 1288 (11th Cir. 2016) .................................................................................24

*Glaser v. The9*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011).............................................................................18

*Hall v. Johnson & Johnson*,
    2019 WL 7207491 (D.N.J. Dec. 27, 2019)...............................................................10

*Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.*,
    2022 WL 889158 (E.D. Pa. Mar. 25, 2022).................................................................3

*Harris v. Ivax Corp.*,
    182 F.3d 799 (11th Cir. 1999) .....................................................................................5

*Hatchigian v. Cap. One, N.A.*,
    2024 WL 4906489 (E.D. Pa. Nov. 27, 2024) ...........................................................22

*Head v. NetManage*,
    1998 WL 917794 (N.D. Cal. Dec. 30, 1998)............................................................16

*Howard v. Arconic Inc.*,
    2021 WL 2561895 (W.D. Pa. June 23, 2021)...........................................................23

*In re Adams Golf, Inc. Sec. Litig.*,
    381 F.3d 267 (3d Cir. 2004)..........................................................................................5

*In re Advanta Corp. Sec. Litig.*,
    180 F.3d 525 (3d Cir. 1999)...............................................................................16, 18

*In re Aetna, Inc. Sec. Litig.*,
    617 F.3d 272 (3d Cir. 2010)..............................................................................2, 5, 22

*In re Amarin Corp. PLC Sec. Litig.*,
    2021 WL 1171669 (D.N.J. Mar. 29, 2021)...............................................................18

*In re Ascena Retail Grp., Inc. Sec. Litig.*,
    2022 WL 2314890 (D.N.J. June 28, 2022) .................................................................8

*In re Astea Int'l Inc. Sec. Litig.*,
    2007 WL 2306586 (E.D. Pa. Aug. 9, 2007) ......................................................16, 18

*In re ATI Techs., Inc. Sec. Litig.*,
    216 F. Supp. 2d 418 (E.D. Pa. 2002) ..........................................................................3

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997)..................................................................................5, 18

*In re Coinbase Glob., Inc. Sec. Litig.*,
   2024 WL 4053009 (D.N.J. Sept. 5, 2024) ................................................................4, 21

*In re Countrywide Fin. Corp. Sec. Litig.*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008) ....................................................................24

*In re CRM Holdings Sec. Litig.*,
   2012 WL 1646888 (S.D.N.Y. May 10, 2012) ..........................................................18

*In re Dentsply Sirona, Inc. Sec. Litig.*,
   2026 WL 124581 (S.D.N.Y. Jan. 16, 2026) ............................................................13

*In re Dentsply Sirona, Inc. Sec. Litig.*,
   665 F. Supp. 3d 255 (E.D.N.Y. 2023) .......................................................................8

*In re Donald J. Trump Casino Sec. Litig.*,
   7 F.3d 357 (3d Cir. 1993)...........................................................................................5

*In re Farfetch Ltd. Sec. Litig*,
   2021 WL 4461264 (S.D.N.Y. Sept. 29, 2021).........................................................18

*In re Farfetch Ltd. Sec. Litig.*,
   802 F. Supp. 3d 652 (S.D.N.Y. 2025)..................................................................3, 10

*In re HD Supply Holdings, Inc. Sec. Litig.*,
   341 F. Supp. 3d 1342 (N.D. Ga. 2018) ...................................................................19

*In re Hertz Glob. Holdings, Inc.*,
   905 F.3d 106 (3d Cir. 2018).............................................................................11, 17

*In re Kenvue Inc. Sec. Litig.*,
   2025 WL 889640 (D.N.J. Mar. 24, 2025)................................................................10

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010)......................................................................................10

*In re Mylan N.V. Sec. Litig.*,
   2023 WL 3539371 (W.D. Pa. May 18, 2023)............................................................7

*In re Novo Nordisk Sec. Litig.*,
   2018 WL 3913912 (D.N.J. Aug. 16, 2018) .......................................................17, 20

*In re Ocugen, Inc. Sec. Litig.*,
   659 F. Supp. 3d 572 (E.D. Pa. 2023) .......................................................................25

*In re Omnicare, Inc. Sec. Litig.*,
    769 F.3d 455 (6th Cir. 2014) .........................................................................................10

*In re Party City Sec. Litig.*,
    147 F. Supp. 2d 282 (D.N.J. 2001) .................................................................................16

*In re Pixar Sec. Litig.*,
    450 F. Supp. 2d 1096 (N.D. Cal. 2006) ..........................................................................17

*In re Radian Sec. Litig.*,
    612 F. Supp. 2d 594 (E.D. Pa. 2009) ..............................................................................11

*In re Rite Aid Corp. Sec. Litig.*,
    2025 WL 968306 (E.D. Pa. Mar. 31, 2025).....................................................................12

*In re Silicon Graphics, Inc. Sec. Litig.*,
    970 F. Supp. 746 (N.D. Cal. 1997)..................................................................................17

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006).............................................................................................17

*In re Supreme Indus., Inc. Sec. Litig.*,
    2019 WL 1436022 (N.D. Ind. Mar. 29, 2019)...................................................................5

*In re Toronto-Dominion Bank Sec. Litig.*,
    2018 WL 6381882 (D.N.J. Dec. 6, 2018).........................................................................13

*In re Urban Outfitters, Inc. Sec. Litig.*,
    103 F. Supp. 3d 635 (E.D. Pa. 2015) ...................................................................10, 17, 21

*In re Viropharma Inc. Sec. Litig.*,
    21 F. Supp. 3d 458 (E.D. Pa. 2014) .................................................................................17

*Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*,
    45 F.4th 1236 (10th Cir. 2022) ........................................................................................19

*Industriens Pensionsforsikring A/S v. Becton Dickinson & Co.*,
    620 F. Supp. 3d 167 (D.N.J. 2022) ......................................................................4, 5, 6, 20

*Inst. Invs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)...................................................................................4, 11, 21

*Lingam v. Dish Network Corp.*,
    167 F.4th 1094 (10th Cir. 2026) ......................................................................................10

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
  363 F. Supp. 3d 476 (D. Del. 2019)................................................................13

*Martin v. GNC Holdings, Inc.*,
  2017 WL 3974002 (W.D. Pa. Sept. 8, 2017)....................................................19

*Martin v. Quartermain*,
  732 F. App'x 37 (2d Cir. 2018)........................................................................9

*Meade v. Lincoln Nat'l Corp.*,
  2025 WL 2087783 (E.D. Pa. July 24, 2025).....................................................21

*Newtyn Partners, LP v. All. Data Sys. Corp.*,
  165 F.4th 947 (6th Cir. 2026) .............................................................3, 8, 10, 15

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
  834 F.3d 481 (3d Cir. 2016)..............................................................................9

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
  300 F. Supp. 3d 551 (S.D.N.Y. 2018)...............................................................9

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015).............................................................................6, 7, 8, 9

*Payne v. DeLuca*,
  433 F. Supp. 2d 547 (W.D. Pa. 2006)................................................................3

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
  11 F.4th 90 (2d Cir. 2021) ...............................................................................11

*Reilly v. U.S. Physical Therapy, Inc.*,
  2018 WL 3559089 (S.D.N.Y. July 23, 2018) ...................................................17

*Roofer's Pension Fund v. Papa*,
  2018 WL 3601229 (D.N.J. July 27, 2018).....................................................5, 16

*S.E.C. v. Adler*,
  137 F.3d 1325 (11th Cir. 1998) .......................................................................24

*S.E.C. v. Bonan Huang*,
  684 F. App'x 167 (3d Cir. 2017) .....................................................................24

*S.E.C. v. Chappell*,
  107 F.4th 114 (3d Cir. 2024) ...........................................................................23

*S.E.C. v. Lyon*,
    605 F. Supp. 2d 531 (S.D.N.Y. 2009)......................................................................25

*S.E.C. v. McGee*,
    895 F. Supp. 2d 669 (E.D. Pa. 2012) .....................................................................23

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
    351 F. Supp. 3d 874 (E.D. Pa. 2018) ...................................................................3, 20

*Shulman v. Weston*,
    2025 WL 3754159 (D.N.J. Dec. 29, 2025)...........................................................3, 12

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
    96 F. Supp. 3d 325 (S.D.N.Y. 2015).......................................................................20

*Stadium Cap. LLC v. Co-Diagnostics, Inc.*,
    2024 WL 456745 (S.D.N.Y. Feb. 5, 2024)..............................................................20

*Swartzendruber v. Colony Cap., Inc.*,
    2020 WL 7754008 (C.D. Cal. Dec. 10, 2020) .........................................................21

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016).......................................................................................7

*United States v. Jun Ying*,
    2018 WL 6322308 (N.D. Ga. Dec. 4, 2018)............................................................24

*United States v. Kluger*,
    722 F.3d 549 (3d Cir. 2013).....................................................................................23

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
    2015 WL 3755218 (E.D. Pa. June 16, 2015) .......................................................4, 20

*Walling v. Generac Holdings, Inc.*,
    2026 WL 280211 (E.D. Wis. Feb. 3, 2026)..............................................................13

*Westley v. Oclaro, Inc.*,
    897 F. Supp. 2d 902 (N.D. Cal. 2012) .....................................................................19

*Winer Fam. Tr. v. Queen*,
    503 F.3d 319 (3d Cir. 2007).....................................................................................17

*Wu v. GSX Techedu Inc.*,
    2024 WL 3163219 (D.N.J. June 25, 2024)...............................................................13

*Xiaojiao Lu v. Align Tech., Inc.*,
    417 F. Supp. 3d 1266 (N.D. Cal. 2019) ..................................................................8

*Yates v. Mun. Mortg. & Equity, LLC*,
    744 F.3d 874 (4th Cir. 2014) .............................................................................19

**STATUTES**

15 U.S.C. § 78u-4 ..................................................................................................17

15 U.S.C. § 78u-5 ....................................................................................................4

**OTHER AUTHORITIES**

Fed. R. Civ. P. 9 ...............................................................................................1, 24

Fed. R. Civ. P. 12 ......................................................................................................1

SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ..........................................................23, 24

SEC Rule 10b5-1, 17 C.F.R. § 10b5-1 .........................................................18, 19, 24

**INTRODUCTION**

Plaintiffs' complaint jumbles together nearly 90 disparate statements spanning two years that positively articulated West's performance and prospects, suggesting that these statements were fraudulent because West's performance later slipped and its stock price dropped. Yet stock drops alone do not give rise to liability for fraud. Instead, Plaintiffs must allege with specificity that Defendants knowingly misled investors and propped up West's stock price.

Plaintiffs' opposition brief confirms the Complaint's deficiencies in that regard, and shows that this suit is merely a post-hoc attempt to turn a series of stock drops into a purported fraudulent scheme. It is now clear that Plaintiffs do not claim that any of West's financial statements were false or misleading, or that any statement *at all* was factually false. Instead, Plaintiffs advance exclusively a theory of fraud by omission—claiming that Defendants' statements were too optimistic by failing to disclose some underlying product issues and unfavorable sales analyses.

But Plaintiffs must run a difficult gauntlet to proceed on this theory, as they must allege with particularity that the alleged omissions made Defendants' affirmative statements misleading to a reasonable investor. They fail to do so. Indeed, Plaintiffs conspicuously ignore the strict pleading standards of the PSLRA (which they barely mention) and Rule 9(b), instead hoping to skate by under a traditional Rule 12(b)(6) analysis that allows them to fill the Complaint's many gaps with generous inferences. But that is not how securities law works. Yet, as the opposition confirms, Plaintiffs have no particularized allegations to demonstrate how the very specific issues that were purportedly omitted made Defendants' far broader statements misleading. And other doctrines separately make these statements inactionable as a matter of law because they are puffery, forward-looking, and/or statements of opinion.

Plaintiffs also do not allege that Defendants had the requisite scienter. The opposition all

- 1 -

but ignores the demanding actual-knowledge requirement for the many forward-looking statements. And across the board, none of the confidential witnesses' limited allegations demonstrate how *any* statement was made with the requisite mind-state—let alone the broad range of statements at issue here. In suggesting otherwise, Plaintiffs tellingly gloss over the actual statements made in hopes that this Court will let something slide through—a tactic the PSLRA does not permit. Nor do Plaintiffs' other indicia create the strong inference of scienter needed.

Finally, on loss causation, Plaintiffs offer little defense of the final corrective disclosure as it was alleged—and instead try to rewrite their allegations. This attempt fails, as do Plaintiffs' control-person and insider-trading claims. The Court should dismiss the Complaint in full.

<div align="center">ARGUMENT</div>

### I. Plaintiffs' Section 10(b) Claim for Alleged Misstatements Should Be Dismissed.

Although Plaintiffs largely ignore the PSLRA, *see* Opp. 11, it sets a high bar for pleading Section 10(b) claims, under which Plaintiffs do not adequately allege falsity, scienter, or loss causation. None of Plaintiffs' responses cure these defects for the nearly 90 statements at issue.

### A. Plaintiffs Fail to Plead Any Actionable Misstatements.

#### 1. Many of the statements are inactionable puffery.

Plaintiffs do not deny that scores of the alleged misstatements contain language qualifying as "puffery," as "general statements of optimism" or otherwise as "too vague to be actionable." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 283 (3d Cir. 2010); *see* Mot. 9–11; Opp. 18–19. None of Plaintiffs' arguments for why these statements are nevertheless actionable holds water.

*First*, Plaintiffs argue that some of these vague statements were surrounded by more "concrete" language that was "verifiable." *Id*. Critically, however, Plaintiffs do not specifically allege that the "concrete" information in ¶¶ 308 and 355 was false or misleading—*e.g.*, that it was

not true to say that "Biologics continues to be double-digits" growth (Opp. 18). Plaintiffs' only gripe is that accompanying vague characterizations (*e.g.*, "exciting" or "very healthy") were misleading. But merely referencing accurate facts when more broadly asserting optimism—or identifying a specific segment or product as an unverifiable assertion's subject—does not make a statement actionable. *See In re Farfetch Ltd. Sec. Litig.*, 802 F. Supp. 3d 652, 678 (S.D.N.Y. 2025) (rejecting same argument because statements were "not sufficiently specific or concrete" even when referencing specific brand or market).[1] The same goes for the other puffery statements— which Plaintiffs cite without analysis,[2] or do not even address in their puffery argument.[3]

*Second*, Plaintiffs argue that "Defendants likely knew contradictory facts and/or acted recklessly in making such statements." Opp. 19 (quoting *Shulman v. Weston*, 2025 WL 3754159, at *9 (D.N.J. Dec. 29, 2025)).[4] But that is a scienter point. Puffery is inactionable regardless of the speaker's state of mind. *See, e.g.*, *Payne v. DeLuca*, 433 F. Supp. 2d 547, 562 (W.D. Pa. 2006).

*Finally*, Plaintiffs argue that these statements were repeated comments on the same topics, sometimes in response to analyst questions. Opp. 19–20. But puffery turns on whether an assertion is sufficiently concrete—not how often it was stated or the topic's importance. Repeating general positive sentiments that are "ubiquitous in the corporate world" does not make them actionable. *Newtyn Partners, LP v. All. Data Sys. Corp.*, 165 F.4th 947, 961 (6th Cir. 2026).

---

[1] In contrast, in Plaintiffs' cited cases, the statements with vague or optimistic language included specific, concrete factual assertions that were demonstrably false. *See Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.*, 2022 WL 889158, at *10 (E.D. Pa. Mar. 25, 2022); *In re ATI Techs., Inc. Sec. Litig.*, 216 F. Supp. 2d 418, 436 (E.D. Pa. 2002); *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 900 (E.D. Pa. 2018).

[2] *See* Am. Compl. ¶¶ 317, 320, 324, 333–34, 355, 360–61, 364, 367, 378, 382, 385, 392–93, 411, 424, 427, 444–45, 449, 452–53, 496.

[3] *See id.* ¶¶ 303, 319, 328, 340–41, 349, 377, 379, 397, 400, 413, 428, 451, 455, 467, 473, 492, 497, 505.

[4] Besides making this off-hand statement without analysis, *Shulman* is inapposite because it concerned statements about a company's liquidity sufficiency and going-concern status—not vague expressions of optimism like "exciting" or "very healthy." 2025 WL 3754159, at *9–10.

Indeed, Plaintiffs' cited cases all concerned statements that made specific representations about identifiable business practices and thus were far more concrete than the puffery at issue here.[5]

### 2. Many statements are forward-looking and fall under the PSLRA safe harbor.

Many of the alleged misstatements are also inactionable under the PSLRA's safe harbor for forward-looking statements with meaningful cautionary language. *See* Mot. 11–16.[6] Plaintiffs assert scattered counterarguments that all fail.

*First*, Plaintiffs observe that certain statements were surrounded by statements of present or historical fact. Opp. 22–23. But even if so, the safe harbor can apply to such "mixed" statements—and precludes liability for the forward-looking portions. *Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009). The safe harbor thus requires dismissal of Plaintiffs' claims about these statements' forward-looking components. *See* Am. Compl. ¶¶ 303, 336–37, 473. And Plaintiffs do not allege with particularity how these statements' present-focused portions—*e.g.*, "it's more than just one customer, it's multiple customers," Opp. 23—were false or misleading. That is presumably why Plaintiffs' theory focuses on "Defendants' *projections or forecasts*"— which are plainly forward-looking and thus protected by the safe harbor. *Id.*

*Second*, Plaintiffs argue that the safe harbor does not apply to forward-looking statements that *omit* present facts. *Id.* But the safe harbor expressly applies to any "*omission* of a material fact necessary to make the statement not misleading." 15 U.S.C. § 78u-5(c)(1) (emphasis added). Under this statutory text, "there is no question under the statute that a material and misleading

---

[5] *See Industriens Pensionsforsikring A/S v. Becton Dickinson & Co.*, 620 F. Supp. 3d 167, 196 (D.N.J. 2022); *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2015 WL 3755218, at *13 (E.D. Pa. June 16, 2015); *In re Coinbase Glob., Inc. Sec. Litig.*, 2024 WL 4053009, at *10 (D.N.J. Sept. 5, 2024).

[6] *See* Am. Compl. ¶¶ 303, 305, 308, 317, 319–20, 333–37, 340–41, 355, 360–61, 396, 399, 401, 407, 424–25, 427, 429, 435, 445–47, 449, 451–54, 473. Plaintiffs do not dispute that the forward-looking statements without cautionary language, Opp. 22 n.17, are still inactionable under the PSLRA unless they were made with actual knowledge of their falsity, *see infra*, Part I.B.1.

omission can fall within the forward-looking safe harbor." *Harris v. Ivax Corp.*, 182 F.3d 799, 806 (11th Cir. 1999); *see also, e.g.*, *In re Supreme Indus., Inc. Sec. Litig.*, 2019 WL 1436022, at *7 (N.D. Ind. Mar. 29, 2019) (same).[7]  To suggest otherwise, Plaintiffs cite a case that allowed an omissions theory only for "the part of the statement that refers to the present." *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *7 (D.N.J. July 27, 2018).  As noted, those portions of the statements are not at issue—and certainly are not adequately alleged to be misleading.

*Finally*, Plaintiffs contest the sufficiency of the cautionary language.  Plaintiffs first assert that some cautionary language was too vague.  Opp. 24.  But except for one example, *see id.*, Plaintiffs do not explain how any of the language was vague.  As for Plaintiffs' lone example, that language cautioned that global trends "could negatively affect demand for our products due to customers decreasing their inventories in the near-term or long-term," *id.*—which covers exactly the destocking problems that Plaintiffs contend made the statements misleading.  The safe harbor requires nothing more.  *See In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 279 (3d Cir. 2004) (dismissal where "cautionary statements relate directly to the claim on which plaintiffs allegedly relied").  This is a far cry from the sort of boilerplate warning (*e.g.*, "the investment has risks") that courts will reject as applicable to any company or topic.  *See In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371 (3d Cir. 1993).[8]

---

[7] The same statutory text precludes Plaintiffs' suggestion that the safe harbor does not apply to opinions without a "reasonable basis."  Opp. 23–24.  This atextual exception apparently comes from a case with facts that *predated the PSLRA* and thus did not even mention the safe harbor.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427 (3d Cir. 1997).  Even under Plaintiffs' authority, this supposed implicit exception to the safe harbor would require a forward-looking opinion "unmoored from . . . reality." *Becton*, 620 F. Supp. 3d at 192.  Plaintiffs do not allege anything of that sort here.

[8] Plaintiffs also criticize Green's reference at one conference to a "Safe Harbor Statement" on West's website.  Opp. 24 n.18.  West's Q3 2023 10-Q, which was published just a few weeks earlier, was featured on the "Investors" section of West's website at that time.  And "[c]autionary statements disclosed in SEC filings may be incorporated by reference." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 282 (3d Cir. 2010).

Plaintiffs also say that certain cautionary language (concerning destocking and increased "efficiency") does not apply because aspects of those risks had already materialized. Opp. 24–25. But for destocking, all that Plaintiffs cite to suggest a materialized risk is limited data, and certain employees' assessment of it, about purported issues in specific areas. *Id.* This is not enough to suggest an actual materialization of the far broader risk at issue here. Mot. 19–20; *infra*, Part I.A.4; *cf. Becton*, 620 F. Supp. 3d at 191 (finding cautionary language insufficient when same exact risk had materialized). And for efficiency, the cautions about *future* "efficiency" enhancements falling short could not have materialized based on *current* performance issues—especially when Plaintiffs acknowledge that West stated it was attempting to improve efficiency, *see* Am. Compl. ¶¶ 419, 427–28, 445, 497, 505–07, 510. This may be why Plaintiffs never connect this argument to any purported misstatements, instead just criticizing the language in the abstract. *See* Opp. 24–25.

In all events, Plaintiffs argue that the risks had materialized only for three of the nine pieces of cautionary language. The other, unchallenged cautionary language—which concerned, for example, "customers' changing inventory requirements and manufacturing plans," "manufacturing or design defects," and "lower-than-expected sales growth of [West's] high value proprietary product offerings," Mot. 14—alone suffices to trigger the safe harbor.

### 3. Plaintiffs allege no basis for finding any opinion statements false or misleading.

As they largely do not dispute, Plaintiffs also target many opinion statements. Mot. 16–20; Opp. 20.[9] These cannot be "misleading just because external facts show the opinion to be incorrect." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175,

---

[9] The one exception is the statement alleged in ¶ 492. Opp. 20. In response to a question about regulatory changes, Birkett stated: "[I]t will be converting existing volumes of standard product to HVP. So, then you're picking it up on the pricing as that dynamic changes. And then, really on the margin profile of those products, should shifts in a positive way for us." Am. Compl. ¶ 492. In context, Birkett's prediction—like almost any prediction—was subjective in nature and thus an opinion. Plaintiffs also fail to allege with particularity how this statement was misleading.

188 (2015). Instead, opinions are actionable only when they (1) are not sincerely believed, (2) embed a false factual assertion, or (3) omit material facts that conflict with what a reasonable investor would glean from the opinion. *See id.* at 189; *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 686 (3d Cir. 2023). Plaintiffs do not satisfy this standard.

*First*, Plaintiffs argue that two of the opinions were accompanied by "direct assertions" of historical fact. Opp. 20–21; *see* Am. Compl. ¶¶ 378, 452. But Plaintiffs do not even allege that these factual "assertions" were false or misleading, much less with the requisite particularity. *See* Opp. 21 (failing to explain how it was false to say that HVP and Biologics "continued to grow" "in Q1"). So this context makes no difference to their claims.

*Second*, more broadly, Plaintiffs say that Defendants' opinions were all misleading by omission. Opp. 21–22. As Defendants previously explained, this path is not viable. Mot. 18–20. The Supreme Court has "cautioned against an overly expansive reading of this standard, noting that '[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts,' and adding that '[a] reasonable investor does not expect that *every* fact known to an issuer supports its opinion statement.'" *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare*, 575 U.S. at 189). So "a statement of opinion is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." *Id.* (citation modified).

Rather, as courts have held, omissions liability for an opinion "could only arise if the undisclosed fact *made it impossible* for the speaker's opinion to be correct." *In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, at *13 (W.D. Pa. May 18, 2023) (emphasis added); *see also, e.g.*, *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1329 n.13 (11th Cir. 2019) (similar). Plaintiffs do not dispute that they flunk this standard. So instead, they argue that *Mylan* is wrong, and that the Eleventh Circuit's analysis in *Carvelli* was "dicta." Opp. 21 n.15. But the Sixth Circuit echoed

this point just recently: "A company can keep quiet about newly-acquired 'soft' facts— predictions, matters of opinion, and the like—until they become '*virtually as certain* as hard facts.'" *Newtyn Partners*, 165 F.4th at 959 (emphasis added) (citation omitted). Even Plaintiffs have framed this inquiry as whether the underlying facts "*contradict*[] . . . the public pronouncements." Opp. 23 (emphasis added). Plaintiffs' allegations do not clear this bar.

In any event, even under the caselaw cited by Plaintiffs, the allegations must show that Defendants "*lacked the basis* for making those [opinion] statements that a reasonable investor would expect." *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 288 (E.D.N.Y. 2023) (emphasis added); *see* Opp. 21–22. Plaintiffs conclusorily contend that certain high-level issues— "destocking headwinds," "demand developments," and "pervasive SmartDose issues"— "contradicted" Defendants' opinions. Opp. 21–22. But Plaintiffs never identify any *specific* opinions that were "contradicted," much less explain how Defendants "lacked the basis" for those opinions. The Court cannot do this legwork for Plaintiffs now. *Cf. Xiaojiao Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1277 (N.D. Cal. 2019) (rejecting argument that would "require the Court to guess *how* these factual allegations render the Defendants' representations misleading").

Nor do these underlying "facts" show that Defendants "lacked [a] basis" for these opinions. *In re Dentsply*, 665 F. Supp. 3d at 288. Instead, at most, Plaintiffs are alleging purported data "cutting the other way"—which does not suffice. *Omnicare*, 575 U.S. at 176; *see also, e.g.*, *In re Ascena Retail Grp., Inc. Sec. Litig.*, 2022 WL 2314890, at *6 (D.N.J. June 28, 2022). For example, operational snags with one product (SmartDose) are perfectly compatible with broader opinions about company-wide or segment-wide performance. *See, e.g.*, Am. Compl. ¶¶ 317, 340, 376. Likewise, one lower-level employee's views about potential destocking, *id.* ¶¶ 150–51, and a single pessimistic "inventory analysis" of certain customers, *id.* ¶ 330, as well as the other scattered

data points Plaintiffs allege, do not contradict broader statements about customer demand or otherwise, *see, e.g.*, *id.* ¶ 317. Disagreeing with an opinion does not make it *misleading*, nor is it misleading for an opinion to omit adverse facts or "one of many factors." *Warren*, 70 F.4th at 687; *see also, e.g.*, *Omnicare*, 575 U.S. at 189–90; *Martin v. Quartermain*, 732 F. App'x 37, 40–42 (2d Cir. 2018); *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 555–57 (S.D.N.Y. 2018). Because that is the most that Plaintiffs allege, their claims about opinion statements should be dismissed.

### 4.   Many statements are not alleged to be false or misleading with particularity.

Plaintiffs also do not provide "sufficiently particularized factual pleading" that many of the challenged statements were false or misleading when made. *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 490 (3d Cir. 2016). Most fundamentally, there is frequently a mismatch between their theories of falsity and the alleged misstatements, with the statements at issue being far too general—about overall company performance, entire product categories, market segments, etc.—to be misleading because of the far more granular issues that Plaintiffs allege. Mot. 21–27.

Plaintiffs do not dispute that their falsity theories are far narrower than almost all of the statements at issue, which (save for a few exceptions) did not touch on the topics in Plaintiffs' focus.[10] Indeed, the opposition hardly addresses any alleged misstatements with specificity—instead speaking in broad strokes, even though Defendants and this Court are "not obligated to parse" a complaint for points not made in the briefing. *Lingam v. Dish Network Corp.*, 167 F.4th

---

[10] Notably, Plaintiffs do not even respond to Defendants' argument that certain purported misstatements do not even possibly implicate Plaintiffs' theory of falsity. This includes statements referencing data points that Plaintiffs do not challenge. Mot. 22; *see, e.g.*, Am. Compl. ¶¶ 308–09, 367–68, 424, 433, 444, 449, 453, 464. And also statements about West's relationships with its customers that Plaintiffs do not challenge. Mot. 23; *see, e.g.*, Am. Compl. ¶¶ 349, 351, 379, 393, 410, 417, 465. And statements that concerned particular topics (like GLP-1 drugs) that Plaintiffs do not challenge. Mot. 23; *see* Am. Compl. ¶¶ 336–37. And, finally, statements about Generics discussing current revenue figures, which would be consistent with inventory build-up. Mot. 25; *see, e.g.*, Am. Compl. ¶¶ 154, 333–34, 361, 392, 401, 411.

1094, 1108 n.11 (10th Cir. 2026); *see Farfetch*, 802 F. Supp. 3d at 676 (similar).

Plaintiffs' principal argument is that the mismatch problem is really a materiality argument that "is inapt" on a motion to dismiss. Opp. 15–16. The Third Circuit and other courts have held otherwise. *See, e.g.*, *Warren*, 70 F.4th at 686 (no falsity by omission based on similar mismatch); *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 484 (6th Cir. 2014) (affirming dismissal because "[t]here is a disparity between the levels of generality at which the internal reports and external statements are framed"). Indeed, "the omitted facts must have a reasonably close fit to what defendants disclosed" in order for a falsity-by-omission theory to survive a motion to dismiss, because "a statement cannot be misleading when the words spoken and the facts omitted operate on different 'levels of generality.'" *Newtyn Partners*, 165 F.4th at 963.

But the Complaint here lacks specific allegations as to why the alleged granular omissions somehow made the far broader statements at issue misleading.[11] This stands in stark contrast to the cases cited by Plaintiffs, in which the complaints had particularized allegations (absent here) connecting those dots between alleged internal problems and public statements. *See* Opp. 15–16.[12]

As for the statements that were specifically about SmartDose, here too Plaintiffs falter. Plaintiffs contend that "Defendants had no license to speak about SmartDose while omitting" the alleged facts at issue. Opp. 17. But discussing a topic does not "trigger a generalized duty requiring defendants to disclose the entire corpus of their knowledge regarding that topic." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010). And, contrary to their

---

[11] Although Plaintiffs do call SmartDose a "flagship" product, Opp. 16; Am. Compl. ¶ 219, no allegations illustrate with specificity why difficulties with just SmartDose made it misleading to speak positively about the company more broadly.

[12] *See In re Kenvue Inc. Sec. Litig.*, 2025 WL 889640, at *11 (D.N.J. Mar. 24, 2025) (statements directly contradicted by omitted facts); *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *16 (D.N.J. Dec. 27, 2019) (same); *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 647 (E.D. Pa. 2015) (same).

claim, Plaintiffs do not allege any specific facts "directly at odds" with any statements about SmartDose.  Opp. 17.  Plaintiffs claim that certain issues purportedly "undermined SmartDose margins," *id.*, but even as framed by Plaintiffs, the alleged misstatements concerned whether SmartDose's performance would *improve*.[13]  There is nothing inconsistent about expecting improvement with a product facing certain difficulties—and certainly expressing the former does not obligate one to detail the latter.  "[D]isclosure is not a rite of confession."  *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 98 (2d Cir. 2021).

Nor is this "a factual dispute."  Opp. 17.  Comparing what was stated to what was allegedly omitted—and doing this for *each* statement, unlike Plaintiffs' preference for generalities—is how one determines if a theory of falsity by omission is adequately pled.  And here, it is not.

## B.    Plaintiffs' Allegations Fail to Create a Strong Inference of Scienter.

Plaintiffs also fail to sufficiently allege scienter, which requires an "intent to deceive, manipulate, or defraud, either knowingly or recklessly."  *In re Hertz Glob. Holdings, Inc.*, 905 F.3d 106, 114 (3d Cir. 2018).  Recklessness requires a mental state "closely approach[ing] . . . conscious deception."  *In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 613 (E.D. Pa. 2009).  And for forward-looking statements, liability attaches "only upon proof of knowing falsity."  *Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 274 (3d Cir. 2009).  Plaintiffs establish neither.

### 1.    Plaintiffs all but concede that they do not allege the forward-looking statements were made with actual knowledge of their purported falsity.

Even Plaintiffs do not seriously argue that they have alleged Defendants' "actual knowledge" of falsity, even though Plaintiffs must clear this higher bar for the many forward-

---

[13] Plaintiffs contort these statements, too.  For example, Plaintiffs contend that Defendants "promised 'margin improvement' from SmartDose."  Opp. 17 (citing Am. Compl. ¶ 419).  That is false.  This statement was made by non-defendant Chad Winters, who said merely that various HVP products are "continuing to move up that HVP margin curve" and that "as our volumes grow, we'll see that margin improvement follow."  Am. Compl. ¶ 419.  This conditional language about a *group of products* is in no way a "promise" that *SmartDose* will experience margin improvement.

- 11 -

looking statements at issue. *See* Mot. 27.[14]  The Complaint's only basis for actual knowledge is the confidential witnesses ("CWs"), yet Plaintiffs argue merely that the CW statements establish "recklessness, at a minimum." Opp. 30.  Plaintiffs never actually explain how the allegations show *actual knowledge* of falsity. *See* Opp. 25.[15]  This alone warrants dismissal of the claims about forward-looking statements. *See In re Rite Aid Corp. Sec. Litig.*, 2025 WL 968306, at *1 n.5 (E.D. Pa. Mar. 31, 2025) ("Failing to substantively respond to an argument contained within a motion to dismiss constitutes a waiver to those claims or arguments.").  And regardless, none of the CW allegations establish recklessness—much less actual knowledge. *See infra*, Part I.B.2.a.

### 2. Plaintiffs do not allege that any statement was made with the requisite scienter based on confidential-witness statements, stock trades, or other indicia.

Plaintiffs also fail to show the requisite scienter for non-forward-looking statements.

### a. Plaintiffs' confidential-witness allegations do not establish scienter.

Defendants detailed the many gaps in Plaintiffs' CW allegations.  Mot. 27–33.  As Plaintiffs do not dispute, six of the eight CWs—CW-2, CW-4, CW-5, CW-6, CW-7, and CW-8— did not even communicate with the Individual Defendants about the topics at issue, had limited employment during the relevant time periods, and merely had opinions on certain topics (not knowledge of concrete facts suggesting falsity).  Mot. 28–29.  Indeed, Plaintiffs' opposition says nothing specific at all about CW-4, CW-7, and CW-8.  Opp. 32–33.  And Plaintiffs also ignore their allegations' lack of particularity that Defendants would have seen information from CW-2, CW-5, and CW-6.  Mot. 28 n.33; *cf.* Opp. 33.[16]  Instead, Plaintiffs focus almost exclusively on the

---

[14] *See* Am. Compl. ¶¶ 303, 305, 308, 317, 319–20, 324–25, 328, 333–37, 340–41, 351, 355, 360–61, 374, 377–79, 396, 399, 401, 407, 410–11, 413, 417, 419, 424–25, 427, 429, 435, 445–47, 449, 451–54, 464–65, 467, 470, 473, 492, 496, 499, 505–07, 510, 513–14.

[15] Plaintiffs conclusorily cite *Shulman*, Opp. 25, but *Shulman* involved allegations that a company delayed public filings because of its financial condition and prepared bankruptcy filings while stating publicly that it had adequate credit and liquidity.  2025 WL 3754159, at *6–8, 11.

[16] Other allegations reinforce these defects.  For example, CW-5 states that he "would be shocked" if management did not have "eyes on the issues."  Am. Compl. ¶ 236.  But that is

other two CWs:  CW-1 and CW-3.  *See* Opp. 27–29.[17]

But there are also limits to what CW-1 and CW-3 allegedly knew—and, as discussed below, neither is alleged to have provided information that actually conflicts with the alleged misstatements.  Mot. 29–31.  Repeatedly, Plaintiffs take evidence about one product, segment, or time period and use it to attack statements about different products, segments, or time periods— without alleging specific facts to connect the two, as the PSLRA requires.  *See, e.g.*, *Walling v. Generac Holdings, Inc.*, 2026 WL 280211, at *12 (E.D. Wis. Feb. 3, 2026) (finding no scienter for similar "destocking" case based on lack of facts showing that "any report or information" was provided to the defendants that "contradicted" their statements).

***Destocking.***   Much of Plaintiffs' case for scienter rests on CW-1's alleged internal warnings about destocking.  But CW-1 worked only in Generics, and his purported views lack an adequate basis for other parts of the company.  Mot. 29.  Plaintiffs respond that CW-1 considered his inventory analysis "holistic" beyond his Generics sector, Opp. 29; Am. Compl. ¶ 165, but Plaintiffs do not dispute that CW-1 based this subjective assessment on conversations with unnamed "peers" and an assumption that "some" Generics customers also bought products in other segments.  Mot. 29; Am. Compl. ¶¶ 142, 164–65, 284–85, 289.  No particularized allegation supports this leap—for example, by alleging who these "peers" were or what they specifically said. Nor does the Complaint specifically allege which Generics customers purchased products in other

---

speculation, not evidence.  Similarly, CW-6 suggested that Green's actions "spoke of" an awareness of problems.  *Id.* ¶ 220.  But that is an inference, not direct knowledge.

[17] None of Plaintiffs' cases salvage this Complaint or undermine Defendants' arguments. Opp. 31–33.  Plaintiffs pull-quote from cases that had specific allegations demonstrating exactly how the CWs' views supported a strong inference of particular defendants' state of mind—or more concrete information for establishing scienter.  *See, e.g.*, *Warren*, 70 F.4th at 691–92; *Wu v. GSX Techedu Inc.*, 2024 WL 3163219, at *8 (D.N.J. June 25, 2024); *In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *5 (D.N.J. Dec. 6, 2018); *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476, 493 (D. Del. 2019); *Carmignac Gestion, S.A. v. Perrigo Co. PLC*, 2019 WL 3451523, at *14 (D.N.J. July 31, 2019); *In re Dentsply Sirona, Inc. Sec. Litig.*, 2026 WL 124581, at *10 (S.D.N.Y. Jan. 16, 2026).

segments, or how much they purchased.  Certainly the Complaint does not allege that Defendants received specific data showing destocking in other segments.  But these are the kinds of details that the PSLRA requires.  As a result, CW-1 does not support scienter for these non-Generics statements—and particularly for the statements that *preceded* CW-1's purported presentations.[18]

Plaintiffs try to rehabilitate these problems with CW-1 by pointing to CW-3.  Opp. 27–28, 31–32.  But Plaintiffs just regurgitate conclusory assertions that some Defendants must have known that non-Generics "customers were cancelling orders," Opp. 27; Am. Compl. ¶¶ 118–20, and that this was affecting "everybody," Opp. 32; Am. Compl. ¶¶ 119–20.  Allegations that are so generalized are not remotely sufficient to show scienter.[19]

As for the CW-1 allegations with respect to destocking within Generics, Plaintiffs do not respond to any of Defendants' arguments on this point (Mot. 29–30)—*i.e.*, that Reiss-Clark, the only purported recipient of CW-1's "inventory build-up analysis" of Generics, made her only alleged misstatements one-and-a-half years later, and they had nothing to do with Generics, and none of the other Defendants made any predictions about revenues for Generics after June 2023.  So CW-1's purported views on that topic do not suggest scienter for Defendants' statements.[20]

---

[18] For example, Plaintiffs suggested (without particularity) that Birkett was in attendance for a presentation by CW-1 in June 2023, Am. Compl. ¶ 155; but Birkett's statements about customer visibility and destocking came before this, *see id.* ¶¶ 349–51 (statements from Birkett on May 11, 2023).

[19] CW-3's statement that cancellations came from "everybody"—meaning "both generic and branded customers"—is precisely the type of "generic and hyperbolic" allegation that fails the PSLRA's particularity requirement.  Mot. 30.  Which branded customers canceled orders?  How many orders, and for how much money?  When?  CW-3's sweeping characterization provides no quantified data for non-Generics cancellations comparable to the specific inventory data CW-1 provided for Generics customers.  And to the extent Plaintiffs focus on Pfizer and Moderna to support their claim, Opp. 32, Plaintiffs ignore that this focus on the COVID-19 segment undercuts Plaintiffs' claims that destocking occurred *beyond* the COVID-19 segment.  Mot. 31 n.36.  In addition, Plaintiffs' other nebulous allegations (Opp. 27-29) about "dropped and cancelled orders," "missed targets," and "demand drop off" all lack sufficient particularity about what exactly was known and also fail to connect to any particular statement made afterwards.

[20] The same goes for the "warning" to Reiss-Clark about the potential demand effects of price increases.  Opp. 29.  CW-1's analysis on this score specifically covers the "very price sensitive" "Generics industry," Am. Compl. ¶ 276; and as above, Plaintiffs do not address how this makes Reiss-Clark's statements much later on different topics false or misleading.

*SmartDose.*   To show scienter for statements about "SmartDose" as a whole, Plaintiffs focus on what CW-3 said about customer complaints and "failure reports." Opp. 28.  But Plaintiffs never explain how Defendants would have been privy to this particular information[21]—much less how they would have realized it somehow undermined broader statements that were not about SmartDose specifically.    And even for SmartDose-specific statements, this basis lacks particularity.  For example, the Complaint highlights CW-6's statement that SmartDose complaints "leveled off in 2024."  Am. Compl. ¶ 229; *see also* Opp. 28 (suggesting that problems persisted "through 2024").  But a "level off" undermines Plaintiffs' narrative of ever-worsening problems— and does not suggest that it was reckless for Defendants to express a more positive outlook for SmartDose.  At most, this type of evidence shows differences of opinion, which are not enough to allege scienter.  *See* Mot. 31–33 (collecting many cases that Plaintiffs never address).[22]

*Contract Manufacturing.*     Finally, with respect to alleged issues in Contract Manufacturing, Plaintiffs note CW-3's allegations that certain Defendants knew about the impending exit of one CGM customer (Dexcom).  *See* Opp. 29 (citing Am. Compl. ¶¶ 173–74, 176–78).  But Plaintiffs have no allegation—*e.g.*, an analyst asking specifically about CGM— establishing that a speaker should have known a broader statement about Contract Manufacturing might be misleading because of a CGM-specific issue.  Moreover, Defendants' disclosure about Dexcom after that contract expired reflected West's regulatory obligations and thus cuts *against* any scienter.  *See Newtyn Partners*, 165 F.4th at 968 ("[D]efendants' decision to hold off on

---

[21] Although Plaintiffs imply that Green would have reviewed these materials, the Complaint does not actually allege this—instead alleging only that someone (but not necessarily Green) on West's Executive Leadership Team would have seen these reports.  Am. Compl. ¶ 228.

[22] Similarly, as for allegations about customers leaving, Plaintiffs highlight (Opp. 28 n.22) CW-3 conveying to Birkett a "risk" that certain customers *could* leave without addressing any statement by Birkett.  Am. Compl. ¶ 189.  This "risk," too, at most shows a difference of opinion. And again, Plaintiffs do not match up these underlying facts with any of the alleged misstatements about SmartDose or otherwise.  *See* Mot. 31 n.37.  The same goes for the hyperbolized statement about SmartDose being a "black hole."  Opp. 28.

disclosure until [customer] formally announced its exit complied with" SEC requirements and thus "suggests an intent to comply with their disclosure obligations, not to mislead").[23]

### b.    Plaintiffs do not allege any motive or opportunity to defraud investors.

Plaintiffs do not dispute that the "absence [of motive] can raise a 'compelling inference *against* scienter,'" *Roofer's Pension Fund*, 2018 WL 3601229, at *17 (citation modified), or that Plaintiffs' only purported motive is stock sales, Opp. 36.  Plaintiffs also agree that only stock sales "unusual in scope and timing" can suggest motive.  *Id.*  Plaintiffs try to dismiss or downplay the timing of the sales here, the existence of stock options and trading plans, the *increase* in shares held, and the nature of the sales—but these all negate any purported motive.  Mot. 33–37.

On timing in particular, Plaintiffs do not dispute that seven of the nine sales at issue came after at least one corrective disclosure.  Mot. 33–34.  And while Plaintiffs try to minimize the gaps between stock sales and corrective disclosures, Opp. 41, the fact remains that Defendants' class-period trades occurred, on average, 94 days before the next corrective disclosure, *see* Am. Compl. ¶¶ 580–85, App'x A—meaning, under Plaintiffs' theory, Defendants sold shares because they knew the stock would drop months later.  Courts routinely hold that three-month gaps before disclosures will not support an inference of scienter.[24]  Indeed, most of these corrective disclosures were quarterly earnings announcements, so it would have been almost impossible for there to have been a larger gap between these disclosures and the supposedly suspicious trades.[25]

---

[23] Plaintiffs also provide no basis for applying the corporate-scienter doctrine in this context even if the Third Circuit permitted such a doctrine.  *See* Mot. 41 n.43.

[24] *See, e.g.*, *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 313 (D.N.J. 2001) (no scienter for sales three months before corrective); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 540 (3d Cir. 1999) (same for sales three months before negative news publicly announced); *Head v. NetManage*, 1998 WL 917794, at *4 (N.D. Cal. Dec. 30, 1998) (same for two months); *In re Astea Int'l Inc. Sec. Litig.*, 2007 WL 2306586, at *15 (E.D. Pa. Aug. 9, 2007) (same for five months).

[25] This timing distinguishes this case from the ones Plaintiffs cite.  *See In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 474 (E.D. Pa. 2014) (sales made weeks before FDA denial); *In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 655–56 (E.D. Pa. 2015) (sales made a

In response, Plaintiffs focus on the dollar amounts of shares "collectively sold" by the "Individual Defendants" as a whole. Opp. 37. But what was "collectively" sold has no bearing on whether *each* Individual Defendant had motive. *See, e.g.*, 15 U.S.C. § 78u-4(b)(2) (requiring allegations that "the defendant" acted with scienter); *Winer Fam. Tr. v. Queen*, 503 F.3d 319, 337 (3d Cir. 2007) (no group pleading under PSLRA); *In re Silicon Graphics, Inc. Sec. Litig.*, 970 F. Supp. 746, 767 (N.D. Cal. 1997) (a court must "consider each defendant's sales separately").

When turning to each individual, Plaintiffs offer very little specific to Defendants Reiss-Clark, Lai, or Birkett—and ignore the critical reality that each ended the class period with more shares than they previously held, undermining any inference of scienter. Mot. 34–35.[26] Take each:

- *Reiss-Clark.* Plaintiffs cannot and do not say that Reiss-Clark's trading patterns differed during the class period and instead offer only one fact—that she earned more from her 2023 stock sale ($1,367,643) than her 2023 salary ($475,000). Opp. 37–38. But that does not show motive, even under Plaintiffs' cases. *See Suprema*, 438 F.3d at 277 (focusing primarily on spike in sales from prior years rather than salary comparison); *In re Novo Nordisk Sec. Litig.*, 2018 WL 3913912, at *4 (D.N.J. Aug. 16, 2018) (citing *background* section of plaintiff's allegations).

- *Lai.* Plaintiffs' sole allegation is that Lai's sales increased by 19% and proceeds increased by 12% during the class period. Opp. 37 n.31. Plaintiffs cite no case holding that such minor increases suggest motive, particularly when the defendant's overall holdings still increased.

- *Birkett.* Plaintiffs highlight Birkett's increased stock-sale proceeds during the class period. *See id.* But that merely reflects a higher stock price, not that the sales were suspicious—especially given that Birkett's class period sale of 22,334 shares resembles his Control Period sale of 14,174. *See, e.g.*, *In re Pixar Sec. Litig.*, 450 F. Supp. 2d 1096, 1104–05 (N.D. Cal. 2006) (50% increase in sales was not "dramatically out of line with . . . prior trading practices").

None of these selling patterns show motive. *See Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *15 (S.D.N.Y. July 23, 2018) (no scienter for defendant who sold 100% of holdings);

---

week before corrective disclosure); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277–78 (3d Cir. 2006) (defendant's first-ever sales made weeks before corrective disclosure).

[26] Plaintiffs try to downplay this increase by emphasizing unexercised share options. Opp. 40 (citing *Hertz*, 905 F.3d at 121). But this *Hertz* point addressed merely the percentage of "pre-class holdings" sold—which still did not "move the scienter needle" (even with 62.3% of holdings sold) in light of "other factors." 905 F.3d at 121. Such "factors" are abundant here, where Defendants' actual shares held increased in size—a reality which is incompatible with their stock sales supporting an inference of scienter. *See* Mot. 35 n.40.

*In re CRM Holdings Sec. Litig.*, 2012 WL 1646888, at *23 (S.D.N.Y. May 10, 2012) (same).

The same is true for Green. Plaintiffs emphasize that Green allegedly gained $104 million from his sales. Opp. 37. But "large dollar amounts, standing alone, typically do not suffice to establish motive," *Bldg. Trades United Pension Tr. Fund v. Kenexa Corp.*, 2010 WL 3749459, at *9 (E.D. Pa. Sept. 27, 2010), and Plaintiffs cite no cases holding otherwise. Moreover, Plaintiffs ignore or improperly downplay the factors that undercut their story for Green's trades.

Start with the trading plans.[27] Green received stock options in 2015 and 2016 that would expire 10 years later.[28] In May 2023, with expiration approaching, Green entered into a trading plan to exercise those options over the next two years—specifically exercising 234,864 options and selling 204,864 resulting shares across the next five permissible trading windows. Mot. 37. Plaintiffs dispute neither these facts nor that exercising options is a routine part of executive compensation. Mot. 34; *see Advanta*, 180 F.3d at 541; *Burlington*, 114 F.3d at 1424; *Astea*, 2007 WL 2306586, at *14. Instead, Plaintiffs emphasize that one of Green's trading plans was entered into during the class period, Opp. 39, but that ignores that the earliest allegations of Green's "knowledge" stem from CW-1's pessimistic views in June 2023—a month *after* Green entered into that trading plan.[29] A trading plan negates scienter when it was entered into before the defendant

---

[27] Plaintiffs surprisingly claim that it is "premature" to consider Green's "10b5-1 trading plan." Opp. 39 n.37. But Plaintiffs addressed Defendants' trading plans at length in their complaint, Am. Compl. ¶¶ 553–56, and thus cannot now block Defendants from raising them in this motion. *See, e.g.*, *In re Farfetch Ltd. Sec. Litig*, 2021 WL 4461264, *4 n.1 (S.D.N.Y. Sept. 29, 2021); *Glaser v. The9*, 772 F. Supp. 2d 573, 592 n.14 (S.D.N.Y. 2011); *see also In re Amarin Corp. PLC Sec. Litig.*, 2021 WL 1171669, at *9, *18 (D.N.J. Mar. 29, 2021) (noting that "courts in the Third Circuit consider Form 4s to assess insider-trading allegations on motion to dismiss" and referencing defendants' arguments about sale under "trading plan" when finding no scienter).

[28] Exs. 47–48 (options granted in 2015–16); Exs. 28–29, 31, 35–36 (options expiring in 2025–26).

[29] In Plaintiffs' cited cases, there were *specific allegations* that the trading plans were *manipulated* with contemporaneous material nonpublic information ("MNPI") or adopted *after* key MNPI was obtained. *See Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015) ("When executives enter into a trading plan during the Class Period and the Complaint sufficiently alleges that the purpose of the plan was to take advantage of an inflated stock price, the plan provides no defense to scienter allegations."); *Cent. Laborers' Pension Fund*

acquired the knowledge at issue. *See, e.g.*, *Martin v. GNC Holdings, Inc.*, 2017 WL 3974002, at *15 (W.D. Pa. Sept. 8, 2017) (dismissal because 10b5-1 plan weighed against scienter); *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 891 (4th Cir. 2014) (similar).[30]

Plaintiffs nevertheless suggest that "nothing stops a corporate insider from setting up automatic trades and then making false statements to artificially inflate the stock price." Opp. 39 (citing *Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1266 (10th Cir. 2022)). But Plaintiffs do not allege that here, *see* Am. Compl. ¶¶ 553–56—unlike in *Pluralsight*, where actually "that [was] what Plaintiffs allege[d] occurred," 45 F.4th at 1266. As for Plaintiffs' reliance on *In re HD Supply Holdings, Inc. Sec. Litig.*, 341 F. Supp. 3d 1342, 1348, 1363 (N.D. Ga. 2018), that case involved a near-total liquidation of stocks over five days with no evidence of a trading plan governing those sales.

### c. Plaintiffs otherwise fail to plead facts supporting any inference of knowing fraud or extreme recklessness.

*i. Visibility Statements.* Plaintiffs contend that Defendants' vague statements about having "visibility" into the business support an inference of scienter. Opp. 34. But Plaintiffs allege that these "visibility" statements were false, and Plaintiffs do not cite any cases where allegedly false statements were simultaneously used to establish scienter. Mot. 39. Regardless, Plaintiffs offer no retort to how these "visibility" statements are too vague for scienter. *Id.*; *see Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 928 (N.D. Cal. 2012) ("customer visibility" statements insufficient for scienter). Indeed, Defendants' "visibility" statements simply described a *process* for monitoring

---

*v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 554 (5th Cir. 2007) (defendant never even provided "a direct response to this assertion").

[30] Plaintiffs are wrong that trading plans were not part of the scienter analysis in *Martin*. Opp. 40 n.38; *see Martin*, 2017 WL 3974002, at *15 & n.21. And even if the *Yates* plan preceded the class period, Opp. 40 n.38, Plaintiffs miss the point: *all* of Green's class period trades were charted *before* he learned about the alleged MNPI. Mot. 37.

demand at a high level—which does not show that Defendants knew or were reckless about the facts that supposedly were misleadingly omitted. *See* Am. Compl. ¶ 465 (Birkett: "we are constantly in communication with our customers," which is "something that we monitor very closely"); ¶ 559 (Green: "our customers are giving us visibility of their demands over the next several quarters, and then we plan accordingly"). Defendants never claimed omniscience.[31]

    ***ii.  Departures.*** As for some Individual Defendants' departures from West, Plaintiffs offer just a single sentence reiterating their conclusory innuendo that the departures must show scienter. Opp. 35. But unlike Plaintiffs' cases, Plaintiffs supply no evidence that these individuals were "fired" for "implementing" the fraudulent scheme at issue or reporting it to higher-ups. *See Nordisk*, 2018 WL 3913912, at \*4; *W. Palm Beach*, 2015 WL 3755218, at \*15; Mot. 39–40.

    ***iii.  Post-Class-Period Statements.*** Defendants' post-class-period statements about the company's performance also do not support an inference of scienter. Mot. 40; *see, e.g.*, *Becton*, 620 F. Supp. 3d at 196 n.29. Plaintiffs' responses do not change this. Opp. 36. At most, Plaintiffs' identified statements show a retrospective assessment of the company's performance—not an acknowledgement that individuals had scienter when making the statements at issue. For example, Green's acknowledgment in June 2025 (which Plaintiffs misleadingly excerpt) that "[t]he last [two] years has been a challenge when you think about going through the destocking period of time" hardly suggests that he long concealed that information from the market, instead of it just being a hindsight observation. Ex. 50; *cf.* Opp. 36. Indeed, "fraud is always obvious in retrospect, but it is not reckless to lack clairvoyance." *Special Situations Fund III QP, L.P. v. Deloitte Touche*

---

[31] Plaintiffs' three cases on this score (Opp. 33–34) all involved detailed, specific, real-time data and monitoring claims tied to those concrete, verifiable systems. *See SEB Inv. Mgmt. AB v. Endo Int'l*, 351 F. Supp. 3d 874, 906 (E.D. Pa. 2018); *City of Warwick Ret. Sys. v. Catalent, Inc.*, 2024 WL 3219616, at \*14 (D.N.J. June 28, 2024); *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, 2024 WL 456745, at \*6 (S.D.N.Y. Feb. 5, 2024). Whereas West's statements are general claims of visibility without identifying any particular data source or monitoring mechanism.

*Tohmatsu CPA, Ltd.*, 96 F. Supp. 3d 325, 344 (S.D.N.Y. 2015) (citation omitted).[32]

*iv. Responding to Analysts.*   Finally, Plaintiffs argue (even though they never alleged) that scienter should be inferred because Defendants were often responding to analysts.  Opp. 34–35; *see* Am. Compl. ¶ 539.  This new argument makes no sense.  If anything, the fact that statements were made extemporaneously in response to analyst questions, rather than in prepared statements, reinforces that Defendants lacked any culpability if they somehow misled the market.  That is why courts reject such overreliance on the context of analyst questions when assessing scienter.  *See Avaya*, 546 F.3d at 270 ("We do not suggest that the specific nature of the analysts' inquiries, by itself, creates a strong inference of a culpable state of mind."); *Meade v. Lincoln Nat'l Corp.*, 2025 WL 2087783, at *8 (E.D. Pa. July 24, 2025) (similar when no "confident, unhedged denials" alleged); *Swartzendruber v. Colony Cap., Inc.*, 2020 WL 7754008, at *7 (C.D. Cal. Dec. 10, 2020) (similar when "no allegations as to the specificity or repetitive nature of the analyst questions").[33]

### C.   Plaintiffs Also Fail to Plead Loss Causation for the Final Corrective Disclosure.

Plaintiffs fail to plead loss causation for their last corrective disclosure, on February 13, 2025.  Mot. 41–42.  The Complaint alleges only the description of SmartDose as "margin dilutive" as corrective.  Am. Compl. ¶ 518.  Plaintiffs do not dispute they must allege that this (or any other) "corrective disclosure actually revealed the truth about earlier misstatements."  Mot. 41.

In response, Plaintiffs principally protest that they believe other portions of this February 13, 2025 statement were corrective, too.  Opp. 43.  But that is not what the Complaint alleges.

---

[32] Plaintiffs' cases (Opp. 36) are inapposite, as *Coinbase* involved post-class statements that were tantamount to confessions, *see* 2024 WL 4053009, at *10 n.17, *15; and *Freudenberg v. E*Trade Fin. Corp.* did not even address scienter, *see* 712 F. Supp. 2d 171, 183 (S.D.N.Y. 2010).

[33] In *In re Urban Outfitters*, which Plaintiffs cite (Opp. 35), the defendants were asked direct, targeted questions about the very topic they were allegedly concealing and they responded with specific, affirmative reassurances that directly contradicted the adverse facts they allegedly knew.  *See* 103 F. Supp. 3d at 653.

Rather, the Complaint specifically indicated that "[s]tatements in bold and underlined provided corrective information to the market," Am. Compl. ¶ 359 n.4—and, by implication, anything *not* "in bold and underlined" is not providing "corrective information." *Id.* Far from "exalt[ing] form over substance," Opp. 43 n.42, Defendants are merely taking the claims as they were pled. Defendants should not have to guess what portions of statements are corrective disclosures—and Plaintiffs should not be allowed to change their theories after seeing the arguments for dismissal. *See, e.g.*, *Hatchigian v. Cap. One, N.A.*, 2024 WL 4906489, at *4 n.9 (E.D. Pa. Nov. 27, 2024).

Plaintiffs tellingly say far less about this issue on the merits. They argue that the "margin dilutive" phrase corrected Defendants' earlier statements that referenced "margin effects in 2025." Opp. 43–44. But Green's prospective assertion that SmartDose would "become" margin dilutive in 2025 does not address any earlier statements (and certainly no statements that are actionable). *See* Mot. 21–22, 42. Indeed, Plaintiffs' ellipsis with ¶ 510 (Opp. 44) misrepresents how Birkett was saying merely that West would "onboard[]" an "automated line" for SmartDose in late 2025 and early 2026—not that SmartDose *would reach certain margins by that time*. Am Compl. ¶ 510.

In any event, even if more of the February 13, 2025 statement had been alleged as a corrective disclosure, Plaintiffs still have not alleged loss causation. Plaintiffs reference statements about how two CGM customers had "made the decision to not participate going forward." *Id.* ¶¶ 518, 520. But announcing a future "intention to exit in mid-2026" (*id.* ¶ 520) cannot possibly have corrected statements about West's business in the past. *See supra*, 21–22. And if that statement corrected prior *forward-looking* statements, those statements are inactionable. Mot. 42.

## II. Plaintiffs' Control-Person Claim Under Section 20(a) Fails.

Because Plaintiffs' Section 10(b) claim fails, so too does their Section 20(a) claim. *See Aetna*, 617 F.3d at 285. Plaintiffs also do not allege this claim's extra elements. Mot. 43; *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 484 (3d Cir. 2013). As "recent decisions" have squarely

- 22 -

held, *Howard v. Arconic Inc.*, 2021 WL 2561895, at *29 (W.D. Pa. June 23, 2021), Plaintiffs are wrong to suggest they need not plead culpable participation, when that is an element of Section 20(a) liability. Opp. 47. Moreover, alleging *awareness* of other violations does not allege "either knowing and substantial *participation* in the wrongdoing or inaction with *the intent* to further the fraud or prevent its discovery." *Howard*, 2021 WL 2561895, at *29 (emphasis added).

## III. Plaintiffs' Insider-Trading Claims Fail.

### A.   Plaintiffs' Section 10(b) and Rule 10b-5 Insider-Trading Claims Fail.

To allege insider trading, Plaintiffs concede they must allege the 20A Defendants' August 2023 trades were made on the basis of MNPI and with scienter. Opp. 44. Plaintiffs allege neither.

#### 1.   Plaintiffs must allege actual use, not "mere possession," of MNPI.

Plaintiffs insist that they need only allege the 20A Defendants' "mere possession" of MNPI and knowledge that it was "material and nonpublic," Opp. 44 & 45 n.44, rather than "actual use" of MNPI. Indeed, Plaintiffs do not even *argue* that they can satisfy an "actual use" standard.

But the weight of Third Circuit authority supports the "actual use" standard. In *S.E.C. v. Chappell*, the Third Circuit explained that pleading insider trading requires showing more than "mere possession" of MNPI. 107 F.4th 114, 135 (3d Cir. 2024) (citation omitted). Plaintiffs neither distinguish *Chappell* nor address that Third Circuit courts generally characterize insider trading as "use"—not "mere possession"—of inside information. *See, e.g.*, *United States v. Kluger*, 722 F.3d 549, 560 (3d Cir. 2013) (describing civil insider trading case in which defendant "used inside information"); *S.E.C. v. McGee*, 895 F. Supp. 2d 669, 673 (E.D. Pa. 2012) (concluding civil complaint alleged insider trading where "it recites that [defendant] . . . used . . . [MNPI]"); *S.E.C. v. Bonan Huang*, 684 F. App'x 167, 171 n.3 (3d Cir. 2017) (noting jury instruction that SEC must "prove by a preponderance of the evidence the information [defendant] accessed and *used* . . . was both material and nonpublic at the time he traded in each of the stocks" (emphasis added)).

- 23 -

Indeed, "the use test best comports with precedent and Congressional intent" because Rule 10b-5 prohibits "any device, scheme, artifice to defraud," and "the Supreme Court has repeatedly emphasized this focus on fraud and deception." *S.E.C. v. Adler*, 137 F.3d 1325, 1337–38 (11th Cir. 1998); *see also Fried v. Stiefel Laboratories, Inc.*, 814 F.3d 1288, 1295 (11th Cir. 2016). *Using* MNPI breaches a fiduciary duty, but merely *possessing* it does not. *Adler*, 137 F.3d at 1338. And "[o]nly" the "'actual use' standard satisfies the PSLRA," because "courts cannot establish categorical [scienter] presumptions in PSLRA analyses." *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1203 n.82 (C.D. Cal. 2008).[34]

### 2.    Even applying a "mere possession" standard, Plaintiffs' claim still fails.

Even if a "mere possession" standard applied, Plaintiffs' claim fails for three reasons.

*First*, Plaintiffs fail to allege with particularity (as Rule 9(b) requires) that the information on which the 20A Defendants allegedly traded in August 2023 was both material and nonpublic. Mot. 44–46.[35] Their only specific allegations of MNPI concern what CW-1 purportedly told Reiss-Clark in March 2023, and Green and Birkett in June 2023, about Generics inventory. Am. Compl. ¶¶ 147–48, 154. But Plaintiffs offer only a conclusory statement that this information "was material," Opp. 45, without particularized allegations showing how this single inventory analysis for just one business segment would have "altered the total mix of information made available" to reasonable investors. Mot. 45. Moreover, the August 2023 trades came *after* the alleged July 27, 2023 corrective disclosure of "destocking activity impacting West's 'base business'"—and Plaintiffs do not explain how this information could subsequently remain MNPI. Mot. 45–46.

---

[34] Nor does the "actual use" standard "rewrite the rule." Opp. 45. The regulation states that "judicial opinions" *provide* "[t]he law of insider trading" and that "Rule 10b5-1 does not modify the scope of insider trading law" except as explicitly stated. 17 C.F.R. § 240.10b5-1(b); *see United States v. Jun Ying*, 2018 WL 6322308, at *5 n.10 (N.D. Ga. Dec. 4, 2018).

[35] Plaintiffs do not even try to distinguish Defendants' authorities on this score. Mot. 45.

*Second*, Plaintiffs' allegations about other information that the 20A Defendants allegedly received "from other sources" besides CW-1 (Opp. 45–46) do not plead possession of MNPI with requisite specificity.  As above, CW-3's secondhand speculation does not suffice.  *See supra*, 14; *Chan v. New Oriental Educ. & Tech. Grp. Inc.*, 2019 WL 2865452, at \*12 (D.N.J. July 3, 2019).

*Third*, Defendants' trading behavior defeats any inference of scienter.  *See* Mot. 46–47; *supra*, Part I.B.2.b.  The above points regarding Plaintiffs' failure to allege scienter apply here, as even Plaintiffs' cases recognize.  *See Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 595 F. Supp. 2d 1253, 1288 (M.D. Fla. 2009) (no scienter because trades not suspicious); *S.E.C. v. Lyon*, 605 F. Supp. 2d 531, 548 (S.D.N.Y. 2009) ("history or practice of regular trading . . . might provide an innocent explanation for the trading in question").  Indeed, only the August 2023 trades are at issue here, and Plaintiffs offer no credible explanation why the 20A Defendants waited *months* after learning the MNPI—and after an alleged corrective disclosure and stock drop—to make these purportedly improper trades.  This timeline is plainly inconsistent with fraudulent intent.

## B.   The Section 20A Claim Also Fails.

Because Plaintiffs have not stated a primary Exchange Act violation, they cannot maintain their Section 20A claim.  *See In re Ocugen, Inc. Sec. Litig.*, 659 F. Supp. 3d 572, 598 (E.D. Pa. 2023).  Notwithstanding Plaintiffs' assertion to the contrary, Opp. 46 & n.47, Defendants contest whether Plaintiffs have sufficiently alleged that the 20A Defendants possessed MNPI—which cuts across *both* insider-trading claims.  Mot. 44–47.

## CONCLUSION

For these reasons, this Court should dismiss this lawsuit with prejudice.

Dated:  March 31, 2026

<div style="margin-left:50%;">

*s/ Margaret C. Gleason*
Margaret C. Gleason (PA 201742)
**JONES DAY**
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Telephone: (412) 394-7235
Facsimile: (412) 394-7959
mcgleason@jonesday.com

Nina Yadava (*pro hac vice*)
Rajeev Muttreja (*pro hac vice*)
Sarah D. Efronson (*pro hac vice*)
**JONES DAY**
250 Vesey Street
New York, NY 10281
Telephone: (212) 326-3746
Facsimile: (212) 755-7306
nyadava@jonesday.com
rmuttreja@jonesday.com
sefronson@jonesday.com

*Counsel for Defendants*

</div>

**CERTIFICATE OF SERVICE**

I hereby certify that on this 31st day of March, 2026, a true and correct copy of the foregoing document was filed electronically. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

<div align="right">

*s/ Margaret C. Gleason*
Margaret C. Gleason (PA 201742)
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Telephone: (412) 394-7235
Facsimile: (412) 394-7959
Email: mcgleason@jonesday.com

</div>

- 27 -